Pages 1 - 37

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )        NO. CR 14-380 CRB
                                 )
FedEx Corp., et al,              )
                                 )
            Defendants.          )
_____  )

                              San Francisco, California
                              Thursday, May 14, 2015

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                         MELINDA HAAG
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California  94102
               **BY:  KIRSTIN M. AULT**
                    **JENNY CLARE ELLICKSON**
                    **ASSISTANT UNITED STATES ATTORNEYS**
For Defendant Federal Express Corp.:
                         ARGUEDAS, CASSMAN & HEADLEY LLP
                         803 Hearst Avenue
                         Berkeley, CA 94710
               **BY:  CRISTINA C. ARGUEDAS**
                    **RAPHAEL M. GOLDMAN**
                    **TED W. CASSMAN**
                    **ATTORNEYS AT LAW**

also present: Connie Lewis Lensing, Senior V.P. Federal Express

Reported By:  Rhonda L. Aquilina, CSR #9956, RMR, CRR,
              Court Reporter

**APPEARANCES:   (cont.'d)**

For Defendant FedEx:

                        Skadden, Arps, Slate, Meagher & Flom
                        525 University Avenue
                        Palo Alto, California  94301
               By:  **ALLEN RUBY**
                     **ATTORNEY AT LAW**

```
 1   Thursday - May 14, 2015                         10:05 a.m.

 2                       P R O C E E D I N G S

 3       THE CLERK:  Calling case CR-14-0380, the United States

 4   of America versus FedEx Corporation, Federal Express, and FedEx

 5   Corporate Services.

 6       Appearances, counsel.

 7       MS. AULT:  Good morning, Your Honor.  Kirstin Ault and

 8   Jenny Ellickson for the United States.

 9       MS. ARGUEDAS:  Good morning, Your Honor.  Chris

10   Arguedas for FedEx, and here representing the company is Connie

11   Lewis Lensing, senior vice-president of Federal Express

12   Corporation.

13       MR. GOLDMAN:  And Raphael Goldman from Arguedas,

14   Cassman & Headley on behalf of the FedEx defendants as well.

15       MR. RUBY:  Good morning, your Honor.  Allen Ruby for

16   FedEx.

17       MR. CASSMAN:  Good morning, Your Honor.  Ted Cassman.

18       THE COURT:  So this is on for two matters, basically;

19   right?  The motion to dismiss with respect to the exemption,

20   the 822(c) exemption --

21       MS. AULT:  Yes, Your Honor.

22       THE COURT:  -- and the subpoenas.

23       So let's deal with the motion to dismiss.  At least it's

24   my impression that the section doesn't apply to the charges

25   here.  There is an exemption, but the exemption is directed to
```

1     a particular section, and that's not this.

2         And then just common sense, let's add a drug dealer -- and

3     I think now I really want to just deal with -- I want to go

4     into the transportation of drug business, that's what I'm

5     interested in.  I want to be a real middleman, and that's my

6     vice and ambition, and so I decided that that's what I'm going

7     to do.  And then I realize that of course transporting illegal,

8     illicit substances, controlled substances has a certain risk to

9     it.  That is, I could be caught and then prosecuted.  And

10    that's rather unpleasant.  So I, in order to minimize my risk,

11    what I decide to do is I do a little research, and I see that

12    common carriers -- there's an exemption, and so I go and I get

13    a license to be a common carrier.  After all, I'm transporting,

14    and maybe I'll deliver a few pieces of mail in addition to my

15    drugs.  But that's what I want to do.  I want to be a common

16    carrier.  I hold myself out to be a common carrier.

17        Well, nobody would seriously suggest that that exemption

18    would apply.  No one would seriously suggest that.

19        And so just the logic of it all, it seems to me that there

20    is an exemption with respect to common carriers.  So you might

21    say, well, what's that exemption all about?  And it's clear,

22    because the law is you can't deal with -- if you're going to

23    deal with a controlled substance, you have to deal with it in a

24    particular way.

25        It starts out, by the way, that nobody can touch a

controlled substance.  That's been there through all the
exceptions.  And the exception -- one of the exceptions is if
you're a common carrier in the business of delivering, you
know, these types of drugs.  And I know that that's then what
FedEx has latched onto, but it's in connection with their
ordinary course of business delivery of these drugs.  But it's
related to a particular section, not the section involving
criminal conspiracies and delivering drugs illicitly.

So anyway, I really -- if you want to argue it, I'll let
you argue it.  But I have a lot of paper, and, really, I just
think that it's not that it's an uphill battle, it's an
impossible battle.  So if you want to deal with the impossible,
you can deal with that.  Because I don't want to deny you your
moment of eloquence, but I'm just telling you that it's not
going to work.

**MR. GOLDMAN:**  Yes, Your Honor.  I would like to be
heard.

**THE COURT:**  Great.  Go right ahead.

**MR. GOLDMAN:**  I understand the Court's point, and I
agree that the common carrier exemptions are most plainly
directed to situations when regulated entities like pharmacies
are shipping either between the regulated entities or to an end
user, but that's actually the case that the Court has in front
of it right now.

The gravamen of every allegation in the case --

1    **THE COURT:**  Well, why don't you just tell me this.

2  Answer my hypothetical.  Let's -- wouldn't under your logic,

3  wouldn't under your logic exempt my criminal enterprise,

4  because I've now gotten an exemption -- I can get an exemption;

5  right?  I could meet the test for being a common carrier.

6  There's nobody that -- no licensed requirement, is there?

7  Maybe there is.  I mean, I suppose technically there would be

8  that you'd -- but couldn't I get around it that way?  I mean,

9  couldn't I just get one of those licenses and do it?

10    **MR. GOLDMAN:**  Well, that's right, Your Honor.  FedEx

11  is a certificated air carrier.  That's a certificate that it

12  has to possess.  That gives the executive branch some measure

13  of control over -- I mean, if some common carrier went rogue

14  and decided that its main business was going to be serving drug

15  cartels, then the executive branch could think long and hard

16  about whether they ought to have a common carrier certificate.

17  That's not the --

18    **THE COURT:**  Well, let's say I get the certificate and

19  then I go rogue.

20    **MR. GOLDMAN:**  Well, it has to be renewed, Your Honor.

21  It could be taken away.

22    **THE COURT:**  Well, but nobody knows about it, I mean,

23  until I get caught.  But then I get caught.  The logic of your

24  position is I can do it, I can go rogue, and then I won't get

25  my certificate renewed.

1    But, of course the question isn't the renewal of the

2    certificate, the question is what about the activity that made

3    me go rogue?  Could I be prosecuted?  Could I be prosecuted if

4    I went rogue?

5         **MR. GOLDMAN:**  Well, the definition of a common

6    carrier, as we understand it -- and I don't think it's

7    disputed -- is that you're picking up packages for the general

8    public and transporting them in exchange for compensation.

9    A company that's truly doing that actually has no agency,

10   and it doesn't decide who ships, who receives, what's in the

11   package, or who gets it.

12        **THE COURT:**  You might be acquitted.  I understand all

13   that.  I'm just saying do I apply the exemption?  The answer is

14   no.  But if you say it's "yes," explain to me how do you deal

15   with common carriers who have gone rogue.  Just -- and the

16   answer is you don't, under your -- you penalize them by what,

17   not renewing their certificate?

18        **MR. GOLDMAN:**  Your Honor, when Congress drafted this

19   provision, it was balancing two policy goals.  We agree with

20   the Government that one of the goals was to prevent diversion

21   medications.  It had other goals, and one of them is codified

22   in 21 U.S.C. section 801 that says:

23        (Reading) Many of the drugs included within this

24        subchapter have a useful and legitimate medical purpose

25        and are necessary to maintain the health and general

1          welfare of the American people.

2          So one of the things it was trying to do was make sure

3     that people can get the medications they need.

4          **THE COURT:**  By the way, you're not being prosecuted

5     under that subchapter, are you?

6          **MR. GOLDMAN:**  I'm sorry?

7          **THE COURT:**  I don't think the prosecution is under

8     that subchapter; am I wrong?

9          What does the Government -- am I right in that?  Am I

10    wrong?  I could be wrong.

11         **MS. ELLICKSON:**  Your Honor, they're being prosecuted

12    under 841 and 846.

13         **THE COURT:**  Isn't it a different subchapter?

14         **MR. GOLDMAN:**  I think that the whole CSA is the

15    subchapter in question, Your Honor.

16         **THE COURT:**  Oh, well, wait a minute.  21 -- sorry.

17    What is it, 822?

18         **MR. GOLDMAN:**  822, yes, Your Honor.

19         **THE COURT:**  I'm now looking at "exempt;" right?

20         **MR. GOLDMAN:**  Yes.

21         **THE COURT:**  Under this subpart, the prosecution is

22    under what, 18 U.S.C. -- I mean 21 U.S.C. what?  21 what?

23         **MS. ELLICKSON:**  841 and 846, principally.

24         **THE COURT:**  I'm trying to figure out what is the

25    subchapter.

1          **MR. GOLDMAN:**  Your Honor, if I may, I think the

2    original language of the CSA said "under this title," and it's

3    been amended by the codifiers to say "under this subchapter."

4    But the title is Title 2 of the 19 -- of the act that became in

5    part -- Title 2 is the Controlled Substances Act, as it appears

6    in the United States Code now.

7          **THE COURT:**  So you're saying it is the same

8    subchapter?

9          **MR. GOLDMAN:**  Yes.

10         **THE COURT:**  Then I think I was off on that theory.

11         **MR. GOLDMAN:**  I believe it is, Your Honor.

12         **THE COURT:**  Okay.  Still, the logic applies.  You got

13   me on the words.  Now, where comes the logic?

14         **MR. GOLDMAN:**  Okay.  So, as I was saying, Congress had

15   a separate -- had two goals.  It's a complicated statute.  One

16   of the goals was to make sure that people can get the

17   medications they need.

18      And Congress recognized here, and in provisions dotted

19   throughout the United States Code, the economic activity in

20   this country happens in large part through the conduit of the

21   common carrier.

22         **THE COURT:**  But I know all that.  I mean, I know --

23   look.  I understand that there should be an exemption for

24   common carriers handling, handling of drugs, controlled

25   substances.  That's the point of the exemption.

1    **MR. GOLDMAN:**  Right.

2    **THE COURT:**  Okay.  But the question is does it really

3    apply to common carriers that are engaged, in part, knowingly

4    or unknowingly -- all this, by the way, will all be fleshed out

5    at the trial; okay?

6    **MR. GOLDMAN:**  Of course.

7    **THE COURT:**  But knowingly or unknowingly it showed

8    that exemption, is it so broad that it would encompass within

9    it a common carrier that embarks on a scheme to deliver illicit

10   drugs?  That's the question.  That's what you're accused of

11   doing.

12   **MR. GOLDMAN:**  I agree, Your Honor.

13   **THE COURT:**  This isn't a negligent -- by the way, the

14   Government had -- not to make too fine a point on it, the

15   Government decided to prosecute this, to bring this case

16   criminally, not civilly.  That was their decision.  Whether it

17   made sense or not is for another day to determine.

18   But they say, they -- they say you're part of a criminal

19   conspiracy to deliver drugs, accepting illicit drugs.

20   Accepting their characterization of it does this exemption

21   trump that scenario?  It clearly doesn't, because Congress

22   would never pass something to say, by the way, if you're a

23   common carrier you can't be prosecuted for drug offenses, if in

24   fact the evidence showed that what you did was knowingly engage

25   in distributing illicit drugs.

1          After all, I would do -- let's say I'm a drug dealer or a

2     supplier, all I would do is phone FedEx and tell them:  "Hey,

3     I've got a shipment of drugs here.  I'd like to have you

4     deliver this for me.  Come to the back side of my, you know,

5     house and pick them up, or my meth lab," or something else.

6     And you may say, "Well, but wait a minute; you're a drug

7     dealer; a criminal drug -- oh yeah, don't worry about that.

8     You're exempted."  Really?

9          **MR. GOLDMAN:**  The exemption that Congress wrote has a

10    limiting principle, and the limiting principle is acting in the

11    usual course of business.

12         **THE COURT:**  But their usual course of business is

13    delivering things.

14         **MR. GOLDMAN:**  That's right.

15         **THE COURT:**  That's their usual course of business.

16    That's what they do every day, every day, every night, round

17    the clock faithfully with great efficiencies they deliver.

18         **MR. GOLDMAN:**  Right.  And that's the point, that they

19    need to be able to do that without being worried that they

20    might be held responsible for the contents of some of their

21    packages, because it's an unrealistic expectation that they

22    would be able -- that they understand the regulations that

23    would apply to the thousands and thousands of different

24    commodities that they ship every night.

25         **THE COURT:**  But that's not the scope of the exemption,

1    in my view.

2         **MR. GOLDMAN:**  Well, we differ on that, because I think

3    that's how Congress wrote the exemption.

4         **THE COURT:**  Yeah, but that's not how -- it's very

5    difficult to divine, necessarily, Congressional intent.  But to

6    the extent I can divine it, was there some discussion in

7    Congress when they passed this to say, "Look.  What about a

8    rogue common carrier that embarks upon a criminal conspiracy,

9    say, to deliver illicit substances?  Oh well, you know, let's

10   exempt them as well.  Let's not make any exceptions.  Let's

11   have a nice broad, clear, bright-line exemption."

12        **MR. GOLDMAN:**  Well, I didn't find any clear

13   legislative history, and that may be because it goes back over

14   a hundred years, this exemption.

15        But The Supreme Court says, and this is in *Salinas versus*

16   *the United States*:

17             (reading) Courts in applying criminal laws generally

18        must follow the plain and unambiguous meaning of the

19        statutory language.  Only the most extraordinary showing

20        of contrary intentions in the legislative history will

21        justify a departure from that language.

22        So the absence of legislative history doesn't hurt our

23   case, it helps our case.  It means the Court ought to read the

24   exemption according to the plain language as it's written.  And

25   what it says is that the limitation on the exemption is acting

1   in the usual course of business.

2        **THE COURT:**  But it just doesn't make sense.  I mean,

3   I'm just telling you it doesn't make sense.  It doesn't make

4   sense that somebody can knowingly deliver illicit drugs and be

5   exempted.

6        **MR. GOLDMAN:**  Well, it's not the only time that

7   Congress would have done something like that, Your Honor.

8        **THE COURT:**  You mean done something that didn't make

9   sense?

10                       (Laughter)

11        **MR. GOLDMAN:**  No.  That may be true also, but I'm not

12   making any claim about whether this makes sense or not.

13       We could have a policy argument about the best place to

14   draw the line, but of course our job now is to figure out where

15   the line was drawn.

16        **THE COURT:**  Exactly.

17        **MR. GOLDMAN:**  Congress has, in a number of different

18   places, drawn lines that, if taken to an extreme, have

19   unattractive results.  There's one in the common carrier

20   context.  It's the Airline Deregulation Act, and that has --

21        **THE COURT:**  Oh, please, please don't mention the

22   Airline Deregulation Act.  I'm very familiar with the Airline

23   Deregulation, because someone I know quite well was the head of

24   the judiciary -- was the chief council of the judiciary

25   committee when they brought about Airline Deregulation.  And

1    haven't you noticed how well airlines have worked since then?

2                       (Laughter)

3              THE COURT:  Not as good as the sentencing guidelines.

4                       (Laughter)

5              MR. GOLDMAN:  My only point is that one of the things

6    that our Airline Deregulation Act did is that it preempts state

7    law or tort actions, including things that have bad mens rea,

8    like fraud.  It has the result that people -- you could come up

9    with a hypothetical where a common carrier defrauds someone,

10   and it's too bad for that person.  That's a harsh result.

11         Congress decided that the importance of the common carrier

12   business working in this country trumps those types of

13   concerns, and that's a similar thing to what happened here.

14         It's highly unrealistic that a company like FedEx is going

15   to get purposefully involved in a Mexican drug cartel scheme

16   like the Government has alleged.  But, the structure and the

17   words of the statute say that the exemption applies so long as

18   the company is acting in the usual course of business.

19             THE COURT:  So, actually, the logic of your argument

20   is let's change the drug distribution process in the United

21   States.  Let's get the drug dealers simply a phone to FedEx, or

22   UPS, I guess -- but this is competition, so you would prefer it

23   with you -- and let's just have them, you know, phone that 800

24   number.

25             MR. GOLDMAN:  Well, I think Your Honor has already

seen that FedEx every single day is cooperating with the fight
against drug distribution, so that would not be a very
effective strategy for drug dealers.

Many of our employees are ex-law enforcement.  The company
calls the police every day when it finds a green, leafy
substance and white powdery substances in its shipments.  So
that wouldn't work for drug dealers.

I think maybe one thing -- one thing to note is that I
think the Court is right.  The common carrier -- the Mexican
drug cartel idea is at the very far reaches of what the
exemption might or might not cover, but it's not the case
before the Court.

The common carrier exemptions are most plainly directed to
the situation we have in this case.  Regulated -- in fact,
DEA-registered pharmacies that are shipping to patients, the
CSA common carrier exemption, as you noted, appears in
section 822.  That's the section that governs registrants and
their authority to have prescription medications.  The FDA as a
whole is the same.  It talks about distribution of prescription
medications, not narcotics like marijuana.

And the policy underlying the common carrier exemptions is
strongest in that area, because the exemption is seen, most
plainly intended to allow regulated entities like pharmacies to
ship between themselves and to end users, and because it's the
most unreasonable to expect a carrier to have expertise

1    necessary to distinguish between prescription medications

2    prescribed by doctors acting in the usual course of

3    professional practice and for a legitimate medical purpose,

4    from the same prescription medication issued by a doctor acting

5    outside the usual course.

6        As paragraph three notes, of the indictment notes, FedEx

7    doesn't have any direct relationship with these doctors.  It's

8    picking up from pharmacies.  Pharmacies are shipping lawfully

9    prescribable drugs.  They look the same to FedEx, especially

10   from the outside of the package.

11       **THE COURT:**  Even if they looked inside the package, I

12   mean, that's part of it.  I mean, if FedEx opened up these

13   packages because they were suspicious that they were illicit,

14   opening up a package wouldn't have told them anything.

15       **MR. GOLDMAN:**  Well, that's right.

16       **THE COURT:**  They would see a drug, they'd see a

17   prescription number, they'd see a doctor, and they'd see an

18   address and a patient.  They wouldn't know anything after

19   that -- about that.

20       Look, you know, so I -- I mean, the fact that -- no, of

21   course, you're absolutely right.  Nothing would be gained by

22   invading the packaging, opening up the package.  They wouldn't

23   know anything more about it.

24       **MR. GOLDMAN:**  Well, that's right, and that's why this

25   case falls into the very heartland of the exemption scope.  The

exemptions authorize common carriers to possess

pharmaceuticals, at least in some degree, and at least it must

have to do with carriers carrying packages between registered

entities and end users or between registered entities

themselves from a manufacturer to a wholesaler.

**THE COURT:**  Well, let's hear -- the Government might

take a different view, so let's just hear from them.

**MR. GOLDMAN:**  Okay.

**MS. ELLICKSON:**  Yes, Your Honor.  So section 822(c) is

limited to situations in which a common carrier is transporting

drugs in legitimate channels, and that's actually clear from

the legislative history of the statute and Congress's purposes

in enacting the statute.  And what the Supreme Court said in

its decision --

**THE COURT:**  I'm sorry.  I'm thinking about your words:

"Legitimate channels."  What does that mean?  What does that

mean?

**MS. ELLICKSON:**  Legitimate channel of distribution

means that the drug has been properly prescribed by a doctor in

accordance with --

**THE COURT:**  Well, that's not a channel.  I mean --

okay.  Let's just try to figure out what you're saying here.

A pharmacy -- FedEx goes to a pharmacy, picks up the drugs

from a pharmacy, and delivers it to the addressee; okay?  Now,

that's picking it up at a pharmacy.  Let's say you have a

pharmacy that's operating as a pharmacy, that is to say it's

licensed in and of itself, but it's engaged in other acts --

inappropriate activities, that is, as the case was, as this

case was.  These are fulfillment pharmacies that, you know,

would fulfill prescriptions even though the patients, the

people who ordered the drugs, didn't have a in-person physical

examination.  So that it can be said, and the Ninth Circuit has

said it as well, it can be said that these were not properly

prescribed medications.

    But is that then -- does that then make it an illegal

channel, an illicit channel; is that what you mean by the

channel?

        MS. ELLICKSON:  Well, it becomes part of the

illegitimate distribution chain once the drug is improperly

prescribed, and so at that point we have an illegitimate

situation.

    It's possible in some theoretical circumstances that

Federal Express wouldn't know about the illegitimacy.  But

that's not at issue in this case, because of the knowledge

requirements.

        THE COURT:  Is there something you can point to in the

statute that talks about these channels being -- well, I mean,

it talks about in the ordinary course of business, that's what

counsel has said.  Counsel said there is a limitation.  So I

don't think that FedEx could, oh, I don't know, I can't even

1   make up these things; whenever I do I get into trouble, but I

2   don't know.

3        **MR. GOLDMAN:**  I have a good one, Your Honor.  We

4   couldn't steal Merck's drugs and sell them on the street.  That

5   would be improper.

6        **THE COURT:**  There you go.  Thank you very much.

7      Okay.  So you can't do that.  You know, you couldn't do

8   that.  FedEx couldn't break into a pharmacy, take the drugs,

9   and then just throw them out into the street or something.

10      I'm just trying to figure out is there anything in the

11   statute that would be a limiting --

12        **MS. ELLICKSON:**  Well, the Supreme Court addressed this

13   issue in *Moore* about -- and this is where they discussed in

14   large part how they were able to conclude that the statute was

15   designed to protect legitimate channels of distribution, and to

16   ensure that there was prosecution in illegitimate activities.

17   And they looked at the legislative history for the statute, and

18   they looked at other provisions of the statute to conclude that

19   what Congress was really concerned about was whether it was an

20   illegitimate or a legitimate transaction, and that's from the

21   beginning, rather than the status of the person who might have

22   been involved in the conduct.

23      And what the defendants were trying to do here is ask the

24   Court to look not at whether it was a legitimate or an

25   illegitimate transaction, but rather say because of who we are,

1   because we are common carriers --

2          **THE COURT:**  That's where they lose me, is because

3   we're a common carrier, and common carriers are exempt,

4   therefore we can do X, as long as it's in the ordinary course

5   of business, what we normally do.  What we normally do is

6   deliver products, pick them up one place, deliver them to

7   another place, that's what we do.  That's called the ordinary

8   course of business.

9          So they say because we're dealing with the ordinary course

10  of business, therefore we're exempt.  To which I say I don't

11  know how that would work in the case of some common carrier who

12  decides to go rogue.  And counsel hasn't addressed that.

13  Counsel concedes, he says, I hear your argument.  Well, that --

14  first of all, he says that's not us.  And I appreciate that.

15  Okay.  That's called not guilty; it's not us.

16         But, the question is we're now interpreting a statutory

17  statement to see whether or not it would encompass, without

18  anymore facts, it would encompass FedEx in this case.  And what

19  I come down to, I say his argument says it proves too much,

20  much too much.  It proves that anybody who simply gets a

21  license then would be exempt under his logic, as long as

22  he/she/it is in the business of serving as a common carrier.

23  And that's where counsel loses me.

24         So I don't know if the argument is any different from

25  that, what you're saying.  I mean, that's the way I look at it.

1  I mean, after all, this is probably a fairly novel prosecution,

2  and I don't think there are a lot of cases on this, on common

3  carriers, are there?

4       **MR. GOLDMAN:**  No, there are not.  In fact, there's

5  never been a prosecution that we know of.

6       **THE COURT:**  Yeah.  So, again, that suggests how

7  unusual it is for the Government to bring a criminal

8  prosecution, when in fact there are no cases around that they

9  can point to that I have seen supporting a criminal -- a

10  criminal prosecution under these types of circumstances.  But I

11  haven't heard any of the evidence, so when I hear the evidence,

12  or a jury hears the evidence, that's up to the jury or me.

13      So anyway, I'm going to deny the motion.  Okay.  I mean,

14  we're just going back and forth on it.

15      Let me turn to the subpoenas.

16       **MR. GOLDMAN:**  I'm going to make way, Your Honor.

17       **THE COURT:**  So Ms. Arguedas, you gave your co-counsel

18  the easy case, and you take the difficult one; right?

19       **MS. ARGUEDAS:**  Yes, Your Honor.

20       **THE COURT:**  Very good planning.  That's a sign of a

21  seasoned, experienced trial lawyer.

22      Well, I'm going to grant the Rule 17 subpoenas.  I mean,

23  it seems obvious.  I think the Government is arguing both

24  sides -- both sides of it.  I can't understand it.  You say on

25  the one hand, save and except for one entity, we're not

1   responsible for Rule 16 disclosures, and so forth.  I agree,

2   you may be right.  Not going to argue it.

3       But if you're not responsible for the Rule 16 disclosures,

4   and so forth, and this information is relevant, and this

5   information may be probative, then there's got to be a way for

6   them to get it.  Either you do it, and if you can't do it,

7   either, one, because you choose not to, or two, you don't feel

8   you have the authority to do it, or three, you're not counsel

9   representing all these entities, so it's even questionable

10   whether you have standing to object -- for any of those

11   reasons, fine.  I don't have to say whether you're right or

12   wrong.  But you can't box a defendant into a situation where

13   you say, by the way, I object to that information being

14   produced, and I have no obligation to produce that information,

15   and, yeah, it may be relevant or it may be probative.  I mean,

16   that simply isn't going to work.

17       Now, Ms. Ault, go right ahead.

18       **MS. AULT:**  Okay.  Your Honor, the Supreme Court in

19   *Nixon* imposed more than just a relevancy and probity obligation

20   on the defense to get a Rule 17(C) subpoena.

21       **THE COURT:**  Now, believe me, we're not rearguing what

22   we did three months ago, because this is the argument you made

23   three months ago, and, respectfully, you lost.

24       **MS. AULT:**  And however, Your Honor --

25       **THE COURT:**  So is this the same argument or is this --

1    I know it's to a different set of subpoenas, but is it the same

2    argument?

3            MS. AULT:  No, your Honor.  It's -- the argument is

4    this.  Because these are true third parties, not anybody who

5    was involved in this prosecution, in this investigation, true

6    third parties, many of them very small police departments in

7    rural areas with little or no staff capable of complying with

8    the really overbroad subpoenas that the defendants wish to

9    issue that --

10           THE COURT:  Do you represent these third parties, by

11   the way?

12           MS. AULT:  Your Honor, we don't represent these third

13   parties.  However, if the Court wants me to address the

14   standing issue I will.

15           THE COURT:  Yes.

16           MS. AULT:  Okay.  Your Honor, what I have to say about

17   the standing issue is this.  I had a case in front of the

18   Honorable D. Lowell Jensen where this issue came up, and what

19   Judge Jensen said was the first time this issue came to his

20   attention, if he recalled correctly, was in 1954.  And he did

21   not believe that the issue of the Government standing in this

22   context was any clearer today than it was then.  And the reason

23   why that is, I think, is because on the one hand it seems

24   logical to say we don't represent the Bristol, Virginia Police

25   Department, and so therefore how could we be standing here

1     asserting their rights?  That is a logical argument.

2         On the other hand, how in the world can the Bristol,

3     Virginia Police Department assert their rights in a case where

4     they are not a party; they don't know what the case is about;

5     they don't know whether the issue is irrelevant, whether it's

6     relevant, whether it's admissible; they don't really know

7     anything about the case, so how could they --

8         **THE COURT:**  Yes, they do.  They know one thing about

9     the case.  They know one thing, and that is whether it would be

10    burdensome, or whether these requests seem to be unreasonable.

11        Every day -- that's an exaggeration.  Frequently, I get

12    motions to quash subpoenas by third parties out there who come

13    in and they say "Look, Judge, do you have any appreciation of

14    what this is going to cause my little entity in order to comply

15    with?"  And I say "no, tell me."  And they tell me.  And I say,

16    "Well, that is a burden.  Maybe I won't require you to do it."

17        Maybe there's a different way of doing it.  Maybe it could

18    be done by way of declaration.  Maybe you could simply allow

19    counsel the opportunity to review something.  Maybe I would

20    require counsel to make a further declaration showing it's --

21    the necessity of obtaining that information.  That happens all

22    the time.

23        **MS. AULT:**  But --

24        **THE COURT:**  All the time.  And so I don't think those

25    other arguments carry the day.  The real argument is it's

burdensome.  And the odd thing is that you're making the argument that it's burdensome for them, absent their coming in and telling me it's burdensome.

     **MS. AULT:**  And Your Honor, because even just coming in and telling you that it's burdensome is burdensome.

     **THE COURT:**  Well, what about writing a letter?

     **MS. AULT:**  And Your Honor, if you request that they do that, I mean, I have --

     **THE COURT:**  No, I'm not requesting they do it.  It's up to them.

     **MS. AULT:**  And, Your Honor, we were -- we have been in contact with virtually all of these entities.  I can tell you that they all said that if they got this subpoena, they don't know how they would even begin to comply with it, because it does require them to conduct an extensive search of 15 years worth of records for something mentioning the term "internet pharmacy" and "FedEx," that's the entire parameters that they have given.

     And so we're asking the Court -- we're saying that we do not think any of these are justified under Rule 17(C).  If the Court is inclined to issue them, which the Court is saying that it is, we would like the opportunity to submit revised subpoenas to the Court that we think narrowly tailor the request to something that the defense has shown is likely to exist, is likely to be helpful to their defense, and is

something that these entities could actually reasonably search

for, as opposed to the requests that they have actually made,

which is not at all something that it is reasonable to ask the

Bristol, Virginia Police Department to search for.  Where

they've established that there was one conversation at one time

with one person, it is unreasonable to use that as a hook to

say you now have to search 15 years worth of your records for

any conversation with anybody else that may possibly have

occurred, and we don't have any reason to believe anything

happened other than that one conversation.

          **THE COURT:**  Your response?

          **MS. ARGUEDAS:**  The Government has no standing to make

these arguments, period, and shouldn't be permitted to here.

     The subpoenas should issue, because we have a

constitutional right to compel evidence.  And all of the

evidence that we're asking for couldn't be more relevant in

terms of good faith, in terms of countering criminal-specific

intent.  And we have given you examples of exactly the kind of

evidence that is, no question about it, going to go to the

heart of the case.

     If the people who get the subpoenas have a problem with

them, they will do what everyone does, which is that they'll

first come and talk to us, and we'll see whether or not we can

work it out, and if we can't, then maybe they will file a

motion, and you will consider it.

1    The Government doesn't have a role in that process.  And

2  it is surprising and disappointing that the Government, who

3  brings an indictment like this, who accuses FedEx of being a

4  conspirator with alleged co-conspirators who we actually helped

5  to investigate and convict, is now trying to say to us you

6  can't -- we think you shouldn't be able to go get that evidence

7  from West Virginia, because West Virginia is small, and it will

8  be hard for them to find it.

9         **THE COURT:**  Well, I mean, I really think the -- we'll

10  follow the normal procedure.  I'm going to issue all the

11  subpoenas.  If anybody has a problem with the subpoena, that is

12  to say if a person, an entity who receives this subpoena, they

13  feel it's too burdensome, they'll follow the procedure they do

14  in every single case, which is contact defense counsel, see

15  whether they can arrive at an agreement, and absent an

16  agreement, then some legal action is taken.

17     You know, the Court has a lot of options open to it.

18  Defense counsel has a lot of options to it.  You don't have

19  standing, and that's how we deal with it.  That's how we deal

20  with it.

21         **MS. ARGUEDAS:**  Thank you, Your Honor.

22         **THE COURT:**  It's a regularized process.

23         **MS. AULT:**  Your Honor, may we at least submit some

24  proposed --

25         **THE COURT:**  No, I don't want a revised subpoena.  It's

up to them.  You're not subpoenaing anything.  You're not out
there as a helpmate to the defense in this case.  They get to
put on the case they want to put on, provided that it's
admissible, and not the case that you want them to put on.

     **MS. AULT:**  Your Honor --

     **THE COURT:**  Let's make it absolutely clear.  It is an
adversary process:  The Government produces its evidence, the
defense is entitled to produce its evidence.  And the
prosecution is not authorized and not -- to help the defense in
shaping their defense.  They get to shape it as they see fit,
subject to the admissibility and other constraints that the
Court always has.

    So I'm going to issue the subpoenas as drafted.  I'm going
to encourage defense counsel to be in contact with these --
with the parties who receive the subpoena --

     **MS. ARGUEDAS:**  We will.

     **THE COURT:**  -- perhaps by way of cover letter, and so
forth, and to be willing to accommodate them in terms of, you
know, small entities.

    I think you, by the way, I think that's a good point that
you raise.  I mean, I think it is clear the Bristol County,
something or another, you know, we don't want them to spend
$10,000 on lawyers, transportation, motions, and so forth, if
all that could be avoided.

     **MS. ARGUEDAS:**  Right.

1              **THE COURT:**  And you know what, actually, FedEx doesn't

2    want them to do it either.

3              **MS. ARGUEDAS:**  Right.

4              **THE COURT:**  They just want to see if they can get --

5              **MS. ARGUEDAS:**  Exactly.

6              **THE COURT:**  -- that information which is relevant.

7              **MS. ARGUEDAS:**  Right.  This is not an exercise in

8    harassment.

9              **THE COURT:**  All right.

10             **MS. AULT:**  Can I bring a request to the Court on

11   behalf of several of the entities that raised this with us,

12   which is will the Court please order that FedEx must cover the

13   cost of compliance with the subpoenas.

14             **MS. ARGUEDAS:**  Your Honor --

15             **THE COURT:**  I don't know what I'm doing about costs.

16       Look.  You know, I think it's probably a drop in the

17   bucket, but I'm not going to order it.

18             **MS. AULT:**  Your Honor, however, it's not --

19             **MS. ARGUEDAS:**  The Government has no standing to make

20   any of these arguments.

21             **MS. AULT:**  Your Honor, it is not --

22             **MS. ARGUEDAS:**  We appreciate it.  Thank you, Your

23   Honor.

24             **MS. AULT:**  Your Honor, it is not a drop in the bucket

25   for the Bristol, Virginia County Police Department, and they --

1  we would like the Court --

2       **THE COURT:**  The Bristol County Police Department

3  probably has sufficient funds, I would guess, to write a letter

4  to the Court outlining its concerns.  If their concerns are

5  monetary concerns, I appreciate that.  Let them -- and I will

6  accommodate that, if they are legitimate monetary concerns.

7  But in the first instance, I want FedEx to try to accommodate

8  them.

9       **MS. ARGUEDAS:**  We will.

10       **THE COURT:**  And I would be really surprised if FedEx

11  either directly or indirectly wishes to impose burdens on third

12  parties.  My guess is they don't, but I don't run their

13  company, and it's up to them to make these decisions.

14      And I'm not criticizing the Government for making that

15  point.  But, again, you don't have standing.

16      Anyway, anything unclear about what I'm saying?

17       **MS. ARGUEDAS:**  Not a thing.  Thank you.

18       **THE COURT:**  Well, you know, there's some good days and

19  some bad days, Ms. Ault.  You just have to take a mixed

20  message.

21       **MS. AULT:**  Your Honor, the other concern that we have,

22  and really why we're standing up here and doing this, is that,

23  one, we have an interest in the orderly administration of

24  justice.  We also have an interest that certain defendants not

25  be treated differently than other defendants.  And we do have a

concern that in this case these defendants are being allowed to go out and issue subpoenas not in compliance with *Nixon*, not in compliance with Rule 17(C), because they are saying they're being unfairly treated, and they need to go out and get all this evidence; where, as in another case, with a different defendant the requirements of specificity and admissibility would actually be imposed.  And these subpoenas don't even come close to meeting those requirements.

     And so part of our concern is that because this defendant feels like they should be treated differently, they're acting differently.  And we need to stand up and say -- in another case with another defendant who was charged with street-level drug trafficking, and if they decided that they wanted to go out and issue a subpoena to the Bristol County Virginia Police Department for all records of any drug transactions for 15 years, the Court would never issue it.  But the Court is issuing it in this case, and we feel like we need to stand up and say no.  These defendants need to be held to the same standards as everybody else.  Specificity and admissibility --

          **THE COURT:**  That is somewhat of an odd argument.

          **MS. AULT:**  -- need to be a requirement of the subpoenas, and they're just not met in this case.

          **THE COURT:**  Well, Ms. Ault, what I said this morning was that we should follow the same procedure for this case as I would for every other criminal case that I have, that's

number one; okay.  And number two is I would require standing,
because that's what the Constitution requires, standing to make
these arguments, in my view, and you haven't come close to
demonstrating that you have standing.  You're actually asking
for an exception.  You're the one who is asking for an
exception.  You're the one who is saying that these people
should be treated differently.  That's number one.

Number two is I have reviewed the subpoenas, and in my
view they are -- that's my view, not your view, but my view is
that they are appropriate to be issued under *U.S. -v- Nixon*,
and therefore, I don't accept your argument.

Now, that's why I asked you are you making the same
argument you made three months ago.  And yes, you are now
making the same argument you made three months ago.  You said,
you know, Judge, three months ago you were wrong, you're wrong
today.  It's the same argument.  You're treating these people
differently.  And the answer is I'm treating these people as
the criminal -- the Federal Rules of Criminal Procedure dictate
any defendant should be treated.  That's my view.

Now, you know, that's not your view, it's not the
Government's view, but it's the Court's view.  And anyway,
that's what the Court is supposed to do, is treat people the
same, and I believe I have treated people the same.

If you know some other cases out there that I -- that you
think I do it differently, you know, I'll be -- I'm not sure

1   this is the forum for it, but I'll be delighted to go back,

2   look at those cases, and try to see whether or not my approach

3   to them is consistent with what I've done in the past.

4        **MS. AULT:**  Your Honor, all we would ask is that you

5   take a look under your own authority and discretion again at

6   the subpoenas, consider how broad they are, and just consider

7   whether the Court would narrow them in some respects so that

8   it's something that when these police departments get these,

9   they're going to look at them and just say that there's just

10  not a conceivable way they could --

11       **MS. ARGUEDAS:**  She has no standing to make this

12  argument.

13       **THE COURT:**  Let them do it.

14       **MS. AULT:**  I'm not making an argument.  I'm simply

15  asking the Court to use its own discretion.

16       **THE COURT:**  No, you're not.  You're actually saying --

17  let's assume that they come in and they say they can't comply

18  with these subpoenas.  Assuming that, don't you think, Judge,

19  that you ought to read that, and you ought to narrow the

20  subpoena?  To which I say let's see what these entities say.

21  Let's see whether or not they could be tailored.

22       I see in many, many cases defense narrowing subpoenas

23  where they think it's appropriate to narrow the subpoena.  But,

24  you know, sometimes even by the narrowest subpoena it

25  requires -- may require the same amount of work as a broad

1    subpoena, you know.

2        So, look, we're going to follow the same procedure in this

3    case that we do in every other case, which is the subpoenas go

4    out, and if somebody has a problem with it, they phone FedEx;

5    and if FedEx can't work it out, then they move to quash or

6    FedEx moves to compel.  I don't know which way it works.

7    Either way, bring it to the Court's attention.

8        So anyway, and I would say that this case is different,

9    because this case turns on the question of what did FedEx know,

10   what were they told, what options were presented to them, what

11   did they say about those things?

12       This is an unusual case.  So when one says, oh, it should

13   be just like every other case, it's not quite just like every

14   other case.  Most cases are did you do the deed?  Did you

15   commit the act?  Here, that's not at issue.  FedEx said we

16   delivered X.  I mean, I'm anticipating they will say we

17   delivered these -- this product, and we delivered this letter

18   or we delivered this package.  That's their business.  But what

19   did they know about it?  What did they know about the

20   operation?  What were their obligations under the law with

21   respect to it?  Those are all highly -- they are allegations or

22   information that must be developed in order to provide the jury

23   with a fair picture as to what occurred here.  It's

24   extraordinarily important in this case, not the physical act of

25   doing the delivery, but what did they know?  It's a state of

1   mind case; and so with a state of mind case, other than

2   somebody simply declaring, well, I thought this or I thought

3   that, whether they did think this or did think that depends on

4   corroborative details.  What are the corroborative details?

5   They are statements; they are letters; they are communications;

6   they are practices; they are a history of events that either

7   corroborate or bring into question a theory about the defense,

8   about the case, and that's not -- well, I mean, I think that's

9   what this case is about.  Now, it's always been about that.

10          **MS. ARGUEDAS:**  And may I -- I haven't said anything to

11   the --

12          **THE COURT:**  Let me hear again from Ms. Ault.  I don't

13   want -- I want her to have her day.

14          **MS. AULT:**  Your Honor, I just want to be clear that we

15   are not opposing these subpoenas because we are afraid of this

16   evidence.  This is evidence that we think supports our case.

17          **THE COURT:**  Well, then you can encourage -- you should

18   encourage that it be rather -- then maybe the Government should

19   pay for it.

20                          (Laughter)

21          **MS. AULT:**  Your Honor, we are --

22          **THE COURT:**  Does it help you?

23          **MS. AULT:**  We think we have plenty of evidence, Your

24   Honor.  We don't actually need any.

25          **THE COURT:**  Well, A little bit more never hurts.

1         (Laughter)

2    **MS. AULT:**  We are doing this because we really do

3  believe that this is an incredibly burdensome process to put

4  these small entities through that is not justified under the

5  law.  That is why we are here.

6    **THE COURT:**  Thank you.  Yes?

7    **MS. ARGUEDAS:**  In terms of the unusual nature of the

8  case, given Ms. Ault's comments, I do want to say this.  This

9  is the first case that I have ever heard of, drug conspiracy

10  case, in which the evidence will establish, and these subpoenas

11  will establish, that the defendant, FedEx, assisted law

12  enforcement in the prosecution and conviction of the very

13  co-defendants, co-conspirators that it is charged with

14  conspiring with, as well as many other on-line pharmacies.

15   So we are definitely in a new and different situation,

16  which is exactly why we need to subpoena this information.

17  Thank you.

18    **MS. AULT:**  Your Honor, this will certainly not be the

19  first case before this Court or any court where a cooperator on

20  the one hand offered to cooperate with the Government, and on

21  the other hand continued to and expanded their criminal

22  activity with their co-conspirators.

23    **THE COURT:**  But doesn't it go to their state of mind

24  if, in fact -- if, in fact, they were confronted with the very

25  issue that you say they have been confronted with, that is that

1    they knew that they were delivering illicit drugs or drugs

2    prescribed not in the ordinary course; okay.  So you say

3    that's -- we're going to show that, we're going to show that in

4    order to convict the defendant.

5         And then it turns out that in X number of cases, being

6    advised of certain facts, they then prevented the further

7    commission of a crime.  Doesn't that -- isn't that some

8    evidence that in fact your overall theory is not -- is not

9    terribly convincing?

10            **MS. ARGUEDAS:**  Of course it is.

11            **THE COURT:**  That's the way I look at it.

12            **MS. AULT:**  It would be if those were the facts, Your

13   Honor.

14            **THE COURT:**  Okay.  I have no idea what the facts are.

15            **MS. AULT:**  If the facts, on the other hand, are that

16   they were informed of all this and continued to participate in

17   the crime anyway, that would support our --

18            **THE COURT:**  All right.  Well, and the reason we're

19   here this morning is to get to the facts, and that's why I'm

20   issuing the subpoenas.  Okay.  Thank you very much.

21            **MS. AULT:**  Thank you, Your Honor.

22            **MS. ARGUEDAS:**  Thank you.

23            (Proceedings adjourned at 10:54 a.m.)

24                       ---oOo---

25

1

2

3                         **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Tuesday, May 19, 2015

8

9

10

11     _____

12     Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                    Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25