Pages 1 - 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **No. CR 14-0380 CRB** |
| | ) | |
| FEDEX CORPORATION, | ) | |
| FEDERAL EXPRESS CORPORATION, | ) | |
| FEDEX CORPORATE SERVICES INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | San Francisco, California |
| | | Tuesday, October 6, 2015 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:      Melinda Haag
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            **By:  Kirstin M. Ault, AUSA**
                  **Kyle F. Waldinger, AUSA**


For Defendants:     Arguedas, Cassman & Headley, LLP
                    803 Hearst Avenue
                    Berkeley, California  94710
            **By:  Cristina C. Arguedas, Esquire**
                  **Ted W. Cassman, Esquire**
                  **Raphael M. Goldman, Esquire**


                    Skadden, Arps, Slate, Meagher & Flom
                    525 University Avenue, Suite 1100
                    Palo Alto, California  94301
            **By:  Allen J. Ruby, Esquire**


Also Present        Connie Lewis Lensing, Legal Department
                    Federal Express Corporation


Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporter

| | |
|---|---|
| 1 | **Tuesday - October 6, 2015**                    **10:38 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE COURT:**  Calling case CR 14-0380, the United States |
| 5 | of America versus FedEx Corporation, Federal Express, and FedEx |
| 6 | Corporation Services. |
| 7 | Appearances, Counsel. |
| 8 | **MS. ARGUEDAS:**  Good morning, Your Honor.  Cris |
| 9 | Arguedas for FedEx.  And with us today, from the company, is |
| 10 | Connie Lewis Lensing, Senior Vice President. |
| 11 | **MS. AULT:**  Good morning, Your Honor.  Kirstin Ault and |
| 12 | Kyle Waldinger for the United States. |
| 13 | **MR. RUBY:**  Good morning, Your Honor.  Allen Ruby for |
| 14 | FedEx. |
| 15 | **THE COURT:**  Mr. Cassman. |
| 16 | **MR. CASSMAN:**  Good morning, Your Honor.  Ted Cassman. |
| 17 | **MR. GOLDMAN:**  And Raphael Goldman.  Thank you, Your |
| 18 | Honor. |
| 19 | **THE COURT:**  Good morning. |
| 20 | So I received the government -- let me just, sort of, get |
| 21 | some things out of the way.  I received the government's |
| 22 | submission on other cases.  And I then immediately requested |
| 23 | the defense to file some response whenever they can get around |
| 24 | to it. |
| 25 | **MS. AULT:**  And, Your Honor, I was not present at the |

1    last hearing.  I was ill.  If that's not what the Court was

2    looking for, if the Court needs additional information, please

3    just let us know.

4         **THE COURT:**  I appreciate that.  No, I think that's

5    exactly what I was looking for.  I mean, I don't -- I read

6    through it.  I'm just trying to figure out, make sure I

7    understand it.

8         But let me turn to UPS for a minute because you devote a

9    fair amount of -- you highlight that.

10        UPS, I guess, and Google --

11        **MS. AULT:**  Yes, Your Honor.

12        **THE COURT:**  -- agreed to nonprosecution agreements.

13        **MS. AULT:**  Yes, Your Honor.

14        **THE COURT:**  And I'm trying to figure out -- and, also,

15   paid some penalty.

16        **MS. AULT:**  Google paid $500 million, and UPS paid

17   $40 million.  Both of those were forfeitures of ill-gotten

18   gains.

19        **THE COURT:**  And in doing so, would you explain to me

20   exactly what they said they did.

21        I mean, in other words, I want to make sure I, sort of,

22   understand this.  And that's why I really asked FedEx to

23   comment on it.  Though I can understand some of the other

24   things, I need to understand some of the other things.

25        But I'm trying to figure out, you go to a company and you

1    say, "This is what we think you did.  This is what the evidence

2    is.  You engaged in criminal conduct."  I guess you said that

3    to UPS.

4              **MS. AULT:**  Uhm --

5              **THE COURT:**  Well --

6              **MS. AULT:**  We informed them they were under

7    investigation.  And we informed them what our investigation --

8    we believed that it showed.

9              **THE COURT:**  Okay.  And I don't know whether the facts

10   of UPS are the same as the facts of FedEx or not.  There are

11   some similarities.  And, obviously, there would be some

12   dissimilarities.  Okay.  Maybe the dissimilarities make a big

13   difference in this case.  I have no idea.

14      Okay.  So they come in and they say, well, "Here is

15   $40 million."  Or "Here is $500 million."  And do they say, in

16   that connection -- this is what I need to know -- "And, by the

17   way, we think we did something that was wrong.  We don't think

18   it's criminal, but we think that -- we admit that what we did

19   was wrong"?

20      Did they say that?

21             **MS. AULT:**  Yes, Your Honor.

22             **THE COURT:**  Okay.  And that's in the agreement in the

23   document?

24             **MS. AULT:**  Yes, Your Honor.  There's a lengthy

25   statement of facts, in both of them, where they admit the

1    factual conduct and that what they did was wrong.

2           **THE COURT:**  Well, they are two different things.

3    Admitting the factual conduct is one thing.  And admitting that

4    what they did, those facts, constitute a wrong on their part.

5    And, I guess, there's also a third thing, is that they knew it

6    was wrong at the time that they did it.

7           And you're saying all that's in there, so all I have to do

8    is look at it?

9           **MS. AULT:**  We believe so, yes, Your Honor.

10          **THE COURT:**  All right.  Anyway, I invited FedEx to

11   comment on it.  And I'm quite sure that they will do so.

12          **MS. ARGUEDAS:**  Certainly we will, Your Honor.  We have

13   plenty to say about the submission.  And we'll file something

14   at a date that we agree on.  But I was interested in what the

15   Court was particularly looking for from us.

16          So, for example, just -- just having had this for only one

17   day, we believe that the Court said, "Tell us, Government, if

18   you have filed any criminal cases similar to this" -- meaning a

19   common carrier; and I think you said this -- "conducting a

20   legitimate business."

21          **THE COURT:**  Right.

22          **MS. ARGUEDAS:**  The answer you got in the government

23   pleading is not that.  It's a list of people who were

24   prosecuted.

25          And, from our review of it, as much as we've been able to

1    do so far, they are people who are engaging in drug trafficking

2    and had a truck that they were using.

3          **THE COURT:**  Like Playboyz, P-l-a-y-b-o-y-z, Playboyz

4    Trucking Company, or something like that.

5          **MS. ARGUEDAS:**  Yeah.

6          **THE COURT:**  Well, yeah, I mean, well, but that's the

7    answer.  That's why I'm inviting a response.

8          The government gave me -- I would guess -- their response

9    to my inquiry.  The inquiry was exactly as you said it.  And

10   that's their response.  So if it's -- it is what it is.  And

11   you analyzed it from that point of view.

12         And if you have come to the conclusion that there is

13   nobody situated like FedEx is -- and it looks to me like that's

14   true as to the first category of responses because, looking at

15   it initially, it didn't look to me like it was FedEx --

16         **MS. ARGUEDAS:**  Right.

17         **THE COURT:**  -- FedEx facts.

18         But, however, the Google and UPS examples are at least

19   FedEx-like.  And the question is:  What are the differences?

20   What are the similarities?

21         Now, every case is different and every case is similar.

22   But at least in terms of categories of cases, I thought that

23   their FedEx -- pardon me, UPS and Google responses were at

24   least in the ballpark of similarities at least in response to

25   my direct inquiry.

1    **MS. ARGUEDAS:**  In a big, gigantic ballpark, yes.  I

2    mean Google, of course, is not a common carrier.  UPS is this

3    case.  Right?  In other words, it didn't precede this case.  It

4    is this case.

5        UPS, for example, is a registrant under the Controlled

6    Substances Act, which FedEx is not.  So there are many

7    case-specific determinations that go into a company deciding to

8    go one way or the other.

9        I'm sure the Court is aware that the government frequently

10   goes to companies, in all kinds of -- not common carriers, but

11   all kinds of cases, and says, "We're going to indict you.  Or

12   you can sign this nonprosecution agreement and pay us tens of

13   millions of dollars."  And 99 times out of a hundred the

14   companies say, "That's what we're going to do."

15       FedEx --

16           **THE COURT:**  Like going to GM --

17           **MS. ARGUEDAS:**  Correct.

18           **THE COURT:**  -- and saying, your ignition case --

19           **MS. ARGUEDAS:**  Right.

20           **THE COURT:**  "We're not going to prosecute you on your

21   ignition case, even though 120 people died and you knew about

22   it for some period of time.  We won't prosecute you if you do

23   X, Y and Z."

24           **MS. ARGUEDAS:**  Right.

25           **THE COURT:**  Okay.  I got that.  I mean, actually, I

1    know all that stuff.

2            **MS. ARGUEDAS:**  Yeah.

3            **THE COURT:**  And the question is, you put in your

4    submission.

5        And then if the government wants to respond you're, of

6    course, entitled to respond.

7        And it's a matter that ought to -- that you ought to take

8    your time and analyze and respond to.  Okay.

9            **MS. ARGUEDAS:**  Okay.

10           **THE COURT:**  So that takes care of that issue.

11       So we're here, really, today to set a trial date.

12           **MS. ARGUEDAS:**  Right.

13           **MS. AULT:**  Yes, Your Honor.

14           **THE COURT:**  With the government taking the position

15   that I ought to reinstate the trial date of February 29th.  And

16   the defense taking the position that it would be fine to try it

17   as February 29th or 28th of two years from now.  Something like

18   that.

19           **MS. ARGUEDAS:**  I would like to take that position.  My

20   client won't permit it.

21           **THE COURT:**  Well, nor will I.

22           **MS. ARGUEDAS:**  Right.

23           **THE COURT:**  So I am now -- there are two things.

24   Number one, I think that I can pick a trial date that's a

25   reasonable trial date, which I will do right this minute.

```
 1              MR. RUBY:  Your Honor --

 2              THE COURT:  Yes, Mr. --

 3              MR. RUBY:  If the Court please.

 4              THE COURT:  Yes.

 5              MR. RUBY:  I don't like to burden --

 6              THE COURT:  Pardon me?

 7              MR. RUBY:  -- bother the Court with my small problems.

 8         In terms of the date, before the Court announces it in

 9    such a way that it's set in stone --

10              THE COURT:  You mean like Judge Orrick used to do?  He

11    set them in concrete.

12              MR. RUBY:  Yes.

13              THE COURT:  But he was a bit nicer than I am about it.

14    He would say to the lawyers, "What date do you want?"  And they

15    would say, "Well, this date."  Like I did with Ms. Arguedas,

16    "What date did you want?"  That was some time ago.  I said,

17    Okay.  We'll set it then, but it's set in concrete."

18         Yes.

19              MR. RUBY:  I have cases set next year.  And, again,

20    not to bother anybody with that, but if per chance the Court

21    happened to pick a particular date when I have to be in a

22    particular part of Oklahoma for a trial, I might at least want

23    an opportunity to ask it to be a week later or a week earlier.

24    Something like that.

25              MS. ARGUEDAS:  Do you want to hear from us on this
```

1    subject?  Or do you already have in your mind what we're doing?

2           **THE COURT:**  Well, I have your submissions.

3           **MS. ARGUEDAS:**  Yeah.

4           **THE COURT:**  You point out all the discovery issues,

5    and so forth, and review of all the materials.  And the

6    government comes in and they say, "We've now given you

7    everything, and it's not going to take that long to find" --

8           **MS. ARGUEDAS:**  Yes.  But, Your Honor, the government

9    doesn't have a basis to know how long it's going to take us to

10   review 3 million pages of discovery.  I do have a basis, which

11   I put under oath to the Court.

12          **THE COURT:**  I appreciate that.

13          **MS. ARGUEDAS:**  And I am -- we can't do it faster than

14   the schedule that we laid out because it's --

15          **THE COURT:**  Well, I'm not sure about that.

16          **MS. ARGUEDAS:**  Because we just got the last load of

17   discovery yesterday.  And we got two other loads last week.

18   And we haven't gotten FDLE materials until November/December.

19       This is not a defense lawyer standing in front of you

20   saying, I don't want to do it for a long time.  This is a

21   defense lawyer standing in front of you, having put under oath

22   that we've been working on this for 14 months.  We know what

23   the pace is and we know how long it will take us to do what we

24   need to do.

25          **THE COURT:**  Right.  But the issue is you're going to

1    have to make some choices.  Every defense lawyer has to make

2    some choices in connection with how the resources are going to

3    be devoted.  And I think it's very hard to make those choices

4    without knowing what the evidence is or without having the

5    evidence available.

6        But once it is there -- and you're going to tell me, well,

7    it doesn't make any sense to say it's there because you have to

8    review it.  But I understood this case, at least certain

9    aspects of the case, having tried this case twice in a

10   different form on different issues, but basically the same

11   facts, to be augmented by the defense in this case.  I have a

12   sense of the case.  And it strikes me that this case could go

13   to trial in June.  June.  So, therefore, the trial date in this

14   case will be June 6.

15       Now, Mr. Ruby.

16           **MR. RUBY:**  Your Honor, if the Court please --

17           **THE COURT:**  Oklahoma?  Because I may move in the other

18   direction.  Before you say anything, I just want to tell you I

19   can go in either direction.

20           **MR. RUBY:**  June 6th I'm invited to the Circuit Court

21   of Illinois, the state court.  The following week by the

22   Northern -- I'm sorry.  This is just what I said I wouldn't do.

23       If the Court could begin this trial in the later part of

24   June --

25           **THE COURT:**  No, no, no, no, no.

1          **MS. ARGUEDAS:**  How about one week later?

2          **THE COURT:**  Fine.  Okay.  However, I want you to block

3     out the week of June 6 because I may do things like jury

4     selection, motions.

5          So evidence to be presented, opening statements to be

6     presented June 13th.  Pretrial matters to be dealt with June 6

7     or earlier.  But I don't want to hear you're somewhere on

8     June 6; right?

9          **MR. RUBY:**  Of course.  Look --

10         **THE COURT:**  Great.

11         **MR. RUBY:**  -- we know the rules.

12         **THE COURT:**  Okay.  Now, having decided that weighty

13    issue, the government will be ready; right?

14         **MS. AULT:**  Yes, Your Honor.  And we, in fact,

15    submitted to the Court a proposed pretrial schedule starting

16    June 1st.  We're happy to modify that and resubmit it to the

17    Court.

18         **THE COURT:**  Why don't you do that and talk to each

19    other now before you leave.

20         I actually don't understand the government's position on a

21    privilege log.  In other words, it seems to me that if -- there

22    isn't a rule out there, that I know of, which says a -- for

23    this matter, a privilege log must be prepared so many days, and

24    cite this and cite that.

25         But it seems to me just a common-sense process that if the

government withholds something, they say this is -- they don't

say it's privileged.  They say, well, we have withheld blah

blah blah because we don't think it's discoverable because it's

not relevant.  Or this or that.

I'm not using the word "privilege."  I mean, "privilege"

is a term of art.  I understand that.  And so we talk about it

as a term of art.

I'm simply saying, and I think that the defense is saying,

if you withhold something, say what you're withholding and

submit it to the Court.  Because you've obviously made a

decision in your mind.

In other words, you looked at something and you said, "I'm

not going to give them that."  Okay.  Write it in a piece of

paper.

**MS. AULT:**  Your Honor, our point isn't that we're

withholding it.  It's that it's not discoverable.

**THE COURT:**  Well, I don't quite know what that means.

I mean, you're saying -- you're saying it wasn't called for by

the subpoena?  Or are you saying -- or by the rule?  Or you're

saying that -- I mean, there are all sorts of things that

aren't discoverable, like your records of prosecutions four

years ago.  You're not turning them over --

**MS. AULT:**  Correct.

**THE COURT:**  -- to the defense because it has nothing

to do with the case.

1          **MS. AULT:**  Correct.

2          **THE COURT:**  Okay.  I'm not asking you to, sort of, go

3    through everything that exists and say it has nothing to do

4    with the case.

5          I'm asking you, I think, to say, "If I redacted something

6    that I gave to the defense, so they have a redacted version, I

7    should put down on a piece of paper why I redacted something."

8          It may be, look, it had nothing to do with this case.

9          **MS. AULT:**  Your Honor.

10         **THE COURT:**  Or had nothing to do with the request.

11         But you took the time and the effort to exclude something.

12   And so as to that, I think it ought to be in a submission to

13   the Court.

14         **MS. AULT:**  Your Honor, that would be an impossible

15   task because --

16         **THE COURT:**  So you've given them papers and you've

17   redacted things, but it would be an impossible task to say why

18   you redacted?

19         **MS. AULT:**  Yes, Your Honor.

20         **THE COURT:**  Tell me why.

21         **MS. AULT:**  Because there are a number of things, for

22   example, that are routinely redacted when we provide reports to

23   the defense.  For example, agency case numbers.  You know,

24   identifiers of --

25         **THE COURT:**  So you can't say that in a piece of paper

1    to me?

2         **MS. AULT:**  You're talking about us going back through

3    millions of millions of documents, looking at each piece of

4    paper and --

5         **THE COURT:**  No, I'm not.  I'm saying, "We have

6    redacted the following things."  Case numbers; agents' names;

7    whatever it is.

8         **MS. AULT:**  Oh, we can do a general, "We have redacted

9    the following things."  We can do that.

10        **THE COURT:**  Okay.  And then, you know, identify the

11   connection with the submission that you made to them, because

12   you've obviously redacted things.  And then if there's an

13   issue, we can then turn to it.

14        What if, for example, you redacted the agents' names, one

15   of whom spoke to FedEx in this case or spoke to FedEx about --

16   about delivering drugs?  That may be very relevant.  Though,

17   routinely you redact that sort of thing.

18        **MS. ARGUEDAS:**  And one of the instances that we

19   brought to the Court's attention was a part of a PowerPoint

20   presentation that the government gave to FedEx about online

21   pharmacies.  And we noticed that there was some other

22   memorandum related to it.  And we asked about it, and the

23   government said, "Well, we didn't give you that because it's

24   attorney-client privileged."

25        So that's the sort of thing that we think needs to be on a

1  privilege log so we can see if we need to debate whether we

2  have a right to it or not.  We wouldn't have particularly known

3  they withheld that on privilege grounds.  They could be right,

4  but we have a right to check it out.

5          **MS. AULT:**  Your Honor --

6          **THE COURT:**  Yes.

7          **MS. AULT:**  -- I think this is something we're going to

8  have to brief, because we simply cannot -- Rule 16(a)(2) says

9  we do not have to turn over our files at all.

10     The fact that we voluntarily turned over our files -- some

11  parts of our files, but not all of them -- does not give them

12  the right to come back and say, "Well, because you voluntarily

13  produced some things and not others, now you have to tell us

14  what you didn't voluntarily produce because we might come back

15  and say that we want that," when there is no legal basis for

16  them to come back and say that they want that.

17     So making us go through this pointless --

18          **THE COURT:**  Let's take a memorandum as an example --

19          **MS. AULT:**  Yes.

20          **THE COURT:**  -- which you withheld on attorney-client

21  privilege.  Is that -- work product privilege?

22          **MS. AULT:**  Your Honor, I think what they're referring

23  to is that there is a memorandum, a DEA-6, so, I guess, a

24  report, an investigative report, that says that this pharmacy,

25  I think, their DEA license was suspended.

1      And so there's a suspension form that's attached to that,

2  which is located in some archive somewhere.  We're trying to

3  get it to them.  And then there is a communication with DEA

4  counsel about the suspension form.

5      We did not produce the communication with DEA counsel

6  because we don't produce communications with DEA counsel.  They

7  are privileged.  But, in addition, they are, under 16(a)(2),

8  records of an attorney working for the United States, an agent

9  working for the United States, that are not subject to

10  discovery.

11          **THE COURT:**  Well, but are you saying -- are you saying

12  that you can't put that in a privilege log?

13          **MS. AULT:**  I am saying, Your Honor, that that happens

14  routinely.  There are all kinds of things in government files

15  that we don't turn over to the defense.  For example, why a

16  case number is assigned; when the case number is changed; when

17  an agent is assigned; when the agent is changed.  There's all

18  sorts of paperwork in the government files that we do not turn

19  over.

20      And some of that is when an agent consults with an AUSA;

21  when an agent consults with an agency counsel; when agents

22  discuss what agency counsel told them they could or could not

23  do.  Some of that is included in there.  And we do not produce

24  it.  Under 16(a)(2), we are not required to produce it.

25      And to go through and to catalog all of that and provide a

1   catalog of the stuff that is not discoverable to the defense,

2   one, we don't think the Court has the authority to order us to

3   do it.  And, two, it would be a glossal waste of our time

4   because there is nothing in there that the rule entitles them

5   to have.  The rule specifically tells them they are not allowed

6   to have it.

7        Out of the goodness of our hearts, and to fulfill, you

8   know, what we think are honorable obligations, we have given

9   them a bunch of stuff to which the rule says they are

10  specifically not entitled.  And what they are trying to do is

11  take our generosity and turn that into an obligation.

12       It is our generosity.  It is not an obligation.  And the

13  fact that we choose to withhold certain things does not give

14  them an entitlement to those things.  Those things are not

15  exculpatory.

16       **THE COURT:**  It may not.  You're right.  It may not.

17  I'm not disagreeing on the issue of whether you have to turn it

18  over or not.  You may have a very good reason not to turn over

19  anything or everything that you haven't turned over.

20       The question is:  Should you be required to give that

21  reason to the Court?

22       What you're telling me, as I hear it, is you're saying,

23  "Since we voluntarily turned over X, Y and Z, but kept A, B and

24  C, we don't have to tell you what our reasons were for A, B and

25  C because we never had to turn over X, Y and Z."

1           **MS. AULT:**  Correct.

2           **THE COURT:**  That's your argument.  That's your

3    argument.  And, I guess, in a way, I have to think about that

4    because it's somewhat complicated in this case and different

5    from the run-of-the-mill case.

6           Which is, the government's view of the case is that FedEx

7    is guilty of a crime because of what the government said to

8    FedEx.  That's the -- it's a very different thing that when you

9    go out and prosecute the bank robbery or the -- the government

10   comes in after the fact and says, "Here are the facts that

11   involve the crime."

12          The government generally had nothing other than using --

13   even in the context, well, we have the context of undercover or

14   so forth, those operations, I don't think we're talking about

15   here.  But, as a general rule, there is no government

16   involvement in a crime.

17          Then you have the category of government involvement in

18   which undercover agents are used so there is government

19   involvement in the crime.

20          Here it's a third category.  One, by the way, that I

21   haven't seen before, which is, "We told them X.  We told them

22   Y.  And they did A and B."  That's what you're saying.

23          So now you're saying, "We gave them things that we didn't

24   have to give them."  But I think they fall in the category of

25   what did the government know and what did the government say

1    about it.

2              **MS. ARGUEDAS:**  Correct.

3              **THE COURT:**  And what did the government speak.

4        In other words, if the government knows X and says Y to a

5    defendant, that's an interesting issue.  And now you're saying,

6    "What we gave them was out of the goodness of our hearts.  And,

7    therefore, we don't have to justify withholding any

8    information."

9        Ms. Ault, yes.

10             **MS. AULT:**  Let me clarify something.

11       With respect to the Rule 17(c) subpoena, which was

12   directed towards the "What did the government say to FedEx?" we

13   gave them a privilege log for that.

14       So if we withheld something for the Rule 17(c) subpoena,

15   which was about communications with FedEx, if we withheld

16   something on privilege grounds we gave them a privilege log for

17   that.

18       What I am talking about is the massive stuff we gave them

19   under Rule 16, which has to do with the underlying pharmacy

20   investigations, which are routine investigations that the

21   agents conducted, and the routine production of Rule 16

22   information, which, under Rule 16(a)(s), we don't have to give

23   them all the investigative reports.  We never create a

24   privilege log of that context because it's simply not

25   discoverable.

1          With respect to the Rule 17(c) subpoena, the stuff the

2     Court is concerned about, we did give them a privilege log.

3               **THE COURT:**  Okay.

4          **MS. ARGUEDAS:**  May I be heard here?

5               **THE COURT:**  Yeah.

6          **MS. ARGUEDAS:**  It's quite galling to hear the

7     government say that they have given us information out of the

8     goodness of their hearts.  It is not true.  They have fought us

9     all the way in terms of getting information out of them.

10         They originally told us they were going to be finished

11    giving us discovery months ago.  We just got the last load

12    yesterday.  We haven't even picked it up yet.  So none of this

13    is from the goodness of their hearts.  It is Rule 16 material

14    that we're entitled to.

15         You have to put that together with the fact that the

16    government has never prosecuted a case like this before, as

17    evidenced by the pleading they just filed before you.

18         They have never understood what is important in this case,

19    which is evidenced by the fact that we had to get those

20    Rule 17(c) subpoenas, and they fought us on that two or three

21    times before this court.

22         So our assessment is that the government is probably not a

23    good arbiter of what they can and can't hold back.  And, yes,

24    sometimes it is troublesome to have to make a log when you're

25    withholding something.  Defense has to do it all the time.

1    FedEx has been doing it for six years for the government.

2         But we have a right to be able to at least consider

3    litigating over what they have held back in a case of first

4    impression like this is.

5              THE COURT:  I would like you to prepare a privilege

6    log with the Rule 16 materials if you believe that you are

7    withholding any of the documents on the basis of a privilege.

8         If you believe that you're holding it for some other

9    reason, and, therefore, you would not assert a privilege, fine.

10   Okay.

11        But if it's a privilege like attorney-client work product

12   or any of those privileges out there, please identify it.  That

13   is a legal matter.

14        Okay.  Okay.

15             MR. RUBY:  Thank you.

16             MS. ARGUEDAS:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18             MS. AULT:  Your Honor.

19             THE COURT:  Yes, Ms. Ault.

20             MS. AULT:  I will include this in a proposed order.

21   But we would request the Court exclude time between now and the

22   trial date of June 13.  The matter --

23             THE COURT:  I will be delighted to do so.

24             MS. AULT:  Thank you, Your Honor.

25             THE COURT:  Provided Mr. Frentzen finishes his case

1   before June 13th.

2          **MS. AULT:**  Thank you.

3          **THE COURT:**  Thank you.

4      (At 11:05 a.m. the proceedings were adjourned.)

5                  -   -   -   -

6

7

8                 **CERTIFICATE OF REPORTER**

9          I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:   Wednesday, October 14, 2015

13

14

15                    *Katherine Sullivan*

16  _____

17      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                  U.S. Court Reporter
18

19

20

21

22

23

24

25