Cristina C. Arguedas (CalBN 87787)
    Email: arguedas@achlaw.com
Ted W. Cassman (CalBN 98932)
    Email: cassman@achlaw.com
Raphael M. Goldman (CalBN 229261)
    Email: goldman@achlaw.com
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Facsimile: (510) 845-3003

Allen J. Ruby (CalBN 47109)
    Email: allen.ruby@skadden.com
Jack P. DiCanio (CalBN 138782)
    Email: jack.dicanio@skadden.com
Patrick Hammon (CalBN 255047)
    Email: patrick.hammon@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA  94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Counsel for FedEx Corporation,*
*Federal Express Corporation and*
*FedEx Corporate Services, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>FEDEX CORPORATION, FEDERAL EXPRESS CORPORATION, and FEDEX CORPORATE SERVICES, INC.,<br><br>      Defendants. | **No. CR 14-380 (CRB)**<br><br>**REPLY IN SUPPORT OF MOTION BY FEDEX CORPORATION AND FEDEX CORPORATE SERVICES, INC. TO DISMISS COUNTS DUE TO THE EXPIRATION OF THE STATUTE OF LIMITATIONS**<br><br>**[PUBLIC VERSION – REDACTED]**<br><br>Date: March 2, 2016<br>Time: 2:00 p.m.<br>Hon. Charles R. Breyer |

# TABLE OF CONTENTS

I.  INTRODUCTION ..............................................................................................1

II.  THE INFORMATION ABOUT WHICH THE GOVERNMENT WAS
SUPPOSEDLY "MISLED" WAS READILY AVAILABLE .....................................3

    A.  The Government Had Full Access to the Information in Question ..........3

        1.  FedEx Routinely Revealed the Information to Both the
Government and the Public.............................................................4

        2.  The Government Was Conducting a Grand Jury Investigation;
It Had Great Powers to Discover Information ................................5

    B.  FedEx Did Not Fail to Disclose Information, and the Government Did
Not Justifiably Rely on Such an Omission .................................................6

III.  THE GOVERNMENT'S STRAINED EFFORTS DO NOT SUGGEST THAT
FEDEX WAS INVOLVED IN AN EFFORT TO MISLEAD THE
GOVERNMENT .................................................................................................7

IV.  THE LAW DOES NOT SUPPORT "REFORMATION" OF THE TOLLING
AGREEMENTS ...............................................................................................10

    A.  Neither FedEx Corporation Nor FedEx Corporate Services, Inc.
Knowingly or Voluntarily Waived Its Statute of Limitations Defense ......10

    B.  The Law of Contracts Does Not Apply in the Manner the Government
Contends .................................................................................................10

        1.  No Authority Supports Applying an Equitable Contracts
Defense in this Context ................................................................10

        2.  Even if Reformation Were Sometimes Permissible in the
Context of Criminal Tolling Agreements, It Would Not Be
Appropriate to Reform the Contract to Add FedEx Corp. and
FedEx Services to the Tolling Agreements ..................................12

V.  CONCLUSION................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*20th Century Ins. Co. v. Liberty Mut. Ins. Co.*, 695 F.2d 747 (9th Cir. 1992)...............14

*Blair v. United States*, 250 U.S. 273 (1919)....................................................................5

*Brown v. Equitable Life Ass. Soc.*, 766 F. Supp. 928 (D. Kan. 1991) .........................13

*Crosby v. Petromed, Inc.*, No. CV-09-5055-EFS, 2009 U.S. Dist. LEXIS 87628
(E.D. Wash. Sept. 4, 2009) ...............................................................................................6

*H. Prang Trucking Co. v. Local Union No. 469*, 613 F.2d 1235 (3rd Cir. 1980)..........14

*Hansen v. Unum Life Ins. Co. of Am.*, No. CIV-S-03-1230 FDC PAN, 2004 U.S.
Dist. LEXIS 22995 (E.D. Cal. Oct. 21, 2004)..................................................................13

*Mabb v. Merriam*, 129 Cal. 633 (1900).................................................................12, 13

*Monaco v. Bear Stearns Cos., Inc.*, No. CV 09-05438 SJO (JCx), 2011 U.S. Dist.
LEXIS 105471 (C.D. Cal. Sept. 12, 2011) .....................................................................13

*Morning Star Packing Co., L.P. v. Crown Cork & Seal Co. (USA), Inc.*, 303 Fed.
Appx. 399 (9th Cir. 2008) ..........................................................................................12, 13

*North Carolina v. Alford*, 400 U.S. 25 (1970) ...............................................................12

*United States v. Anglin*, 215 F.3d 1064 (9th Cir. 2000) ..........................................13, 14

*United States v. Bibian*, 605 Fed. Appx. 615 (9th Cir. Mar. 23, 2015)
(unpublished) ...................................................................................................................10

*United States v. Caldwell*, 859 F.2d 805 (9th Cir. 1988)...............................................10

*United States v. Escamilla*, 975 F.2d 568 (9th Cir. 1992)............................................11

*United States v. Johnson*, 1099 F.3d 1015 (9th Cir. 1999)...........................................13

*United States v. Partida-Parra*, 859 F.2d 629 (9th Cir. 1988) ......................................11

*United States v. Segal*, __ F.3d __, No. 13-3847, 2016 U.S. App. LEXIS 1020
(7th Cir. Jan. 21, 2016)....................................................................................................11

*United States v. Spector*, 55 F.3d 22 (1st Cir. 1995) ....................................................10

*Weihnacht v. WestEd*, No. 14-cv-01564-BLF, 2015 U.S. Dist. LEXIS 11443 (N.D.
Cal. Jan. 30, 2015) ..........................................................................................................13

*Welles v. Academy of Motion Picture Arts & Sciences*, No. CV 03-05314 DDP
(JTLx), 2004 U.S. Dist. LEXIS 5756 (C.D. Cal. Mar. 4, 2004) .....................................14


Other Authorities

66 AM. JUR. 2d *Reformation of Instruments* § 51 (2016) .............................................12

Restatement (Second) of Contracts § 166 .............................................................6, 13

1

2

## I.   INTRODUCTION

3          FedEx Corporation ("FedEx Corp.") and FedEx Corporate Services, Inc. ("FedEx

4    Services") filed a motion to dismiss certain counts in the superseding indictment due to

5    the expiration of the statute of limitations, noting that they were not parties to tolling

6    agreements signed by Federal Express Corporation ("FedEx Express").  Dkt. 160.  The

7    government does not contest the facts in FedEx's motion.  Instead, the government's

8    opposition relies entirely on the novel assertion that the tolling agreements should be

9    "reformed" to include entities that were never parties to the agreements in the first place

10   — all because the FedEx defendants and their outside counsel supposedly participated

11   over several years in a "shell game," Govt. Oppo. at 2, regarding the proper names of

12   the various FedEx entities.

13          The FedEx defendants deny that they or their attorneys sought to mislead the

14   government about their respective corporate names; deny that they or their attorneys

15   were aware, at the time they entered the tolling agreements at issue, that the

16   government had made a mistake in drafting the agreements; and deny that they or their

17   attorneys sought to take advantage of the government's mistake concerning the FedEx

18   entities' corporate names.

19          The prosecution made an error that, as it turns out, has important implications for

20   the government's case.  Now, the prosecution seeks to escape the consequences of its

21   own mistake by blaming FedEx's attorneys.  These accusations create an awkward

22   situation — although the evidentiary hearing requested by the government would

23   certainly demonstrate that the government's charges are wrong, the subject matter

24   implicates the thoughts and communications of criminal defendants' counsel.  FedEx is

25   concerned that its attorneys cannot respond to the government's allegations in

26   testimony (or, likewise, in declarations) without risking privilege and work product

27

28

waivers.[1]

In any event, the waiver problems need not be addressed.  It is abundantly clear that the government's argument cannot possibly prevail.  The Court should deny the government's request for an evidentiary hearing and grant the motion to dismiss charges due to the expiration of the statute of limitations.

First, the idea that FedEx could have sought to perpetuate the alleged scheme is inconceivable.  Apparently, the government misapprehended the proper corporate names for the various FedEx entities.  But FedEx had no reason to imagine that the government could have made this mistake.  The information in question was a matter of public record.  In fact, the information was contained in the FedEx entities' periodic SEC filings.  In other words, the FedEx entities told the federal government their proper corporate names *every quarter of every fiscal year*.  Likewise, during the times governed by the tolling agreements, the prosecution was conducting a grand jury investigation.  If the government had any questions about the FedEx entities' proper corporate names, it could have (a) asked one of the attorneys for FedEx, (b) subpoenaed records relating to the matter, (c) asked one of the many witnesses it subpoenaed, or (d) subpoenaed an additional witness or witnesses to answer the questions.

Second, a grand jury investigation is conducted in secret.  The FedEx entities were of course aware of the investigation in the instant case, but they had no way of knowing what specific crimes or which defendants the government was considering charging.  It was the government's job to determine which entity or entities to investigate, from which entity or entities it wanted tolling agreements, and ultimately which entity, if any, should be charged with a crime.  FedEx had no ability, and was

---

[1] In making its unfounded claims, the government apparently was unconcerned about its own potential work product waivers.  Such government waivers are an issue that would have to have to be addressed in anticipation of any further litigation of this matter.

under no obligation, to determine on behalf of the government which corporate entities it ought to investigate or prosecute.  Nor did the FedEx entities have an obligation to parse the parties' past communications in an effort to ascertain whether the government understood certain basic and publicly-available facts about the case it was investigating.  The government requested tolling agreements from Federal Express Corporation; Federal Express Corporation signed the agreements.  Although the government's papers make a persuasive case that the prosecution made a mistake when it sought a tolling agreement only from Federal Express Corporation, the papers utterly fail to establish that anyone at FedEx perceived the mistake.

Third, and perhaps most importantly, the law does not support the relief the government seeks.  The government's request is completely without precedent.  No court has ever reformed a tolling agreement in a criminal case to add a party, and for good reason: a defendant's waiver of a statute of limitations defense must be knowing and voluntary.  It would defy that rule to "reform" a tolling agreement so that it effects a waiver by a defendant who was never party to the agreement in the first place.  Furthermore, even if this were a civil case, reformation would be inappropriate.  The common law holds that reformation cannot be employed to bind parties to a contract into which they never entered.

## II.    THE INFORMATION ABOUT WHICH THE GOVERNMENT WAS SUPPOSEDLY "MISLED" WAS READILY AVAILABLE

The gravamen of the government's opposition is the contention that FedEx strategically concealed from the government the true names of the various FedEx entities.  The allegation is incredible, and FedEx denies it.

### A.    The Government Had Full Access to the Information in Question

FedEx had no reason to expect that the prosecution would fail to know the proper corporate names of the companies it was investigating.  That information was publicly available, including in disclosures FedEx frequently made to the federal government

itself.  Moreover, the government was conducting a grand jury investigation; it had the power to learn any information it needed.

### 1.   FedEx Routinely Revealed the Information to Both the Government and the Public

The information in question was publicly available.  Indeed, it was more than available — FedEx provided it to the federal government on a regular basis.  For example, Federal Express Corporation filed a Form 10-Q report with the United States Securities and Exchange Commission on December 18, 2009, shortly before the parties entered the first tolling agreement.  *See* Supplemental Declaration of Clement E. Klank III ("Supp. Klank. Decl.") ¶ 5 & Ex. B.  The face of 10-Q report stated, in the section designated for "Exact name of registrant as specified in its charter," that the entity is called "Federal Express Corporation."  *Id.*  It further stated, on the same page, that "[t]he registrant is a wholly owned subsidiary of FedEx Corporation."  *Id.*  The same information was presented on page 7 of the report.  *Id.*

FedEx Corporation also filed a 10-Q report in December 2009.  Supp. Klank. Decl. ¶ 4 & Ex. A.  The face page of that report lists the registrant's "[e]xact name" as "FedEx Corporation."  *Id.*  On page 12 of the report, FedEx Corporation stated that "Our primary operating companies include Federal Express Corporation ('FedEx Express'), the world's largest express transportation company . . . ."  *Id.*  Page 24 of the report presented additional information about the operations of "FedEx Corporation ('FedEx')"; it stated that "Our primary operating companies include Federal Express Corporation ('FedEx Express') . . . . These companies represent our major service lines and, along with FedEx Corporate Services, Inc. ("FedEx Services"), form the core of our reportable segments."  *Id.*

FedEx Corporation and Federal Express Corporation made similar SEC filings containing similar information throughout the period of the grand jury investigation.  Supp. Klank. Decl. ¶ 7 & Ex. D (FedEx Corporation 10-K report for 2010); *id.* ¶ 8 & Ex. E

(Federal Express Corporation 10-K report for 2010); *id.* ¶ 10 & Ex. G (FedEx Corporation 10-K report for 2011); *id.* ¶ 11 & Ex. H (Federal Express Corporation 10-K report for 2011); *id.* ¶ 13 & Ex. J (FedEx Corporation 10-K report for 2012); *id.* ¶ 14 & Ex. K (Federal Express Corporation 10-K report for 2012).

In each of the relevant years, FedEx Corporation also published an annual report to its shareholders, and it made each report available on the internet.  Supp. Klank. Decl. ¶ 3.  As an example, on page 9 of the 2009 report the company discussed the finances of "FedEx Corporation ('FedEx')."  Under the header "Description of the Business," the report stated that "We provide a broad portfolio of transportation, e-commerce and business services through companies competing collectively, operating independently and managed collaboratively, under the respected FedEx brand.  Our primary operating companies include Federal Express Corporation ('FedEx Express'), the world's largest express transportation company . . . ."  *Id.* ¶ 6 & Ex. C; *see also id.* ¶ 9 & Ex. F (2010 Annual Report); *id.* ¶ 12 & Ex. I (2011 Annual Report); *id.* ¶ 15 & Ex. L (2012 Annual Report).

### 2.   The Government Was Conducting a Grand Jury Investigation; It Had Great Powers to Discover Information

Given the above disclosures, it was simply not imaginable that the government would be unable to determine which FedEx entities were which, or what were their proper names.  Moreover, even if the government was confused, the ongoing grand jury investigation was capable of putting an end to the confusion.  The grand jury wields powerful tools that enable a government investigation.  *See, e.g., Blair v. United States*, 250 U.S. 273, 280 (1919).  As the government's papers concede, the prosecution in this case had the ability — through the auspices of the grand jury — to subpoena both documents and witnesses to provide information.  If the government needed to know the proper name of one or more of the FedEx entities, it could have commanded answers.

Accordingly, FedEx and its attorneys had no reason to question whether, when the prosecution drafted an agreement that referred to Federal Express Corporation, the government intended to refer to Federal Express Corporation and not another FedEx operating company.

## B. FedEx Did Not Fail to Disclose Information, and the Government Did Not Justifiably Rely on Such an Omission

In light of the ready availability of the information the government apparently overlooked, there is no basis for the Court to "reform" the tolling agreement as the government urges.

First, even under the government's authorities on contract law — which we submit are not controlling in this criminal case, *see* Part VI., *infra* — reformation for a unilateral mistake requires proof that the opposing party failed to disclose information.  Restatement (Second) of Contracts § 166 cmt. a.  Here, however, FedEx *did* disclose the information in question — to the world at large, and also specifically to the federal government.

Second, as the government concedes, reformation is appropriate only if one party to a contract *justifiably* relied on another party's misrepresentation or misleading omission.  Govt. Oppo. at 16 (citing Restatement (Second) of Contracts § 166 cmt. a).  FedEx denies that it was involved in any effort to mislead, but regardless, the government had no reason to rely on FedEx to parse corporate names.  Even a private person cannot claim to have justifiably relied on an omission when the same information was publicly available.  *See Crosby v. Petromed, Inc.*, No. CV-09-5055-EFS, 2009 U.S. Dist. LEXIS 87628 at *11-12 (E.D. Wash. Sept. 4, 2009).  Here, the party in question was the federal government, which was at the time wielding the considerable investigatory powers of a grand jury — *and which had actually been told the supposedly omitted information on numerous occasions.*  No reliance on an omission could be justified under the circumstances.

1
2

**III.   THE GOVERNMENT'S STRAINED EFFORTS DO NOT SUGGEST THAT
FEDEX WAS INVOLVED IN AN EFFORT TO MISLEAD THE GOVERNMENT**

3          The government's attempt to escape its own error also rests on the assertion that

4    FedEx *knew* that the government mistakenly named the wrong entity in the tolling

5    agreements.  Govt. Oppo. at 14-15, 18-22.  The government's assertion is unfounded

6    speculation, and it is wrong.

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ██████████████████████████████          The problem was that the government

11   mistakenly believed that "Federal Express Corporation" was the name of the parent

12   holding company, rather than one of the subsidiaries.  ████████████  Govt. Oppo. at 1.

13   As it turned out, this mistake had important consequences for the government's

14   eventual indictment, but that does not mean that FedEx foresaw and sought to achieve

15   those consequences.  To the contrary, as the evidence presented by the government

16   itself makes clear, it appeared during the grand jury proceeding that the government

17   intended to indict FedEx Express.

18          First, the government's proposed tolling agreements used the term "Federal

19   Express Corporation" — the full corporate name for FedEx Express.  The natural

20   conclusion was that the government was considering charges against that corporate

21   entity, which, after all, was the entity that actually made the shipments that underlie this

22   case.   As discussed in Part II, *supra*, in light of the public information available to the

23   government and its ongoing grand jury investigation, there simply was no reason for

24   
25   FedEx to suspect that the prosecution was mistaken about the proper corporate name.

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████

1

2

3

        Third, the government appeared to know the true corporate name for the FedEx

parent company.

And, indeed, the initial indictment properly called the parent company "FedEx

Corporation."  Dkt. 1.  This was the government's language.  Thus, when the

government separately sought tolling agreements that referred to "Federal Express

Corporation," it was not apparent that the government was conflating that name with the

name of FedEx Corporation.

███████████████████████████████████████████████████████████

███████████████████████   It was not surprising, in light of such communications, that the requested tolling agreements were likewise directed to FedEx Express, and thus there was no reason to be surprised to see the corporate name "Federal Express Corporation" used in the tolling agreements.[4]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

FedEx had no way of knowing which entity, if any, the government intended to charge with a crime.

We can see from the government's papers that the prosecution was confused. But that does not mean that FedEx *knew* the government was confused or that it intended to take strategic advantage of the confusion.  Nothing in the record establishes such conclusions, and they are not true.

---

[4] The government points out that the tolling agreements relate to "Federal Express Corporation (FedEx) *and its subsidiaries*."  Govt. Oppo. at 19 (emphasis added). Nothing about the reference to subsidiaries was unusual or out of place, as Federal Express Corporation does in fact have numerous subsidiaries.  Supp. Klank. Decl. ¶ 16.

1
2

## IV.   THE LAW DOES NOT SUPPORT "REFORMATION" OF THE TOLLING AGREEMENTS

3

4

5

6

Leaving aside all of the factual problems with the government's contentions, the law does not support the result it seeks.  In a criminal case, a court cannot "reform" a tolling agreement to waive defenses on behalf of a defendant that was not a party to the agreement.

7

8

### A.   Neither FedEx Corporation Nor FedEx Corporate Services, Inc. Knowingly or Voluntarily Waived Its Statute of Limitations Defense

9

10

11

12

13

14

15

16

17

18

The first problem with the government's legal argument is that it scarcely acknowledges that the tolling agreements constituted waivers of a defense in a criminal case.  A waiver of a statute of limitations defense is not valid unless it is made knowingly and voluntarily.  *United States v. Caldwell*, 859 F.2d 805, 806-07 (9th Cir. 1988); *see also United States v. Spector*, 55 F.3d 22, 24 (1st Cir. 1995); *United States v. Bibian*, 605 Fed. Appx. 615, 615-16 (9th Cir. Mar. 23, 2015) (unpublished).  The government has not cited a single case holding that this principle may be overcome by a prosecutor seeking to reform a tolling agreement.  Reforming the tolling agreements as the government requests would impose an involuntary waiver on two criminal defendants.  This the law does not permit.

19

20

### B.   The Law of Contracts Does Not Apply in the Manner the Government Contends

21

22

The second problem is that the government's legal argument is unsupported by any authoritative jurisprudence.

23

24

#### 1.   No Authority Supports Applying an Equitable Contracts Defense in this Context

25

26

27

28

As discussed, the government did not find a *single case* holding that a criminal tolling agreement may be reformed pursuant to the contract principles that appear in the Restatement (Second) of Contracts.  In the absence of such authority, the government is primarily left to argue by analogy to cases that relate to plea agreements.  *See* Govt.

Oppo. at 15-16.  But the law governing plea agreements does not support the result the government seeks.

The Ninth Circuit has never held that plea agreements are governed entirely by contract principles.  To the contrary, as the court explained in *United States v. Escamilla*, 975 F.2d 568 (9th Cir. 1992), "the use of the contract analogy in plea bargain cases is valid only 'within a limited range of fact patterns.'"  *Id.* at 571 n.3 (quoting *United States v. Partida-Parra*, 859 F.2d 629, 633 (9th Cir. 1988)); *see also United States v. Hammond*, 742 F.3d 880, 883 (9th Cir. 2014).  In *Partida-Parra*, the Ninth Circuit expressly rejected in a plea bargain case the precise argument the government now makes in this tolling agreement case:

> According to the government, a unilateral mistake of one party is a ground for relief from a contract where the other party "knew or had reason to know of the mistake."  We do not believe that the plea-agreement/contract analogy extends so far as to allow the district court to revisit an accepted plea to reconsider whether the "contract" was formed (as distinct from considering whether it was breached).  The contract analogy is imperfect.

859 F.2d at 634.

FedEx recognizes that the motion at bench does not relate to a plea bargain.  But since the plea bargain cases are the only source of support for the government's attempt to apply equitable contract defenses in a criminal case, it is significant that the Ninth Circuit's jurisprudence expressly disapproves in the plea bargaining context the type of equitable relief sought by the government.[5]  In fact, since the cases hold that

---

[5] The government also cites to *United States v. Segal*, __ F.3d __, No. 13-3847, 2016 U.S. App. LEXIS 1020 (7th Cir. Jan. 21, 2016), asserting that it relates to "a settlement agreement in a criminal case" where the court considered applying the mutual mistake of fact defense.  Govt. Oppo. at 17.  That is misleading.  The appeal before the *Segal* court involved an agreement to "resolve a series of disputes that arose over [a] forfeiture judgment" long after the associated criminal case had ended.  *Segal*, 2016 U.S. App. LEXIS 1020 at *2.  Thus, the settlement agreement in question related to the disposition of property, not the waiver of defenses in an ongoing criminal proceeding.  Nor did *Segal* suggest that a court could reform a contract to add a party who had not signed it.

statute of limitations waivers must be knowing and voluntary — as must agreements to

plead guilty, *see, e.g., North Carolina v. Alford*, 400 U.S. 25, 31 (1970) — the two

situations are analogous.

> 2.   Even if Reformation Were Sometimes Permissible in the Context of Criminal Tolling Agreements, It Would Not Be Appropriate to Reform the Contract to Add FedEx Corp. and FedEx Services to the Tolling Agreements

Even if the Court were to find it appropriate to import wholesale the principles of

contract law into this criminal case, the government still could not obtain the result it

seeks.

First, the government fails to cite a single case holding that a contract may be

reformed to involuntarily add an absent party — nor have we found such a case.  No

doubt this is because at common law such a remedy is not permitted:

> While a court of equity can reform contracts under many varying circumstances, it does not have the power to add a party to a contract or substitute parties to a contract.  A court of equity may not add or substitute other parties for those appearing on the face of a contract where the effect may be to make a new contract.  An agreement may not be reformed to make one a party to an instrument where that person was originally not a party to it.

66 AM. JUR. 2d *Reformation of Instruments* § 51 (2016) (footnotes omitted).

Tellingly, the government's citation on this subject is to a dissent in an

unpublished Ninth Circuit case.  Govt. Oppo. at 16-17 (citing *Morning Star Packing Co.,*

*L.P. v. Crown Cork & Seal Co. (USA), Inc.*, 303 Fed. Appx. 399, 406-08 (9th Cir. 2008)

(unpublished; Trager, J., dissenting)).  The *majority* in *Morning Star* applied the

California case *Mabb v. Merriam*, 129 Cal. 633 (1900), the holding of which was

consistent with the common-law principles discussed above:

> While a court of equity will reform contracts under many varying circumstances, still it has no power to make a new contract.  Its power is simply to reform a contract already made . . . . *[A] court of equity can neither add additional parties nor substitute other parties for those already appearing upon the face of the writing.*  J.J. Mabb acted as one of the

contracting parties, and whether he did it by mistake, through ignorance of law or fact, or did it with knowledge of everything, we deem an immaterial matter.

129 Cal. at 664 (emphasis added).  As the *Morning Star* court determined, *Mabb* remains good law in California.  303 Fed. Appx. at 401 & n.1; *see also Monaco v. Bear Stearns Cos., Inc.*, No. CV 09-05438 SJO (JCx), 2011 U.S. Dist. LEXIS 105471 at *43-44 (C.D. Cal. Sept. 12, 2011) (applying *Mabb* in holding that a civil tolling agreement cannot be found to "bind[ ] a party that is not named in the tolling agreement").[6]

Second, the law recognizes that, when the government drafts a contract, it must presumptively be construed against the government.  *See, e.g., United States v. Anglin*, 215 F.3d 1064, 1067 (9th Cir. 2000); *United States v. Johnson*, 1099 F.3d 1015, 1020 (9th Cir. 1999); *see also Hansen v. Unum Life Ins. Co. of Am.*, No. CIV-S-03-1230 FDC PAN, 2004 U.S. Dist. LEXIS 22995 at *32 (E.D. Cal. Oct. 21, 2004) (applying the principle, in a reformation case, that "ambiguities in the contract are resolved against the drafter"); *Brown v. Equitable Life Ass. Soc.*, 766 F. Supp. 928, 932-33 (D. Kan. 1991) (same).  Similarly, the reformation remedy is an equitable one, and a court has discretion to refuse to apply it if doing so would create an inequitable result.  Restatement (Second) of Contracts § 166 cmt. a.  The government's proposed reformation would flout these principles.  As this Court has observed, the U.S. criminal justice system envisions an "adversary process."  5/14/2015 Tx (Dkt. 105) at 28:7.  During the course of a grand jury proceeding, the government carries a big stick and acts largely in secret.  As we previously observed, it is the government's job to decide

---

[6] The government also briefly cites *Weihnacht v. WestEd*, No. 14-cv-01564-BLF, 2015 U.S. Dist. LEXIS 11443 (N.D. Cal. Jan. 30, 2015).  *See* Govt. Oppo. at 16.  But the *Weihnacht* court found its case distinguishable from *Mabb* because in *Weihnacht*, "there [was] no other existing party to the contract" — the named party did not exist.  2015 U.S. Dist. LEXIS 11443 at *6-7.  Moreover, in *Weihnacht* the party seeking to join the contract had actually signed the agreement himself.  *Id.* at *1.  Thus, *Weihnacht* was entirely unlike the case at bench, in which the government seeks to involuntarily add parties to a contract, thereby waiving trial defenses in a criminal case.

which defendants to pursue and in which manner.  It would make no sense to obligate a potential defendant, on pain of constructively waiving defenses, to (a) speculate about the slivers of information that emanate from an ongoing grand jury investigation, and (b) notify the government if, in the course of making an agreement, the potential defendant thinks that the government might have wanted to draft the agreement in a manner that better advantaged the government.

Third, reformation is a remedy that is "sparingly granted."  *H. Prang Trucking Co. v. Local Union No. 469*, 613 F.2d 1235, 1239 (3rd Cir. 1980).  "A written contract, once executed, carries with it a legal presumption that it correctly expresses the intention of the parties," and the evidence supporting reformation must be "clear and convincing and not loose, equivocal or contradictory."  *Welles v. Academy of Motion Picture Arts & Sciences*, No. CV 03-05314 DDP (JTLx), 2004 U.S. Dist. LEXIS 5756 at *13 (C.D. Cal. Mar. 4, 2004) (applying California law); *see also Anglin*, 215 F.3d at 1067; *20th Century Ins. Co. v. Liberty Mut. Ins. Co.*, 695 F.2d 747, 759 n.12 (9th Cir. 1992).  The government's proffered evidence never comes close to meeting that standard.  At most, it shows that the prosecuting attorneys were mistaken about which entity was named Federal Express Corporation.  FedEx did not know about this misunderstanding or seek to benefit from it, and nothing in the government's presentation even approaches clear and convincing evidence to the contrary.  Reformation is not appropriate.

//
//
//
//
//
//
//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.      CONCLUSION**

For all the foregoing reasons, and those set forth in FedEx's opening motion papers, the Court should dismiss counts One through Twelve and Fourteen and Fifteen as against FedEx Corporation and FedEx Corporate Services, Inc.

Dated:  February 24, 2016

Respectfully submitted,                    ARGUEDAS, CASSMAN & HEADLEY, LLP


By: _____/s/_____
                         Cristina C. Arguedas
                         803 Hearst Avenue
                         Berkeley, CA 94710
                         (510) 845-3000

                         Counsel for Federal Express
                         Corporation, FedEx Corporation and
                         FedEx Corporate Services, Inc.