1        **UNITED STATES DISTRICT COURT**

2    **NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

3        **HONORABLE CHARLES R. BREYER, U.S. DISTRICT JUDGE**

4                  **– – –**

5  **UNITED STATES OF AMERICA,**              )
                                             )
6                    **PLAINTIFF,**           )    **Case No.**
                                             )
7           **vs.**                          )    **CR-14-380-CRB**
                                             )
8  **FEDEX CORPORATION,**                     )
   **FEDERAL EXPRESS CORPORATION,**           )
9  **AND FEDEX CORPORATE SERVICES, INC.,**    )
                                             )
10                   **DEFENDANTS.**          )
   _____ )

11

12            *REPORTER'S TRANSCRIPT OF*
              *MOTION TO DISMISS HEARING*
13            *WEDNESDAY, MARCH 2, 2016*
              *SAN FRANCISCO, CALIFORNIA*

14

15  <u>**APPEARANCES:**</u>

16  **FOR PLAINTIFFS:**   DAVID R. CALLAWAY
                       Attorney for the United States
17                     Acting Under Authority Conferred by 28 USC 515
                       BY:  Kirsten M. Ault, Assistant U.S. Attorney
18                          Jenny Ellickson, Assistant U.S. Attorney
                            W.S. Wilson Leung, Assistant U.S. Attorney
19                     450 Golden Gate Avenue
                       San Francisco, California  94102
20                     451-436-6940   Fax: 415-436-7234

21

22            **(APPEARANCES CONTINUED ON PAGE 2)**

23

24

25  **REPORTED BY:**       VICTORIA L. VALINE, CSR 3036, RMR, CRR
                       VictoriaValineCSR@gmail.com

```
 1   FOR DEFENDANTS:     ARGUEDAS, CASSMAN & HEADLEY LLP
                         Attorneys at Law
 2                       BY:  Cristina C. Arguedas, Esq.
                              Ted W. Cassman, Esq.
 3                            Raphael M. Goldman, Esq.
                         803 Hearst Avenue
 4                       Berkeley, California  94710
                         510-845-3000   Fax:  510-845-3003
 5

 6                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
                         Attorneys at Law
 7                       BY:  Allen J. Ruby, Esq.
                         525 University Avenue, Suite 1100
 8                       Palo Alto, California  94301
                         650-470-4500   Fax:  650-470-4570
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1        *SAN FRANCISCO, CALIFORNIA;  WEDNESDAY, MARCH 2, 2016*

2                          *2:04 P.M.*

3                          - - -

4        THE CLERK:  Calling case CR-14-0380 the United States

5  of America versus FedEx Corporation, et al.

6      Appearances, counsel.

7        MS. ARGUEDAS:  Yes, your Honor.  Cris Arguedas, and

8  here with us is Connie Lewis Lensing, Senior Vice President

9  Federal Express Corporation.

10        MR. RUBY:  Good afternoon, your Honor.  Allen Ruby

11  appearing for the defendants.

12        MR. CASSMAN:  Good afternoon, your Honor.  Ted Cassman

13  on behalf of the defendants.

14        MR. GOLDMAN:  And Raphael Goldman.  Thank you, your

15  Honor.

16        MS. AULT:  Good afternoon, your Honor.  Kirstin Ault

17  for the United States, and Wilson Leung, and Jenny Ellickson

18  from the Department of Justice.

19        THE COURT:  So this matter is on for a motion brought

20  by defendants in connection with the statute of limitations as

21  it relates to Counts One through Twelve, Fourteen and Fifteen

22  of the Superseding Indictment as to FedEx Corp. and FedEx

23  Service; is that correct?

24        MS. AULT:  Yes, your Honor.

25        MR. RUBY:  Yes.

1          THE COURT:  And what I understand is there isn't a

2   dispute as to whether the statute of limitations expired, the

3   dispute is whether or not the tolling agreement was -- whether

4   the tolling agreement covered the entities and counts that

5   we're now -- which are the subject of the motion to dismiss,

6   with the government's view that, while literally it was not

7   covered, it should be reformed so that it would include within

8   it the defendants and counts that are subject to the motion to

9   dismiss; is that right?

10          MS. AULT:  That is correct, your Honor.

11          MR. RUBY:  More or less.  I understood the government

12   to concede that as written, the counts are time barred, but if

13   they were reformed, then they would do what your Honor said.

14          THE COURT:  Well, that's what I thought I did say, but

15   is that -- is Mr. Ruby's characterization correct?

16          MS. AULT:  Yes.

17          THE COURT:  All right.  Okay.  So I ask the

18   government, can you cite a case to me which grants the type of

19   relief you are seeking in a criminal prosecution?

20          MS. AULT:  No, your Honor.

21       This is an unprecedented situation.  And we would submit

22   that it is an unprecedented situation because the defendants'

23   conduct is unprecedented.

24          THE COURT:  Well, what does that mean?

25          MS. AULT:  That means, your Honor, I think we have

1    established very firmly by a sworn declaration with exhibits

2    attached, to which the defendants have offered no

3    contradiction, that the entire course of dealing between the

4    parties in this case was that Federal Express Corporation and

5    FedEx Corporation were the same entity; to the extent that they

6    believed otherwise, they misled us into thinking that they

7    were.

8         The entire course of dealing between the parties indicated

9    that they both -- that they were the same entity.  The entire

10   course of dealing between the parties indicated that the

11   tolling agreements were entered into with the entire company,

12   and the defendants have presented nothing to contradict any of

13   the facts that we have set forth.

14        Now -- and in that respect it is unprecedented for any

15   criminal case for a party to come in, claim that they are

16   negotiating with the government in good faith, use the term

17   "good faith" over and over again, get concessions from the

18   government as a result of their protestations that they are

19   there in good faith, and then hide the ball and seek to take

20   advantage of the government's belief that they were exercising

21   good faith to gain advantage in litigation.

22        We agree that there is no on-point case law on this, and

23   we think that is because this situation doesn't happen.  It

24   happened here.  We have cited the provisions of the --

25             THE COURT:  What do you say -- I mean, that's quite a

1    mouthful, and I'm trying to unpack it as to all the different

2    things that you're saying, but -- so I think it's important to

3    take it one step at a time.

4        First of all, there is no case authority supporting your

5    proposition.

6            MS. AULT:  Correct, your Honor, but the reason --

7            THE COURT:  Okay.  Okay.  I just want to get it all.

8    There's no case law.

9        So this would be the first case, if I grant it, and then

10   if it goes up on appeal, it would be the first case to devolve

11   to the Court and the parties in the history of the United

12   States that would grant the type of relief that you're seeking.

13           MS. AULT:  That is correct, your Honor.

14           THE COURT:  Okay.  So you say well, fine.  You say

15   there has to be a first case somewhere, and this is it, and you

16   say -- then you go to the second step and you say well, the

17   reason is that no defendant has ever acted like this before.

18   It's unprecedented -- whatever that means by the way.  It's

19   unprecedented.  It's -- and I'm trying to figure out what is

20   unprecedented?

21       Is it unprecedented for a defense attorney not to offer

22   information to the government about the corporate structure of

23   their -- of their clients?

24       Is it unprecedented for the defense not to come forward

25   and say such things as well, you're about to go after a company

1    that -- that has no assets, let me suggest another company that

2    has all these assets, because if you get a judgment, you

3    certainly want the corporation in a situation in which

4    entities, rather than individuals, are sued.

5         The only remedy is a -- is a money judgment, and we

6    certainly don't want you to come away empty-handed, so we want

7    to tell you about where all the assets are.  Is that

8    unprecedented?  I'm trying to figure out what's unprecedented.

9         First, I start from the proposition that a defendant in a

10   criminal case need not say anything, and if the government is

11   mistaken in its belief, whatever its belief is, that's

12   regrettable -- I don't know.  Wait.

13        If the government's mistaken, they're mistaken;

14   regrettable, not regrettable, I don't know.  You don't have to

15   put a value judgment on it.  If they're mistaken, they're

16   mistaken.

17             MS. AULT:  Your Honor --

18             THE COURT:  So is it the question whether they were

19   privy to certain information that the government had no way of

20   finding out what the truth of the matter was and relied on the

21   defendants for furnishing that information?

22             MS. AULT:  Yes, your Honor.  And we believe that is

23   the case here.

24             THE COURT:  Right.  So then I want to ask you, are you

25   familiar with the website called SEC.org?

1          MS. AULT:  Your Honor --

2          THE COURT:  You know what that is?

3          MS. AULT:  Yes, your Honor.  However --

4          THE COURT:  Yes.  It's a Security Exchange Commission.

5  And if you go to SEC.org and you type in FedEx or some

6  combination thereof, won't it disclose to you, the government

7  of the United States and everybody else who goes there, what

8  the corporate structure is of FedEx?

9      By virtue of the 10-Ks that are filed and everything else

10  that is filed over the years, doesn't it disclose that?

11          MS. AULT:  It does, your Honor.  But I would also --

12          THE COURT:  And did you do it?  Did you do it?

13          MS. AULT:  No, your Honor.  And I will explain why we

14  didn't do it.

15          THE COURT:  Okay.

16          MS. AULT:  Because, pursuant to --

17          THE COURT:  So it's public, right?

18      You're not saying that the defendants -- that the

19  defendants concealed certain information from the United States

20  Government which information was not public, you're saying it

21  was public.

22          MS. AULT:  I will say the following two things, your

23  Honor.

24      One, the defendants did conceal from the government that

25  they were not using the term "Federal Express Corporation" to

1  reference the parent corporation of FedEx.

2      They, in their entire course of dealings with us, used the

3  term "Federal Express Corporation" to refer to the parent

4  corporation.  They concealed from us that they now say oh, no.

5  No.  No.  No.  Federal Express Corporation is not the parent

6  corporation, even though we treated it the entire time we dealt

7  with you as it was.  That is what they concealed from us.

8      The second thing that they --

9          THE COURT:  I'm sorry.  I'm trying to figure out the

10  concealing.  Concealing means that they were -- that -- that

11  there was information that they had that you didn't have.

12          MS. AULT:  Yes, your Honor.

13          THE COURT:  Okay.  But you're saying to me, but while

14  we didn't have it, all we are saying is that we had an

15  understanding different from the understanding that one would

16  have arrived at had they simply gone to public filings in this

17  case.

18          MS. AULT:  Your Honor, the reason why we did not go to

19  the public filings is this.  Pursuant to the grand jury

20  subpoenas that we had issued on Federal Express, which they

21  responded to on behalf of Federal Express, FedEx Services, and

22  FedEx Corporation, treating all entities as if they were

23  covered by the subpoena, we asked them to explain their

24  corporate structure to us.

25      They gave us, in response, the chart that we attached to

UNITED STATES DISTRICT COURT

1    our motion.   Nowhere on this chart does it mention Federal

2    Express Corporation.   It lists FedEx Express.

3         The only information that they gave us that even mentions

4    Federal Express says, "The modern air ground express industry

5    was pioneered with the founding of Federal Express in 1971.

6    The corporation was created in 1998 as FEX Corporation, and

7    became FedEx Corporation in January 2000," leading us to

8    believe that Federal Express became FedEx Corporation --

9              THE COURT:  Let me ask you a question --

10             MS. AULT:  -- because that's what they told us --

11             THE COURT:  -- let me -- wait a minute.  Wait a

12   minute.

13        Whatever they told you, they're representing a client in a

14   criminal matter under a criminal investigation, and they are to

15   act in their client's interest consistent with the rules of

16   professional responsibility.  Okay.  I got that.

17        Now, let's say they said to you, you know what, our

18   clients are innocent.  I bet you have had lawyers who have come

19   in and said my client's innocent.

20             MS. AULT:  Yes, your Honor.

21             THE COURT:  Right?  So you decide not to indict the

22   client within the statute of limitations.  Then you find out

23   the person's guilty, and you say I was mislead by the defense.

24   They told me he was not guilty.

25        I mean, that's an absurd example, but it certainly proves

1   the point.  A defendant doesn't have any responsibility to say

2   anything, number one; and number two, the defendant can rely on

3   how you perceive this case to be developing because, in fact,

4   it may or may not be in their interests to -- to say anything

5   about or disabuse some notion that you may have as to the case.

6       They're not privy to your entire investigation.  They

7   don't know what necessarily you're focusing on, and anyway,

8   even if they did, they don't have a duty, unless you can show

9   me some case --

10          MS. AULT:  Your Honor, when --

11          THE COURT:  -- to speak otherwise.

12          MS. AULT:  -- when a party is entering into a

13   contract, they have a duty to act in a --

14          THE COURT:  We're talking about in a criminal -- in

15   the criminal context of a tolling agreement.

16       Now, all of those statements about the reformation and so

17   forth and so on, and if you're right -- which you're not -- but

18   if you were -- if you were, you'd be able to say look, look at

19   all these authorities upholding our position, and yet the first

20   thing out of your mouth is there isn't a single case supporting

21   your position.

22       And my view is this about criminal law, is that it's

23   probably a mistake to make the first case about something in

24   criminal law, because there are notice, there are procedures,

25   there's all sorts of reasons not to -- now, I know this is a

1    somewhat novel prosecution, but whether it's a novel

2    prosecution or not doesn't mean that the procedures ought to be

3    novel.

4         At some point we have to use settled law for a

5    determination as to what due process is all about, what statute

6    of limitations -- you say well, we have statute of limitations,

7    but this is a novel case, so we shouldn't have a statute of

8    limitations in this case.

9         MS. AULT:  Your Honor, that is not at all what we're

10   saying.

11        THE COURT:  Yes, you are.  You're saying that the

12   normal -- that the tolling agreements in a criminal case, where

13   they incorrectly toll statute -- where they toll statute of

14   limitations for certain entities should, if they're not the

15   entity that we intended it to be, be reformed to put in the

16   entity that we intended it to be.

17        And my question to you is:  Where are the cases that say

18   that?

19        And you say well, no, there aren't any.  That's what you

20   say to me, there aren't any cases.

21        MS. AULT:  Your Honor, there aren't any cases.  And I

22   will say that I have been a prosecutor for 12 years, and this

23   is the first time anything like this has ever happened.

24        THE COURT:  Well, now that's interesting --

25        MS. AULT:  Because --

1      THE COURT:  -- that's interesting.  That's

2  interesting.  I want to think about this.  It's the first time

3  it's ever happened to you.  And you say it's the first time,

4  what, that you've incorrectly drafted a tolling agreement?

5      It's the first time that you haven't gone to public

6  websites and verified what the corporate structure is?

7      MS. AULT:  That we've entered into discussions with

8  good faith with opposing counsel, and been actively deceived by

9  opposing counsel when --

10      THE COURT:  Those are pretty strong words.

11      MS. AULT:  -- when entering into a contract with them.

12      THE COURT:  Well, Mr. Ruby, I thought maybe you

13  wouldn't have to speak at this hearing, but you're -- you're

14  accused of deceit.  You are accused of concealment.  You are

15  accused of -- I guess there's a whole -- I don't know how many

16  more commandments we'll get to, but maybe you better defend

17  yourself --

18      MR. RUBY:  Well, your Honor --

19      THE COURT:  -- because I'm not -- I don't practice law

20  anymore, you do.

21      MS. AULT:  Your Honor, I would point out --

22      THE COURT:  No.  I want to hear from Mr. Ruby --

23      MS. AULT:  Mr. Ruby is not a party to any of these

24  discussions --

25      THE COURT:  Well, he's accused.  It's not you

1    personally, apparently, it's -- it's your predecessors.

2            MR. RUBY:  I take it personally.

3            THE COURT:  Or maybe it's the people at the table.

4            MS. AULT:  Your Honor --

5            THE COURT:  I don't know.

6            MR. RUBY:  Your Honor --

7            THE COURT:  Who is it?

8            MS. AULT:  -- I would simply --

9            THE COURT:  Who is it?

10           MS. AULT:  -- like to point out that --

11           MR. RUBY:  Ms. Ault.

12           THE COURT:  Ms. Ault.

13           MS. AULT:  -- to be --

14           THE COURT:  Ms. Ault --

15           MS. AULT:  Yes, your Honor.

16           THE COURT:  -- who is it that you're pointing your

17   finger at?

18        What person is it that did these things that you believe

19   were acts of dishonesty?  Who?

20           MS. AULT:  Your Honor, I -- I would like to say the

21   following.

22        One, to the extent that the Court wants to rely on counsel

23   for statements of fact, he was not involved in any of these

24   discussions.

25        Defense -- the defense has not submitted any statements

1   under oath, any evidence that the Court can rely on for what

2   happened.

3        I do not know that the attorneys who actually entered into

4   these negotiations with me, whether they knew -- whether the

5   attorneys knew that Federal Express Corporation was not the

6   corporate entities --

7             THE COURT:  Then who concedes something?

8             MS. AULT:  -- it's entirely possible that the

9   attorneys were misled by their clients.  I do not know.  I only

10  know that it is impossible -- given my participation in these

11  discussions, it was impossible for the person on the other side

12  to think that we believed we were entering into a tolling

13  agreement with only one part of the company.

14       The other -- the people on the other side of this

15  negotiation had to have known.  There's no way they could not

16  have known that we believed that we were entering into a

17  tolling agreement with the entire FedEx Corporation.

18            MR. RUBY:  Your Honor, I represent the moving parties,

19  and with the Court's permission, may I now --

20            THE COURT:  Go ahead.

21            MR. RUBY:  -- defend the -- I'll be -- I'll get to the

22  point.  I normally think that it's bad manners to harp on

23  somebody else's mistakes.  We all make mistakes, and usually

24  people feel bad enough.

25       The one exception, which is when someone tries to blame

1   somebody else for their own mistake.  And what the government

2   did here was a mistake, but they're rapidly on their way to

3   creating something worse.

4       What was the mistake that they really claim -- this is a

5   new one today.  If the Court has the opportunity to go to

6   paragraph 3 of Ms. Ault's declaration in opposition to the

7   motion, the declaration says -- here was the mistake, the

8   government "mistakenly believed that Federal Express

9   Corporation was an alternative name for FedEx Corporation."  So

10  that was the mistake.

11      Now, first of all, what does that actually mean in

12  English, that they thought it was an alternative name?

13      Secondly, if the government is saying that their mistake

14  was believing that these two names addressed the same company,

15  could we pause there just for a minute and think about how

16  implausible that is?

17      I mean, some people call me Allen, some people call me Al,

18  some people call me by my last name, and in the hallway that's

19  fine, but for legal purposes the idea that a publicly traded

20  company with tens of thousands of shareholders -- one of the

21  largest corporations in America, which owns airplanes and does

22  business all over the world, would have multiple names for the

23  same company?  It's preposterous.

24      And it is then -- there's an additional layer of

25  preposterousness, because I -- again, I ask the Court, if it

has the opportunity, to look please, at Exhibit E to the

supplemental declaration of the interestingly named Mr. Clank,

which is submitted with our papers -- our reply papers, and

that is a 10-K for the year 2010.  And this 10-K carefully and

succinctly lays out all of the facts which show that what the

government said they believed, could not possibly be true.

This particular exhibit -- and there are others, but this

is a particularly good one --  says, among other things, that

these two companies that the government thought were the same

company were started in different years, and one is the parent

and one is the subsidiary.

The government, in order for its account of things to be

true, had to work hard to stay away from the facts which it now

says -- proudly, really -- that it didn't know.

If anything is happening for the first time, my candidate

would be the government, in a complicated prosecution -- in a

novel prosecution, willfully keeping itself excluded from the

corporate structure and corporate facts of the target and now

the indicted party.

The additional layer -- and then I'll stop --  but the

government says not only did they not know all these things

that were publicly available, but somehow FedEx knew that the

government didn't know what was available all over the

internet.  That's what would lead, in another case, in another

setting with different facts, to a discussion of reformation.

1          In other words, the theory, as I understand it, is that

2     unnamed people, the -- the agents of some bad design, were

3     pulling the strings so that the government was -- my word --

4     manipulated somehow.

5          So that somehow somebody on the FedEx side knew that the

6     government had excluded itself from the publicly available

7     facts, and was going to continue to exclude itself from the

8     facts for years to come, because this all started, according to

9     the government, in 2008.

10          With respect, I think that the mistake -- representations

11     that have been made are implausible, but, you know, they are

12     what they are.

13          But even if they are given their full weight and their

14     full value, they show a state of affairs that corresponds to

15     what your Honor said previously, and I won't try to paraphrase

16     that.  That's what's happening here.

17          MS. AULT:  Your Honor, if I may.  I think the reason

18     why Mr. Ruby can stand there and say he thinks it's

19     preposterous that we did not -- that we believed Federal

20     Express Corporation and FedEx Corporation were the same thing

21     was because he was not involved in any of the discussions that

22     we had prior to the indictment in this case.

23          If he had, he would know that both sides -- all parties,

24     used the terms interchangeably when we were discussing them

25     with each other, as I have set forth in my declaration, to

1     which they have offered no response.

2          As I have set forth in my declaration, the entire course

3     of dealing with the parties -- and the Court can see the

4     letters that used the terms FedEx Corporation and Federal

5     Express Corporation interchangeably constantly, that it is not

6     at all preposterous that when they use the terms

7     interchangeably, we also would use the terms interchangeably.

8          As set forth in my declaration, also, every witness that

9     we spoke to who works for the company also used the terms

10    interchangeably.

11         People who worked for Services said they worked for

12    Federal Express Corporation.  People who worked for Federal

13    Express Corporation said they worked for FedEx Express.

14         As cited in our brief, there was an employee of FedEx

15    Services who filed a complaint against the company calling them

16    Federal Express Corporation.  She worked for them and she

17    didn't know.

18              THE COURT:  Ms. Ault, all you're saying is something

19    which, by the way, I think you're probably right, which is

20    people use the term "FedEx" or some variation of it.  Of course

21    you're right.  Of course you're correct.

22         People all the time -- I work for Coca-Cola.  I work for

23    FedEx.  I work for UPS.  I work for this or that and so forth.

24    People constantly, rather than saying, in some formalistic way,

25    I work for X, also known as Y, not to be confused with Z, you

1    know, people don't say that in any conversation.  They don't

2    say that.  I appreciate that.

3        But when you prepare a document -- by the way, you're the

4    drafter of the document to be construed against you -- when you

5    prepare a document which you want to have legal effect to do

6    something called tolling a statute of limitations, I have to

7    believe that some level of competence would require a

8    governmental agency to check sources which, by the way, in this

9    case happen to be publicly filed documents, to ascertain

10   whether they are spelling the name right, whether they are --

11   whether there's a hyphen in there, whether it is the complete

12   name, what the structure is, I just -- you know, it -- there

13   are some documents that aren't like the spirit of the thing.

14       There are some documents that are very, very controlling

15   in terms of its legal impact and that have to be carefully

16   drawn, carefully drafted.

17       This wasn't like giving the other side notice of an

18   intention to waive a statute of limitations.  This was the

19   waiver of the statute of limitations.

20       Now, we all know how those come about.  They are

21   documents, or contracts, or agreements that are mutually

22   beneficial.  That is, that to the government it gives them more

23   time to consider, as you point out, the wisdom of proceeding a

24   particular way, and it gives the defendant more time to make

25   its case as to which the proper course should be.

1        So it is in the mutual benefit of the parties to enter

2    into these agreements.

3        After saying that, I am not saying that the bargaining

4    power of the parties is equal, far from it.  It's usually the

5    case that the government has the far superior bargaining power

6    in tolling agreements because the "or else" that the government

7    has, is the power of indictment.

8        And so it is as if a strong -- well, let's see, let's try

9    to choose the words carefully -- that there is a strong

10   incentive placed upon a defendant to enter into these

11   agreements, as mistaked from equal bargaining power between the

12   parties.

13       So we don't have that, and I've never seen that, and I'm

14   sure you, as a prosecutor, can appreciate how much more power

15   you have in -- in proposing and executing tolling agreements

16   than the defense has.

17       Nevertheless, that's not the issue here.  The issue is

18   whether or not the document should be construed as it's

19   written.  And indeed, absent some authority to the contrary, I

20   can see no reason -- no legal reason or precedent for changing

21   it.

22            MS. AULT:  Well, your Honor, let me --

23            THE COURT:  Yes.

24            MS. AULT:  -- let me take a step back and go back to

25   the legal authority.

1    THE COURT:  And I don't think it helps to say things

2    like, this was concealed from us and that was concealed,

3    because -- because now you say well, it's not the lawyers who

4    did it.  I don't know who did it.

5    MS. AULT:  Your Honor --

6    THE COURT:  It's a big sort of -- you know, these are

7    just words to toss around, and the problem is when you have

8    attorneys who are negotiating agreements, you're not saying

9    these attorneys didn't operate in good faith, you're saying

10   some other people didn't operate in good faith.  I don't know

11   who they are.

12   MS. AULT:  Well, your Honor, the reason why we don't

13   know who they are is because they have not submitted anything

14   to say who they were.

15   THE COURT:  Well, who did you --

16   MS. AULT:  They have not submitted anything --

17   THE COURT:  Well, who did you talk to?

18   You didn't talk to the FedEx employee who delivers the

19   package you continue to use.  You don't -- you didn't say to

20   him, how do you feel about this, or what's your company like.

21   You must have talked to people.

22   MS. AULT:  Yes, your Honor.

23   THE COURT:  Okay.  You're saying the people concealed

24   something.  So I said well, who are the people?

25   You said well, I don't know.

1          MS. AULT:  I do know, your Honor.

2      What I'm saying is:  I don't know if those are the people

3  who concealed something, or if there was something that was

4  concealed from them.  And if they would submit a declaration,

5  then we would know what happened, but they haven't submitted a

6  declaration so we don't know what happened.

7          THE COURT:  Okay.

8          MS. AULT:  So let me take a step back to the law --

9          THE COURT:  Good.

10          MS. AULT:  -- which is the restatement of contracts

11  second, section 166 which states that, "where one party makes a

12  unilateral mistake about the meaning of a contract and the

13  other party is aware of the mistake and therefore recognizes

14  what the contract actually means, the Court can reform the

15  contract to bind the silent party to an agreement of what was

16  actually intended."

17      And, your Honor, I think the course of dealings between

18  the parties in this case clearly means that the parties

19  actually intended to bind the entire company.

20      And to the extent that the defendants realized that by

21  saying Federal Express Corporation, instead of FedEx

22  Corporation, we hadn't bound the entire company and stayed

23  silent when making that realization, the restatement gives the

24  Court the authority to reform the contract to what was

25  originally intended, which was clearly to bind the entire

1    corporation.

2        As my declaration sets forth, it's clear that that's what

3    the intent was, because this isn't a situation where the

4    government only got a benefit.  The defendants got a huge

5    benefit in that they got -- the tolling agreement was their

6    idea, and they were the ones that said they wanted it in

7    exchange for us suspending our investigation so that we could

8    talk -- so that we could talk about a pre-indictment

9    resolution.

10        We gave something up, which was continuing on our

11   investigation, which was heavily active at that point.  They

12   gave something up, which was the tolling of the statute of

13   limitations.

14        Our investigation encompassed the entire company.  It

15   would be preposterous for them to think that we would enter

16   into a tolling agreement with only one part of the company

17   while giving up our investigation to the whole part of the

18   company.

19        It's clear that both sides intended the tolling agreement

20   to apply to the entire company.  To the extent that they

21   realized we made a mistake in drafting it and said nothing, the

22   restatement says the Court has the authority to reform the

23   contract.  And we are asking the Court to do that because we

24   think that's what the equities require in this case.

25             THE COURT:  I'm asking you for some authority -- I'm

1   asking you for some authority, some criminal case which affirms

2   your request.  And you say there isn't one.

3           MS. AULT:  No, your Honor, but there are --

4           THE COURT:  And then you go on to say, which is fine,

5   that's true, but then you go on to say by the way, this is

6   absolutely unprecedented.

7       I have no idea -- is there some -- is there something I

8   should look at?  I should look at the 250 years of legal

9   jurisprudence and figure out if this has ever happened before?

10  What do I look at?

11      Do I look at every case where the statute of -- where

12  tolling agreements have been enforced as written and then make

13  some determination as to what were the facts surrounding that?

14      How can you say something like that?

15          MS. AULT:  Your Honor, I -- one source that you can

16  look to --

17          THE COURT:  Yes.

18          MS. AULT:  -- is Judge Trager's dissent in --

19          MR. RUBY:  An unpublished opinion --

20          THE COURT:  An unpublished --

21          MR. RUBY:  Yes.  Your Honor, an unpublished opinion.

22  Excuse me.  I know she was going to tell you that, but --

23          THE COURT:  I'm sure.

24          MR. RUBY:  -- so we didn't forget.

25          THE COURT:  I frequently look at dissents all the

1  time, and I remind my brethren of the fact that they're a

2  dissent.

3          MR. RUBY:  But those are published.

4          MS. AULT:  I apologize, your Honor.

5          THE COURT:  It's all right.  Take your time.

6          MS. AULT:  I'm forgetting the name of the case at this

7  particular moment in time.

8      If your Honor looks at the dissent from Judge Trager in

9  *Morningstar Packing*, which is a Federal Appendix case not an

10  F.3d case, in which he explains that for an attorney to stay

11  silent during the negotiation of a contract -- during the

12  negotiation of a tolling agreement, when they realized that the

13  other party had made a mistake --

14          THE COURT:  This is in a criminal case?

15          MS. AULT:  *Morningstar Packing* was not a criminal

16  case, your Honor.

17          THE COURT:  But don't you see --

18          MS. AULT:  But, your Honor --

19          THE COURT:  -- I mean, isn't there a difference?

20          MS. AULT:  No, your Honor.

21          THE COURT:  Oh, there isn't between federal -- or

22  between criminal and civil?

23      Well, I better go back to law school, because I always

24  thought in a criminal case the defendant doesn't have to do

25  anything, say anything, correct misimpressions of what the --

1    what the government thinks its case is about.

2         They don't have to come forward and say -- as I said at

3    the beginning, by the way, you're interested in assets, it's

4    company X, not company Y.

5         They don't have a duty to do that.  They don't have a duty

6    to say oh, by the way, you think I'm guilty, you should see my

7    uncle, he's really guilty.

8         You know, I mean, they don't have an affirmative duty to

9    straighten out the prosecution's misconceptions about the case.

10        As an example, take this case.  This unprecedented case as

11   you think you have pointed out, not just a statute of

12   limitations, but the whole case in FedEx, you filed with me

13   a -- a document which said well, there are precedents through

14   this, and you pointed out the UPS settlement in this case.

15        Were there other carriers that delivered drugs similar to

16   what FedEx did and UPS?

17             MS. AULT:  Yes, your Honor, DHL.

18             THE COURT:  DHL.  What happened to them?

19             MS. AULT:  They packed up and left the country before

20   our investigation began.

21             THE COURT:  And that was it?  Nobody else -- nobody

22   else did anything?

23             MS. AULT:  There are no other carriers, your Honor.

24             MS. ARGUEDAS:  Wait.  Wait.  Wait.  Wait.  The United

25   States Post Office --

1    THE COURT:  What about the postal service, did they

2    deliver any drugs?

3    MS. AULT:  They did, your Honor.  And they opened

4    criminal investigations that resulted in prosecutions.

5    THE COURT:  They what?

6    MS. AULT:  They did, and their Postal Inspection

7    Service opened criminal investigations into internet pharmacies

8    that they referred for prosecution.

9    THE COURT:  Doing -- do you mean people who worked for

10   the postal service?

11   MS. AULT:  So the postal service was used

12   occasionally, not very often by internet pharmacies --

13   THE COURT:  Yes.

14   MS. AULT:  -- and the Postal Inspection Service, which

15   is the investigative arm of the post office, opened

16   investigations into internet pharmacies that were using the

17   postal service and referred them for prosecution.

18   THE COURT:  But it's the postal service that is doing

19   something wrong here, isn't it?

20   Aren't you just saying that -- that the postal service did

21   what FedEx did?

22   MS. AULT:  No, your Honor.

23   MS. ARGUEDAS:  Yes.

24   MS. AULT:  We have no evidence that the postal service

25   did what FedEx did.

UNITED STATES DISTRICT COURT

1      THE COURT:  In terms of volume or in terms of kind?

2      MS. AULT:  In terms of knowledge and intent.

3      THE COURT:  I don't know.  I don't know.

4      MS. AULT:  We have no evidence that --

5      THE COURT:  You investigated the postal service and

6  concluded that you shouldn't prosecute the postal service,

7  because you have no evidence?

8      MS. AULT:  We did not investigate the postal service

9  because we had no evidence that we -- we had no indication

10  leading us to believe that anyone in the postal service created

11  a company-wide policy designed to facilitate the distribution

12  of illegal internet drugs, knowing -- based on the fact that

13  the DEA was shutting down illegal internet pharmacies, and that

14  they were owing the postal service money and trying to recoup

15  those losses.  We have no evidence that happened in the postal

16  service.

17      We have no evidence that the postal service had sales

18  agents that also had a specific company-wide policy directed

19  towards online pharmacies designed to help the sales agents not

20  lose money when the online pharmacies were shut down by the

21  DEA, that specifically says, "shut down by the DEA."

22      We have no evidence that any of those things happened with

23  the postal service and so no, your Honor, we did not

24  investigate or prosecute the postal service.

25      We do have evidence that those things happened with FedEx

1    and that's why we're here.

2        And again, to the extent that this is unprecedented

3    prosecution, we again say it's because their conduct is

4    unprecedented.  You have a major corporation behaving the way

5    they have behaved is, we submit, unprecedented, but let us step

6    back and get back to the motion at hand --

7            THE COURT:  I think I'll allow Ms. Arguedas to

8    respond.

9            MS. ARGUEDAS:  Yes, your Honor.  I understand that

10   this is a bit of a side trip to the motion you're handling, but

11   I can't let those comments be left unrebutted.

12       As I understand what the government just said is, they've

13   conceded that they did not investigate the United States Postal

14   Service.

15           THE COURT:  Right.

16           MS. ARGUEDAS:  We do have evidence, and they have

17   evidence, and we could present it, that the United States

18   Postal Service, like FedEx, went to a variety of meetings and

19   conferences for common carriers, got told what they got told

20   about online pharmacies, and picked up packages from very

21   much -- in fact, exactly the same online pharmacies that FedEx

22   picked up packages for.

23       So they did the same thing.  They -- it's possibly true

24   that they didn't do it as often as FedEx, because the United

25   States Postal Service is not as good at overnight delivery as

UNITED STATES DISTRICT COURT

1    FedEx is, but they did exactly the same things that FedEx did.

2        So if the government wants to then make a bunch of

3    representations like, but we don't know if they did it after

4    they knew that so and so was shut down, that would be unknown

5    to them, since they didn't do an investigation of the United

6    States Postal Service, but they are a common carrier.

7        We have -- we have evidence which we have provided to the

8    government, for instance, when there were occasions when FedEx

9    stopped shipping for somebody that was an online pharmacy, and

10   the next day the same packages were being picked up by the

11   United States Postal Service.

12       So it -- it's not a fair representation.  So I didn't want

13   to leave it like that.

14           THE COURT:  I'm not -- I don't feel I have to pursue

15   that at this time --

16           MS. ARGUEDAS:  I understand.

17           THE COURT:  -- it's not before me.

18       The only question before me is whether or not to reform

19   the statute of limitations absent legal authority to do so in a

20   criminal context, and I'm not going to do so.

21       I am going to grant the motion to dismiss with respect to

22   those counts.  I don't know that it has any -- I don't know

23   what effect it may have on the --

24           MS. AULT:  It will have no effect, your Honor.

25           THE COURT:  No effect.  Okay.  Well, I'm delighted to

1   be able to participate in a motion, the consequences of which

2   are zero.  That makes it all worthwhile, and I -- I feel,

3   notwithstanding the fact that it has no impact on anything and

4   is unimportant, I'm going to write an opinion on this because I

5   think that the issue is of concern.

6       I think it is of concern when the government has an

7   expectation that matters such as tolling agreements should be

8   reformed in the criminal context.  That is a concern to me

9   because I think it is instructive to duties for parties that

10  appear in front of me all the time.

11      So I have your opposition in mind, and I want to address

12  those points.  So there's something in writing and, in fairness

13  to the parties, my reasons are whatever they'll be in the

14  opinion, and people are free to ignore it because apparently it

15  has no effect, but that's okay.  I don't take it personally.

16      So moving ahead -- and it will be forthcoming in the next

17  ten days, I trust.

18      Moving ahead.  We are set for trial.

19          MS. AULT:  Yes, your Honor.

20          THE COURT:  The case has some impact, doesn't it

21  Ms. Ault?  I mean, I hate to go through a whole trial where it

22  makes no difference to the government.

23          MS. AULT:  Your Honor, it makes a very great deal to

24  the government.

25          THE COURT:  Okay.

UNITED STATES DISTRICT COURT

1    MS. AULT:  We do believe this is a very important

2    case --

3         THE COURT:  All right.

4         MS. AULT:  -- if not the least of which to impress

5    that a large corporation is not above the law.  They are

6    treated just like everyone else.

7         THE COURT:  Well, yeah.  I got that part.  I, from

8    time to time, have large corporations in front of me, and I

9    think that I -- I think that that's a valid point.

10        I don't think FedEx's defense in the case is, we're above

11   the law --

12        MS. ARGUEDAS:  I do --

13        MS. AULT:  I do think that it is their --

14        THE COURT:  -- and we don't care about --

15        MS. ARGUEDAS:  I do need to say this, your Honor,

16   since she just made that crack, which is that it's important to

17   us, too.

18        THE COURT:  Of course.

19        MS. ARGUEDAS:  And the principal is that we are

20   innocent.

21        THE COURT:  Okay.  So the issues are joined, and we're

22   going to have jury selection in the first week of June, right?

23        MS. ARGUEDAS:  June 6th.

24        MS. AULT:  Your Honor, I believe that you said it

25   was -- that we should reserve the first week in June for jury

1   selection and other pretrial matters.

2           THE COURT:  Right.  So we're all set and the trial --

3           MS. ARGUEDAS:  Your Honor, you have, to my surprise,

4   never asked the government how long they think the case is

5   going to last, and I would like to know the answer to that.  I

6   would think you would want to know the answer to that.

7           THE COURT:  We all want an answer.

8           MS. AULT:  Your Honor, I would say that the United

9   States' case will last anywhere from, I would say, eight to

10  ten weeks.

11          THE COURT:  Eight to ten weeks?

12          MS. AULT:  Yes, your Honor.  Well, depending on --

13          THE COURT:  Wow, okay.

14          MS. AULT:  -- assuming that the defense does not

15  stipulate to any major facts of the case.

16          THE COURT:  Well, let's talk about that for a minute.

17  I would expect that stipulations can certainly be arrived at in

18  connection with authenticity of documents, with respect to

19  events that there's no dispute as to whether or not on a

20  particular occasion a particular event occurred.

21      There may be disputes as to what somebody would say about

22  it and what somebody knew or didn't know, or what somebody --

23  those sorts of things, but I think that I will then direct the

24  parties to spend a certain amount of time -- because you're all

25  getting along so well, spend a certain amount of time together

1    going over proposed stipulations.  I would like the

2    government --

3              MS. AULT:  We will.

4              THE COURT:  -- to prepare a set of proposed

5    stipulations, you know, and send them off to the defense, and

6    the defense will review those and see whether they have a good

7    faith reason not to enter it, which will not be because you

8    won't enter into something, they're not going to enter into

9    something.

10             MS. ARGUEDAS:  We agree with you.  There's no problem

11   there.

12             THE COURT:  There's no purpose served -- especially if

13   the defense hardly wants a ten-week trial where their defense

14   is, we did nothing wrong.

15             MS. ARGUEDAS:  Right.

16             THE COURT:  You know, that's not --

17             MS. ARGUEDAS:  Right.

18             THE COURT:  -- that's not a good trial tactic.  I've

19   never seen it as a good trial tactic.

20        So I think they will be more than willing to accommodate

21   you on stipulations with respect to those facts and documents.

22   I think --

23             MS. AULT:  Your Honor --

24             THE COURT:  -- we should also get stipulations as to

25   authenticity of documents so everybody knows how it's going to

1   work.

2       It's going to work a little bit like this.  If you come in

3   with a big load of documents and, you know, this is the file

4   from X, Y, Z and so forth, and all you're interested in is a

5   portion of it because it's one sentence out of many, many

6   emails and so forth and so on, I don't force you to go through

7   and pick out A and B and get rid of C, D, and E if it's in the

8   context and so forth, but what I do is I generally, if there's

9   not a dispute as to authenticity, I let in the entirety of the

10  document or documents, and I preclude the parties from arguing

11  anything that hasn't been fairly presented to the jury.  And I

12  think -- I think we did that in these last cases with the drugs

13  and so forth.

14          MS. AULT:  Your Honor, I would like to say my estimate

15  is based in part on those cases.  I know the Napoli case took

16  six weeks to try and I think this will take longer.  So eight

17  to ten weeks seems a fair estimate to me, but it can always go

18  faster than what we anticipate.

19          THE COURT:  Didn't the Napoli case have a lot of

20  defendants?

21          MS. AULT:  It had three, your Honor.

22          THE COURT:  Oh, so we only have one person.

23          MS. AULT:  We have three defendants, your Honor.

24          THE COURT:  Oh we have three.  Okay.  We'll deal with

25  that.

1          MS. ARGUEDAS:  Judge, there's a corollary question

2    that comes up with that, particularly when we hear eight to

3    ten weeks, that pretty much takes up the entire summer.

4          THE COURT:  Right.

5          MS. ARGUEDAS:  I think most of the government's

6    witnesses -- or many of the government's witnesses are going to

7    be FedEx employees, because they brought 80 people back here

8    during the grand jury process, and I would like to be able to

9    not have, however many, 80 people not be able to take a summer

10   vacation, for example.

11       So I'd like to know, even just a ballpark like a month --

12   June, July, or August for some group of people so that we can

13   start to organize this a little bit.

14         MS. AULT:  June, July, or August, yes, your Honor.

15         MS. ARGUEDAS:  No.  You know what I mean.  In other

16   words, Joe schmo can be June --

17         THE COURT:  I don't think that's what you meant.  I

18   think you meant can you say as to this group of witnesses we'll

19   try to put them on in June, this group we'll try to put on in

20   July, this group we'll put on in August?

21         MS. AULT:  Your Honor, I cannot do that precisely

22   because what I would really like to do is try to streamline our

23   case as much as possible, so I don't want to say we'll put on

24   these 20 witnesses in June, and then only end up calling three

25   of them.  So --

1          THE COURT:  Well, okay.

2          MS. ARGUEDAS:  You get the idea.

3          THE COURT:  I'm mindful that you've got to organize

4    the case the way you want to organize it, and present it the

5    way you want to present it.  That's fine.  No one's going to

6    interfere with that, but I would like to know when you're going

7    to be in a position to let us know how the case is going to be

8    organized, when is that going to take place?

9          MS. AULT:  Your Honor, so I will say this.  Our

10   witness list is due to the Court and the defense on April 11th.

11      We're not going to put 80 FedEx employees on the witness

12   list.

13      To the extent they're not on the witness list, they can go

14   ahead and plan their summer vacation.  To the extent that we

15   then later determine that we need to have them, of course we're

16   going to work around whatever vacation they've planned, but

17   whoever is on the witness list, we will work with them and

18   their counsel -- I think if they're current employees they all

19   have counsel -- to find out what their vacation plans are and

20   work around them.

21          THE COURT:  Sound okay?

22          MS. ARGUEDAS:  Sounds good.

23          THE COURT:  Okay.

24          MS. AULT:  It's not our first rodeo, your Honor.

25          MS. ARGUEDAS:  The one thing we didn't put on our

1    schedule that you have already approved of is, we don't have a

2    date for an exhibit list.

3            MS. AULT:  Oh --

4            MS. ARGUEDAS:  So we need to --

5            THE COURT:  I thought we did.

6            MS. AULT:  -- we have a date for pretrial filings,

7    your Honor, which is -- includes the exhibit list.

8            THE COURT:  Which is -- yes.  What date is that?

9            MS. AULT:  It is May 25th.

10           MS. ARGUEDAS:  That seems late to me for a June 6th

11   trial, because the exhibits will be very important to everyone.

12           THE COURT:  Right.

13           MS. ARGUEDAS:  And I didn't view that -- I didn't view

14   that as a pretrial filing --

15           THE COURT:  I'd like to move that -- I'd like to

16   move -- for the pretrial conference, when is the pretrial

17   conference?

18           MS. AULT:  Your Honor, the pretrial conference is

19   currently scheduled for June 1st.

20           THE COURT:  Oh, really?  Well --

21           MS. AULT:  So we could submit our exhibit list on

22   May 4th.

23           THE COURT:  Okay.  Then I'm going to move the pretrial

24   conference.

25           MS. AULT:  Okay.

UNITED STATES DISTRICT COURT

1      MS. ARGUEDAS:  Yes.  To earlier, huh?

2      THE COURT:  Yes.

3      MS. ARGUEDAS:  Yeah.

4      THE COURT:  I'm moving the pretrial conference to -- I

5  can do either the 19th or 20th of May.  Any preference?

6      MR. RUBY:  Whatever works for you.

7      MS. ARGUEDAS:  Either.

8      MS. AULT:  The 20th, your Honor.

9      THE COURT:  That's a Friday.

10      MS. AULT:  Is that at 2:00?

11      THE COURT:  No, I think -- I'd rather -- let's --

12  the -- I'd rather do the 19th, unless you had some problem with

13  that, Ms. Ault, because then I have a day to do it, and if we

14  get into some discussions and so forth, we can -- we can work

15  our way through.

16      So if we start at 9:30 on the 19th, I just feel that that

17  will give us -- if we're going to make a production of it, that

18  will give us a heads up.

19      MS. AULT:  Your Honor --

20      THE COURT:  So -- yes, go ahead.

21      MS. AULT:  -- we're going to need to change all of our

22  deadlines then, because they're all currently scheduled around

23  a June 1st.

24      THE COURT:  Okay.  Then let's change deadlines.

25      MS. AULT:  So that, I think, means that we would have

UNITED STATES DISTRICT COURT

1    to move the -- and hopefully counsel will correct me if I get

2    this wrong -- but that we would move the deadline for motions

3    in limine, replies, and pretrial filings to May 12th.

4          MS. ARGUEDAS:  Can we -- instead of doing this on the

5    fly, can we just figure it out and submit it --

6          THE COURT:  I'll change all those dates --

7          MS. ARGUEDAS:  -- when we --

8          THE COURT:  -- once you can get a stipulation.

9          MS. ARGUEDAS:  And for May 19th is the day of the

10    conference, and we'll back it up from there.

11          THE COURT:  Right.  And work backwards from there.  Is

12    that all right?

13          MS. AULT:  Yes, your Honor.

14          THE COURT:  Anything else?

15          MS. ARGUEDAS:  Well, we actually did have another

16    motion on, this thing about the notice for entrapment by a -- I

17    mean, not entrapment, by estoppel of defense of acting on the

18    basis of public authority.  It's not -- it hardly matters,

19    actually.

20          THE COURT:  Another one of those.

21          MS. ARGUEDAS:  If the other one didn't matter, this

22    one matters even less.  The point -- I think we can dispatch

23    with it in no time at all.

24        The point of it is, when do we have to give notice of if

25    we were going to defend on the basis of public authority?  We

1   filed something that said we might use that defense.  The

2   government has filed something that said "might" is not

3   adequate.

4       I can tell you that at this moment we are not intending

5   today to assert a defense based on public authority, so I think

6   we don't need to worry about this.

7           THE COURT:  Okay.  So I'm going to hold that you're

8   not --

9           MS. ARGUEDAS:  Yes.  That's right.

10          THE COURT:  -- and if you decide otherwise, you should

11  do so by way of motion, and then I'll see who's prejudiced and

12  so forth and so on.

13          MS. ARGUEDAS:  Right.

14          THE COURT:  Is that all right?

15          MS. ARGUEDAS:  Right.  We filed something and we

16  called it, because it was the abundance of caution -- and I'm

17  reminded again that whenever I write the words "abundance of

18  caution," I should just hit delete for the whole thing because

19  it's a bad idea.

20          MS. ELLICKSON:  I just have to clarify one thing,

21  which is that their purported notice identified three different

22  defenses that they thought that they might bring, one of them

23  was public authority, but it also mentioned entrapment by

24  estoppel and innocent intent, and I was wondering if this

25  statement applies to all three defenses?

1        MS. ARGUEDAS:  It does not apply to all three, but the

2  those -- the other two, estoppel and innocent intent, are not

3  required to be noticed under the rule or by any Ninth Circuit

4  authority.

5        MS. ELLICKSON:  And that was something we briefed, and

6  I think there was a disagreement between the parties on that

7  issue.

8        THE COURT:  Well, I haven't looked at the briefs.

9        MS. ARGUEDAS:  I think they agree it's not required

10  under the face of the rule, and it's not required under any

11  Ninth Circuit authority, you agree with that?

12        MS. ELLICKSON:  Well, the face of the rule refers to

13  an intent to rely on actual or believed public authority, and

14  both entrapment by estoppel and innocent intent are -- do fit

15  the description of a believed public authority defense.

16    So it may not be actual public authority, but -- so I

17  think we've cited the cases in our papers on this if the Court

18  wants to look at that.

19        THE COURT:  Well, I have to look at the cases.  I

20  haven't read them, and I'll take a look at them, but I think

21  for these purposes, the -- the entrapment defense --

22        MS. ARGUEDAS:  Entrapment by estoppel.  The first one

23  was public authority.

24        THE COURT:  Okay.  Public authority is --

25        MS. ARGUEDAS:  Public authority, we're not doing that.

1          THE COURT:  Okay.  So public authority is out.

2          MS. ARGUEDAS:  Correct.

3          THE COURT:  So now we have to look at the entrapment

4    by estoppel and the --

5          MR. RUBY:  Innocent intent.

6          THE COURT:  Pardon me?

7          MR. RUBY:  Innocent intent.

8          THE COURT:  Innocent intent.  Okay.

9          MS. ELLICKSON:  Innocent intent.  These were the three

10   defenses that they mentioned in their motion -- in their

11   notice.

12         THE COURT:  Okay.  Well, I'll take a look at that,

13   because I haven't looked at that.

14         MS. ARGUEDAS:  Of course we are asserting that a

15   general intent is intent.

16         THE COURT:  Well, that --

17         MS. ARGUEDAS:  This is in the context of the public

18   authority cases.  Anyway, I don't think you need to worry about

19   it.

20         THE COURT:  Famous last words.

21      Okay.  Anyway, I'll look at it and see what, if anything,

22   I should do about it.

23      If I need some further argument, I'm quite certain that I

24   can get you people to come in and argue.

25         MS. ARGUEDAS:  You bet.

UNITED STATES DISTRICT COURT

1        THE COURT:  Okay.  Thank you very much.

2        MS. ARGUEDAS:  Thank you.

3        MS. AULT:  Thank you, your Honor.

4        (Whereupon the matter concluded at 2:57 p.m.)

5                        --o0o--

UNITED STATES DISTRICT COURT

1

2

3

<u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7

8   _____

9          Victoria L. Valine, CSR 3036, RMR, CRR

10              WEDNESDAY, MARCH 9, 2016

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25