Cristina C. Arguedas (CalBN 87787)
    Email: arguedas@achlaw.com
Ted W. Cassman (CalBN 98932)
    Email: cassman@achlaw.com
Raphael M. Goldman (CalBN 229261)
    Email: goldman@achlaw.com
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Facsimile: (510) 845-3003

Allen J. Ruby (CalBN 47109)
    Email: allen.ruby@skadden.com
Jack P. DiCanio (CalBN 138782)
    Email: jack.dicanio@skadden.com
Patrick Hammon (CalBN 255047)
    Email: patrick.hammon@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA  94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Counsel for FedEx Corporation,
Federal Express Corporation and
FedEx Corporate Services, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FEDEX CORPORATION, FEDERAL EXPRESS CORPORATION, and FEDEX CORPORATE SERVICES, INC.,<br><br>Defendants. | **No. CR 14-380 (CRB)**<br><br>**FEDEX DEFENDANTS' MOTIONS IN LIMINE**<br><br>Date: May 19, 2016<br>Time: 9:30 a.m.<br>Hon. Charles R. Breyer<br><br>**[Public/Redacted Version]** |

**TABLE OF CONTENTS**

I.    DEFENSE MOTION IN LIMINE #1: PRETRIAL INSTRUCTION
      REGARDING THE ILLEGAL DISTRIBUTION OF PRESCRIPTION
      MEDICATIONS..........................................................................................1

II.   DEFENSE MOTION IN LIMINE #2: EXCLUDE EVIDENCE RELATED TO
      ONLINE PHARMACY ENTITIES THAT WERE NOT PART OF THE
      ALLEGED CHHABRA-SMOLEY OR SUPERIOR DRUGS NETWORKS..........2

III.  DEFENSE MOTION IN LIMINE #3: EXCLUDE EVIDENCE POST-
      DATING THE CONSPIRACIES CHARGED IN THE INDICTMENT .................6

IV.   DEFENSE MOTION IN LIMINE #4: EXCLUDE EVIDENCE OF THE SO-
      CALLED "CHHABRA-SMOLEY ORGANIZATION" OR, ALTERNATIVELY,
      EXCLUDE EVIDENCE OF ALLEGED CO-CONSPIRATORS'
      STATEMENTS PURSUANT TO RULE 801(d)(2)(E)........................................7

      A.    Facts ................................................................................................8

            1.    ████████████████████████ .................................10

            2.    ████████████████████████
                  ████████ .................................................................12

            3.    ████████████████████████████████
                  ███████ ..................................................................13

            4.    ████████████████████████
                  ████████ ...............................................................14

            5.    ████████████████████████████████ .........15

      B.    Argument ........................................................................................16

      C.    Conclusion ......................................................................................19

V.    DEFENSE MOTION IN LIMINE #5: REQUIRE A PROFFER
      CONCERNING THE ADMISSIBILITY OF EVIDENCE RELATED TO THE
      ALLEGED SUPERIOR DRUGS CONSPIRACIES ...........................................19

      A.    The Contours of Superior Drugs Conspiracy As Set Out in the
            Indictment .......................................................................................20

      B.    Previous Prosecutions ....................................................................21

            1.    *United States v. Carolina* et al. (E.D. Pa. 09-cr-00682-JS) .........21

            2.    *United States v. Napoli* et al. (N.D. Cal. 10-cr-00642-CRB) ........22

3.    *People v. Cohen* et al. (Ventura County, CA Case No. 2006024072) ...............................................................22

4.    *United States v. Birbragher* et al. (N.D. Iowa 07-cr-01023-LRR) ...............................................................22

5.    Affpower Cases ...............................................................23

6.    Other Referenced Entities ...............................................23

C.    Discussion ...............................................................24

VI.    DEFENSE MOTION IN LIMINE #6: EXCLUDE EVIDENCE OF "GROSS GAINS" AND STRIKE THE ALTERNATIVE MAXIMUM FINE ALLEGATION FROM THE INDICTMENT ...............................26

A.    "Gross Gains" Means "Pre-Tax Profits" ...............................29

B.    The Presentation of Evidence of "Gross Gains" would Unduly Complicate and Prolong the Trial ...............................33

1.    The "Gains" Attributable to the Alleged Co-Conspirators ...........33

2.    The "Gains" Attributable to FedEx ...............................35

C.    Conclusion ...............................................................36

VII.    DEFENSE MOTION IN LIMINE #7: EXCLUDE EVIDENCE RELATED TO SHIPMENT OF CIGARETTES BY FEDEX GROUND TO RESIDENTIAL CONSUMERS ALLEGEDLY IN VIOLATION OF STATE AND FEDERAL LAW ...............................................................37

A.    Factual Background ...............................................38

B.    Argument ...............................................................40

1.    The Government's Failure to Timely Produce Documents Related to Alleged Contraband Cigarette Shipments Compromises Defendants' Ability to Fully and Fairly Defend Against These Satellite Allegations ...............................40

2.    There Is No Permissible Basis for the Introduction of Evidence Related to Untaxed Cigarette Shipments Delivered to New York State Recipients ...............................41

a.    The Contraband Cigarette Issue Involves a Different FedEx Operating Company Not Charged in the Criminal Action ...............................42

   b. The Alleged "Illegality" of Untaxed Cigarette Shipments Involves a Completely Different Statutory Framework ....................................................................42

   c. There is Little Overlap in Evidence or Witnesses in These Two Separate "State of Mind" Cases....................43

  3. Any Relevance of Contraband Cigarette Deliveries by FedEx Ground is Vastly Outweighed by the Dangers of Unfair Prejudice to the Charged FedEx Defendants, Confusion of the Issues and Misleading the Jury ............................................44

VIII. DEFENSE MOTION IN LIMINE #8: EXCLUDE EVIDENCE OF FEDEX'S POLICIES CONCERNING THE SHIPMENT OF ALCOHOL ..........................46

 A. The Government's Proposed Evidence Pursues a Theory of Negligence, Not Criminal Knowledge or Intent ........................................46

 B. Even if a Negligence Theory Were Permissible, the Alcohol Evidence Would Not Be Relevant ........................................................47

  1. Unlike Pharmaceuticals, Common Carriers Such as FedEx Are Directly Regulated With Respect to Alcohol Shipments ........47

  2. The Rules and Regulations for Alcohol Shipping Principally Relate to Issues Relating to the Transit and Delivery of Alcohol ....................................................................49

 C. The Proffered Evidence Must Be Excluded Under Rule 403 ................50

IX. DEFENSE MOTION IN LIMINE #9: EXCLUDE EVIDENCE OF SETTLEMENT NEGOTIATIONS AND STATEMENTS MADE DURING THOSE NEGOTIATIONS ..........................................................................51

X. DEFENSE MOTION IN LIMINE #10: EXCLUDE EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES ........................................................52

 A. Factual Basis for Motion ........................................................................52

 B. Argument ................................................................................................52

XI. DEFENSE MOTION IN LIMINE #11: ███████████████████████ ███████████████████ ....................................................................54

XII. DEFENSE MOTION IN LIMINE #12: EXCLUDE EVIDENCE THAT FEDEX PURPORTEDLY VIOLATED STATE LAWS AND PROFESSIONAL ASSOCIATION GUIDELINES................................................54

XIII.  DEFENSE MOTION IN LIMINE #13: EXCLUDE PROOF OF ADVERSE EVENTS ...................................................................................57

    A.  Evidence of Adverse Consequences is Not Admissible Under Rule 404(b) ..............................................................................58

    B.  Evidence of Adverse Consequences is Irrelevant.................................59

    C.  The Process of Proving These Events Would Lead to Undue Prejudice and Delay...................................................................60

        1.  The Evidence is Unfairly Prejudicial ............................................60

        2.  The Evidence Has Very Slight Probative Value, At Best............60

            a.  Proffered Events About Which FedEx Had No Knowledge........................................................................61

            b.  Proffered Events About Which FedEx Purportedly Had Some Knowledge.......................................................64

    D.  Communications with FedEx Personnel that Reference People Who Experienced Adverse Events .......................................67

XIV.  DEFENSE MOTION IN LIMINE #14: EXCLUDE EVIDENCE RELATED TO DELIVERY OF MEDICATIONS TO TEENAGERS .....................................67

XV.  DEFENSE MOTION IN LIMINE #15: EXCLUDE EVIDENCE OF CUSTOMER COMPLAINTS AND CLAIMS .......................................................68

XVI.  DEFENSE MOTION IN LIMINE #16: EXCLUDE EVIDENCE RELATING TO NORTHWEST RESEARCH.............................................................69

    A.  Information Learned by Northwest Research........................................70

    B.  Instances in Which Northwest Research "Informed" FedEx of Its Activities and Findings ...................................................71

XVII.  DEFENSE MOTION IN LIMINE #17: PRECLUDE GOVERNMENT FROM INQUIRING INTO PRIVILEGED MATTERS, INSTRUCT ON ATTORNEY-CLIENT PRIVILEGE ..........................................................72

    A.  The Court Should Preclude Inquiry Into Privileged Matters .................73

    B.  The Court Should Instruct the Jury Concerning Privilege .....................74

XVIII.  DEFENSE MOTION IN LIMINE #18: PRECLUDE ARGUMENT THAT FEDEX SHIPPED FOR "ILLEGAL" OR "SHUT DOWN" INTERNET PHARMACIES.............................................................................75

XIX.   DEFENSE MOTION IN LIMINE #19: PRECLUDE GOVERNMENT FROM
       ARGUING THEORIES OF NEGLIGENCE OR RECKLESSNESS ..................76

XX.    DEFENSE MOTION IN LIMINE #20: EXCLUDE EVIDENCE OF
       MEASURES UNDERTAKEN BY OTHER PRIVATE CORPORATIONS ..........78

XXI.   DEFENSE MOTION IN LIMINE #21: PRECLUDE REFERENCES BY
       EXPERTS TO EXCLUDED EVIDENCE ..........................................................79

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>TABLE OF AUTHORITIES</u>**

<u>Cases</u>

*American Airlines v. Wolens*, 513 U.S. 219 (1995) ....................................................55

*Bourjaily v. United States*, 483 U.S. 171 (1987) ..................................................18, 19

*Canella v. United States*, 157 F.2d 470 (9th Cir. 1946) .............................................24

*Daily v. United States*, 282 F.2d 818 (9th Cir. 1960) ..................................................16

*Federal Express Corp. v. California Pub. Util. Comm'n*, 936 F.2d 1075 (9th Cir. 1991) ....................................................................................................................55

*Gauthier v. AMF, Inc.*, 788 F.2d 634, *amended*, 805 F.2d 337 (9th Cir. 1986)............53

*Granholm v. Heald*, 544 U.S. 460 (2005) ..................................................................48

*Kotteakos v. United States*, 328 U.S. 750, 752-53 (1946)....................................16, 17

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992).......................................55

*Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 (2008) .............56

*Southern Union Co. v. United States*, __U.S.__, 132 S. Ct. 2344 (2012)...................27

*Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684 (9th Cir. 2001) ........................5

*United Parcel Service, Inc. v. Flores-Galarza*, 318 F.3d 323 (1st Cir. 2003) ..............56

*United States v. Bader*, No. 07-cr-00338-MSK, 2010 U.S. Dist. LEXIS 76730 (D. Colo. Jul. 1, 2010) ...................................................................................................32

*United States v. Bauer*, 132 F.3d 504 (9th Cir. 1997)................................................73

*United States v. BP Products North America*, 610 F. Supp. 2d 655 (S.D. Tex. 2009) ................................................................................................................31, 32

*United States v. Bradley*, 5 F.3d 1317 (9th Cir. 1993) ............................................4, 41

*United States v. Chen*, 99 F.3d 1495 (9th Cir. 1996) ...........................................74, 75

*United States v. Citgo Petroleum Corp.,* 908 F. Supp. 2d 812 (S.D. Tex. 2012) .........28

*United States v. Cooper*, 286 F. Supp. 2d 1283 (D. Kan. 2003).................................66

*United States v. Cruz-Garcia*, 344 F.3d 951 (9th Cir. 2003).........................................4

*United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007) (en banc) ................................59

*United States v. DSD Shipping, A.S.*, No. 15-00102-CG-B, 2015 U.S. Dist. LEXIS 131003 (S.D. Ala. Sept. 19, 2015) ................................................................................52

*United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979) ............................................19

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) ............................1, 2, 69, 75

*United States v. Foote*, No. 00-20091-01-KHV, 2003 U.S. Dist. LEXIS 19312 (D. Kan. 2003)....................................................................................................................32

*United States v. Griffin*, 464 F.2d. 1352 (9th Cir. 1972) .............................................17

*United States v. Hodges*, 770 F.2d 1475 (9th Cir. 1985)...............................................4

*United States v. Hui Hsiung*, 778 F.3d 738 (9th Cir. 2015) (as amended)............30, 32

*United States v. Jackson*, 696 F.2d 578 (7th Cir. 1982) ..............................................17

*United States v. Johnson*, 515 F.2d 730 (7th Cir. 1975)..............................................17

*United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) ............................16, 24, 25, 26

*United States v. Lovin*, No. 07cr2016-IEG, 2009 U.S. Dist. LEXIS 101567 (S.D. Cal. Oct. 30, 2009) ....................................................................................................75

*United States v. Mayans*, 17 F.3d 1174 (9th Cir. 1994)...............................3, 4, 41, 42

*United States v. McDonald*, 576 F.2d 1350 (9th Cir. 1978) ...........................................6

*United States v. Mehrmanesh*, 689 F.2d 822 (9th Cir. 1982) ........................................4

*United States v. Pfaff*, 619 F.3d 172 (2d Cir. 2010) (*per curiam*) ..............................27

*United States v. Romero*, 282 F.3d 683 (9th Cir. 2002) ..............................................42

*United States v. Sanford Ltd.,* 878 F. Supp. 2d 137 (D.D.C. 2012) ..........27, 28, 30, 31

*United States v. Sayakhom*, 186 F.3d 928 (9th Cir. 1999) ..........................................52

*United States v. Silverman*, 861 F.2d 571 (9th Cir. 1988) ..........................................19

*United States v. Smith*, 573 F.3d 639 (8th Cir. 2009) ..................................................75

*United States v. Smith*, 893 F.2d 1573 (9th Cir. 1990)..........................................19, 26

*United States v. Pacific Gas & Electric Co.*, CR No. 14-175 ......................................32

*United States v. Payseno*, 782 F.2d 832 (9th Cir. 1986) ............................................16

*United States v. Weiner*, 578 F.2d 757 (9th Cir. 1978) ..............................................19

*United States v. Wilbur*, 674 F.3d 1160 (9th Cir. 2012) .......................................17, 18

*United States v. Zelinka*, 862 F.2d 92 (6th Cir. 1988) ............................................6, 7

*United States v. Zingsheim*, 384 F.3d 867 (7th Cir. 2004) ........................................75

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ...................................................75

*Wal-Mart Stores v. Dukes*, 561 U.S. 338 (2011) ......................................................36

Other Authorities

U.S. Const. Amend. 21, § 2 ........................................................................................48

15 U.S.C. § 376a ........................................................................................................43

18 U.S.C. § 1956 ........................................................................................................27

18 U.S.C. § 3571 .................................................................................................. *passim*

21 U.S.C. §§ 301 *et seq.* ...........................................................................................47

21 U.S.C. §§ 801 *et seq.* ...........................................................................................47

21 U.S.C. § 373 .....................................................................................................48, 57

21 U.S.C. § 822 ...............................................................................................48, 57, 77

21 U.S.C. § 823 ..........................................................................................................77

21 C.F.R. §§ 1.1 *et seq.* .............................................................................................47

21 C.F.R. §§ 1300.01 *et seq.* .....................................................................................47

21 C.F.R. § 1301.74 ...................................................................................................77

31 C.F.R. § 1020.210 .................................................................................................79

31 C.F.R. § 1020.220 .................................................................................................79

49 U.S.C. § 1305 ........................................................................................................55

Federal Rule of Criminal Procedure 11 ......................................................52

Federal Rule of Evidence 104 ...................................................................19

Federal Rule of Evidence 401 ............................................................. *passim*

Federal Rule of Evidence 402 ............................................................. *passim*

Federal Rule of Evidence 403 ............................................................. *passim*

Federal Rule of Evidence 404 ............................................................. *passim*

Federal Rule of Evidence 407 ..............................................................52, 53

Federal Rule of Evidence 410 ...................................................................51

Federal Rule of Evidence 801 ...........................................................7, 18, 20


2012 Florida Statutes Title XXXIV, Sec. 562.20 ...........................................48

N.Y. PHL § 1139-ll...................................................................................43

California Code of Regulations Title 18, Article 4, Regulation 2540 ...........................48


Ninth Circuit Model Criminal Jury Instruction 8.22 (2010) ............................................17

United States Attorney's Manual, Principles of Federal Prosecution of Business Organizations § 9-28.300 ...........................................................................53

On May 19, 2016, at 9:30 a.m. in the above-titled Court, FedEx Corporation, Federal Express Corporation and FedEx Corporate Services, Inc. (collectively, "FedEx") will and hereby do move this Court for orders granting the following motions in limine.

## I. DEFENSE MOTION IN LIMINE #1: PRETRIAL INSTRUCTION REGARDING THE ILLEGAL DISTRIBUTION OF PRESCRIPTION MEDICATIONS

A complicated legal issue will permeate this case: what constitutes criminal distribution of a prescription medication in violation of federal law?  The Ninth Circuit has taken care to emphasize that the Controlled Substances Act is not violated by a doctor who merely commits malpractice — even intentional malpractice.  *See United States v. Feingold*, 454 F.3d 1001, 1010-11 (9th Cir. 2006).  Rather, criminal convictions must rest on a showing that the doctor in question "completely betrayed any semblance of legitimate medical treatment" and intentionally acted "as a pusher rather than a medical professional."  *Id.* at 1008, 1010; *see also id.* at 1011 ("[T]o avoid conviction, the practitioner could have demonstrated *either* that he had complied with a generally recognized standard of care *or* that he had prescribed the drugs in good faith for a legitimate medical purpose." (emphasis added)).

These principles are especially important in this case.  FedEx does not, and does not purport to, provide medical or pharmacy services.  It does not have the expertise of practitioners in those fields, and is not normally subject to, or even aware of, their professional obligations.  In order to achieve a conviction, the government will have to prove (among other things) that the doctors who prescribed the medications at issue in the case were not just acting outside the usual course of professional practice but were intentionally acting as drug pushers.  The government will also have to prove that FedEx *knew* and *intended* that the doctors affiliated with online pharmacy shipments were acting so far outside the usual course of medical practice and with such bad-faith intent that they were committing federal crimes.  That will be a heavy burden, and the jury should not lose sight of it.

Given the importance of the issue, FedEx requests that the Court provide the jury a pretrial instruction that is consistent with the Ninth Circuit's holding in *Feingold* and properly describes the proof required in this case:

> During this trial, you will hear about various entities that the government says distributed prescription medications in violation of the federal Controlled Substances Act or Food, Drug and Cosmetic Act.
>
> To demonstrate that a doctor violated those laws when he or she distributed a prescription medication, the government would have to prove that (1) the doctor distributed the prescription medication, (2) the distribution of the prescription medications was outside the usual course of professional practice and without a legitimate medical purpose, and (3) the doctor acted with intent to distribute the medications and with intent to distribute them outside the course of professional practice.  The government must prove not merely that the doctor intended to distribute the medication, but also that the doctor intended to act as a pusher rather than a medical professional.
>
> With respect to the crimes charged against FedEx in this case, the government must prove that FedEx knew it was distributing prescription medications prescribed in a manner consistent with all three of the elements I just discussed, and also that FedEx intended to participate in distribution that met all three of those elements.

## II. DEFENSE MOTION IN LIMINE #2: EXCLUDE EVIDENCE RELATED TO ONLINE PHARMACY ENTITIES THAT WERE NOT PART OF THE ALLEGED CHHABRA-SMOLEY OR SUPERIOR DRUGS NETWORKS

The charges in the superseding indictment ("indictment") relate to FedEx's shipment of packages for two alleged online pharmacy networks — the so-called "Chhabra-Smoley Organization," and a network of businesses and people associated with a pharmacy called Creative Pharmacy Services or Superior Drugs.  The indictment's charges are entirely predicated upon FedEx's provision of common carrier services to some members of these networks and the company's acceptance of payment for those shipping services.  *See* Dkt. 28, *passim.*  Yet the government apparently hopes to try its case by presenting evidence about dozens and dozens of *other* online pharmacy entities.

In a letter dated March 17, 2016, the government disclosed a list of evidence that it is "most likely to introduce pursuant to [Federal Rule of Evidence] 404(b)."

Declaration of Raphael M. Goldman in Support of Motions in Limine ("Goldman Decl.") ¶ 2, Ex. A.   Included on the government's list are records related to FedEx's alleged provision of shipping services for 80 online pharmacy entities or groups of entities "other than those named in the Superseding Indictment." *Id.* at 2-9.[1]   The letter also lists "[c]riminal prosecutions" of 122 individuals and entities, the majority of whom do not appear in the indictment.   *Id.* at 9-12.   The letter further makes reference to specific categories of evidence that the government proposes to introduce concerning the pharmacies listed as "other" Internet and fulfillment pharmacies.   *Id.* at 16-18.   The government's witness list likewise includes numerous witnesses who will be called to testify about entities not referenced in the indictment, including a few entities that are not mentioned either in the indictment or the government's Rule 404(b) letter.   Dkt. 232. The Court should preclude the prosecution from presenting evidence concerning all of these unrelated online pharmacy entities.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but may be admissible for other purposes, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   Rule 404(b)(1) & (2).   "[E]vidence of prior . . . conduct may be admitted if (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged."   *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994).

"With respect to the relevance requirement — the first prong of the 4-part test —

---

[1] Despite the description, the list appears to include a small number of entities that *are* named as co-conspirators in the indictment.  This motion relates to the large number of entities on the list that are not named in the indictment.

the government 'must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence.'" *Id.* at 1181 (quoting *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982)).  Moreover, the Ninth Circuit has counseled the district courts to exercise care in admitting Rule 404(b) evidence:

> [E]xtrinsic acts evidence is not looked upon with favor.  We have stated that our reluctance to sanction the use of evidence of other crimes stems from the underlying premise of our criminal justice system, that the defendant must be tried for what he did, not for who he is.  Thus, guilt or innocence of the accused must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing.

*Id.* (quoting *United States v. Bradley*, 5 F.3d 1317, 1320 (9th Cir. 1993)); *see also United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir. 1985).  Even when all the other requirements for admission of 404(b) evidence are met, the court must carefully consider the factors set out in Rule 403 that may weigh against admission.  *Mayans*, 17 F.3d at 1183; *see also United States v. Cruz-Garcia*, 344 F.3d 951, 956 & n.4 (9th Cir. 2003); *Hodges*, 770 F.2d at 1479.

The above principles militate strongly against admitting the vast swath of evidence identified by the government.  First, it is not clear how FedEx's provision of shipping services for uncharged pharmacies demonstrates the company's knowledge and specific intent with respect to the charged pharmacies.  Certainly the government's Rule 404(b) letter does not "articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence."  *Mayans*, 17 F.3d at 1181 (quoting *Mehrmanesh*, 689 F.2d at 830).  Rather, the evidence appears intended to pursue the improper goal of "showing that the defendant has engaged in other acts of wrongdoing."  *Id.* (quoting *Bradley*, 5 F.3d at 1320).

Second, any arguable relevance of evidence concerning FedEx's provision of shipping services for uncharged online pharmacy entities would depend wholly on a showing that doing so was *illegal* — that is, that the online pharmacy entities were

1   violating federal law,[2] that FedEx knew they were violating the law, that FedEx intended

2   to facilitate such crimes, and that FedEx agreed to facilitate the crimes.  In the absence

3   of such proof, the alleged prior acts would not be similar to the charged crimes, nor

4   would they shed any probative light on FedEx's knowledge or intent concerning the

5   charged Chhabra-Smoley or Superior Drugs conspiracies.

6          Some of the listed online pharmacy entities also present their own, particular

7   relevance problems.  For example, the government lists UHTG as an entity about which

8   it plans to introduce evidence.  Goldman Decl. ¶ 2, Ex. A at 8.  But UHTG shipped

9   primarily by way of FedEx Ground — an operating company that has not been charged

10  in connection with this case.

11         The necessary predicate for the admission of the proffered evidence would be

12  dozens and dozens of "mini trials" concerning (a) the legality of conduct by entities not

13  even mentioned in the indictment, (b) FedEx's knowledge about the legality of the

14  entities' conduct, and (c) FedEx's intent with respect thereto.  In a trial already predicted

15  to last for several months, such tangential disputes would certainly be unduly time

16  consuming.  *See Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 690 (9th Cir.

17  2001) (affirming the exclusion of evidence when it "might have resulted in a 'mini trial'").

18  More troublingly, admission of the proffered evidence would pose an extreme risk of

19  unfair prejudice and jury confusion: the evidence related to the two charged

20  conspiracies would be swamped by evidence related to dozens of other online

---

[2] The mere fact that an entity may be classified as an "Internet pharmacy" does not make it a foregone conclusion that the entity was violating the law.  As the Associate Commissioner for Regulatory Affairs for the U.S. Food and Drug Administration observed in testimony before a Congressional subcommittee, "many reputable Internet pharmacies provide consumers seeking prescription drugs with a measure of safety, privacy and convenience."  S. Hrg. 108-684 (July 17 and 22, 2004, available at *https://www.gpo.gov/fdsys/pkg/CHRG-108shrg95190/ pdf/CHRG-108shrg95190.pdf*) at 232 (J. Taylor prepared statement).

pharmacies, creating the likelihood that the jury would make its decision based largely upon conduct bearing no direct relation to the charges brought by the grand jury.[3]

The Court should preclude the government from introducing the evidence proffered in sections 1 and 2 of the government's letter.

## III. DEFENSE MOTION IN LIMINE #3: EXCLUDE EVIDENCE POST-DATING THE CONSPIRACIES CHARGED IN THE INDICTMENT

The indictment charges several conspiracies alleged to have ended on May 12, 2010; several conspiracies alleged to have ended on February 20, 2008; and several substantive counts that allegedly occurred in 2007 and 2008. Dkt. 28, *passim*. Thus, the period relevant to the charges in this case extends no later than May 12, 2010. Yet the government's Rule 404(b) notice includes references to conduct and communications that occurred after that date. FedEx seeks an order excluding evidence relating to conduct post-dating May 12, 2010.

While Rule 404(b) does not inviolably prohibit the introduction of evidence related to conduct that occurred subsequent to the charged crime, the timing of the events in question is an important factor to be considered by the Court in determining admission. *See United States v. McDonald*, 576 F.2d 1350, 1356 & n.10 (9th Cir. 1978). As the court recognized in *United States v. Zelinka*, 862 F.2d 92 (6th Cir. 1988), in a case in which the question is whether the defendant participated in a conspiracy, it is error to

---

[3] The government's letter also asserts that much of the listed evidence is "admissible pursuant to Rule 401 and 402." But, for the same reasons discussed above, evidence related to online pharmacy entities that were not part of the alleged conspiracies is not relevant under Federal Rule of Evidence 401, and is therefore inadmissible pursuant to Rule 402. A demonstration that FedEx provided shipping services for a *different* online pharmacy entity would not help to establish any of the elements of the charged offenses. It would not show that FedEx agreed or intended to facilitate crimes by the Chhabra-Smoley or Superior Drugs networks, that FedEx had guilty knowledge concerning those networks, or that FedEx took any actions in furtherance of crimes committed by those networks. In any event, for the reasons discussed above, the evidence must be excluded under Rule 403.

1
2
3
4
5
6

permit the introduction of evidence of subsequent conduct involving none of the defendant's alleged co-conspirators. *Id.* at 99. Such evidence is not relevant to demonstrating motive, intent, plan, knowledge, or identity with respect to the *charged conspiracy*. *Id.* Instead, it serves only to impermissibly suggest that the defendant has a propensity to commit the charged crime. *Id.*

7
8
9
10
11
12
13

Furthermore, Rule 403 factors militate against the introduction of events occurring after May 12, 2010. The jury will already have before it a decade worth of evidence derived, apparently, from hundreds of witnesses and possibly thousands of exhibits. Adding to this case even more events and evidence, especially ones that by definition are extrinsic to the charges, risks confusing the jury and unduly prolonging the case. The Court should prohibit the government from introducing evidence relating to conduct post-dating May 12, 2010.

14
15
16

**IV.  DEFENSE MOTION IN LIMINE #4: EXCLUDE EVIDENCE OF THE SO-CALLED "CHHABRA-SMOLEY ORGANIZATION" OR, ALTERNATIVELY, EXCLUDE EVIDENCE OF ALLEGED CO-CONSPIRATORS' STATEMENTS PURSUANT TO RULE 801(d)(2)(E)**

17
18
19
20
21

This is a "novel prosecution," Dkt. 231 at 1; this is an unusual motion in limine. FedEx moves to exclude *all evidence* that the government may proffer to support the allegations that FedEx conspired with the so-called "Chhabra-Smoley Organization," as charged in Counts One through Twelve, Fourteen and Fifteen. Although the indictment alleges that the Chhabra-Smoley conspiracy spanned the years from 2000 to 2008, ███

22
23
24
25

████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████ Accordingly, the charges relating to the "Chhabra-

26
27
28

Smoley Organization" will have to be dismissed as time barred.[4]

Of course, it would make little sense for the Court and the jury to sit through weeks of evidence relating to charges that are barred by the statute of limitations.  That would confuse the jury, unfairly prejudice the defense, and waste everyone's time and resources.  We urge the Court to require the government to make an offer of proof of evidence that would bring the alleged Chhabra-Smoley conspiracies within the applicable statute of limitations.  Unless the government can establish that the charged conspiracies are not time-barred, all evidence relating to those charges should be excluded.

**A.     Facts**

_____

[4] The Court has already dismissed the Chhabra-Smoley counts as time-barred with respect to defendants FedEx Corporation and FedEx Corporate Services, Inc.  *See* Dkt. 231.  The remaining defendant, Federal Express Corporation, signed tolling agreements that result in a statute of limitations period that extends to January 2007.  *See* Dkt. 1 (indictment filed July 17, 2014); Dkt. 162, Ex. A (tolling agreements).





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**B.   Argument**

When an indictment alleges a broad-ranging conspiracy that spans many years and includes numerous entities, individuals and objectives, there is an inherent danger that the evidence will support a finding not of one over-arching conspiracy but of multiple conspiracies.  *See, e.g., Kotteakos v. United States*, 328 U.S. 750, 752-53 (1946); *United States v. Lapier*, 796 F.3d 1090, 1097 (9th Cir. 2015) ("[T]he indictment was sufficiently broad and the evidence sufficiently complex as to create a risk that different jurors voted to convict on the basis of different facts establishing different offenses.").  This type of variance between the charges and the proof at trial can result in a fatal constructive amendment of the indictment, a violation of the right to a unanimous verdict and/or the erroneous admission of evidence of co-conspirators' actions and statements against a defendant who is not party to the same conspiracy. *Kotteakos*, 328 U.S. at 752; *United States v. Payseno*, 782 F.2d 832, 835 (9th Cir. 1986); *Daily v. United States*, 282 F.2d 818 (9th Cir. 1960).  Moreover, a defendant who is forced to defend against multiple conspiracies charged as a single conspiracy confronts an undue burden "not only in preparation for trial, but also in looking out for

1   and securing safeguard against evidence affecting other defendants, to prevent its

2   transference as 'harmless error' or by psychological effect, in spite of instructions for

3   keeping separate transactions separate."  *Kotteakos*, 328 U.S. at 767.

4          In some cases, these issues can be adequately addressed by appropriately

5   tailored jury instructions.  *See United States v. Griffin*, 464 F.2d. 1352, 1357 (9th Cir.

6   1972) ("The cautionary instruction largely attenuated any prejudice flowing from the

7   establishment of the variance."); Ninth Circuit Model Criminal Jury Instruction 8.22

8   (2010).  As the Seventh Circuit has explained, "[w]hen the proof at trial reveals the

9   existence of more than one conspiracy, 'the adequacy of the trial judge's instructions

10  are of critical importance in evaluating the likelihood [that] confusion or prejudice'

11  resulted from transference of guilt from one conspiracy to another."  *United States v.*

12  *Jackson*, 696 F.2d 578, 584 (7th Cir. 1982) (quoting *United States v. Johnson*, 515 F.2d

13  730, 735 (7th Cir. 1975)). ████████████████████████

14  ████████████████████████████████████████████

15  ██, the Court is confronted with at least two issues that should be addressed in

16  advance of a lengthy and potentially unnecessary trial.

17

18          ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████

24          The Ninth Circuit's decision in *United States v. Wilbur*, 674 F.3d 1160 (9th Cir.

25  2012), is instructive.  There, after conditional pleas of guilty, the court addressed the

26  defendants' contentions that their conspiracy convictions should be set aside because

27  their eight-year scheme was interrupted by a period of two years during which the

28  alleged object of the conspiracy was not illegal.  The panel majority determined that the

defendants were correct as to the gap and that, as a consequence, the two years of the conspiracy that pre-dated the gap during which the object of the conspiracy was lawful could not be prosecuted because those allegations were beyond the statute of limitations.  *Id.* at 1177.[6]

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■  Accordingly, the Court should require the government to proffer evidence that the "Chhabra-Smoley Organization" endured into a period within the applicable statute of limitations and, ultimately, should order the exclusion of all evidence of the so-called "Chhabra-Smoley Organization."  Of course, the reality is that this will result in the dismissal of all charges relating to that conspiracy.

Second, even if the charges survive, there is the question of the admissibility of alleged co-conspirators' statements.  "Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule."  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  To qualify for this hearsay exception, "'a foundation (must be) laid to show that: (1) the declaration was in furtherance of the conspiracy, (2) it was made during the pendency of the conspiracy, and (3) there is independent proof of the existence of the conspiracy and of the connection of the

---

[6] Nevertheless, a majority of the court held that the defendants' convictions should still be confirmed because the conspiracy that post-dated the legal gap narrowed, rather than broadened, the conspiracy charge in the indictment, and because the facts upon which the convictions could stand were not "distinctly different from those set forth in the charging instrument."  *Wilbur*, 674 F.3d at 1177 (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984); internal quotation marks omitted).

declarant and the defendant to it.'"  *United States v. Eubanks*, 591 F.2d 513, 519 (9th Cir. 1979) (quoting *United States v. Weiner*, 578 F.2d 757, 768 (9th Cir. 1978); alteration added by *Eubanks* court).  "In addition, a necessary corollary to the above three conditions is the requirement that there must be independent proof of the defendant's and the declarant's status as members of the same ongoing conspiracy before a statement will be admitted under this exception."  *United States v. Smith*, 893 F.2d 1573, 1578 (9th Cir. 1990).

Under Rule 104(a), these are "are preliminary questions of fact that . . . must be resolved by the court."  *Bourjaily*, 483 U.S. at 175.  The burden imposed upon the proponent of co-conspirators' statements is a preponderance of the evidence, and the court's ruling may not be based solely on the content of the proffered statements themselves.  *Id.* at 176; *United States v. Silverman*, 861 F.2d 571, 577-78 (9th Cir. 1988).  FedEx requests that the Court hold a hearing in advance of trial to determine the parameters for the admissibility alleged co-conspirators' statements as to the so-called "Chhabra-Smoley Organization."

## C.   Conclusion

██████████████████████████████████████████████

████████████████████████   A trial on charges that FedEx participated in the conspiracy would constitute an enormous waste of the Court's and parties' time and resources.  The Court should order an offer of proof from the government and, in the absence of adequate proof, exclude all of the evidence and dismiss the charges.  Alternatively, the Court should order a Rule 104 hearing in advance of trial to determine the admissibility of alleged co-conspirators' statements.

## V.   DEFENSE MOTION IN LIMINE #5: REQUIRE A PROFFER CONCERNING THE ADMISSIBILITY OF EVIDENCE RELATED TO THE ALLEGED SUPERIOR DRUGS CONSPIRACIES

In the counts that relate to Superior Drugs, the government has charged the FedEx defendants with participation in wide-ranging conspiracies that supposedly

encompassed numerous named persons and entities, not to mention "others known and unknown." *See* Dkt. 28 ¶¶ 71-87, 91, 108, 115. But — leaving aside the issue that FedEx is innocent of participating in any criminal conspiracy — there is reason to think that the government has lumped together into one alleged joint venture numerous actors who were competitors or otherwise unaffiliated, and thus that the charged conspiracy never existed.

The Court should require the government to make a proffer of the evidence that will establish the existence of the broad Superior Drugs conspiracy charged in the indictment. In the absence of adequate proof, the Court should exclude evidence that relates to entities whose conduct ceased before the end of 2006, and thus did not extend into the period covered by the statute of limitations. Similarly, before admitting statements as "coconspirator statements" under Federal Rule of Evidence 801(d)(2)(E), the Court should require the government to establish the necessary predicates under the Rule.

## A.  The Contours of Superior Drugs Conspiracy As Set Out in the Indictment

The counts that relate to the alleged Superior Drugs conspiracy assert that FedEx joined a conspiracy along with a wide group of other entities:

> Creative Pharmacy Services (doing business as Superior Drugs), Wayne White, Anthony Spence, Christopher Napoli, Sanford Cohen, Orlando Birbragher, Marshall Kanner, David Glass, Michael Bezonsky, Claude Covino, Genetechnica, Physicians Online Network, The Spence Group, Pharmacom, Carmel Management, SaveOn Rx, SafescriptsOnline, Affpower, and others known and unknown to the grand jury . . . .

Dkt. 28 ¶ 71; *see also* ¶¶ 91, 108, 115. The indictment asserts that

> Wayne White ('White') was the chief pharmacist at Creative Pharmacy Services, doing business as Superior Drugs ('Superior'). White operated Superior as a fulfillment pharmacy that illegally distributed controlled substances without valid prescriptions directly to consumers who had ordered them from Internet pharmacies owned and operated by unindicted co-conspirators Anthony Spence, Christopher Napoli, Sanford Cohen, Orlando Birbragher, Marshall Kanner, David Glass, Michael Bezonsky, and others known and unknown to the grand jury.

*Id.* ¶ 72.

According to the indictment, "[t]he Internet pharmacies for which Superior filled orders for controlled substances[ ] includ[ed] discreetonlinemeds.com, pricebustersrx.com, safescriptsonline.com,  safetrustprocessing.com, rx-max.com, integrarx.com, medscriptsmd.com, dietpillscheap.com, and buymeds.com . . . ." *Id.* ¶ 73.  The indictment further alleges that,

> [t]o meet the high demand for illegally obtained controlled substances, the Internet pharmacies for which Superior filled orders for controlled substances based on invalid prescriptions partnered with, recruited, and hired other fulfillment pharmacies throughout the United States, including Gem Pharmacy, Universal Pharmacy, Union Pharmacy, Waterview Pharmacy, United Care Pharmacy, Kwic Fill, and SaveOn Rx, among others . . . .

*Id.* ¶ 75.[7]

### B.    Previous Prosecutions

Most of the entities included in the broad Superior Drugs charges were previously the subject of criminal prosecutions in various courts.  Notably, however, none of those previous cases included allegations that the defendants participated in a conspiracy that included all, or even a large number, of the entities that have been lumped together in the instant action.  And, with one exception, all of the cases related to conduct that concluded in or before 2006.

### 1.    *United States v. Carolina* et al. (E.D. Pa. 09-cr-00682-JS)

Wayne White was initially indicted in October 2009 in Eastern District of Pennsylvania case number 09-cr-00682-JS.  The charges eventually included allegations of a conspiracy between the following individuals:

- White, the operator of Superior Drugs, a fulfillment pharmacy;

---

[7] Paragraph 75 is oddly drafted.  It is not clear whether the indictment purports to allege that Superior Drugs conspired with these other fulfillment pharmacies, which would seem to be competitors.

- Carleta Carolina, operator of the Internet pharmacy discreetonlinemeds.com, which fulfilled orders at Superior Drugs and at other fulfillment pharmacies;[8]

- Anthony Spence, operator of the online pharmacy entities The Spence Group and pricebusterrx.com, which purportedly fulfilled orders at Superior Drugs; and

- Michael Gibson, M.D., who allegedly issued invalid prescriptions fulfilled by Superior Drugs.

*Carolina* Dkt. 22 (Second Superseding Indictment).  The conspiracy allegedly terminated in May 2010.  *Id.*

     2.    *United States v. Napoli* et al. (N.D. Cal. 10-cr-00642-CRB)

Alleged co-conspirator Christopher Napoli was indicted in this district in case number 10-cr-00642-CRB.  The superseding indictment set forth three separate conspiracies.  It alleged that, as part of one of the conspiracies, Napoli and others conducted an online pharmacy operation called SafeScriptsOnline between November 2004 and December 2006.  The indictment also alleged that Napoli conspired with various others, including the operators of Kwic Fill pharmacy.  *See Napoli* Dkt. 144.

     3.    *People v. Cohen* et al. (Ventura County, CA Case No. 2006024072)

Alleged co-conspirator Sanford Cohen was the operator of Carmel Management Group, Inc.  In June 2006, Cohen was charged in California state court with ten counts of unlawful sale of a controlled substance; each crime allegedly occurred in August or September 2005.  Cohen had one co-defendant, Juan Carlos Lopez.

     4.    *United States v. Birbragher* et al. (N.D. Iowa 07-cr-01023-LRR)

Alleged co-conspirators Orlando Birbragher and Marshall Kanner were indicted in the above-titled case.  According to the superseding indictment, in 2003 and 2004, Birbragher and Kanner owned Pharmacom International Corporation, an online

---

[8] Discovery suggests that Carolina is also affiliated with the Genetechnica and Physicians Online Network entities named as co-conspirators in the indictment at bench.

pharmacy processing center that operated the website <u>buymeds.com</u>.  *Birbragher* Dkt.
257.  The superseding indictment alleged that during 2003 and 2004, Birbragher and
Kanner also conspired with other people, none of whom features in the indictment in
this case.  *Id.*

### 5.   Affpower Cases

Several of FedEx's alleged co-conspirators were indicted in separate cases that
alleged an affiliation with the Affpower online pharmacy operation, which employed the
website <u>safetrustprocessing.com</u>.  Claude Covino, the operator of the SaveOn Rx
fulfillment pharmacy, was indicted — along with seventeen co-defendants — in *United
States v. Heredia* et al. (S.D. Cal. 07-cr-02016-JLS); the indictment alleged that Covino
joined a conspiracy that lasted from August 2004 through June 2006.  *Heredia* Dkt. 1.
Michael Bezonsky, one of the operators of the Affpower organization, was indicted in
*United States v. Bezonsky* et al. (S.D. Cal. 06-cr-01400-JAH) for his alleged
participation in a conspiracy that lasted from June 2004 through June 2006; and in
*United States v. Bezonsky* et al. (E.D. Pa. 06-cr-00394-RK) for his alleged participation
in an earlier conspiracy, which purportedly lasted from February 2003 through May
2004.  Universal Pharmacy Solutions was also a defendant in the latter case.  David
Glass was separately charged by information for conspiring with Bezonsky in the
alleged conspiracy that lasted from 2004 through 2006.  *United States v. Glass* (S.D.
Cal. 06-cr-01460-JAH).

### 6.   Other Referenced Entities

Some of the websites referenced in paragraph 73 of the superseding indictment,
and some of the pharmacies referenced in paragraph 75, were also the subject of
separate criminal cases.  For example, in 2006 various individuals were charged in
connection with the operation of United Care Pharmacy in *United States v. Russo* et al.
(N.D. Cal. 06-CR-00748-RMW).  Likewise, the operators of online pharmacies that
fulfilled through Waterview and Union pharmacies were indicted in 2006 in *United*

*States v. Quinones* et al. (E.D.N.Y. 06-cr-00845-FB) and *United States v. Mendez* et al. (06-cr-00580-PJM).

**C.    Discussion**

The alleged Superior Drugs conspiracy appears to be a Frankenstein's monster composed of mismatched parts of separate conspiracies charged in other cases.  The great majority of the entities referenced in the indictment were accused of crimes that were completed in or before 2006, which would appear to put their alleged crimes outside the statute of limitations applicable in this case.  Only by accreting those entities' conduct into a single conspiracy with the defendants charged in *United States v. Carolina* (which involved alleged conduct that purportedly lasted until May 2010) could the government hope to overcome the statute of limitations problem.  But this conglomerate conspiracy seems unlikely to hold together.

"To show a conspiracy, the circumstances must lead to an inference that some form of overall agreement exists, and that each defendant knew or had reason to know of the scope of the conspiracy and . . . reason to believe that their own benefits were dependent upon the success of the entire venture."  *Lapier*, 796 F.3d at 1101 (internal quotation marks omitted, ellipsis added by *Lapier* court).  In other words, there must be evidence of a "common purpose of a single enterprise."  *Id.* (quoting *Canella v. United States*, 157 F.2d 470, 476 (9th Cir. 1946)).

All of the entities referenced in the indictment are alleged to have been players in the same general business — selling prescription medications over the internet.  Still, that alone does not mean that they were *conspirators* who agreed to act with the "common purpose of a single enterprise."  *Lapier*, 796 F.3d at 1101 (quoting *Canella*, 157 F.2d at 476).  Indeed, on its face it appears incredible that all of these entities would conspire, as their business positions suggest that they were competing with one another.

For example, a number of the entities — such as the Affpower organization, the

Spence Group, Pharmacom, SafeScriptsOnline, Genetechnica and their affiliated operators — were online pharmacy networks or processing centers. Such entities presumably competed with one another for customers' business. The indictment does not suggest links between the entities, except for one: they used the same fulfillment pharmacy or pharmacies. But that does not mean that they agreed to operate in concert, or that they did so.

Similarly, some of the entities referenced in the indictment were fulfillment pharmacies. SaveOn Rx is listed as a co-conspirator of Superior Drugs. Dkt. 28 ¶ 71. Numerous others are somewhat vaguely listed as "partners" or "recruits" of online pharmacy networks. *Id.* ¶ 75. Again, these entities appear to be competitors, not conspirators. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ [9]

The Ninth Circuit's decision *Lapier* provides important guidance on these issues. In that case, the defendant was a dealer of methamphetamine. He had two different suppliers — Kanyid and Boucher — but was charged with participation in a single drug conspiracy with those two. 796 F.3d at 1093-94, 1097. The court found "no evidence that Kanyid and Boucher had any agreement with each other or acted pursuant to a single conspiracy involving them both," and concluded that the evidence strongly suggested the existence of multiple conspiracies. *Id.* at 1097. Even on plain error review, the Ninth Circuit reversed Lapier's conviction, finding that under the circumstances the district court should have given a specific and targeted unanimity instruction. *Id.* at 1097-98.

Here, the indictment appears to have cobbled together a single alleged

---

[9] ████████████████████████████████████████████████
████████████████

conspiracy by alleging that A conspired with B; A conspired with C; and C conspired with D.  As the Ninth Circuit taught in *Lapier*, such connections do not a single conspiracy make.

The Court should require the government to proffer the evidence that will establish the existence of the broad Superior Drugs conspiracy charged in the indictment.  To the extent the Court determines that the entities referenced in the indictment were not part of a single conspiracy, the Court should determine which entities' conduct extended into the statute of limitations period.  To the extent that there were separate conspiracies, some of which entirely preceded the statute of limitations, the evidence related to the time-barred entities should be excluded for the reasons discussed in Defense Motion In Limine #2, *supra*: the evidence would be irrelevant, unduly time-consuming, and prejudicial.

The same proffer will also be useful in determining the admissibility of purported co-conspirator statements.  The Court will need to exercise special vigilance in enforcing the Ninth Circuit's command that, in order to support admission of a statement under Rule 801(d)(2)(E), "there must be independent proof of the defendant's and the declarant's status as members of the same ongoing conspiracy before a statement will be admitted under this exception."  *Smith*, 893 F.2d at 1578.  If the government's proof establishes several separate conspiracies, the Court must take care to admit under Rule 801(d)(2)(E) only statements made by a declarant in furtherance of a conspiracy in which the defendants are shown to have participated.

## VI.   DEFENSE MOTION IN LIMINE #6: EXCLUDE EVIDENCE OF "GROSS GAINS" AND STRIKE THE ALTERNATIVE MAXIMUM FINE ALLEGATION FROM THE INDICTMENT

The indictment charges FedEx with the commission of eighteen offenses carrying

aggregate maximum statutory fines of $17,324,966 million.[10]  The indictment also includes a "sentencing allegation" asserting that "for the purposes of determining the alternative maximum fine pursuant to" 18 U.S.C. § 3571(d), FedEx and its "coconspirators derived gross gains of at least $820,000,000."  Dkt. #28 ¶ 126.  Under § 3571(d), the trial court has discretion to impose a maximum fine in an amount up to twice the "gross gain" from the offense — here, allegedly $1.64 billion.  However, § 3571(d) also expressly vests the court with discretion not to impose such a fine if the "imposition of a fine under this subsection would unduly complicate or prolong the sentencing process."  As elaborated below, the Court should exercise its discretion to exclude evidence proffered in support of the alternative maximum fine and should decline to impose such a fine.

First, following the Supreme Court's decision in *Southern Union Co. v. United States*, __U.S.__, 132 S. Ct. 2344, 2357 (2012), any fact that could expose a criminal defendant to a potential maximum fine greater than that which would otherwise apply must be proven to the trial jury beyond a reasonable doubt.  *United States v. Pfaff*, 619 F.3d 172, 175-76 (2d Cir. 2010) (*per curiam*); *United States v. Sanford Ltd.,* 878 F. Supp. 2d 137, 147 (D.D.C. 2012).  Here, that means that the government will be required to prove at trial that FedEx and/or its alleged co-conspirators derived gross gains (and the amount of those gross gains) from the commission of the charged

---

[10] This fine is calculated as follows:  Count One = $1,000,000; Count Thirteen = $2,500,000; Counts Two through Ten, Fourteen and Fifteen = $1,000,000 each, for a subtotal of $11,000,000; Counts Eleven and Sixteen = $500,000 each, for a subtotal of $1,000,000; Count Twelve = $824,966; and Counts Seventeen and Eighteen = $500,000 each, for a subtotal of $1,000,000.  Because Counts Two through Ten, Fourteen and Fifteen each allege transactions involving Schedule IV medications, the maximum fine attributable to each of those counts is $1,000,000.  Count Twelve alleges transactions involving $412,483, making the maximum fine $824,966 pursuant to 18 U.S.C. § 1956(a)(1).

offenses.  To sustain the indictment's allegation of gross gains in the amount of $820 million, the government would need to establish the culpability and gross gains of at least twelve "organizations," only nine of which are actually named as co-conspirators in the indictment.[11]  For this reason alone, the government's invocation of the alternative maximum fine would unduly complicate and prolong the trial.

Second, determining the amount of each alleged co-conspirator's gross gains under § 3571(d) would be an extremely complicated process.  Although the definition of "gross gain" remains an open question in the Ninth Circuit, the leading case addressing the issue has held that the term "gross gain" means "pre-tax profit," not revenues or proceeds.  *Sanford Ltd.,* 878 F. Supp. 2d at 147-148; *see also United States v. Citgo Petroleum Corp.,* 908 F. Supp. 2d 812, 814 (S.D. Tex. 2012).  We believe that *Sanford's* definition is correct and that the determination of the gross gains allegedly derived from the charges in the indictment would require an audit and deduction of all of the pre-tax expenses (i.e. cost of goods, doctors' fees, pharmacists' fees, shipping, labels, etc.) incurred by each of the alleged co-conspirators.  ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████  The Court should adopt the *Sanford* court's definition of gross gains as pre-tax profits.

Even if this Court declined to follow the *Sanford* decision and determined instead that the term "gross gains" under § 3571(d) means "revenues," the necessary calculations would still be unduly complex and time consuming.  The "gross gains" allegedly derived from the sale of illegal prescription drugs would be the aggregate

---

11 ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

amount that conspirators actually received from customers who purchased medications using prescriptions that were issued outside the usual course of medical practice and not for a legitimate medical purpose.  Given the complicated webs of relationships between websites, doctors, pharmacists and middlemen in the internet pharmacy industry, an accurate calculation of the enterprise's "gross gain" would require tracing the transfers of funds from one alleged accomplice to another accomplice in order to avoid double counting.  Without such tracing, the revenues of the various parties would significantly and unfairly exaggerate the gross gain realized by the alleged criminal enterprise.  But the tracing exercise would greatly complicate and lengthen the trial.

Third, calculating FedEx's own "gross gain" from alleged co-conspirator online pharmacies would be a daunting task just by itself.  ████████████████████ █████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ █████████████████████████████████████████ Moreover, for the same reasons stated above, FedEx's shipping revenues from allegedly illegal online pharmacies would not constitute additional "gross gains" to the overall conspiracies but would instead represent transfers of revenues among alleged joint venturers.  Again, that would be double counting.

For these reasons, the Court should exclude evidence of "gross gains" and should not impose an alternative fine under § 3571(d).

## A.    "Gross Gains" Means "Pre-Tax Profits"

The Ninth Circuit has not attempted to define the term "gross gain" under

§ 3571(d).[12]   Among the courts that have considered the question, "there is a difference of opinion as to whether [the term 'gross gain'] includes only 'net' gains, i.e. *profits*, [or] whether it includes all revenues derived from an offense without deducting costs and taxes . . . ." *Sanford Ltd.*, 878 F. Supp. 2d at 149 (emphasis added); *Citgo Petroleum Corp.,* 908 F. Supp. 2d at 820-21.   The most comprehensive analysis of the issue was conducted by the court in *Sanford*, which concluded that "gross gain" means pre-tax profits, not gross revenues.   *See Sanford Ltd.*, 878 F. Supp. 2d at 147-48 ("the term 'gross gain' means any additional before-tax profit to the defendant that derives from the relevant conduct of the offense"); *but see BP Products North America*, 610 F. Supp. 2d at 683 ("'Gross' pecuniary gain or loss simply means that the court is not to reduce the amounts to a net sum, by deducting such items as costs.")

The analysis in *Sanford* is compelling.   There, in the context of an in limine motion to exclude evidence, the court considered the type of evidence that would be admissible and that the jury would be permitted to consider for the purpose of establishing the defendant's "gross gain" within the meaning of § 3571(d).   The court began its inquiry by determining that the term is ambiguous:   the word "gross," as opposed to "net," generally refers to all revenue without consideration of costs; but the word "gain" generally refers to "profit" or "net income."   *Id.* at 148.   The court, however, found that several sources shed light on the term's meaning.   First, the Sentencing Guidelines for Organizations state that the base fine shall be the greatest of three amounts, one of which is the "pecuniary gain" to defendant.   *Id.* (citing U.S.S.G. § 8C2.4(a)(2)).   The guidelines then define such gain to be "the additional before-tax

---

[12] In *United States v. Hui Hsiung*, 778 F.3d 738, 760-61 (9th Cir. 2015) (as amended), the defendants challenged the trial court's imposition of an alternative minimum fine on two grounds:   whether the fine could be based on the collective gross gain of all of the conspirators and whether the court erred by failing to impose joint and severable liability for the fine.   *Hsiung*, 758 F.3d at 760-61.   The issue of the proper definition of the term "gross gain" was not presented or addressed in either the trial court or the court of appeal.

profit resulting from the relevant conduct of the offense." *Id.* (quoting U.S.S.G. § 8A1.2, Application Note 3(H)).  The *Sanford* court found this definition "helpful in determining the meaning of 'gross gain' because, as the commentary makes clear, the Guidelines' use of the term 'pecuniary gain' is 'derived from 18 U.S.C § 3571(d).'" *Id.* at 148.

Second, the court relied on the legislative history.  Noting that § 3571(d)'s predecessor statute, 18 U.S.C. § 3623(c)(1), also employed the term "gross gain," the court found clear indication that "Congress intended the 'gross gain' language to refer to the net proceeds or profits derived from an offense." *Sanford*, 878 F. Supp. 2d at 148. For example, the Report of the House Judiciary Committee for the bill that became § 3623(c)(1) stated that the alternative fine provision was "intended to enable federal courts to impose fines that will prevent convicted offenders *from profiting from their wrongdoing*."  H.R. REP No. 98-906 at 17 (1984) (emphasis added).  Additionally, the drafters of § 3623(c)(1) relied on the Model Penal Code, which provided for fines intended to deprive offenders of their illicit *profits.  Sanford*, 878 F. Supp. 2d at 149.

Third, the *Sanford* court found that those cases that had approved fines under § 3571(d) based upon a defendant's *illicit profits*, as opposed to *revenues*, comported more closely to the common meaning of the word "gain," as well as to Congress' intent as expressed in the legislative history, and to the text of the Sentencing Guidelines. *Id.* at 150; *see also Securities and Exchange Commission v. Bilzerian*, 814 F. Supp. 116, 120 (D.D.C. 1993) ("§ 3571(d) provides a calculation for the potential allowable fine based upon the amount of illicit profit"); *United States v. Wilder*, 15 F.3d 1292, 1301 (5th Cir. 1994) (affirming district court's fine of $4 million under § 3571(d) where "the record adequately demonstrate[d] that [defendant] received *gross profits* of over two million dollars from the scheme to defraud"); *but see United States v. BP Products North America*, 610 F. Supp. 2d 655, 682 (S.D. Tex. 2009) (stating in dictum that "'[g]ross' pecuniary gain or loss simply means that the court is not to reduce the amounts to a net

1    sum, by deducting such items as costs").[13]

2        Ultimately, the *Sanford* court reserved judgment on whether to permit the

3    government to present evidence in support of the alternative maximum fine under

4    § 3571(d).  The court ordered the government to make an offer of proof "regarding the

5    number of witnesses and kinds of evidence to be offered in support of the 'gross gain' to

6    Sanford that was 'derive[d] . . . from' the charged offenses."  *Sanford*, 878 F. Supp. 2d

7    at 153-54.  Thereafter, the government filed a notice that it would not proceed with the

8    presentation of evidence in support of an alternative maximum fine.  *United States v.*

9    *Sanford*, CR No. 11-352 (BAH), D.C. Dist., Dkt. 179.[14]

10

11       For these reasons, the Court should follow *Sanford* and hold that the term "gross

12   gain" means pre-tax profits as used in § 3571(d).

13

14   ───────────────

15   [13] The *BP Products North America* case arose in the context of the victims' challenge to
     the $50 million fine set forth in a plea agreement.  After ruling that the amount of gross
16   pecuniary gain or loss would have to be decided by a jury, the court found that such
     litigation would unduly complicate and prolong the sentencing proceedings and decided
17   to accept the plea agreement.  *Id.* at 683, 707.  Three courts appear to have imposed a
     fine under § 3571(d) based upon the gross revenues derived from the crime of
18   conviction.  *See Hsiung*, 778 F.3d at 760-61 (affirming a fine under § 3571(d) based on
     revenues without addressing the definition of "gross gain"); *United States v. Bader*, No.
19   07-cr-00338-MSK, 2010 U.S. Dist. LEXIS 76730 at *8-9 (D. Colo. Jul. 1, 2010)
     (imposing a $9.6 million fine based upon the jury's finding that the defendant "grossed
20   $4.8 million in revenue"); *United States v. Foote*, No. 00-20091-01-KHV, 2003 U.S. Dist.
     LEXIS 19312 at *21 (D. Kan. 2003) (the "gain is equivalent to the amount of the bank
21   deposits attributed to his sale of infringing merchandise").  However, it does not appear
     that the definition of "gross gain" within the meaning of § 3571(d) was challenged or
22   litigated in these cases.

23

24   [14] The question whether the government should be precluded from presenting evidence
     to support an alternative maximum fine was recently addressed by Judge Henderson in
25   *United States v. Pacific Gas & Electric Co.*, CR No. 14-175, Dkt. 201.  There, after
     determining that presentation of the government's proposed gross loss theory would be
26   too complicated and time consuming, the court excluded it from the trial.  *PG&E* Dkt.
     201 at 4.  The court also reserved the question whether to exclude the presentation of
27   the government's gross gain theory and, after receiving the government's offer of proof,
     ordered that the government's alternative fine allegations be bifurcated "into a second
28   trial phase."  *PG&E* Dkt. 275 at 2.

**B.    The Presentation of Evidence of "Gross Gains" would Unduly Complicate and Prolong the Trial**

Under every possible scenario, the presentation of "gross gains" evidence at trial would be unduly complex and time consuming.

1.    The "Gains" Attributable to the Alleged Co-Conspirators

Proving the gains attributable to the uncharged co-conspirators would present severe complications.  First, the government would have to establish that each alleged co-conspirator illegally distributed prescription drugs under the CSA and/or FDCA and that FedEx agreed to participate in those illegal distributions. ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████

Second, as to each alleged co-conspirator, the government will have to present evidence establishing the gross gain allegedly derived from the illegal sales of prescription drugs.  We urge and expect that the Court will adopt the *Sanford* definition and will require the government to prove each alleged co-conspirator's pre-tax profits.  Under that definition, the government would necessarily be required to produce evidence not only of revenues but also expenditures for the costs of goods, doctors' fees, pharmacists' fees, shipping, etc.  If, on the other hand, the Court were to rule that "gross gain" means revenues, the inquiry would remain extremely complicated.  As a matter of logic and commonsense, the "gross gains" realized by these alleged conspiracies would be the total amount of funds received from customers for the illegal purchase of prescription drugs.  To the extent the government's revenue evidence includes transfers of those proceeds among alleged conspirators, there would be impermissible double counting.

[REDACTED].15

Third, the government will have to identify and subtract all revenues related to prescription medications that the alleged co-conspirators shipped by way of UPS, DHL and the United States Postal Service, as those carriers are not identified as co-conspirators, and are, without question, FedEx's competitors.  The process of sorting all this out falls somewhere along the spectrum between complicated and impossible.

---

15 The government has not designated an expert witness to present evidence on the issue of gross gain for the alternative maximum fine and apparently intends to present its evidence through an agent at trial, [REDACTED].  Given the legal issues and factual complexities of the calculation and the appropriateness of their resolution at the in limine motion stage, the government should be compelled to make a proffer at this time.

### 2.    The "Gains" Attributable to FedEx

This brings us to FedEx's revenues. ███████████████████████

███████████████████████████████████

There are several objections to that number.

The first problem is that under *Sanford* ████████████ is an incorrect measure of gross gains.  Only FedEx's pre-tax profits are admissible under 18 U.S.C. § 3571(d).

The second problem is that including in the gross gain number any of FedEx's revenues from internet pharmacies would be double counting: those same revenues were already included in the revenue numbers for the pharmacies and internet processing centers themselves. ████████████████████

████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

███████████████████████

The third problem is that ██████████████████████

█████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████  At trial,

any meaningful presentation of evidence in support of the alternate maximum fine allegation would require the tracing of FedEx's revenues to alleged co-conspirators' sales of prescription medications, after evidence has established beyond a reasonable doubt that those sales were illegal — and that FedEx conspired to facilitate the illegal distributions.

The fourth problem arises from ██████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████.  It will be for the government to establish that the revenues FedEx received were in fact generated by illegal sales of prescription medications, as charged in the indictment.  Many of the alleged conspirators had numerous FedEx accounts and often utilized some their accounts to pay for shipments by third parties, including pharmacies that may or may not be included in the charged conspiracies.  An accurate presentation of the revenues in support of the alternative maximum fine allegations will require tracing those revenues to co-conspirators' actual shipments of illegal prescription medications, as alleged in the indictment.  Formulas and assumptions will not suffice.  *See, e.g., Wal-Mart Stores v. Dukes*, 561 U.S. 338, 367 (2011) (rejecting the concept of a "trial by formula," without consideration of individual claims, in a civil class action case).

## C.    Conclusion

For all of the reasons set forth above, the Court should exclude evidence offered in support of the alternative fine allegation pursuant to § 3571(d) on the grounds that the

presentation of such evidence would unduly complicate and prolong the proceedings.

## VII.   DEFENSE MOTION IN LIMINE #7: EXCLUDE EVIDENCE RELATED TO SHIPMENT OF CIGARETTES BY FEDEX GROUND TO RESIDENTIAL CONSUMERS ALLEGEDLY IN VIOLATION OF STATE AND FEDERAL LAW

The government's Rule 404(b) letter states that the government plans to introduce evidence of "FedEx's shipment of cigarettes to residential consumers in violation of state and federal law, and in violation of the Assurance of Compliance reached with the City and State of New York."  Goldman Decl. ¶ 2, Ex. A at 15.  The letter cites to voluminous documents produced in a civil matter that relates to FedEx Ground Package System, Inc.'s ("FedEx Ground's") alleged shipments of cigarettes to residential addresses in New York.  This civil case is the subject of ongoing litigation in the Southern District of New York between FedEx Ground and the City and State of New York.  The evidence must be excluded.

First, FedEx conditioned its agreement to have the Rule 404(b) disclosures scheduled for less than three months from the start of trial upon the government's representation that any 404(b) matters would be limited to materials already exchanged between the parties.  In preparing for this massive and complex trial, defendants relied on that agreement.  Yet the government's letter cites to almost 10,000 pages of materials that were never exchanged between the parties.  Defendants are now in the exact position that they sought to avoid: learning at the eleventh hour that the government intends a substantial expansion of an already lengthy and complex trial on an issue that will shed no light on whether FedEx committed the offenses charged in the indictment.

Second, evidence regarding FedEx Ground's alleged residential deliveries of untaxed cigarettes should be excluded because it does not prove any material point; is not probative as to whether FedEx Corporation, Federal Express Corporation and FedEx Corporate Services, Inc. entered into criminal conspiracies with internet pharmacies; and is not similar to the offenses charged in the internet pharmacy criminal

matter.  The New York residential cigarette litigation involves:  (a) FedEx Ground, a FedEx operating company with a separate transportation network that is not charged in this prosecution; (b) civil, not criminal, liability; (c) entirely different federal and state statutory schemes, some of which have common carrier provisions that are fundamentally different from the provisions in the CSA and the FDCA; (d) a dispute over the parties' obligations under a contractual Assurance of Compliance ("AOC") between FedEx Ground and the State of New York; and (e) distinct legal and factual defenses on issues such as knowledge and intent.

Third, evidence regarding the residential delivery of contraband cigarettes should be excluded under Rule 403.  In light of the facts that the proffered evidence is a civil case involving a different operating company, a different commodity, different federal and state statutory frameworks, and obligations arising under a negotiated agreement, taking up the cigarette issue in this case will assuredly result in confusion of the issues and misleading the jury.  And, while government may intend to offer just "a soupçon" of evidence about the cigarette issue — i.e., enough to prejudice the jury without providing the full factual, procedural or legal context — FedEx would have no choice but to present a vigorous defense, which would involve numerous additional witnesses and documents.  Undue delay and waste of time are therefore not just a danger, but a certainty.  Moreover, the dubious relevance of cigarette deliveries in a trial about internet pharmacies is more than overcome by the prejudicial effect: communicating to the jury that FedEx has delivered other items for which there is some level of public disapprobation.  This is exactly the type of prejudicial "bad acts" evidence that Rule 404(b)(1) proscribes.

## A.    Factual Background

In its Rule 404(b) letter, the government revealed its intention to introduce nearly 10,000 of pages of records related to residential cigarette deliveries, as well as a deposition transcript.  Goldman Decl. ¶ 2, Ex. A at 16.  The government has also

identified two witnesses on this subject, one of whom is a law enforcement official expected to testify exclusively on an "investigation related to FedEx's distribution of cigarettes into the City and State of New York."  *See* Dkt. 232, No. 42.

This issue regarding the alleged shipment of untaxed or unstamped "contraband" cigarettes to residential recipients located in the State of New York is the subject of two ongoing lawsuits brought by the City and State of New York against FedEx Ground[16] in December 2013 and November 2014 in the United States District Court for the Southern District of New York.  *See City of New York and People of the State of New York v. FedEx Ground Package System. Inc.* (13-cv-9173-ER); *City of New York and People of the State of New York v. FedEx Ground Package System Inc.* (14-cv-8985-ER).

The first lawsuit alleges that in violation of several federal and state statutes FedEx Ground knowingly delivered contraband cigarettes to residential recipients in the state of New York.  The City and State of New York seek damages and penalties under the Contraband Cigarette Trafficking Act, 18 U.S.C.  § 2341 *et seq.*, the Prevent All Cigarette Trafficking Act 15 U.S.C. § 375 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.,* as well as penalties under New York Public Health Law § 1139-ll and under an Assurance of Compliance between the state of New York and FedEx entered into in 2006 (the "AOC").  The claims by the City and State of New York in the 2014 action are substantially similar to the 2013 case; the plaintiffs contend that FedEx Ground provided delivery services on behalf of several additional contraband cigarette shippers.  Both cases are presently in the discovery phase.

---

[16] FedEx Express was initially named as a defendant in the first lawsuit but was voluntarily dismissed near the start of the action pursuant to Fed. R. Civ. P. 41(a)(1). *See City of New York and People of the State of New York v. FedEx Ground Package System. Inc.* (13-cv-9173-ER), Dkt. No. 6.

**B.     Argument**

    1.     <u>The Government's Failure to Timely Produce Documents Related to Alleged Contraband Cigarette Shipments Compromises Defendants' Ability to Fully and Fairly Defend Against These Satellite Allegations</u>

Since the date of the indictment, FedEx has sought to bring this case to trial as quickly as practicable to demonstrate that it is innocent of all charges.  This overarching goal had to be balanced against defendants' need to defend against charges involving a nine-year grand jury investigation, millions of pages of documents produced by each side, 262 witnesses named by the government, and allegations that FedEx conspired with two far-flung internet pharmacy organizations for which the only discernable "organization" appears to be one created by the government from whole cloth for the purposes of this prosecution.  Given the remarkable scope of this case, prompt disclosure of all evidence on which the government would seek to rely was of paramount importance.

In an effort to avoid unfair surprise, FedEx approached the USAO in October 2015 about an early date for Rule 404(b) disclosures.  *See* Dkt. 129, Ex. A.  In an October 2, 2015 telephone discussion on this subject, the prosecution attorneys advised FedEx counsel that the government would not give notice of an intention to introduce evidence that had not previously been provided to the defense in discovery (or produced by FedEx itself to the government in response to a grand jury subpoena).  *See* Dkt. 129 ¶ 13.  Based on this representation, FedEx agreed to the original timetable for Rule 404(b)-type disclosures, which called for disclosure approximately three months before the trial date.  *Id.*

Unfortunately, the government has not lived up to its promise.  With the exception of individual pages from the FedEx *Service Guide*, none of the documents identified in Item 9 of the government's Rule 404(b) notice were previously exchanged between the parties.  Goldman Decl. ¶ 9.  Consequently, FedEx had no prior notice of the government's intention to make FedEx Ground's alleged delivery of untaxed

cigarettes to residents within the State and City of New York part of its internet pharmacy prosecution.

Of course, the FedEx companies were aware of the litigation in New York.  But that is not the issue — FedEx's counsel *in this case* was not on notice that this tangential, yet complicated, dispute would be a part of this trial.  This situation creates a fundamental unfairness to defendants.  As set forth below, even so much as a mention of "illicit delivery of cigarettes" in the upcoming criminal trial requires FedEx to put on a defense against a totally different set of allegations of misconduct involving a different operating company, a different commodity, different documents and witnesses, a different set of state and federal laws, disputes about obligations under the AOC and different standards of proof.  Defendants entered into the October 2015 agreement regarding timely production of 404(b) documents precisely to avoid the situation that FedEx now faces.

> ## 2.   There Is No Permissible Basis for the Introduction of Evidence Related to Untaxed Cigarette Shipments Delivered to New York State Recipients

Rule 404(b) provides, in pertinent part:

(1) Prohibited Uses:   Evidence of a crime, wrong, or other act is not admissible to prove a person's character or show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses:  This evidence may be admissible for another purpose, such as proving motive, opportunity, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

The "guilt or innocence of the accused must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing."  *Mayans*, 17 F.3d at 1181 (quoting *Bradley*, 5 F.3d at 1320). Evidence may be admitted pursuant to 404(b) only if "(1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in certain cases)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the act is similar to the offense charged."  *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002); *see also Mayans*, 17 F.3d at 1181.  The proffered evidence does not meet that test.  FedEx Ground's alleged shipment of contraband cigarettes to residential locations in New York is quintessential "bad acts" evidence intended only to show that FedEx "has engaged in other acts of wrongdoing."

> a.    *The Contraband Cigarette Issue Involves a Different FedEx Operating Company Not Charged in the Criminal Action*

In the case at bench, the government brought charges against FedEx Corporation ("FedEx Corp."), FedEx Corporate Services, Inc. ("FedEx Services"), and Federal Express Corporation ("FedEx Express").  The City and State of New York's actions regarding untaxed cigarette deliveries are exclusively against FedEx Ground.  FedEx Ground is a different subsidiary of FedEx Corp. that operates a completely separate delivery network from Express.  Ground has its own employees, its own management and executive team and, unlike FedEx Express, makes extensive use of independent contractors and independent service providers for its pick-up and delivery functions.  While FedEx Services does provide sales, marketing, IT and other back-office support for both Express and Ground; there is little overlap between the FedEx Services employees involved in the two cases.  The fact that FedEx Ground may have delivered untaxed cigarettes to residential consignees in the State of New York is not at all probative as to whether Express knowingly transported FDA-approved prescription drugs for which the prescription was not issued in the usual course of professional practice and for a legitimate medical purpose, with the specific intent of furthering such criminal activity.

> b.    *The Alleged "Illegality" of Untaxed Cigarette Shipments Involves a Completely Different Statutory Framework*

Cigarettes do share one thing in common with prescription drugs:  neither are inherently illegal items.  What turns these otherwise lawful commodities into alleged "contraband" involves complex statutory and regulatory schemes.

The "illegality" in the cigarette litigation principally turns on the question whether certain persons have paid certain New York excise taxes imposed by the city and the state, under a highly complex regime.  To understand the nature of the alleged "violations of state and federal law" and "violation of the Assurance of Compliance reached with the City and State of New York" jurors will, at a minimum, need to hear evidence on the Contraband Cigarette Trafficking Act, the AOC, New York public health laws, New York tax laws, and city administrative codes related to cigarettes.

Moreover, the treatment of common carriers under some of these statutory schemes is vastly different from their treatment under the CSA and FDCA.  For example, New York state law has very specific language relevant to the obligations of common carriers, such as a unique evidentiary presumption on knowledge specific to common carriers transporting cigarettes to homes or residences.  *See* N.Y. PHL § 1139-ll(1) ("if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a [authorized recipient]"); *see also* 15 U.S.C. § 376a(b)(2) (PACT act provision establishing obligations for common carriers or other delivery services).  As discussed *supra* and in prior pleadings, the CSA and FDCA have very different provisions regarding the obligations of common carriers.  The danger that jurors may confuse or conflate these two very different statutory schemes and the very different treatment of common carriers vastly outstrips the dubious relevance of the proffered evidence.

> c.    *There is Little Overlap in Evidence or Witnesses in These Two Separate "State of Mind" Cases*

The internet pharmacy prosecution and the residential tobacco civil case are distinct in another significant way: there are virtually no witnesses with substantial involvement in both matters.  Indeed, the government has listed only one witness who has a foot in both cases — Heath Harlem — and his foot in the internet pharmacy matter relates to one of the government's 85+ alleged "404(b)" pharmacies, not one of

the alleged co-conspirators in the superseding indictment.  While the *Romero* factors do permit the introduction of Rule 404(b) evidence where it proves a material point or shows that the defendant committed the charged act, that standard is not satisfied where the proffered evidence involves an uncharged company, different employees and different FedEx customers shipping a commodity governed by an entirely different legal regime and a negotiated Assurance of Compliance.

3.

### 3. Any Relevance of Contraband Cigarette Deliveries by FedEx Ground is Vastly Outweighed by the Dangers of Unfair Prejudice to the Charged FedEx Defendants, Confusion of the Issues and Misleading the Jury

Even if there is a colorable basis to admit the proffered evidence under Rule 404(b), it would still have to be excluded under Rule 403.  Indeed, introducing this collateral matter would give rise to nearly the full panoply of circumstances that call for exclusion under Rule 403, including unfair prejudice, confusing the issues, misleading the jury, undue delay and wasting time.

It is well established that when Rule 404(b) evidence would result in a "mini trial," the Court can and should decline to allow such matters to be introduced.  *See Tennison*, 244 F.3d at 690 (affirming the exclusion of evidence under Rule 403 where the evidence "might have resulted in a 'mini trial'").  In this instance, discussion of purportedly illegal residential cigarette deliveries by FedEx Ground would not just give rise to a mini trial — but a *full trial* on what is demonstrably a satellite issue.  No doubt the government will assert that it is capable of making its allegations through one or two witnesses whose testimony will not exceed a few hours.  But as this Court has already observed, "in the system there are things called a defense."  Dkt. 122 at 10:12-13.  The fact that FedEx has been sued by the City and State of New York does not mean that the company has in fact engaged in any wrongdoing.  Indeed, FedEx Ground is defending the allegations in those cases on both factual and legal bases.  *See, e.g., New York v. FedEx Ground* (13-cv-9173-ER) Dkt. 101; *New York v. FedEx Ground* (14-

cv-8985-ER) Dkt. 34. And defending against allegations that are the subject of two complex lawsuits in the Southern District of New York, with dozens of witnesses and tens of thousands of pages of records — and totally separate statutory and regulatory regimes — is not something that can be accomplished by FedEx through one or two witnesses in a few hours. Nor is this an issue that FedEx can "just phone . . . in." Dkt. 122 at 10:9. Especially in the context of a trial expected to last for several months, *see* Dkt. 229 at 34, and for which the government has identified more than 200 prosecution witnesses, Dkt. 232, pursuing this complicated tangent would be inappropriate.

The danger of confusion of the issues is also manifest. The New York tobacco matter involved FedEx Ground, which is not a party to the criminal case. The New York tobacco matter is a civil case, while the instant matter has been brought as a criminal case with different standards of proof and different evidentiary standards. The two commodities are subject to vastly different regulatory schemes, including widely disparate provisions specific to common carriers. It is not just likely, but a virtual certainly, that jurors could allow the laws and standards applicable to cigarette shipments by FedEx Ground to impact their deliberations regarding whether FedEx Express, Corporation or Services committed a crime related to the transportation of prescription medicine.

Finally, introduction of evidence regarding the shipment of cigarettes to residential consumers will work an unfair prejudice to FedEx. Whatever rationale the USAO may apply to seeking admission of this evidence, the impact will be to communicate to jurors that FedEx ships other items that are harmful to the public health. The issue in this case is not whether FedEx's networks are used to transport items that may (or may not) be contraband — but whether FedEx committed the specific intent crimes of criminal conspiracy, substantive distribution, felony misbranding, or money laundering. Evidence that other possibly illicit items were allegedly transported by a FedEx operating company is probative of nothing.

1

2

## VIII.   DEFENSE MOTION IN LIMINE #8: EXCLUDE EVIDENCE OF FEDEX'S POLICIES CONCERNING THE SHIPMENT OF ALCOHOL

3

4

The government's Rule 404(b) notice states that the prosecution plans to

introduce evidence of:

5

6

7

> FedEx's policies for shipping alcohol, including the "grid" of states into which and from which shipping is allowed, FedEx's practices with respect to alcohol shippers, FedEx's sending of warning letters, cashing of accounts and revoking of shipping services to violators of its alcohol policies, and FedEx's improper alcohol shipments form.

8

Goldman Decl. ¶ 2, Ex. A at 15.  The government has also listed FedEx employee

9

Melissa Jones on its witness list, identifying her as a witness who is expected to testify

10

about "FedEx's policies and procedures for the shipment of alcohol."  Dkt. 232 (No.

11

109).

12

As FedEx is not charged with any crimes relating to alcohol, it appears that the

13

purpose of this proposed extrinsic evidence is to juxtapose FedEx's conduct in the

14

alcohol sphere with its conduct in relation to prescription medications.  For several

15

reasons, such an approach is impermissible.  Pursuant to Federal Rules of Evidence

16

402, 403 and 404(b), FedEx seeks an order precluding the government from introducing

17

the proffered evidence.

18

19

### A.   The Government's Proposed Evidence Pursues a Theory of Negligence, Not Criminal Knowledge or Intent

20

The government's apparent hope to contrast FedEx's conduct in the alcohol and

21

medication arenas should not be permitted.  It is not relevant whether FedEx could have

22

undertaken steps with respect to shipments of medication that it took with respect to

23

alcohol shipments.  The charges in this case each require the government to prove that

24

FedEx acted with guilty *knowledge* and specific *intent*.  *See* Dkt. 208 at 4-5.  They raise

25

the questions: "What did FedEx know?  What were they told?  What did they do?  What

26

did they say?"  *See* Dkt. 53 (9/25/2014 Tx) at 5:8-12 & 22-24; *see also* Dkt. 69

27

(1/21/2015 Tx) at 8:20-23, 9:24-10:3, 11:20-12:16; Dkt. 85 (2/20/2015 Tx) at 11:3-8.

28

The charges do *not* raise the question "What *could* FedEx have done?"  Pursuing such

proof would be akin to trying FedEx on a negligence theory.  But this is not a negligence case.  *See also* Defense Motion In Limine #19, *infra*.

In short, FedEx's policies concerning alcohol shipments say nothing at all about the company's knowledge or intent concerning shipments of prescription medications. The evidence is therefore irrelevant.

## B.    Even if a Negligence Theory Were Permissible, the Alcohol Evidence Would Not Be Relevant

Even if the government were permitted to demonstrate what steps FedEx *could* have taken, the proffered evidence relating to alcohol shipping would still have to be excluded as irrelevant and unfairly prejudicial.  Alcohol shipments are so unlike shipments of prescription medications that FedEx's policies related to alcohol cannot justly be set up as an exemplar.

### 1.    Unlike Pharmaceuticals, Common Carriers Such as FedEx Are Directly Regulated With Respect to Alcohol Shipments

Prescription medication and alcohol share one similarity: they are *legal* commodities subject to complex regulatory regimes.  For purposes of this matter, however, they differ in a highly significant way: while common carriers are not directly regulated with respect to the transportation of prescription drugs, they are subject to extensive state regulation in the alcohol arena.

With respect to prescription drugs that have been classified as controlled substances, all manufacturers, wholesalers, prescribers and dispensers are required to register with the DEA, and registrants' activities are governed by a detailed series of regulations.  *See* 21 U.S.C. §§ 801 *et seq.*; 21 C.F.R. §§ 1300.01 *et seq.*  Prescription medications — both controlled and non-controlled — are also monitored by the Food and Drug Administration ("FDA") pursuant to the FDCA.  *See* 21 U.S.C. §§ 301 *et seq.*; 21 C.F.R. §§ 1.1 *et seq.*  Common carriers, however, are not subject to these detailed regulatory schemes involving prescription medications.  To the contrary, they are expressly exempted.  The CSA provides that common carriers that possess controlled

substances in the usual course of business "shall not be required to register and may lawfully possess any controlled substance."  21 U.S.C. § 822(c).  Similarly, the FDCA unequivocally provides that "carriers engaged in interstate commerce . . . . shall not be subject to the other provisions of this Act by reason of their receipt, carriage, holding or delivery of food, drugs, services, tobacco products, or cosmetics in the usual course of their business as carriers . . . ."  21 U.S.C. § 373(a).

The regulatory framework for common carriers engaged in the domestic shipment of alcohol is categorically different.  The 21st Amendment to the U.S. Constitution expressly grants each state the right to govern the transportation of alcoholic beverages into the state.  *See* U.S. Const. Amend. 21, § 2 ("The transportation or importation into any state, territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."); *Granholm v. Heald*, 544 U.S. 460, 486 (2005) (noting that the states "have broad power to regulate liquor under § 2 of the Twenty-First Amendment").  In turn, many states have imposed licensing, recordkeeping, and affirmative reporting requirements directly applicable to common carriers.  *See, e.g.,* California Code of Regulations Title 18, Article 4, Regulation 2540 (requirement to report all deliveries of alcoholic beverages, for shipments originating outside of California); 2012 Florida Statutes Title XXXIV, Sec. 562.20 (Florida monthly reporting requirements).[17]

The marked difference in the two regulatory regimes — one in which Congress has expressly exempted common carriers versus one in which there is direct regulation by the states — takes alcohol shipments and FedEx's alcohol shipping program outside

---

[17] As discussed in Defense Motion In Limine #12, *infra*, many state laws that impact common carrier services are preempted by the Airline Deregulation Act.  The situation is different in the alcohol arena, as the 21st Amendment expressly provides that "[t]he transportation or importation into any State, . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."  U.S. Const. Amend. 21, § 2.

the ambit of admissibility under Rule 404(b)(2).  FedEx's alcohol policies and alcohol

shipping programs are mandated in order for FedEx to comply with state law.  It would

be unfair for the government to contrast FedEx's treatment of a commodity for which it

is directly regulated by the states with its treatment of commodity for which the federal

government has explicitly exempted common carriers from regulation.

<strong>2.     The Rules and Regulations for Alcohol Shipping Principally Relate<br/>to Issues Relating to the Transit and Delivery of Alcohol</strong>

In addition to the difference in statutory and regulatory treatment, there is another

material way in which FedEx policies regarding the shipment of alcohol are distinct from

the conduct alleged in the indictment.  FedEx's alcohol shipper program is oriented

towards meeting the company's reporting obligations and compliance with the laws and

regulations regarding the *transportation and delivery of alcohol*.  The program does not

involve an assessment of the legality or illegality of the manufacture or sale of alcohol

tendered for shipment, nor an assessment whether alcohol tendered for shipment has

been improperly adulterated as defined under state law.

At base, FedEx's alcohol shipper program requires entering into the FedEx

Alcohol Shipping Agreement before tendering a package containing alcohol to FedEx.

Enrolling in the program is mandatory for all alcohol shippers, and involves: (a) requiring

the use of specialized alcohol indicators upon label creation, so that FedEx can meet its

state law reporting requirements; (b) validating that the shipper is licensed by the

applicable state and federal authorities; (c) requiring that shippers only ship between

permissible origin and destination states; (d) requiring that the shipment be labeled as

containing alcohol per applicable state laws; and (e) requiring that the shipper use

FedEx's Adult Signature Required service, which triggers obtaining the signature of a

person twenty-one years or older at time of delivery.

These requirements are designed to prevent against an alcohol shipment

violating state law by virtue of its transit or delivery — an element that is distinctly within

a carrier's purview, but is *not* at issue in the government's charges regarding internet pharmacies.  By way of illustration: a bottle of wine shipped from the state of California may be legal if delivered to an address in Tennessee, but illegal if shipped to an address in Mississippi.  Or, a shipment of alcohol may be permissible if the recipient is over twenty-one but impermissible if delivered to a minor.  These are violations that occur as a consequence of something attendant to the functions of a common carrier — transporting and delivering packages.  But FedEx does not concern itself with ascertaining whether a shipment of scotch is a "valid" scotch product that has been aged in oak barrels for three years.

In contrast, in the prosecution at bench, the government is not claiming that the prescription medications came to violate the law as result of something involving the transportation or receipt of the item.  Rather, the government asserts that the item was contraband at the time it was tendered for delivery because the medication was prescribed by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose.

For this reason, evidence regarding the contours, mechanics and execution of FedEx's alcohol shipping program, which focuses on transportation and delivery requirements specific to alcohol and FedEx's state law reporting obligations, is not probative as to whether FedEx committed the charged crimes, will confuse the issues, and will waste time.

### C.    The Proffered Evidence Must Be Excluded Under Rule 403

Finally, any fair exposition of this issue would require an extended detour into the thicket of varying state laws and regulations regarding licensee-to-licensee alcohol shipments and direct to consumer wine shipments.  This evidence would mislead the jury, cause undue delay and waste time, and it must therefore be excluded under Rule 403.

For all of the above reasons, the Court should exclude the evidence described in

Item 8 of the government's Rule 404(b) notice and the testimony of Melissa Jones

insofar as it relates to FedEx's policies and procedures regarding alcohol.

## IX. DEFENSE MOTION IN LIMINE #9: EXCLUDE EVIDENCE OF SETTLEMENT NEGOTIATIONS AND STATEMENTS MADE DURING THOSE NEGOTIATIONS

The government has observed that, during the grand jury investigation that gave

rise to this case, FedEx and the prosecution participated in negotiations to determine

whether to settle the investigation by way of a non-prosecution agreement.  Dkt. 127 at

5; Dkt. 231 at 4; ███████████████████████████████████

███████████████████████████████.  Pursuant to Federal

Rule of Evidence 410, the Court should exclude any evidence of statements made

during the settlement negotiations.

Rule 410 provides as follows:

(a) Prohibited Uses. In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions:

    (1) a guilty plea that was later withdrawn;

    (2) a nolo contendere plea;

    (3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or

    (4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

(b) Exceptions. The court may admit a statement described in Rule 410(a)(3) or (4):

    (1) in any proceeding in which another statement made during the same plea or plea discussions has been introduced, if in fairness the statements ought to be considered together; or

    (2) in a criminal proceeding for perjury or false statement, if the defendant made the statement under oath, on the record, and with counsel present.

*See also* Federal Rule of Criminal Procedure 11(f); *United States v. Sayakhom*, 186 F.3d 928, 935-36 (9th Cir. 1999).

The settlement negotiations between the prosecution and FedEx should be excluded from evidence, as neither of the exceptions set forth in Rule 410(b) apply.

## X.  DEFENSE MOTION IN LIMINE #10: EXCLUDE EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES

Pursuant to Federal Rule of Evidence 407, FedEx moves for an order precluding the government from introducing evidence of training programs or other remedial measures regarding online pharmacy shippers that were initiated by FedEx after the period covered by the indictment.

### A.  Factual Basis for Motion

Subsequent to the time period covered by the indictment, FedEx developed and initiated employee training programs and other measures related to internet pharmacy shippers. ███████████████████████████████████████████████████████ ████████████████████████████████████████████  The prosecution may seek to introduce evidence of these measures in an attempt to demonstrate the types of efforts that, if previously implemented, might have equipped FedEx employees to determine whether the online pharmacies in the indictment were operating illegally.

### B.  Argument

Evidence regarding internet pharmacy-related initiatives implemented by FedEx following the initiation of the government's investigation should be excluded under Federal Rule of Evidence 407.  The rule provides that evidence of subsequent remedial measures is not admissible to prove culpable conduct.  Fed. R. Evid. 407; *see also United States v. DSD Shipping, A.S.*, No. 15-00102-CG-B, 2015 U.S. Dist. LEXIS 131003 at *2-5 (S.D. Ala. Sept. 19, 2015) (recognizing that Rule 407 applies in criminal as well as civil cases).  The training programs and other measures that post-date the conduct set forth in the superseding indictment are precisely the types of efforts that the

1

2   rule was designed to encompass.

3          Rule 407 is based on the social policy of encouraging parties to take action in

4   response to events that might alleviate future harm without fear that their actions will be

5   used as evidence against them. *See Gauthier v. AMF, Inc.*, 788 F.2d 634, 637

6   *amended*, 805 F.2d 337 (9th Cir. 1986).  Permitting the government to introduce

7   evidence of training programs or other initiatives implemented by FedEx after the

8   initiation of the government's investigation would squarely contravene this social policy.

9   The chilling effect would be substantial, as corporations or other defendants would

10  become justifiably reluctant to take remedial measures out of fear that such efforts

11  would become the proverbial "Exhibit A" at trial of what previously could, should, or

12  might have been done.

13         In the context of a criminal prosecution brought by the United States Department

14  of Justice against corporate defendants, the basis to exclude evidence of subsequent

15  remedial measures is not only grounded in Rule 407, but in considerations of public

16  policy.  Under the Department's "Principles of Federal Prosecution of Business

17  Organizations," one of the factors that determines whether the government will bring

18  charges against a corporate defendant is "the corporation's remedial actions."  *See*

19  United States Attorney's Manual, Principles of Federal Prosecution of Business

20  Organizations § 9-28.300 (Factors to Be Considered).  Corporations are thus

21  incentivized to take remedial measures as a means to potentially avoid a criminal

22  prosecution.  The Department of Justice cannot encourage the adoption of remedial

23  measures to avoid prosecution, and then turn around and use those exact measures to

24  obtain a conviction should the federal prosecutors exercise their discretion to prosecute

25  notwithstanding the corporation's efforts.

26         For these reasons, the training programs and other measures taken by FedEx

27  related to online pharmacies subsequent to the period set forth in the superseding

28  indictment should be excluded.

XI.   **DEFENSE MOTION IN LIMINE #11:** ███████████████████████████
████████████████████████

The grand jury investigation that gave rise to this case began at least as early as 2008, ███████████████████████████████████████████████████████████. *See* Dkt. 28. Pursuant to Federal Rule of Evidence 403, the Court should preclude the government from introducing evidence of ██████████████████████████████████████ ████████████████████. Such evidence would be irrelevant, confusing and unfairly prejudicial.

███████████████████████████████████ is not probative of any element the government must prove in this matter. Such evidence may, however, tend to unfairly bolster the government's case by suggesting that █████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████ Turning counsel into witnesses (or prospective witnesses) would needlessly complicate the proceedings and could confuse the jury or distract it from consideration of the real evidence in the case.

XII.   **DEFENSE MOTION IN LIMINE #12: EXCLUDE EVIDENCE THAT FEDEX PURPORTEDLY VIOLATED STATE LAWS AND PROFESSIONAL ASSOCIATION GUIDELINES**

In its Rule 404(b) letter, the government advised that it intends to introduce evidence regarding "[v]iolation of various state laws and professional association guidelines governing the practice of medicine and pharmacy." Goldman Decl. ¶ 2, Ex. A at 17 (Item 17). The letter lists eight states as examples, along with guidelines promulgated by the American Medical Association, the Federation of State Medical Boards and the National Association of Board of Pharmacies.

FedEx has not been charged with violations of "various state laws" or "professional association guidelines."  None of the FedEx defendants are engaged in the practice of medicine or pharmacy.  To the contrary, as the defendants are "package delivery companies and providers of specialized transportation and logistics services," Dkt. 28 ¶1, any state laws, regulations or standards that purport to impose requirements related to the pick-up, transportation or delivery of prescription medication would be expressly preempted by federal law.

Federal Express Corporation, the defendant that provided the transportation services at issue in this case, is a federally certificated air carrier.  *See* Goldman Decl. ¶ 10, Ex. G.  When Congress deregulated the airline industry through passage of the Airline Deregulation Act of 1978 ("ADA"), it sought to prevent individual states from "undo[ing] federal deregulation with regulation of their own" by including in the law a preemption clause.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378-79 (1992). The preemption clause provides that "no state shall enact or enforce any law, rule, regulation, standard or any other provision having the force and effect of law relating to rates, routes or services of any air carrier."  49 U.S.C. § 1305(a)(1).  This provision was intended to prevent states from interfering with federal deregulation by enacting and enforcing their own regulations on air carriers.  *See American Airlines v. Wolens*, 513 U.S. 219, 222 (1995).

Thus, the ADA specifically preempts all state laws, rules, regulations or enforcement actions that have a connection with or reference an air carrier's "rates, routes, or services."  *See Morales*, 504 U.S. at 384.  Preemption may occur even if the effect on rates, routes or services is only indirect.  *Id.* at 386.  The courts have construed the term "services" broadly, *id.* at 383-84*,* finding that it encompasses delivery of air cargo by shipping companies, *see Federal Express Corp. v. California Pub. Util. Comm'n*, 936 F.2d 1075, 1078 (9th Cir. 1991) ("Federal Express is exactly the kind of an expedited all-cargo service that Congress specified and the kind of integrated

transportation system that was federally desired . . . . Congress has freed it from the constrictive grasp of economic regulation by the states."); *United Parcel Service, Inc. v. Flores-Galarza,* 318 F.3d 323 (1st Cir. 2003).

Federal preemption doctrine has been applied to commodity-specific state laws the enforcement of which would have the effect of regulating an air carrier's services.  In *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 (2008), Maine had adopted a law that required tobacco shippers to require carriers to ensure that the recipient was old enough to purchase tobacco products.  *Id.* at 368-69.  Defendant New Hampshire Motor Transport Association argued that the Maine laws were preempted under the Federal Aviation Administration Authorization Act of 1994,[18] as the state laws had a direct effect on, or were connected to, a cargo carrier's service.  *Id.* at 369.  The Supreme Court found the Maine laws to be preempted because, among other reasons, the law imposed a state requirement under which the carrier would be compelled to examine packages to ensure compliance with state law requirements, an undertaking which would "directly regulate[ ] a significant aspect of the motor carrier's package pickup and delivery service" and "create[ ] the kind of state-mandated regulation that the federal Act pre-empts."  *Id.* at 373; *see also id.* ("[F]ederal law . . . must pre-empt state regulation of the essential details of a motor carrier's system for picking up, sorting, and carrying goods — essential details of the carriage itself.")

The holding of *Rowe* would apply with equal force to any state laws, regulations or guidelines that purport to impose requirements on air carriers related to the transportation of prescription medication.  A state legislative or regulatory requirement that required FedEx Express to ascertain whether pharmaceuticals were legally

---

[18] The FAAA's preemption provision is in pertinent part identical to the preemption provision of the ADA and is generally considered in pari materia.  *See Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013); *Rowe*, 552 U.S. at 370.

compliant (i.e. "validly prescribed") before accepting the shipments for transport would be preempted and void, as such requirements would have the effect of regulating a significant aspect of pick-up and delivery services by an air carrier.[19]

FedEx recognizes that state laws and professional association guidelines may have some relevance to the question whether physicians, pharmacies, and pharmacists associated with certain internet pharmacy operations violated the laws, regulations and guidelines governing their conduct. But no physicians, pharmacies and pharmacists have been charged in this instant prosecution. Only FedEx is on trial in these proceedings. The Court should preclude the government from arguing, or seeking to introduce evidence demonstrating, that FedEx's conduct violated state laws or professional guidelines.

## XIII. DEFENSE MOTION IN LIMINE #13: EXCLUDE PROOF OF ADVERSE EVENTS

The government's Rule 404(b) letter asserts that the government hopes to introduce into trial evidence of "[d]rug abuse, overdose, and death of customers of Internet and fulfillment pharmacies." Goldman Decl. ¶ 2, Ex. A at 12-14.[20] The letter

---

[19] Of course, the *federal* regulatory provisions related to common carriers impose no such requirements. *See* 21 U.S.C. § 822(c)(2) (Controlled Substances Act provision that a common carrier "shall not be required to register and may lawfully possess any controlled substance or list I chemical under" if the carrier's "possession of the controlled substance or list I chemical is in the usual course of his business or employment"); 21 U.S.C. § 373(a) (Food Drug and Cosmetic Act provision that carriers shall not be subject to the other provisions of [the Food, Drug and Cosmetic Act] by reason of their receipt, carriage, holding or delivery of . . . drugs . . . in the usual course of business as carriers . . . .").

[20] The indictment itself also makes a number of allegations concerning persons who died during the time period covered by the indictment. In particular, the indictment asserts that "FEDEX delivered controlled substances and prescription drugs from online pharmacies to individuals who subsequently died or accidentally caused the deaths of others, including but not limited to on or about: August 6, 2002, November 8, 2005, February 24, 2006, March 16, 2006, and March 20, 2009." Dkt. 28 ¶ 21. The indictment also asserts that FedEx personnel learned about online pharmacy customers

---

divides the evidence into two groups: adverse consequences "about [which] FedEx had knowledge," *id.* at 12-13, and others, *id.* at 13-14.[21]  The government's witness list likewise includes a large number of witness who the government plans to offer to testify about adverse consequences suffered by themselves or members of their families.  *See* Dkt. 232 at 17-24.

The Court previously excluded such evidence from admission at the *Napoli* trial. *See Napoli* (10-cr-00642-CRB) Dkt. 884 at 61-63.  The government should likewise be precluded from introducing evidence concerning such adverse consequences in this case, except to the extent that information about the events appeared in contemporaneous FedEx communications that are relevant and admissible for reasons other than proving the occurrence of the adverse consequences.  Otherwise, the evidence of adverse consequences is irrelevant and unduly prejudicial.

### A.   Evidence of Adverse Consequences is Not Admissible Under Rule 404(b)

The government's letter asserts that the evidence of deaths and other adverse consequences is admissible under Rule 404(b).  It is not.

Rule 404(b) can sometimes permit the admission of prior *acts*.  *See* Rule 404(b)(1) & (2).  But the evidence the government proffers here constitutes the purported *consequences* of pharmaceutical shipping — i.e., acts that are already either charged in the indictment or proposed to be separately admitted under Rule 404(b).

---

who died.  *Id.* ¶¶ 20, 101-102.  The government appears to have listed each of these events in its Rule 404(b) letter, and we address their admissibility below.

[21] The government's letter includes in the "FedEx had knowledge" group two incidents — both discussed on page 13 of the letter — about which the evidence of FedEx's knowledge is tenuous, at best.  Concerning decedent Corey N., we can find no evidence that any FedEx employee was aware of the events in question.  Concerning decedent Clara W., who died in 2006 in Texas, the only suggestion of knowledge is a witness interview in which a FedEx salesperson recalled learning on a television news broadcast in 2009 or 2010 that "Wayne WHITE was locked up for someone in Texas overdosing on drugs sent from WHITE's pharmacy."  Goldman Decl. ¶ 22.

The consequences of such acts are not made admissible by Rule 404(b).

## B.     Evidence of Adverse Consequences is Irrelevant

The government's letter also suggests that the evidence of deaths and other consequences may be admissible under Rule 401 and 402.  Again, the government is incorrect.

Evidence is relevant and admissible only if it tends to make a fact more or less probable and that fact "is of consequence in determining the action."  Fed. R. Evid. 401; *see also United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc).  The alleged fact that someone suffered an adverse consequence as a result of a shipment by an online pharmacy does not establish any fact of consequence in determining this action.  Such evidence is not required — or even slightly probative — in establishing any of the elements of the charged offenses.

The irrelevance is especially stark in the case of adverse consequences about which the government does not even contend FedEx was aware.  *See* Goldman Decl. ¶ 2, Ex. A at 13-14 (Item #4).  If FedEx employees did not know that someone had died or become addicted as a result of shipments from online pharmacies, then the evidence would establish nothing of consequence to the elements the government is required to prove.

Furthermore, the proposed relevance of any adverse consequences would have to depend on a showing of causation — that the consequences were caused by medications dispensed by FedEx's alleged conspirators and delivered by FedEx.  Yet, as discussed in more detail below, the adverse consequences proffered by the government include such events as a heart attack, a DUI-related car accident, and a possible suicide attempt; all of these are events for which causation is questionable at best.  And even when the events involved drug overdoses, in many cases the person involved had received medications from sources other than FedEx or its alleged coconspirators.  In the absence of proof of causation — which would require mini-trials

as to all of these events — the evidence of adverse consequences is irrelevant.

## C.   The Process of Proving These Events Would Lead to Undue Prejudice and Delay

Even if the evidence of deaths and other adverse consequences had some minor relevance, it would have to be excluded pursuant to Federal Rule of Evidence 403.  Any probative value of evidence of adverse consequences is vastly outweighed by the danger of prejudice, confusion and delay.

### 1.   The Evidence is Unfairly Prejudicial

The tragic nature of an early death, painful addiction or drug overdose is highly inflammatory.  Introduction of this evidence risks distracting the jury with judgments arising from passion rather than reason.

### 2.   The Evidence Has Very Slight Probative Value, At Best

As discussed, the fact that an adverse consequence occurred has scant, if any, relevance to the question whether FedEx committed the charged crimes.  Additionally, almost all of the evidence proffered by the government has fundamental flaws that severely undercut its already minimal value.  The slight value of the evidence is easily outweighed by the danger of unfair prejudice.

First, as discussed, a whole category of the government's adverse-consequences evidence concededly was not known to FedEx.  *See* Goldman Decl. ¶ 2, Ex. A at 13-14 (Item #4).  Such evidence does not tend to establish FedEx's intent, knowledge, motive, conduct, or any other thing that will be at issue in this trial.

Second, the evidence that connects the adverse consequences in question to conduct by FedEx — or even its alleged co-conspirators — is often missing or equivocal.  The government has identified 31 people who suffered adverse consequences.  *See* Goldman Decl. ¶ 2, Ex. A at 13-14.  Below we address a sampling so that the Court can get an idea of the types of tangential disputes that would arise if these events were introduced at trial.

a.      *Proffered Events About Which FedEx Had No Knowledge*

• The government's letter refers to Corey N.  Goldman Decl. ¶ 2, Ex. A at 13. Discovery produced by the government suggests that Corey N. died on August 6, 2002 of heart disease.[22]  The Broward County Medical Examiner, after initially failing to find a link between the death and any medication, eventually proposed that Corey N.'s heart disease may have been compounded by his use of phentermine, a bottle of which was allegedly dispensed by Rx Network of South Florida and delivered to Corey N. by way of FedEx.  *Id.* ¶ 11, Ex. H at RXZ006-1914.  But in a subsequent civil action, the doctor who issued the prescription submitted an expert's medical opinion that concluded that Corey N. "died of severe coronary atherosclerosis that could easily have caused sudden death at any time from any activity . . . . Based on my review of the records there is not a sufficient scientific basis to implicate phentermine as a causative agent in the claimant's death to a reasonable degree of scientific certainty."  *Id.* at RXZ008-0452-54. It appears that the civil suit was eventually voluntarily dismissed without a trial.  *Id.* ¶ 12, Ex. I.  Although the government has listed Corey N. among the people who suffered adverse consequences known to FedEx, *see id.* ¶ 2, Ex. A at 12-13, we find no evidence that any FedEx employee ever learned about Corey N.'s death.

• The government's letter refers to John T.  Goldman Decl. ¶ 2, Ex. A at 13. Discovery produced by the government suggests that the reference is to a man who died in Austin, Texas on November 8, 2005.[23]  Evidence collected and interviews conducted in the subsequent investigation of the death suggest that John T. had obtained prescription medications from numerous sources, including an "unknown pharmacy," Walgreens, a local pharmacy called T.I.S. Pharmacy, United Care

---

[22] The indictment also appears to reference this event.  *See* Dkt. 28 ¶ 21.

[23] The indictment also appears to reference this event.  *See* Dkt. 28 ¶ 21.

Pharmacy, a pain clinic, and others.  John T. had received deliveries of medications from the U.S. Postal Service, UPS and FedEx.  Some of the shipments were from overseas locations.  *Id.* ¶ 13, Ex. J.  We find no evidence that any FedEx employee ever learned about John T.'s death, a conclusion with which the government's letter implicitly concurs.

- The government's letter refers to Abigail V.  Goldman Decl. ¶ 2, Ex. A at 14. Discovery produced by the government suggests that Abigail V. was a six-year old girl who died on February 24, 2006 when her mother drove the car in which Abigail V. was a passenger off the road.[24]  A 911 call reported that Abigail V.'s mother was drinking an alcoholic beverage while driving, and that Abigail V. was seated, unsecured, in the passenger seat.  *Id.* ¶ 14, Ex. K.  The discovery suggests that before the accident, Abigail V.'s mother had received alprazolam from Kwic Fill pharmacy.  *Id.*  The discovery also suggests that Abigail V.'s mother had ingested alcohol before the accident, and that her blood may have contained opiates from an unknown source and possibly cocaine, as well.  *Id.*  We find no evidence that FedEx made any shipment involved in this tragic death.  We also find no evidence that any FedEx employee was aware of Abigail V.'s death, a conclusion with which the government's letter implicitly concurs.

- The government's letter refers to Evan B.  Goldman Decl. ¶ 2, Ex. A at 13. Discovery produced by the government suggests that Evan B. died on March 16, 2006, apparently from "multiple substance intoxication with lethal levels of propoxyphene and alprazolam."[25]  Evan B. had purportedly received packages from online pharmacies that were shipped by way of UPS and FedEx, but he had also received large numbers of

---

[24] The indictment also appears to reference this event.  *See* Dkt. 28 ¶ 21.

[25] The indictment also appears to reference this event.  *See* Dkt. 28 ¶ 21.

shipments — apparently by way the U.S. Postal Service — from foreign sources, including senders in Islamabad, Pakistan; Bangkok, Thailand; India; Argentina; and Germany.  *Id.* ¶ 15, Ex. L.  A DEA Diversion Investigator opened an investigation to determine whether "it could be proven that [an internet pharmacy in the United States] supplied illegally the controlled substances that caused Evan B[.]'s overdose death." The investigator concluded that he "could prove that (the lethal drugs) Propoxyphene and Alprazolam was ordered from Internet pharmacies in the United States, but the same drugs were also being ordered and shipped from several foreign countries in larger amounts during the same time period."  *Id.*  Again, we find no evidence that any FedEx employee was aware of Evan B.'s death, a conclusion with which the government's letter implicitly concurs.

- The government's letter refers to Laura C.  Goldman Decl. ¶ 2, Ex. A at 13. Discovery produced by the government suggests that Laura C. died on March 20, 2016.[26]  The discovery further suggests that Laura C. had a history of suicide attempts, including a several possible attempts in the weeks leading up to her death.  *Id.* ¶ 17, Ex. N.  Laura C. had purportedly received Soma, delivered by FedEx, from a website called myrxbill.com — a website that does not appear to have connection to any entities listed in the indictment.  *Id.* ¶ 16, Ex. M.  After the car accident, toxicology reports showed that Laura C. had ingested, in addition to Carisoprodol (Soma), Hydrocodone and Meprobamate.  The coroner advised that both the Hydrocodone and Carisoprodol were in the therapeutic range but consistent with driving under the influence.  *Id.* ¶ 17, Ex. N.  The discovery does not reveal the source of Laura C.'s Hydrocodone and Meprobamate.  We find no evidence that FedEx employees were aware of Laura C.'s death, a conclusion with which the government's letter implicitly concurs.

---

[26] The indictment also appears to reference this event.  *See* Dkt. 28 ¶ 21.

b.   *Proffered Events About Which FedEx Purportedly Had Some Knowledge*

- The government's letter refers to Steven A., and cites a document Bates numbered FDX_E3_0008176.  Goldman Decl. ¶ 2, Ex. A at 12.  The cited document is a chain of emails from May 26, 2010 in which FedEx Security employees circulated a report also dated May 26, 2010.  Goldman Decl. ¶ 18, Ex. O.  The report states that a FedEx Security Specialist received an email from a law enforcement source, also on that same date, concerning Steven A.'s death.  The report recites that Steven A. "was found dead this morning . . . at his residence.  2 bottles of Soma were located coming from a pharmacy out of New York."  *Id.*  Thus, nothing indicates which pharmacy shipped the medication, or even whether an online pharmacy was involved at all.  Nor is there evidence demonstrating conclusively that the death was caused by any medication.  Additionally, FedEx's purported knowledge appears to have arisen on May 26, 2010 — after the termination of the latest-running conspiracy charged in the indictment.  *See* Dkt. 28 at ¶¶ 71, 91, 108, 115.  Finally, and most importantly, this email is a good example of the paucity of evidence that supports the government's contention that FedEx committed other crimes or wrongs.  The record cited by the government in no way suggests that FedEx had any knowledge or intent with respect to Steven A. until May 26, 2010, at which time the document demonstrates that FedEx began to assist the law enforcement investigation into Steven A.'s death.  Goldman Decl. ¶ 18, Ex. O.

- The government's letter refers to Randall C., and cites to a document Bates numbered USFDX-0020000001.  Goldman Decl. ¶ 2, Ex. A at 12.  That document is a report of an interview between a case agent and Randall C.'s father, Craig C.  Goldman Decl. ¶ 19, Ex. P.  Craig C. recounted that after his minor son bought pharmaceuticals over the internet, he sued an online pharmacy and FedEx.  *Id.* at ¶ 1.  FedEx was quickly dismissed from the case.  *Id.* at ¶ 5; *see also* Goldman Decl. ¶ 20, Ex. Q (email attaching order granting summary judgment for FedEx on the ground that Craig C.'s suit was preempted by the Airline Deregulation Act of 1978).  According to the government's

report, Craig C. "said the only person he ever talked with at FEDEX was their attorney

. . . ."  Goldman Decl. ¶ 19, Ex. P at ¶ 6.  Craig C. "was asked if . . . filings related to

[his] research on valid prescriptions and the expert witnesses was provided to FEDEX,

and C[.] replied that they were not because FEDEX was out of the case by the time he

provided discovery."  *Id.* at ¶ 7.  As reflected in Goldman Decl. ¶ 20, Ex. Q, FedEx

attorneys circulated the summary judgment order; none of the attorneys appear on the

parties' witness lists.

- The government's letter refers to Clara W.  Goldman Decl. ¶ 2, Ex. A at 13.

Clara W. died on December 31, 2006 in New Boston, Texas.  Her estate filed a lawsuit

contending that her death resulted from improper distribution of Phentermine by

Superior Drugs and others.  Materials in the government's discovery suggest, however,

that at the time of her death, Clara W.'s blood contained 1.0 milligram/liter of

Phentermine.  The Dallas County Medical Examiner observed that the range observed

in fatalities by Phentermine toxicity is between 1.5 and 7.6 milligrams/liter.  However,

because the autopsy could not determine any other cause of death, the examiner

consulted that Clara W. died "as a result of the toxic effects of Phentermine."  Goldman

Decl. ¶ 21.  The government's letter asserts that FedEx "had knowledge" about Clara

W.'s death, and cites to a report of an interview with FedEx salesperson Faith Wilson.

According to the report, Ms. Wilson stated in her interview that "she learned [of an

overdose] on the news in 2009 or 2010 and said that Wayne WHITE was locked up for

someone in Texas overdosing on drugs sent from WHITE's pharmacy."  Goldman Decl.

¶ 22.  Thus, the evidence of FedEx's purported knowledge is a salesperson's vague

memory that she learned of "someone" overdosing two or three years after Clara W.'s

death, and that Wayne White was arrested as a result.[27]  This vague information is not

---

[27] Mr. White was arrested in May 2010, at the conclusion of the alleged Superior Drugs
conspiracy.

clearly tied to Clara W.'s death, and in any event is hardly probative of FedEx's guilt or innocence.

\*      \*      \*

Based on the foregoing recitation, it is obvious that numerous proof problems would confront the Court if the government were permitted to present evidence of the alleged adverse consequences.  In order for the evidence to have any value at all, the government would at least have to prove that actions by FedEx or its alleged co-conspirators had some causal relationship to each individual consequence — thereby necessitating numerous "mini trials" on the subjects of various alleged wrongful deaths or injuries.  Such disputes would likely confuse and mislead the jury, and would certainly cause substantial delay in an already long trial.

In *United States v. Cooper*, 286 F. Supp. 2d 1283 (D. Kan. 2003), the court confronted a similar issue in the context of a health care fraud prosecution.  The government sought to introduce evidence that customers "suffered negative health problems as a result of equipment" sold by the defendants.  *Id.* at 1295.  The court excluded the evidence under Rule 403, finding that "[t]he probative value of this evidence . . . is, at best, quite limited.  The medical consequences to . . . customers from the alleged fraudulent activities may be part of the whole story," but "[t]his is not a case where the defendants are accused of engaging in fraudulent transactions for the motive of causing physical harm to . . . customers."  *Id.*

> As far as the probative value of this evidence in telling the whole story, the court is persuaded that this evidence carries the potential of being inflammatory and could influence a jury into placing undue significance on the possible physical harm done to unsuspecting Medicare beneficiaries. Such evidence also would lengthen the trial with evidence regarding medical causation and the presence or absence of beneficiaries with actual medical consequences. Thus, the court concludes that the probative value of this evidence is substantially outweighed by relevant Rule 403 considerations, including unfair prejudice to the defendants.

*Id.*  This Court should follow the *Cooper* court's lead and preclude the government from introducing proof relating to the above-cited evidence.

**D.   Communications with FedEx Personnel that Reference People Who Experienced Adverse Events**

The government's letter references some persons — Jami B., Elizabeth D., Brandon L., Connie L. and Kristy M. — who were the subject of internal FedEx communications during the period covered by the indictment.  Goldman Decl. ¶ 2, Ex. A at 12.  By this motion we do not seek to exclude evidence relating to such communications, so long as the government establishes a proper evidentiary basis for their admission that goes beyond the mere fact that the adverse events occurred.  However, the Court should require the government to make an offer of proof before seeking to present any such evidence, so that the proffered evidentiary basis may be carefully examined and Rule 403 factors applied.  Moreover, for the reasons discussed above, the government should be precluded from introducing separate proof relating to the circumstances and causes of the adverse events and from proving that the adverse events in fact occurred.

**XIV.   DEFENSE MOTION IN LIMINE #14: EXCLUDE EVIDENCE RELATED TO DELIVERY OF MEDICATIONS TO TEENAGERS**

The government's Rule 404(b) notice states that the prosecution plans to introduce evidence of "FedEx's delivery of drugs to teenagers."  Goldman Decl. ¶ 2, Ex. A at 14.  This proposed evidence is typical of the government's skewed approach to the facts of this case; it suggests that FedEx somehow had an obligation to insert itself into the medical relationships between patients and their doctors and pharmacists.  But FedEx had no such obligation, and the evidence should be excluded under Rules 401, 402 and 403 as irrelevant, inflammatory, and a waste of time.

No law or rule prohibits teenagers from obtaining prescription medications or controlled substances; teenagers have medical needs just like everyone else.  Nor is there a rule that prohibits teenagers from obtaining prescription medications without parental supervision — such a rule would threaten teenagers' privacy rights and public

health goals.[28]

Of course, prescription medications must be properly prescribed by the doctor in question.  But that is a separate issue; with its proposed evidence, the government seeks to punish FedEx for failing to have a blanket rule requiring that persons over the age of twenty-one receive all shipments of prescription medications, when no comparable rule governs the prescribing doctors or dispensing pharmacists themselves.  Notably, the U.S. Postal Service imposes no requirement that prescription medications be received by a person over the age of twenty-one.  *See* U.S.P.S. Domestic Mail Manual, available at *http://pe.usps.com/text/dmm300/ dmm300_landing.htm* (accessed March 23, 2016).

The evidence relating to FedEx's delivery of prescription medications to teenagers sheds no probative light on any issue in this case.  Its only possible use would be to irrationally inflame the jury.  The evidence must be excluded.

## XV.   DEFENSE MOTION IN LIMINE #15: EXCLUDE EVIDENCE OF CUSTOMER COMPLAINTS AND CLAIMS

The government's Rule 404(b) notice states that the prosecution plans to introduce evidence of "[c]laims made by customers regarding delivery of drugs from Internet or fulfillment pharmacies named in the Superseding Indictment or listed [as Rule 404(b) evidence] asserting issues such as drugs were not ordered, wrong drugs were delivered, drugs were damaged or missing, and similar complaints . . . ."  Goldman Decl. ¶ 2, Ex. A at 16.  This evidence has little or no relevance, and should be excluded under Rules 401, 402 and 403.

The charges in this case require proof that FedEx knew it was shipping, and

---

[28] *See, e.g., https://www.aclu.org/preventing-teenagers-getting-contraceptives-unless-they-tell-parent-puts-teens-risk* (accessed March 20, 2016) ("Today, in every state, sexually active teenagers can get contraceptives to protect themselves against unplanned pregnancies and sexually transmitted diseases — even if they can't talk about sex with their parents.").

intended and agreed to ship, packages containing medications prescribed outside the usual course of professional practice and not for a legitimate medical purpose. Complaints by customers that they received the wrong medications, or that medications were damaged or missing, are irrelevant to those elements.  Such evidence, which arguably tends to show that certain online pharmacy shippers had shoddy business practices, does not make it more or less likely that FedEx knew it was shipping, or intended or agreed to ship, packages containing medications prescribed outside the usual course of professional practice and not for a legitimate medical purpose.

The government must also prove, of course, that the online pharmacy shippers were themselves committing the crime of intentionally distributing prescription medications outside the usual course of professional practice and not for a legitimate medical purpose.  Perhaps in a trial against those shippers evidence of customer complaints about shoddy business practices would have a very minor tendency to suggest that the online pharmacy entities were committing that crime.  But in the context of charges against FedEx, such evidence has no probative value and, even if it did, that value would be significantly outweighed by Rule 403 factors: presenting the evidence would cause undue delay and would risk confusing the jury about the legal issues in the case.  The government should be required to show that FedEx's alleged co-conspirators "inten[ded] to act as a pusher rather than a medical professional," *Feingold*, 454 F.3d at 1008, and that FedEx intended and agreed to facilitate such conduct — not that FedEx learned that some shippers had shoddy business practices.

## XVI.   DEFENSE MOTION IN LIMINE #16: EXCLUDE EVIDENCE RELATING TO NORTHWEST RESEARCH

In its Rule 404(b) notice, the government says that it plans to present evidence of:

Northwest Research's "red flag pharmaceutical" project and other instances in which Northwest Research employees identified packages from Internet pharmacies, including those named in the Superseding Indictment and listed in #1 above, as containing controlled substances or prescription

drugs, and/or exhibiting characteristics of fraud or illegality, and instances in which Northwest Research informed FedEx of its activities and findings with respect to Internet pharmacies.

Goldman Decl. ¶ 2, Ex. A at 16.  The government's witness list also includes several witnesses whom the government proffers to testify about this topic.  Dkt. 232 at 15 (Keith Johnstone), 16 (Steve Pittman), 21 (Julie Jackson).  This evidence should be excluded, as it is irrelevant.

Northwest Research is a company that FedEx hired to handle certain "overgoods" packages.  "Overgoods" can be conceptualized as a type of "lost-and-found": the category includes packages that, for some reason, cannot be delivered to the recipient or returned to the sender.  Reasons may include, for example, that the shipping label has fallen off the package during transit.  Northwest Research takes possession of some of these packages, attempts to determine an appropriate person to receive them, and — failing that — eventually disposes of the packages through auction or other means.

The government's 404(b) letter makes reference to situations in which Northwest Research received packages containing pharmaceuticals.  Northwest Research flagged some of these pharmaceutical packages as inappropriate for returning to the sender because the shippers had fraudulently abused credit cards, were using closed FedEx accounts, or otherwise undertook apparently improper activities.  Such flagged packages were destroyed.

### A. Information Learned by Northwest Research

Much of the evidence the government proposes to introduce involves information learned *by Northwest Research employees*: "instances in which Northwest Research employees identified packages from Internet pharmacies, including those named in the Superseding Indictment and listed in #1 above, as containing controlled substances or prescription drugs, and/or exhibiting characteristics of fraud or illegality."  Goldman Decl. ¶ 2, Ex. A at 16.  Such evidence is patently irrelevant.

First, the government's case requires it to prove that the *FedEx defendants* possessed guilty knowledge and intent.  It matters not at all what employees of some separate, third party corporate entity learned about online pharmacy shipments.

Second, the mere facts that packages contained "controlled substances or prescriptions drugs," or "exhibit[ed] characteristics of fraud or illegality," would not be relevant — even if FedEx knew them.  The only relevant issues are whether FedEx knew it was shipping, and intended and agreed to ship, packages containing medications prescribed outside the usual course of professional practice and not for a legitimate medical purpose.

The government should be precluded from introducing evidence about Northwest Research employees' knowledge.

## B.    Instances in Which Northwest Research "Informed" FedEx of Its Activities and Findings

The government also hopes to introduce evidence relating to "instances in which Northwest Research informed FedEx of its activities and findings with respect to Internet pharmacies."  Goldman Decl. ¶ 2, Ex. A at 16.  This category of evidence must be excluded under Rules 402 and 403.

First, and again, the only relevant issues are whether FedEx knew it was shipping, and intended and agreed to ship, packages containing medications prescribed outside the usual course of professional practice and not for a legitimate medical purpose.  The fact that Northwest Research identified packages that contained "controlled substances or prescriptions drugs" or "exhibit[ed] characteristics of fraud or illegality"[29] does not relate to those issues.

Second, the government's letter is strategically worded to elide an important

---

[29] In this context, "fraud" has a particular meaning: shipments made on invalid or closed FedEx accounts, using a stolen credit card, or by some other mechanism that prevented FedEx from receiving payment.

problem with the proffered evidence.  The government asserts that Northwest Research "informed" FedEx about its activities and findings.  Goldman Decl. ¶ 2, Ex. A at 16. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████

Additionally, some of the evidence cited in the government's letter relates to events that occurred after the time period covered by the charges in the indictment. Goldman Decl. ¶ 25, Ex. T.  As discussed in Defense Motion In Limine #3, such evidence is not relevant or admissible.

Accordingly, the fact that Northwest Research "informed" FedEx about its findings did not add to FedEx's quantum of knowledge, and therefore could not have affected FedEx's intent.  In light of the potential for jury confusion, and the certainty of consumption of additional trial time, the evidence in question should be excluded under Rule 403.

**XVII.   DEFENSE MOTION IN LIMINE #17: PRECLUDE GOVERNMENT FROM INQUIRING INTO PRIVILEGED MATTERS, INSTRUCT ON ATTORNEY-CLIENT PRIVILEGE**

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

**A.    The Court Should Preclude Inquiry Into Privileged Matters**

The government is not entitled to inquire at trial into privileged communications. *See, e.g., United States v. Bauer*, 132 F.3d 504, 510, 512 (9th Cir. 1997) (reversing conviction due to erroneous introduction of privileged information).  But ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, there is a danger that the government will make such a prohibited inquiry.  Accordingly, FedEx requests that the Court preclude the government from (a) asking trial witnesses questions concerning communications between FedEx lawyers and other FedEx employees, unless the government first provides notice of the questions it intends to ask and FedEx has an opportunity to object outside the presence of the jury; (b) asking witnesses about "decisions" made by FedEx lawyers concerning online pharmacies, unless the government first provides notice of the questions it intends to ask and FedEx has an opportunity to object outside the presence of the jury; (c) presenting evidence

substance of communications between FedEx lawyers and other FedEx employees[30];
or (d) otherwise presenting to the jury FedEx's invocations of privilege.

### B.     The Court Should Instruct the Jury Concerning Privilege

Relatedly, the jury will inescapably become aware that certain information has
been shielded by FedEx's invocation of the attorney-client privilege.  For example,
FedEx produced to the government a number of documents that contain redactions that
protect privileged communications; some of those documents will likely be admitted into
evidence.  To avoid confusing the jury, FedEx requests that the Court instruct the jurors
at an appropriate time concerning the attorney-client privilege:

> In this case, you may encounter situations in which certain information has
> been kept confidential by the government or by FedEx.
>
> People — and companies — need lawyers to guide them through thickets
> of complex government requirements, and, to get useful advice, they have
> to be able to talk to their lawyers candidly without fear that what they say to
> their own lawyers will be transmitted to the government.  The valuable social
> service of counseling clients cannot be performed effectively if clients are
> scared to tell their lawyers what they are doing, for fear that their lawyers
> will be turned into informants for the other side.  A client is entitled to hire a
> lawyer, and have his secrets kept, for legal advice regarding the client's
> business affairs.
>
> Likewise, government agents are entitled to consult with government
> attorneys to obtain legal advice and guidance, and the government is
> entitled to keep such consultations secret.
>
> For that reason, the law recognizes a principle called the "attorney-client
> privilege."  This principle provides that, when someone consults his lawyer
> for the purpose of obtaining legal advice, the communications between the
> lawyer and client are confidential.
>
> The privilege applies in the same manner when the client is a government
> agency or a corporation as when it is a person.  In other words, the attorney-
> client privilege makes confidential communications between corporate

---

[30] Even if a FedEx employee or former employee answered government questions
concerning the substance of communications with a FedEx attorney, that would not
work a waiver of the privilege, since such witnesses lacked the authority to waive
FedEx's privilege.  *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996).  Thus,
the Court should prevent the government from presenting any evidence of consultations
with counsel █████████████████████████████████████████, even if
— especially if — the answer appears to divulge privileged matters.

1    employees and the corporation's attorneys, and it makes confidential
2    communications between government agents and government attorneys.

3    In this case, when you encounter information that has been kept confidential
     because of FedEx's or the government's attorney-client privilege, you are
4    not to speculate about the content of the confidential information, or to make
     any assumptions one way or another about its meaning or import.

5    *See Upjohn Co. v. United States*, 449 U.S. 383, 389-91 (1981); *United States v.*

6    *Zingsheim*, 384 F.3d 867, 871-72 (7th Cir. 2004); *United States v. Chen*, 99 F.3d 1495,

7    1500-02 (9th Cir. 1996).

8    **XVIII.  DEFENSE MOTION IN LIMINE #18: PRECLUDE ARGUMENT THAT FEDEX**
9    **SHIPPED FOR "ILLEGAL" OR "SHUT DOWN" INTERNET PHARMACIES**

10        Periodically in this case, including in the indictment itself, the government has

11   asserted that FedEx shipped prescription medications for "illegal Internet pharmacies,"

12   *see, e.g.,* Dkt. 28 ¶ 8, or "Internet pharmacies that were shut down by the DEA or other

13   law enforcement agencies," *see, e.g.,* Dkt. 28 ¶ 7.  Those descriptions do not match the

14   actual charges the government has leveled against FedEx.  The crimes that FedEx is

15   alleged to have conspired to commit require proof:

16        (1) that the practitioner distributed controlled substances, (2) that the
17        distribution of those controlled substances was outside the usual course of
          professional practice and without a legitimate medical purpose, and (3) that
18        the practitioner acted with intent to distribute the drugs and with intent to
          distribute them outside the course of professional practice.  In other words,
19        the jury must make a finding of intent not merely with respect to distribution,
          but also with respect to the doctor's intent to act as a pusher rather than a
20        medical professional.

21   *Feingold*, 454 F.3d at 1008 (9th Cir. 2006); *see also United States v. Smith*, 573 F.3d

22   639, 652 (8th Cir. 2009); *United States v. Lovin*, No. 07cr2016-IEG, 2009 U.S. Dist.

23   LEXIS 101567 at *25-28 (S.D. Cal. Oct. 30, 2009); Dkt. 28 ¶¶ 23, 42, 44, 63, 71, 89, 91,

24   108, 115.

25        Pharmacies may be closed temporarily or permanently for a variety of reasons

26   other than for the violation of law that is at issue in this prosecution.  The fact that a

27   pharmacy shuttered operations does not, by itself, prove that that the pharmacy was

28   dispensing medications for which a prescription was issued outside the usual course of

professional practice and without a legitimate medical purpose.  Yet, to prove the charges in this case, the government must demonstrate beyond a reasonable doubt that FedEx's purported co-conspirators were committing that specific crime, and that FedEx knew it and intended to facilitate that crime.  The government should not be permitted to shortcut its burden of proof by simply proffering to the jury that a pharmacy was "illegal" or "shut down."

FedEx requests an order prohibiting the government from arguing that FedEx is guilty because it shipped medications for "illegal Internet pharmacies" or pharmacies that had been "shut down."

## XIX.   DEFENSE MOTION IN LIMINE #19: PRECLUDE GOVERNMENT FROM ARGUING THEORIES OF NEGLIGENCE OR RECKLESSNESS

As discussed, the charges in this case each require the government to prove that FedEx acted with guilty *knowledge* and specific *intent*.  *See* Dkt. 208 at 4-5.  The charges raise the questions several times identified by the Court: "What did FedEx know?  What were they told?  What did they do?  What did they say?"  *See* Dkt. 53 (9/25/2014 Tx) at 5:8-12 & 22-24; *see also* Dkt. 69 (1/21/2015 Tx) at 8:20-23, 9:24-10:3, 11:20-12:16; Dkt. 85 (2/20/2015 Tx) at 11:3-8.



Indeed, as discussed in Defense Motion In Limine #8, *supra*, the government has clearly signaled its intent to pursue a negligence-type theory at trial: it apparently hopes

to introduce evidence about FedEx's alcohol shipping program, which could only conceivably be relevant as a mechanism for seeking to show what steps FedEx could have taken, but did not take, in the arena of prescription medications.  As demonstrated in Motion In Limine #8, *infra*, such a theory would diverge from the elements the government must prove, and would unfairly juxtapose policies that arise in completely dissimilar circumstances.

Title 21 and the regulations promulgated thereunder set up a comprehensive scheme for controlling the distribution of prescription medications.  For controlled substances, manufacturers, distributors, and pharmacies must register with the DEA in order to handle such medications.  *See, e.g.,* 21 U.S.C. § 823.  Registrants are subject to regulations that require them to detect and report suspicious orders and to establish the registration status of their business partners.  *See, e.g.,* 21 C.F.R. § 1301.74.  But, whatever else may be the effect of the CSA's common carrier exemption, it is beyond cavil that the provision exempts common carriers like FedEx from registering with the DEA.  *See* 21 U.S.C. § 822(c) ("The following persons shall not be required to register . . . .").  Carriers are therefore also exempt from the regulations that apply to registrants — and neither the DEA nor the FDA has sought to impose regulatory requirements on common carriers in this arena.  In light of the statutory framework, it would be fundamentally unfair to permit the government to pursue a theory that tried FedEx for the "crime" of failing to conform its conduct to the "know your customer" obligations that apply to registrants but expressly do not apply to FedEx.  (Indeed, one of the many ironies of this case is that, if FedEx *was* regulated by the DEA, this case would likely have been contested in the civil or regulatory sphere.)

FedEx requests an order prohibiting the government from making arguments to the jury that suggest that FedEx committed a crime because it did not adequately investigate customers, train its employees, or otherwise attempt to detect and combat misconduct by its customers.  Such arguments would misstate the law and confuse the

1  jury.  The government must prove that FedEx had guilty knowledge and specific intent.

2

3  **XX.    DEFENSE MOTION IN LIMINE #20: EXCLUDE EVIDENCE OF MEASURES UNDERTAKEN BY OTHER PRIVATE CORPORATIONS**

4         Recently, the government produced in discovery a report of an interview with

5  representatives of Visa, Inc. concerning "efforts the corporation has taken to combat

6  Internet pharmacies on the VISA network."  Goldman Decl. ¶ 26.  Accompanying the

7  report was a document issued by Visa in June 2014 called the "Online Pharmacy Guide

8  for Acquirers."  *Id.*  Last week, the government produced a similar report of an interview

9  with MasterCard personnel.  *Id.*  In a similar vein, during interviews with witnesses, the

10 government has sometimes inquired about measures concerning online pharmacy

11 shipments undertaken by companies other than FedEx.  All of this evidence is

12 irrelevant.  The Court should preclude the government from introducing evidence of

13 efforts by other companies "to combat Internet pharmacies."

14        First, evidence of other companies' conduct provides no insight into whether

15 FedEx acted with the requisite knowledge or intent, entered into illicit agreements as

16 charged, or otherwise committed any criminal misconduct.  Rather, the evidence could

17 only be proffered to juxtapose FedEx's conduct with some other company's — a theory

18 of liability that must be precluded for the reasons set forth in Defense Motion in Limine

19 #19 regarding negligence or recklessness theories.  Whether FedEx could have

20 enacted programs similar to those enacted by other private companies is, at base, an

21 evaluation of things that FedEx might have done.  This trial is not about whether

22 FedEx's affirmative efforts to address the nationwide scourge of internet pharmacies

23 was above, at, or below the efforts of other private companies, nor whether FedEx met

24 some government-imposed benchmark of "good corporate conduct."  The trial is about

25 whether or not FedEx conspired with online pharmacies to commit crimes.  Evidence of

26 other companies' approaches to online pharmacy problems must therefore be excluded

27 under Federal Rules of Evidence 401 and 402.

28

Second, the evidence of other companies' steps should be excluded under Rule 403 to avoid the potential for jury confusion and unfair prejudice.  It would be tempting for a juror to conclude that FedEx ought to have acted in the same manner as another company, even though it is highly unlikely that the jury will have enough information to make such a judgment.  Other companies may be very differently situated than FedEx: they might have vastly different sources of knowledge, or operate under different legal regimes.  (For example, a financial institution like those that are part of the Visa network may be regulated by "know your customer" rules that do not govern common carriers like FedEx.  *See, e.g.,* 31 C.F.R. §§ 1020.210 & 1020.220.)  For these reasons, any meaningful inquiry into the practices of other companies would require confusing and time-consuming tangents into the legal and factual contexts and the knowledge and behavior of various uncharged and unaffiliated corporate entities.

## XXI.   DEFENSE MOTION IN LIMINE #21: PRECLUDE REFERENCES BY EXPERTS TO EXCLUDED EVIDENCE

FedEx requests an order precluding the government's experts from making reference to evidence that the Court has excluded pursuant to one of FedEx's other motions in limine.  For example, some of the experts' reports refer to the evidence of deaths and other adverse consequences addressed in Defense Motion in Limine #13. To the extent the Court excludes evidence of a death or other adverse consequence, the government should not be able to make an end-run around the exclusion by presenting the evidence through an expert.

//

//

//

//

//

//

Dated:  April 14, 2016

Respectfully submitted,                    ARGUEDAS, CASSMAN & HEADLEY, LLP


By: _____/s/_____
                    Raphael M. Goldman
                    803 Hearst Avenue
                    Berkeley, CA 94710
                    (510) 845-3000

                    Counsel for Federal Express
                    Corporation, FedEx Corporation and
                    FedEx Corporate Services, Inc.