Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
  vs.                           )  No. CR 14-0380 CRB
                                )
FEDEX CORPORATION, et al,       )
                                )  San Francisco, California
            Defendants.         )  Wednesday
                                )  April 20, 2016
_____)  2:00 p.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**           BRIAN STRETCH
                             UNITED STATES ATTORNEY
                             450 Golden Gate Avenue
                             San Francisco, California  94102
                    **BY:  KIRSTIN M. AULT
                          JOHN HEMANN
                          JENNY CLARE ELLICKSON
                          ASSISTANT UNITED STATES ATTORNEYS**




**For Defendant:**           ARGUEDAS, CASSMAN & HEADLEY, LLP
                             803 Hearst Avenue
                             Berkeley, California 94710
                    **BY:  CRISTINA C. ARGUEDAS, ESQ.
                          TED W. CASSMAN, ESQ.
                          RAPHAEL M. GOLDMAN, ESQ.**




**Also Present:**            **Connie Lewis
                             Peter Blumberg**


*Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR*
              Official Reporter - US District Court
              Computerized Transcription By Eclipse

P R O C E E D I N G S

APRIL 20, 2015                                              2:33 P.M.

     **THE CLERK:**  Calling case CR 14-0380, the United
States of America versus FedEx Corporation, et al.

    Appearances, counsel.

     **MS. AULT:**  Good afternoon, your Honor.  Kirsten Ault,
John Hemann and Jenny Ellickson for the United States.

     **MR. HEMANN:**  Good afternoon, your Honor.

     **MS. ARGUEDAS:**  Good afternoon, your Honor.  Cris
Arguedas for FedEx.  And with us today is Connie Lewis Lensing,
senior vice-president of the Federal Express Corporation.

    And I also wanted to introduce the Court to Peter
Blumberg, who is lead counsel with Federal Express Corporation
and he will be joining us for the trial, assisting us.

     **THE COURT:**  Thank you.

     **MR. GOLDMAN:**  And Raphael Goldman from Arguedas
Cassman and Headley on behalf of FedEx.

     **THE COURT:**  Okay.  Good afternoon.

     **MR. GOLDMAN:**  And Ted Cassman is just walking into
the courtroom now.

     **THE COURT:**  Right.  I know Mr. Cassman.  He is here.
Okay.  I told him he gets what, how many days off?  Two days?
One day?  24 hours?

     **MR. CASSMAN:**  We will make a proposal to the Court,
your Honor.

```
 1              MS. ARGUEDAS:  For the wedding?

 2              THE COURT:  Yes.

 3              MS. ARGUEDAS:  Yes.  Well, good.

 4              THE COURT:  I committed to that.

 5       Okay.  So this matter is on for the motion to dismiss of

 6  several of the counts.  Primarily, I think, it's the money

 7  laundering count.

 8              MS. AULT:  Yes, your Honor.  It's Counts 12 and 17

 9  and Count 18, all of which are money laundering counts.

10              THE COURT:  And there -- a couple of arguments have

11  been advanced.  One is the venue argument.

12              MS. AULT:  Yes, your Honor.

13              THE COURT:  The other -- well, let's see.  The venue

14  argument.

15              MS. AULT:  The other argument, your Honor, is that

16  Count 18 charges the delivery of money and the defense has

17  argued that -- well, Count 18 charges the delivery of drug

18  money and the defense has argued that drug money does not

19  constitute proceeds under the money laundering statute and

20  delivery does not constitute a transaction.

21       We've cited an on point Ninth Circuit case, *United States*

22  *versus Gough* that says that that is not true and a case the

23  defendants do not address in their reply brief, and so...

24              THE COURT:  Well, they also argue that there has been

25  a merger.  Are we talking about the same things?
```

1        **MS. AULT:**  They do -- I'm not sure that they make a

2   merger argument, because the Ninth Circuit has held that there

3   is no merger with the transfer of drug proceeds among

4   co-conspirators.

5        So, again, it would seem that there is on point Ninth

6   Circuit case law that says that there is no merger.

7        **THE COURT:**  Well, I think -- after looking at the

8   authorities, I think you're correct.  There is authority

9   supporting the Government's position.

10       Now, without going too far out on a limb, I would say I

11  don't understand that authority.  I think that the defense is

12  absolutely correct that *Webster* -- let's see.  How can I say

13  it?

14       I think if I -- I -- I don't really understand the logic

15  of *Webster*.  The Court completely misunderstands what the

16  Supreme Court said.  It's not even close.  They simply made a

17  mistake.  Eight -- nine justices of the Supreme Court said

18  that -- said that the proceeds can't just mean proceeds.  It

19  has to be -- it has to be sort of something beyond it and so

20  forth.  And they -- they viewed it.  Then they said, however --

21  however, they said the Congress was ambiguous.  Did they mean

22  profits?  Did they mean receipts?  What exactly did they mean?

23       So five of them said -- five or four, I don't know what

24  the number was -- said:  Well, since it's ambiguous, the rule

25  of lenity applies and we're not going to -- we're not going to

1  enforce it against this defendant.  And the other justices

2  said, whether it's ambiguous or not, it can't mean what the

3  Government says it means and -- and so it makes no sense to

4  read it that way.

5      Since that time, of course, Congress changed it.  Though

6  in -- though I would be following the law before Congress

7  changed it, right?  I think everybody agrees with that.  In

8  *Van Alstyne* and so forth.  So I would think I would have to

9  follow the law before Congress changed it, right?

10          **MS. AULT:**  Yes, your Honor.

11          **THE COURT:**  Okay.  So, I mean, when I -- let me just

12  tell you how I come down on this.

13      The way I come down on it is that in the event -- and I'm

14  not suggesting it would happen.  In the event the defendant was

15  convicted of one or more money laundering counts, the Court

16  would not impose any additional sentence by virtue of a

17  conviction of money laundering.  It seems to me that the money

18  laundering is so integral to the -- to the transaction itself,

19  the underlying substantive offense.  That's number one.

20      And number two.  The way the Government has interpreted

21  the law in this case.  And I see, really, no limits.  Every

22  drug transaction involving two or more people in which there is

23  money in exchange for the drugs become -- and that money is

24  deposited or buys more drugs and so forth, is money laundering.

25      Now, that's -- I think the Government says that's right

1   and that's what it is.  Good, Judge.  You figured it out.

2   That's what the law is.  And -- and there we are.  Okay.  I

3   think you're right.  That's what the law is.  And I have to

4   follow the law.

5        But in terms of sentencing, if it got to that stage -- and

6   I'm not suggesting it would -- I simply would not even think

7   about imposing a sentence that would be enhanced by the money

8   laundering convictions.  And I'm not even sure what I would do

9   about the money laundering convictions in the final analysis,

10  if there were any.

11       So, you know, once again, I'm sort of -- the cases -- I

12  have to deal with all these motions in this case, but, in fact,

13  nothing seems to have much consequence until we get to the

14  trial and then I guess everything will have some consequence.

15       That's the way I looked at it.  And so I think the

16  Government is right.  I'll let you speak.  I think the

17  Government is right in their analysis on what the precedent is

18  and what the controlling authority is.

19       And I think that the defense is correct in its -- in its

20  views as to, perhaps, what the law should be.  But I'm not here

21  to enforce the law as it should be.

22       Yes.

23            **MR. GOLDMAN:**  Your Honor, I think that the Government

24  has misunderstood and mischaracterized our argument and I

25  actually don't think that is what the law.

 1        *Santos*, *Webster* and the other cases are all talking about

 2    a situation where defendants have already received proceeds

 3    from illegal activity and then go on to make some kind of

 4    transaction with them.

 5        Our case fits into a line of cases.  It's a consistent

 6    established line of authority holding that proceeds mean funds

 7    that have already been obtained at the time that that

 8    transaction occurs.  In other words, to constitute the type of

 9    money laundering here, charged here, the defendant has to

10    obtain the money through some underlying crime and then use it

11    to do something else.

12        The obtaining of the proceeds itself is not a transaction

13    in proceeds because the funds have not yet become proceeds of

14    the criminal activity.

15            **THE COURT:**  Well, maybe that's a question of

16    evidence.  In other words, if you're going to -- if you're

17    going to -- I've got to try to follow this.  But if you are

18    saying:  Look, I sell some drugs to somebody.  In exchange I

19    get some money.

20            **MR. GOLDMAN:**  Yes.

21            **THE COURT:**  Okay.  Now if you stop the whole thing

22    there --

23            **MR. GOLDMAN:**  Yes.

24            **THE COURT:**  -- stop the whole thing there, your

25    argument is:  Well, I got this money.  It isn't money

```
 1  laundering.
 2           MR. GOLDMAN:  That's correct.
 3           THE COURT:  I think the Government would say that's
 4  right.  There has to be a couple other things.  But we're not
 5  going to have any trouble proving those other things, and they
 6  won't.
 7       They are going to show that FedEx -- my guess is the
 8  driver, whoever collected the money -- took the money, turned
 9  it over to the bursar or whoever, I mean, whoever collects the
10  money for FedEx, and FedEx then put it in a bank account.
11           MR. GOLDMAN:  No, your Honor.  That's not what's
12  charged.
13       The charge says, in the indictment, that FedEx collected
14  checks and money orders made out to Superior Drugs.  And that
15  is what -- FedEx does not collect cash as part of its COD
16  program.  It collects checks and money orders.  All it does is
17  pick up a check, send it back to the person who sent the
18  package.
19           THE COURT:  What about that?  I mean, then they took
20  the money.  They took the money and then -- and then -- or took
21  the checks and then sent it off to Superior Drugs.  Isn't that
22  enough of an activity to -- to be, quote -- I mean, the
23  Government argued that's an *a fortiori* argument because it's
24  not like they took the money and put it into some unrelated
25  legitimate business entity.  They -- they actually collected
```

1    the money for the illicit drugs or controlled substances and

2    they turned it over to the person who provided the drugs.

3        They say that's -- that comes within the definition of

4    proceeds, doesn't it?

5               MR. GOLDMAN:  Well, my point is that the funds --

6               THE COURT:  Promotional, promotional activity.

7               MR. GOLDMAN:  The funds have not yet been obtained by

8    anyone who can put them to use.  There is no ability to have a

9    subsequent transaction until the pharmacy receives the check.

10   FedEx can't put that check to any use.

11       The case we cited, the sort of seminal case on this is the

12   *Johnson* case.  It comes out of the 10th Circuit.  It reversed a

13   money laundering conviction.  That was a case where the

14   underlying crime was a fraud and the money laundering charges

15   were based on the victims of the fraud wiring money to the

16   defendant.  And he was convicted on those counts and the Court

17   said:  No, that is not money laundering because the funds that

18   he got were not yet the proceeds of crime.  They had not yet

19   ripened into proceeds.

20               THE COURT:  I'm sorry.  I don't understand that.  Had

21   they not -- if I -- if I sold drugs to Jones, and then -- and

22   FedEx delivered the drugs and then Jones, in exchange for

23   receiving the drugs, gave FedEx a check and FedEx then took the

24   check, which are the proceeds of the illegal transaction,

25   arguably, and took the check and sent it back to the sender,

1  why isn't that a completed drug transaction and a money

2  laundering transaction with the proceeds?

3          **MR. GOLDMAN:**  Because -- because what these cases say

4  is that the two transactions have to be separate.  Money

5  laundering has to be a subsequent transaction.

6          **THE COURT:**  Well, it is subsequent to the delivery of

7  the drugs.

8          **MR. GOLDMAN:**  But it's not subsequent to the

9  obtaining of the funds.  That transaction is one in the same.

10      And that's what *Johnson* -- and the Ninth Circuit adopted

11  that in *Savage* and it's continued to say it in cases like the

12  *Wilkes* case that we cited.

13          "Transactions that created the criminally derived

14      proceeds must be distinct from the money laundering

15      transaction."

16          **THE COURT:**  But they argue they are distinct.

17          **MR. GOLDMAN:**  But they are not distinct.  FedEx is

18  part of the obtaining of the money, but it's not obtained until

19  it gets to the -- until it gets to the pharmacy.

20          **THE COURT:**  Why?

21          **MR. GOLDMAN:**  Because it can't be put to any use.

22  FedEx having a check in a package isn't obtained in any useful

23  way.

24          **THE COURT:**  Well, you say these are non-negotiatable

25  instruments.  What are you saying?  They were all checks to the

1  pharmacy?

2         **MR. GOLDMAN:**  They were checks made out to -- I mean,

3  I haven't seen each one, but --

4         **THE COURT:**  You're saying that they were

5  essentially only to be negotiated by the pharmacy.

6         **MR. GOLDMAN:**  Yes.  FedEx couldn't cash them and make

7  use of the money in its own right.

8         **THE COURT:**  So you're saying that if the receipt of

9  the funds is in a non-negotiatable form for the receiver, then

10  the -- the most that that receiver does is -- which, of course,

11  is exactly what the business of FedEx is, to transport or

12  transfer the funds to the intended receiver, that's not --

13  that's not money laundering because money that they received

14  was in a non-negotiatable form.

15    If, for example -- asking this question.  If, for example,

16  the person said:  I don't have a check.  I have to give you 50

17  bucks.  You're saying FedEx wouldn't have taken it.

18         **MR. GOLDMAN:**  No, they would not.

19         **THE COURT:**  So they did not have -- you're saying

20  they did not have monetary instruments which could have been

21  negotiated by them.

22         **MR. GOLDMAN:**  That is correct.

23         **THE COURT:**  They were no more than a transfer agent.

24         **MR. GOLDMAN:**  Yes.

25         **THE COURT:**  Okay.  And you say that the cases hold

1   that you have to have something that's immediately negotiable

2   for -- for the defendant to be held responsible for promotional

3   money laundering.

4          MR. GOLDMAN:   The cases hold that the initial

5   obtaining of funds from criminal activity, that is not money

6   laundering.   There has to be a subsequent transaction.

7        This is all part and parcel --

8          THE COURT:   What do you mean by a "subsequent

9   transaction"?

10          MR. GOLDMAN:   The subsequent transaction -- so if --

11   when Superior does something with the money, cashes the check,

12   spends it, puts it in its bank, if those things meet the other

13   elements of money laundering, then that would be money

14   laundering.

15        But the -- Superior getting the money, that's part of the

16   initial transaction and it's not -- they have not yet ripened

17   into proceeds.   That's what these Courts say.   Proceeds --

18   proceeds are once the money has been taken due to the criminal

19   activity.

20        I can read a quote from the *Johnson* case, if it helps the

21   Court.

22          THE COURT:   It might.

23          MR. GOLDMAN:   It's about 1957, but the principles are

24   the same:

25            "The statute appears to have been drafted to

1    prescribe certain transaction in proceeds that have

2    already been obtained by an individual from an

3    underlying criminal offense.  The defendant did not

4    have possession of the funds, nor were they at his

5    disposal until the investors transferred them to him.

6    The defendant was -- therefore, cannot be said to

7    have obtained the proceeds of the wire fraud until

8    the funds were credited to his account.  Thus, the

9    transfers alleged in Counts 4 through 31 of the

10   indictment were not transactions in criminally

11   derived property" --

12        **THE COURT:**  Okay.  What's the Government's answer to

13   that?

14        **MS. AULT:**  The Government's answer to that, your

15   Honor, is it's an entirely separate statute.  It's not the

16   statute that's charged here.

17        The statute that's charged here is 1956, promotional money

18   laundering.  There is an on point Ninth Circuit case, *Gough*,

19   which the defense still has not addressed, which says that

20   proceeds of a drug transaction that are put in a truck and

21   delivered from Point A to Point B constitutes money laundering.

22        There is nothing in there that says the proceeds have to

23   be negotiable.  There is nothing in there that says -- and the

24   statute defines proceeds as checks, money orders, cash.  There

25   is nothing about what the statute says.  There is nothing about

1   what the Ninth Circuit holds.  There is nothing about any of

2   those cases that interprets the law the way defense would like

3   for the law to be interpreted.

4       The Court is absolutely correct that the way the law --

5   the way the Ninth Circuit has held in the *Gough* case is that

6   putting money in a truck and transporting it from Point A to

7   Point B is money laundering.

8           **THE COURT:**  Putting checks in a truck.  Putting

9   checks in.

10          **MS. AULT:**  The *Gough* case involved cash, but there

11  was nothing about that case that said it had to be a negotiable

12  instrument.  And there was nothing about the statute that

13  distinguishes between checks, money orders or cash.

14          **THE COURT:**  It just talks about proceeds.

15          **MR. GOLDMAN:**  I'll address --

16          **MS. AULT:**  It just -- it just talks about a

17  financial -- not even proceeds.  The statute talks about a

18  transaction in a monetary instrument.

19          **MR. GOLDMAN:**  Your Honor, I'll address *Gough* now.

20  That's about a different element than the one we're talking

21  about.  That is about what constitutes a transaction.

22      We are not saying that this was not a transaction.  We are

23  saying that it was not a transaction in proceeds from criminal

24  activity.

25      It's the proceeds element that *Johnson* talks about.  And

1    the Ninth Circuit adopted *Johnson* in a case called *United*

2    *States versus Savage*, a case which was about a 1956 conviction.

3         So the Government is wrong when it says --

4              **THE COURT:**  It was -- it was concealment, wasn't it?

5              **MR. GOLDMAN:**  Yes, but --

6              **THE COURT:**  I think there is a big difference between

7    concealment and promotional activity.

8              **MR. GOLDMAN:**  But I don't see why it makes a

9    difference the definition of what "proceeds" is.  That is not

10   -- I mean, that's what these cases are all about; *Johnson*,

11   *Savage*, *Wilkes*.  Those cases say that proceeds -- money only

12   ripens into proceeds once the defendant has taken them in from

13   the criminal activity.  Then money laundering can occur

14   subsequently.

15        And that's the thing that allows the Court's intuition,

16   which is the same as mine by the way, to be correct; that a

17   hand-to-hand drug transfer -- if someone gives me cocaine and I

18   give him $20, that's not money laundering because that

19   transaction is not yet in the proceeds of criminal activity.

20   It becomes proceeds once the drug dealer takes the $20 and then

21   has a chance to do something with it.  But this charge is about

22   the handing over of the $20, as an analogy.

23             **MS. AULT:**  Your Honor, that simply makes no sense.

24   That someone gives me a kilo of cocaine.  I give that person a

25   thousand dollars.  That thousand dollars is not the proceeds of

1  drug trafficking, is what he's saying.  And that simply is not

2  in accord with any of the case law surrounding money laundering

3  in a drug trafficking case.

4       **THE COURT:**  I think it is.  I think it is the

5  proceeds of a drug transaction.

6       My problem isn't with that.  My problem is that it makes

7  every transaction -- almost every transaction a money

8  laundering transaction in connection with --

9       **MS. AULT:**  Well, your Honor, the distinction is, and

10 the distinction that the cases that actually deal with the

11 transport of money make, is that -- and there is -- hasn't been

12 a case that we have been able to find that deals with just

13 anybody charging that initial step as money laundering.

14      The -- the cases deal with what is the -- what is the

15 transaction.  So the transaction has to be something more than

16 just handing the money over.  It has to be somebody taking

17 custody of the money.  Having control over it.  Moving it from

18 one point to another and then delivering it to another person.

19 That's what the -- that's where the cases draw the distinction.

20      And here that's exactly what happened.  We're not talking

21 about -- we're not charging just the customer giving the check

22 to the FedEx driver.  We're talking about the FedEx driver

23 taking that money, putting it in their truck, driving it across

24 the country, putting it on a plane, flying it across the

25 country and then delivering to it Superior Drugs.

1             THE COURT:   You're talking about the money was paid

2    to the people who FedEx delivered the drugs to.

3             MS. AULT:   Yes.  And FedEx was paid separately to

4    perform that service.

5             THE COURT:   Yeah.

6             MS. AULT:   So it is an entirely separate transaction

7    from the drug transaction, which is also what the cases hold;

8    which is that this other part, the payment for the drugs, is a

9    totally separate transaction.  It's a totally separate crime

10   from the underlying drug crime.

11            THE COURT:   So is it true that almost every drug

12   transaction in which the person sold drugs and received payment

13   would constitute a money laundering transaction?

14            MS. AULT:   No, your Honor.

15            THE COURT:   What's -- what's different about this

16   from every other case that I've seen?

17            MS. AULT:   Because, your Honor, the person would

18   actually -- has to do a transaction with the money.  And a

19   transaction is defined as a transfer, delivery or other

20   disposition.

21            THE COURT:   Okay.  So --

22            MS. AULT:   So they have to do something with it.

23            THE COURT:   All right.  So you're saying, what --

24   what is -- the money laundering transaction is if you -- if you

25   see that a defendant delivers drugs in exchange for which the

1 defendant receives money or some monetary instrument of some

2 kind and then does something with that --

3          **MS. AULT:**  That's intended to promote the money

4 laundering.  Don't forget that element as well.  If they go out

5 and buy gum with it --

6          **THE COURT:**  No, no, no.  Intended to promote criminal

7 activity.

8          **MS. AULT:**  Yes.

9          **THE COURT:**  You're not going to prove that they are

10 intending to promote money laundering.

11          **MS. AULT:**  I'm sorry, your Honor.

12          **THE COURT:**  To the contrary.  That's not what

13 happened here, right?

14          **MS. AULT:**  No.  That is correct, your Honor.

15          **THE COURT:**  And you conceal.  Oh, we're paying back

16 this money to Superior Drugs and we hope that nobody finds out

17 about it.

18      Okay.  All right.  So any drug transporter who receives in

19 exchange for the transportation some money or proceeds of the

20 sale and then turns it over to a third party -- and in this

21 case it's actually the first party, it's the party who set up

22 the transaction to begin with -- is a money laundering -- is

23 susceptible of liability under this.

24          **MS. AULT:**  Yes, your Honor.  And that's what --

25          **THE COURT:**  Have you ever charged that before?  I

1   mean, this prosecution has a number of unusual -- what I guess

2   I would call novel or first time advancement of legal theories.

3        Now, I've seen, oh, 20 years and you have, too -- not that

4   long because you're much younger than I am, but I've seen so

5   many drug transactions in which people have sold drugs,

6   received money, because that's generally what happens in a drug

7   transaction, and then done something with the money, if they

8   haven't been caught immediately.  And generally what they do is

9   they turn it over to the person who gave them the drugs in the

10  first place, or some third party.  Okay.

11       Have you ever charged money -- promotional money

12  laundering in any of those cases, or is this the first one?

13            **MS. AULT:**  I don't know, your Honor.

14            **THE COURT:**  Okay.  It's the first one I've ever seen

15  anyway.

16            **MR. GOLDMAN:**  Could I make one further point?

17            **THE COURT:**  Sure.

18            **MR. GOLDMAN:**  Your Honor, I think the discussion that

19  you just had with the Government slightly mischaracterizes the

20  charge.

21       The charge here is a conspiracy charge; that FedEx and

22  Superior Drugs acted in a joint venture to receive this money.

23  So it's all about the receipt of the money.

24       And these cases that we cited say the mere receipt of

25  money that comes from --

1              THE COURT:   And they're saying something else

2      happened.   They are going to say:   Yeah -- they are going to

3      say that there is a conspiracy.   And -- and -- and as -- one of

4      the elements of the conspiracy with respect to money laundering

5      is that FedEx turned the money back to its co-conspirator.

6      That's what they are saying.   And that's -- that's money

7      laundering.

8              They are saying that's money laundering.   And under the

9      definition it may very well be.   I've just never seen it --

10     number one, it's contrary to my instincts, but that doesn't

11     mean anything.

12             Number two, it's novel.   And that may mean something.

13             And number three, I'm not going to sentence on it in the

14     event that there was a conviction in this because it seems to

15     me quite unfair and just novel.   I get very concerned about

16     novel applications of criminal law, since there are certain

17     notice requirements.

18             Anyway, I will read your cases.

19             MR. GOLDMAN:   It's not entirely novel.   The *Johnson*

20     case was a case where something like this happened and it was

21     overturned on appeal.

22             THE COURT:   I will see whether that controls in this

23     case.   I appreciate your comments.

24             MR. GOLDMAN:   Thank you, your Honor.

25             THE COURT:   And the venue thing, the venue is denied.

```
 1  I mean, it --

 2          MR. CASSMAN:  Oh, please.

 3          THE COURT:  Mr. Cassman.

 4          MR. CASSMAN:  Please, your Honor.  I have been

 5  standing here patiently.  And I'm privileged today to talk to

 6  you about the venue motion, if I might.

 7          THE COURT:  How did you get that assignment?

 8          MR. CASSMAN:  Because it's a righteous assignment

 9  that I undertook with great vigor, your Honor.

10          THE COURT:  Go ahead.

11          MR. CASSMAN:  And I want to talk to you about it for

12  two reasons because I have some things to say that I think I

13  can put more succinctly than perhaps they were in our brief.

14      And second of all, I want an opportunity to come back

15  here, if necessary, at the time of our Rule 29 and say:  Judge

16  Breyer, I told you so.

17          THE COURT:  Well, you have that right.  I'll give you

18  that right now.

19          MR. CASSMAN:  Well, this is what I want to tell you.

20  There are -- this is Count 12 and Count 17.  And the allegation

21  is it's a different transaction.  This is the transaction of

22  the payment between Superior Drugs, for example, and FedEx for

23  the shipping services.

24          THE COURT:  And it does say in the indictment made

25  numerous deliveries to -- within the Northern District of
```

1  California.

2       **MR. CASSMAN:**   The allegation in the drug conspiracy

3  is that FedEx delivered on several occasions medications to

4  people living in the Northern District of California.

5       **THE COURT:**   Right.

6       **MR. CASSMAN:**   That's all it is.  We would submit that

7  under -- well, let me start.

8       There are four potential bases for venue under the

9  statutes.  The first one is that the conspiratorial agreement

10  was formed in this district.  They don't argue that it was, and

11  it clearly was not.

12       The second would be that an act in furtherance of the

13  conspiracy, of the money laundering conspiracy was committed in

14  this district.  Their only allegation or assertion that that

15  could be true is the delivery of the medications into this

16  district in support of the underlying drug conspiracy.

17       I am -- we've -- both parties have vigorously researched

18  the law.  There is no case that's ever held that the delivery

19  of the underlying drug allegation could be a basis for an act

20  in furtherance of a money laundering conspiracy.  There is

21  none.  Never happened.

22       The third basis would be that the alleged transaction, the

23  money laundering transaction, occurred in this district.  They

24  don't assert that it did, and it clearly did not.  It did not

25  begin.  It did not continue.  And it did not terminate in this

1    district.

2        The fourth basis, and this -- and the problem that is

3    raised by the *Cabrales* and the *Rodriguez Moreno* case, which

4    involved money laundering that occurred in Florida and a drug

5    and money laundering charge brought in Missouri, and the Court

6    said:  No, you can't do that because the underlying drug

7    transaction, which is what they have alleged in their

8    indictment, is not part of the money laundering scheme.

9        So Congress amended the statute in 1956(i) and it provided

10   that there would be an exception in money laundering cases and

11   that the money laundering charge can be brought in the district

12   in which the funds were removed by the defendant in furtherance

13   of a scheme to money launder.

14       Now, there is no allegation in this --

15           **THE COURT:**  They don't have to allege it, do they?

16   I don't think there is any requirement under 7(c) that they

17   have to allege it.  They may have to prove something, but they

18   don't have to allege it.

19           **MR. CASSMAN:**  Well, I suppose they wouldn't have to

20   allege it, but in this case they included allegations in the

21   indictment, presumably to establish venue.  And they have done

22   it for every other charge.  And here it is completely lacking

23   that there's any such assertion.

24           **THE COURT:**  Well, they might have been anticipating

25   my remarking to them:  Why did you bring this case here?

```
 1        So it's sort of a -- it was a -- maybe they just wanted to
 2   have something in there.  But as a matter of law, I don't think
 3   they have to do it.  I think you would agree with that, but
 4   maybe I should hear their response.
 5             MS. ELLICKSON:  Yes, your Honor.
 6        We definitely agree that there is no binding authority
 7   that requires us to allege specific facts in support of the
 8   venue allegation.  The indictment here did allege that the
 9   crimes charged in Counts 12 and 17 occurred in this district
10   and elsewhere.  Even that is not necessary, but that certainly
11   satisfies any pleading requirement.
12        I'd also like to just address the -- what defense counsel
13   said about the basis for venue that the Court can glean from
14   the indictment.  Even though we had no obligation, and the
15   indictment need not allege facts that support venue, there are
16   two different bases from which the Court can glean venue from
17   the indictment, neither one of which is based solely on the
18   delivery of drugs.
19        Instead, I think a reasonable reading of the indictment
20   supports the conclusion that the -- when customers placed
21   orders for the drugs to be delivered to them in the district,
22   they made the payments for those drugs from the same district.
23        So to the extent that the indictment alleges that the
24   defendants ultimately distributed drugs back to this district,
25   the reasonable reading of the indictment is that the payments
```

1  that those customers initiated began in this district.  Those

2  payments are overt acts in furtherance of the money laundering

3  conspiracy and then they also as an independent basis for venue

4  from the beginning of the financial transactions that are the

5  basis for the money laundering conspiracy.

6        **THE COURT:**  I think the -- yeah, the motion on venue

7  is denied.

8      And the motion on the -- I don't know what you call it,

9  the merger -- or not the merger, the previous one.  I'm going

10 to deny it.  However, I'm going to review the materials cited

11 by counsel, the *Johnson* cases and so forth.  If I change my

12 mind, I'll let you know.  But I want you to be able to go

13 forward.  I don't want to delay any proceedings.  And here we

14 are.

15       **MR. CASSMAN:**  We will be ready, your Honor.

16       **MS. AULT:**  Thank you, your Honor.

17       **THE COURT:**  So, let's see.  When are we picking a

18 jury?  When are motions in limine, Ms. Arguedas?

19       **MS. ARGUEDAS:**  They are going to be heard on

20 May 19th, your Honor.

21       **MS. AULT:**  19th?

22       **MS. ARGUEDAS:**  And filed a couple weeks before that.

23 We've already filed them.  You have them.  You have not only

24 our motions in limine, but you have the witness list, which I

25 don't know if the Court has had a chance to look at it, but it

1  has 185 witnesses on it.

2        THE COURT:  Okay.  Okay.

3        MS. AULT:  Your Honor, we would point out that half

4  of those are chemists and computer forensic examiners that we

5  fully expect to reach stipulations with the defense on.  But if

6  we have to prove the case by brute force, we will.

7        MS. ARGUEDAS:  No, no.  Wait, wait.  There is 185

8  witnesses and then there's an additional 70 that are the

9  chemists and the forensics.  There are 185 actual real people

10 there that are not forensic or chemists.

11        MS. AULT:  Your Honor, we have put a great deal of

12 thought and will continue to put a great deal of thought into

13 how we are going to streamline our case.  There are many, many

14 things that we can do to streamline our case with summary

15 witnesses, summary exhibits.  We are prepared to do all of

16 that.

17      There are many other ways we can streamline our case with

18 stipulations and agreement with the defense.  We are prepared

19 to negotiate with them about it.

20      And then there are other things that, you know, we will

21 not know until we get to trial whether we need to call a

22 certain witness because a witness says something unexpected.

23        THE COURT:  I'm not -- I'm not dealing with that

24 category.  Of course, you're right.  The unexpected kind.

25        MS. AULT:  So this could be a massive case, but we do

1  not think it will be.  We simply needed to put on the witness

2  list everybody that if the defense were to refuse to stipulate

3  to anything and the Court were not to allow us to put in any

4  summary evidence, we would have to put on.  We don't think that

5  that is going to be the case.

6        **THE COURT:**  Now, when are we meeting?  That is, you

7  people.  When are we meeting to start to talk about

8  stipulations, to start winnowing down the list?

9      You know, I have to pick a jury.  I don't want to frighten

10  everybody to death by saying this case has 185 witnesses from

11  the Government.

12        **MS. ARGUEDAS:**  Your Honor --

13        **MS. AULT:**  Your Honor --

14        **MS. ARGUEDAS:**  If I may, your Honor.  You asked the

15  Government the last time we were here to put stipulations

16  together and give them to us to review.  We have received none.

17        **THE COURT:**  Okay.  Well, okay.

18        **MS. AULT:**  Your Honor, until we put together our

19  witness list and put together --

20        **THE COURT:**  When?  When -- I'm not -- listen.  I'm

21  not faulting the Government for not -- for being where we are

22  today.  I'm trying to look and see where are we going to be in

23  the next 30 days.

24      The next 30 days are the days that, it seems to me, the

25  parties can come together and establish a -- what I call a true

1   witness list with, of course, the understanding that if

2   somebody gets up and you expect them to say X and they say Y,

3   you may need additional witness.

4       Moreover, I understand that even if they say X and the

5   Government -- and the defense challenges the X, again you may

6   have to call an additional witness.

7       But absent that, I want to know when you people are

8   meeting for one, two, three or four days to go through this and

9   to present a list to the Court of what I call your -- the

10  witnesses that you need in order to -- over contested issues?

11          **MS. ARGUEDAS:**  Your Honor, we're --

12          **MS. AULT:**  Your Honor, we --

13          **MS. ARGUEDAS:**  We're here, but we can't do anything

14  about the Government's witness list except for consider

15  stipulations that they ask us to sign.

16          **THE COURT:**  They are going to do that.

17          **MS. ARGUEDAS:**  Well, that's the only thing we can

18  contribute to.

19          **THE COURT:**  I'll talk about that in a minute.

20          **MS. AULT:**  Your Honor --

21          **THE COURT:**  I think there are two sort of things.  I

22  mean, I don't know -- one are the stipulations.  And I

23  understand the Government is going to deliver a series of

24  stipulations to the defense, and I'll talk about when they are

25  going to do it by.

```
 1        But there is another whole category which is, absent
 2   stipulations, how many witnesses do you need to prove X or Y
 3   or Z?  That has nothing to on do with the stipulation.  That
 4   has to do with, how are you going to do it?
 5             MS. AULT:  And, your Honor, what we propose is that
 6   with our pretrial filings, which are due the week before the
 7   pretrial conference, we will submit to the Court a list of
 8   witnesses that we propose that the Court read out to the jury
 9   as the witnesses do you have any conflict with.  And those are
10   the witnesses that we are most likely --
11             THE COURT:  When is the pretrial?
12             MS. AULT:  It's May 19th.
13             THE COURT:  Now, what I want you to do before
14   May 19th, before May 19th, is two things.
15        One, I want you to submit to the defense a series of
16   proposed stipulations, okay?  How long is it going to take you
17   to do that?
18             MS. AULT:  Your Honor, we've actually been working on
19   them.  The problem is that until we get our exhibit list done,
20   it doesn't make a lot of sense to submit stipulations to the
21   defense because the stipulations have to refer to Exhibit
22   Number X, Y and Z.
23             THE COURT:  Oh, oh, oh.  Really?  I think you can say
24   exhibit blank and then -- I think the defense will say, okay.
25             MS. ARGUEDAS:  We all know all the documents, your
```

1    Honor.  We really do.

2              THE COURT:  I think you can --

3              MS. ARGUEDAS:  We know the important documents.

4              THE COURT:  I think you can work through that, but --

5              MS. AULT:  Your Honor, I --

6              THE COURT:  I want to get this process going.

7              MS. AULT:  Your Honor, we will submit stipulations to

8    the defense on May 12th and then we will have plenty of time to

9    discuss those and to bring any issues that we have to the Court

10   by May 19th.

11             THE COURT:  May 12th for proposed stipulations.

12       Now, when are you going to be able to give to the defense

13   a list of witnesses who otherwise would be testifying even if

14   there is a stipulation?  In other words, that you're going to

15   be using it to prove their case.  They may contest it, but

16   you're going to use it to prove your case.

17             MS. AULT:  That will be on May 12th as well, your

18   Honor.

19             THE COURT:  Okay.  All right.  That's great.  Now we

20   have a date, May 12th.

21             MS. ARGUEDAS:  Honestly, your Honor, to me May 12th

22   is practically the same as June 6th.

23             THE COURT:  To me, it's not.

24             MS. ARGUEDAS:  Well, it's whenever you say it should

25   be, but that seems like -- we all know the case very well.  We

1  know the important documents very well.  They have 185 real

2  people, plus 70 custodians.  So the idea that we are not going

3  to do anything about narrowing that until May 12th when they

4  first propose to us things that we could stipulate away, that

5  does not seem like a --

6         THE COURT:  Well, yes, it does.

7      First of all, let me ask you this, Ms. Ault.  As to the

8  custodians, is there any reason why you can't submit in the

9  next five days a proposed stipulation with respect to

10 custodians?

11        MS. AULT:  Your Honor, I would simply point out this.

12 The Court has already advanced the pretrial filing deadlines in

13 this case by two weeks.  We have not complained about it.  We

14 have complied with them.  We are going to comply with them.

15 That means our exhibit list is due in two weeks.

16     We are working as quickly and diligently as we can to get

17 all of that done and to do it in a way where we're not just

18 naming every document and putting it on our exhibit list.

19        MS. ARGUEDAS:  Like 185 witnesses.

20        MS. AULT:  What I'm saying is that May 12th is a

21 realistic opportunity for us to --

22        THE COURT:  What about a rolling?  What about a

23 rolling?

24        MS. AULT:  If we can do that, we will, your Honor.

25 But May 12th is a realistic date by which we can give a

1  realistic witness list to the defense.  It is still a month

2  before trial.

3          **MS. ARGUEDAS:**  Judge?

4          **MS. AULT:**  It is a very realistic date.  It gives

5  them a week to negotiate with us before the pretrial

6  conference.  It gives them a month to deal with it before

7  opening statements.  It is a very -- and it gives us enough

8  time to really sit down and evaluate what our evidence is, what

9  we really need to put in.

10          **THE COURT:**  I must tell you, I would be surprised if

11  you don't have that well in mind right now.

12          **MS. AULT:**  We do, your Honor.  But as I said, and as

13  the Court knows, the evidence starts out like this.  As we get

14  closer to trial it becomes like this (indicating).  Because we

15  figure out.  We refine --

16          **THE COURT:**  I've actually seen it going frequently in

17  the other direction.  The evidence is just about like that and

18  you figure out you need a lot more evidence.  I don't know.  I

19  see it going in different directions.

20      But, look.  I expect that you will honor the May 12th

21  deadline.

22          **MS. AULT:**  Your Honor, if it's at all possible for us

23  to get stipulations to the defense beforehand, we will.

24          **THE COURT:**  Custodian, I don't know -- you know, this

25  is not something that -- that has to be drafted by -- well, you

1  know, it's something that, as a general rule, can be given to

2  somewhat of a junior attorney to draft a stipulation.

3         MS. ARGUEDAS:  I was going to say, Mr. Hemann

4  perhaps.

5         MR. HEMANN:  Here I am.

6         THE COURT:  I think he's capable.  You all know

7  somebody a bit more senior than Mr. Hemann that can probably

8  draft those custodians.

9         MS. AULT:  But, your Honor, we would rather give them

10  a stipulation that has a custodian for 20 documents that we

11  really want to put in than 100 that we think we might want to

12  put in.

13         THE COURT:  All right.  Okay.  You're promising me

14  you're winnowing it down and will do it by the 12th, that's

15  great.  I'm expecting that.

16         MS. AULT:  Yes, your Honor.

17         THE COURT:  Okay.

18         MS. AULT:  Thank you.

19         MS. ARGUEDAS:  Good afternoon.

20         THE COURT:  Thank you.

21      (Proceedings adjourned.)

22

23

24

25

### CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, May 2, 2016