Cristina C. Arguedas (CalBN 87787)
    Email: arguedas@achlaw.com
Ted W. Cassman (CalBN 98932)
    Email: cassman@achlaw.com
Raphael M. Goldman (CalBN 229261)
    Email: goldman@achlaw.com
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Facsimile: (510) 845-3003

Allen J. Ruby (CalBN 47109)
    Email: allen.ruby@skadden.com
Jack P. DiCanio (CalBN 138782)
    Email: jack.dicanio@skadden.com
Patrick Hammon (CalBN 255047)
    Email: patrick.hammon@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA  94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Counsel for FedEx Corporation,
Federal Express Corporation and
FedEx Corporate Services, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FEDEX CORPORATION, FEDERAL EXPRESS CORPORATION, and FEDEX CORPORATE SERVICES, INC.,<br><br>Defendants. | **No. CR 14-380 (CRB)**<br><br>**FEDEX DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTIONS IN LIMINE**<br><br>Date: May 19, 2016<br>Time: 9:30 a.m.<br>Hon. Charles R. Breyer<br><br>**[Public/Redacted Version]** |

## **TABLE OF CONTENTS**

I.      REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #1: PRETRIAL
        INSTRUCTION REGARDING THE ILLEGAL DISTRIBUTION OF
        PRESCRIPTION MEDICATIONS.................................................................1

        A.      The Government Must Prove that FedEx Had Knowledge and
                Intent About the Conduct of the Doctors Who Issued the
                Prescriptions .........................................................................1

        B.      A Pretrial Instruction is Appropriate ........................................7

        C.      Alternative to the Term "Pusher".............................................7

        D.      Proposed Instruction ..............................................................8

II.     REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #2: EXCLUDE
        EVIDENCE RELATED TO ONLINE PHARMACY ENTITIES THAT WERE
        NOT PART OF THE ALLEGED CHHABRA-SMOLEY OR SUPERIOR
        DRUGS NETWORKS....................................................................10

        A.      UHTG......................................................................................11

        B.      Rx Limited .............................................................................12

        C.      Medipharm and MedCare .......................................................12

        D.      Roots Pharmaceuticals, Marketing US Solutions and Related
                Entities .................................................................................13

III.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #3: EXCLUDE
        EVIDENCE POST-DATING THE CONSPIRACIES CHARGED IN THE
        INDICTMENT .............................................................................15

IV.     REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #4: EXCLUDE
        EVIDENCE OF THE SO-CALLED "CHHABRA-SMOLEY
        ORGANIZATION" OR, ALTERNATIVELY, EXCLUDE EVIDENCE OF
        ALLEGED CO-CONSPIRATORS' STATEMENTS PURSUANT TO RULE
        801(d)(2)(E) ..............................................................................18

        A.      Argument ...............................................................................22

        B.      Conclusion .............................................................................26

V.      REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #5: REQUIRE A
        PROFFER CONCERNING THE ADMISSIBILITY OF EVIDENCE
        RELATED TO THE ALLEGED SUPERIOR DRUGS CONSPIRACIES............28

VI.     REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #6: EXCLUDE
        EVIDENCE OF "GROSS GAINS" AND STRIKE THE ALTERNATIVE
        MAXIMUM FINE ALLEGATION FROM THE INDICTMENT............................31

A.    The Court May Exclude Evidence Offered in Support of the
      Alternative Maximum Fine ........................................................31

B.    "Gross Gains" Means "Pre-Tax Profits"....................................33

C.    Evidence in Support of the Alternative Maximum Fine Allegation will
      Unduly Complicate and Prolong the Trial................................36

VII.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #7: EXCLUDE
        EVIDENCE RELATED TO SHIPMENT OF CIGARETTES BY FEDEX
        GROUND TO RESIDENTIAL CONSUMERS ALLEGEDLY IN VIOLATION
        OF STATE AND FEDERAL LAW ........................................................40

A.    The Evidence Regarding Cigarette Shipments is Not Offered for
      Any Permitted Use Under Rule 404(b)(2), and Instead is Offered as
      Propensity Evidence in Violation of Rule 404(b)(1)...............42

B.    The Proposed Evidence Should Be Barred Under Rule 403
      Because of Waste of Time and Confusion of the Issues........45

VIII.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #8: EXCLUDE
        EVIDENCE OF FEDEX'S POLICIES CONCERNING THE SHIPMENT OF
        ALCOHOL ........................................................................................48

IX.     REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #9: EXCLUDE
        EVIDENCE OF SETTLEMENT NEGOTIATIONS AND STATEMENTS
        MADE DURING THOSE NEGOTIATIONS...........................................52

X.      REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #10: EXCLUDE
        EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES ...............53

XI.     REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #11: EXCLUDE
        EVIDENCE OF GRAND JURY SUBPOENAS ISSUED BY THE
        NORTHERN DISTRICT OF CALIFORNIA .......................................54

XII.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #12: EXCLUDE
        EVIDENCE THAT FEDEX PURPORTEDLY VIOLATED STATE LAWS
        AND PROFESSIONAL ASSOCIATION GUIDELINES ....................56

XIII.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #13: EXCLUDE
        PROOF OF ADVERSE EVENTS .....................................................57

A.    Evidence of Adverse Consequences About Which FedEx Was Not
      Aware....................................................................................57

B.    Evidence of Adverse Consequences About Which FedEx Was
      Allegedly Aware ...................................................................57

C.    Customer Witnesses..............................................................58

XIV.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #14: EXCLUDE
        EVIDENCE RELATED TO DELIVERY OF MEDICATIONS TO
        TEENAGERS ...................................................................................59

XV.     REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #15: EXCLUDE
        EVIDENCE OF CUSTOMER COMPLAINTS AND CLAIMS ............................ 60

XVI.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #16: EXCLUDE
        EVIDENCE RELATING TO NORTHWEST RESEARCH ................................. 62

XVII.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #17:
        PRECLUDE GOVERNMENT FROM INQUIRING INTO PRIVILEGED
        MATTERS, INSTRUCT ON ATTORNEY-CLIENT PRIVILEGE ....................... 65

XVIII.  REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #18:
        PRECLUDE ARGUMENT THAT FEDEX SHIPPED FOR "ILLEGAL" OR
        "SHUT DOWN" INTERNET PHARMACIES ........................................ 67

XIX.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #19:
        PRECLUDE GOVERNMENT FROM ARGUING THEORIES OF
        NEGLIGENCE OR RECKLESSNESS ............................................ 68

XX.     REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #20: EXCLUDE
        EVIDENCE OF MEASURES UNDERTAKEN BY OTHER PRIVATE
        CORPORATIONS ........................................................... 70

XXI.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #21:
        PRECLUDE REFERENCES BY EXPERTS TO EXCLUDED EVIDENCE ....... 71

**TABLE OF AUTHORITIES**

<u>Cases</u>

*3 Penny Theater Corp. v. Plitt Theatres, Inc.*, No. 84 C 3394, 1985 U.S. Dist. LEXIS 13575 (N.D. Ill. Nov. 25, 1985) .......................................................................45

*Berger v. United States*, 295 U.S. 78 (1935) ................................................................6

*Board of Trustees v. Roche Molecular Systems*, 487 F. Supp. 2d 1099 (N.D. Cal. 2007)  63

*Canella v. United States*, 157 F.2d 470 (9th Cir. 1946) ...............................................29

*Curtis v. United States*, 262 U.S. 215 (1923) .............................................................63

*Hernandez v. United States*, 300 F.2d 114 (9th Cir. 1962) ..........................................64

*Kotteakos v. United States*, 328 U.S. 750 (1946) ..................................................25, 29

*Michelson v. United States*, 335 U.S. 469 (1948) ........................................................42

*Old Chief v. United States*, 519 U.S. 172 (1997) .........................................................47

*People v. Ignacio*, 852 F.2d 459 (9th Cir. 1988) ...........................................................7

*Southern Union Co. v. United States*, __U.S.__, 132 S. Ct. 2344 (2012)....................31

*Stirone v. United States*, 361 U.S. 212 (1960) ..............................................................6

*Tennison v. Circus Circus Enterprises*, 244 F.3d 684 (9th Cir. 2001) ...................41, 45

*United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985) ................................................7

*United States v. Basciano*, 599 F.3d 184 (2d. Cir. 2010) ............................................23

*United States v. BP Products North America Inc.,* 610 F. Supp. 2d 655 (S.D. Tex. 2009) ............................................................................................................................33

*United States v. Bradley*, 5 F.3d 1317 (9th Cir. 1993) .................................................43

*United States v. Chen*, 99 F.3d 1495 (9th Cir. 1996) ...................................................66

*United States v. Citgo Petroleum Corp.,* 908 F. Supp. 2d 812 (S.D. Tex. 2012) .........33

*United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) ............................................6

*United States v. Durades*, 607 F.2d 818 (9th Cir. 1979).........................................24, 26

*United States v. Duran*, 189 F.3d 1071 (9th Cir. 1999) ...........................................24, 25

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) ...................................2, 7, 48

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000)..............................................62

*United States v. Gary*, 447 F.2d 907 (9th Cir. 1971) ...................................................64

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988) ..............................................7

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc) ...........48, 62, 68, 69

*United States v. Hernandez-Miranda*, 601 F.2d 1104 (9th Cir. 1979) ..................42, 43

*United States v. Herrera*, 210 Fed. Appx. 569, 572 (9th Cir. 2006) (unpublished) ......24

*United States v. Hodges*, 770 F.2d 1475 (9th Cir. 1985)..............................................45

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) ................................................42

*United States v. Hui Hsiung*, 778 F.3d 778 (9th Cir. 2015) (as amended).......33, 34, 39

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989).........................................23

*United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976) (en banc) ...............................62

*United States v. King*, 200 F.3d 1207 (9th Cir. 1999) ...................................................7

*United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) ...................................24, 25, 29

*United States v. Long*, 706 F.2d 1044 (9th Cir. 1983) ...........................................26, 28

*United States v. Lovern*, 590 F.3d 1095 (10th Cir. 2009) .............................................2

*United States v. Lovin*, No. 07cr2016-IEG, 2009 U.S. Dist. LEXIS 101567 (S.D. Cal. Oct. 30, 2009) ........................................................................................................2

*United States v. Lukashov*, 3:09-cr-0120-BR, 2015 U.S. Dist. LEXIS 117621 (D. Or. Sept. 3, 2015)..........................................................................................................41

*United States v. Mayans*, 17 F.3d 1174 (9th Cir. 1994)...................................12, 43, 45

*United States v. Moore*, 423 U.S. 122 (1975).........................................................2, 7

*United States v. Napoli*, No. 10-cr-642-CRB (2012) Dkt. 1056................................2, 8

*United States v. Nektalov*, S2 03 Cr. 828 (PKL), 2004 U.S. Dist. LEXIS 21539 (S.D.N.Y. Oct. 25, 2004) ............................................................................................62

*United States v. Palma-Salazar*, No. 2015 U.S. Dist. LEXIS 104724, 2015 U.S. Dist. LEXIS 104724 (S.D. Cal. Aug. 10, 2015) ....................................................23

*United States v. Pacific Gas* & *Electric Co.*, CR No. 14-175 (N.D. Cal.), Dkt. 201 ......32

*United States v. Patterson*, 819 F.2d 1495 (9th Cir. 1987).........................................23

*United States v. Prantil*, 764 F.2d 548 (9th Cir. 1985) ................................................55

*United States v. Ramos-Atondo*, 732 F.3d 1113 (9th Cir. 2013) ...........................62, 68

*United States v. Sanford Ltd.,* 878 F. Supp. 2d 137 (D.D.C. 2012) ...........32, 33, 34, 35

*United States v. Smoley*, No. 10-619 JSW (N.D. Cal.), Dkt. 22..................................26

*United States v. Tsinhnahijinnie*, 112 F.3d 988 (9th Cir. 1997) ....................................6

*United States v. Walden*, No. 93-50048, 1993 U.S. App. LEXIS 31982 (9th Cir. Dec. 1, 1993) (unpublished) ........................................................................................46

*United States v. Ward*, 747 F.3d 1184 (9th Cir. 2014)..................................................6

*United States v. Wilbur*, 674 F.3d 1160 (9th Cir. 2012) ..............................................26

*United States v. Yi*, 704 F.3d 800 (9th Cir. 2013)..................................................62, 68

*Upjohn Co. v. United States*, 449 U.S. 383 (1981) ......................................................66

*Villegas v. Mukasey*, 523 F.3d 984 (9th Cir. 2008)......................................................62

## Other Authorities

3 Model Penal Code and Commentaries § 6.03 (1985) ................................................35

18 U.S.C. § 853.............................................................................................................35

18 U.S.C. § 1956...........................................................................................................35

18 U.S.C. § 1963...........................................................................................................35

18 U.S.C. § 3571 ..................................................................................................*passim*

18 U.S.C. § 3623...........................................................................................................34

18 U.S.C. § 3681...........................................................................................................35

18 U.S.C. § 3682 ................................................................................................35

21 C.F.R. § 1306.4 ..............................................................................................2

Federal Rule of Evidence 104 ..................................................................26, 28

Federal Rule of Evidence 402 .........................................................10, 48, 50

Federal Rule of Evidence 403 ................................................................. *passim*

Federal Rule of Evidence 404 ................................................................. *passim*

Federal Rule of Evidence 801 ............................................................................28

Ninth Circuit Manual of Model Criminal Jury Instructions, Instruction 5.7 ...................62

U.S.S.G. § 8A1.2 ................................................................................................34

1

2

FedEx Corporation, Federal Express Corporation and FedEx Corporate Services, Inc. (collectively, "FedEx") submit the below replies in support of their motions in limine.

3

**I.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #1: PRETRIAL INSTRUCTION REGARDING THE ILLEGAL DISTRIBUTION OF PRESCRIPTION MEDICATIONS**

4

5

The government's response to Defense Motion In Limine #1 is mystifying and

6

7

somewhat alarming.  FedEx's motion relies on what appears to be a fairly

8

uncontroversial proposition — that the underlying crime, the thing that allegedly turned

9

the prescription medications at issue into contraband, arose from the purported fact that

10

the medications were prescribed by a doctor acting outside the usual course of

11

professional practice and not for a legitimate medical purpose.  *See* 4/14/2016 Defense

12

Motions In Limine ("Defense MILs") at 1-2.

13

Surprisingly, the government quarrels with this premise.  It asserts that "the

14

United States need only prove that the defendants entered into an agreement with

15

*someone* to distribute the drugs outside the usual course of professional practice and

16

not for a legitimate medical purpose."  Dkt. 263-1 at 4 (emphasis in original).  The

17

government continues:

18

19

20

21

22

23

24

25

> There are numerous scenarios by which the defendants can have committed the charged conspiracies without a doctor needing to have the intent described in the third element of the defendants' proposed instruction: the drugs could be distributed without a doctor's participation at all; the doctor could have been misled into thinking that he or she was not actually issuing prescriptions but was merely performing quality control over prescriptions validly issued by another physician; the doctor's identity could have been stolen; or the doctor could have been mentally incompetent at the time he or she issued the prescriptions . . . . So long as someone in the conspiracy knew and intended that the distribution was outside the usual course of professional practice and not for a legitimate medical purpose and the defendants entered into a conspiracy intending to help accomplish this object, they are guilty of the crimes charged.

26

*Id.*  The government is wrong about the elements of its own case.

27

28

**A.    The Government Must Prove that FedEx Had Knowledge and Intent About the Conduct of the Doctors Who Issued the Prescriptions**

This case is charged under a line of jurisprudence holding that distributions of

prescription medications are illegal when the underlying prescription is invalid because it was issued by a doctor acting outside the usual course of professional practice and not for a legitimate medical purpose.  *See, e.g., United States v. Moore*, 423 U.S. 122, 139-43 (1975); *United States v. Feingold*, 454 F.3d 1001, 1003, 1007-09 (9th Cir. 2006); *see also, e.g., United States v. Lovern*, 590 F.3d 1095, 1099, 1104-05 (10th Cir. 2009); *United States v. Lovin*, No. 07cr2016-IEG, 2009 U.S. Dist. LEXIS 101567 at *7-13 (S.D. Cal. Oct. 30, 2009); 21 C.F.R. § 1306.4.  Prescription medications distributed "without a doctor's participation at all," for example, would be a different crime — the elements would not involve questions about the usual course of professional practice or legitimate medical purpose, as it would be illegal for someone to distribute prescription medications not prescribed by a doctor regardless of the distributor's professional practice or medical purpose.  *See, e.g., Moore*, 423 U.S. at 131; *Feingold*, 454 F.3d at 1003.

This Court's instructions in the *Napoli* case, cited by the government in its own papers, *see* Dkt. 263-1 at 2, make the point clearly.  In *Napoli*, as here, the gravamen of the charged offenses lay in the allegation that *doctors* had issued prescriptions to patients based only upon their review of an online questionnaire.  The *Napoli* instructions thus required proof that the defendants knew and intended that distributions of medication were made "by means of *a prescription issued by a physician* not for a legitimate medical purpose and not in the usual course of professional practice."  *United States v. Napoli*, No. 10-cr-642-CRB (2012) Dkt. 1056 at 19 (emphasis added); *see also id.* at 3, 23, 25, 27, 29, 30, 31, 32.

The superseding indictment in this matter, Dkt. 28 ("indictment"), plainly seeks to charge FedEx with involvement in precisely that same crime.  The indictment repeatedly alleges that the charged crimes involved physicians who prescribed medications without a proper medical basis:

- Paragraph 4 of the indictment asserts that government officials "informed senior

FEDEX management that *a prescription based solely on a customer's completion of an online questionnaire was invalid* and that controlled substances and prescription drugs dispensed based on such an invalid prescription were distributed in violation of the CSA, FDCA, and numerous state laws."

- Paragraph 5 asserts that "FEDEX knew that the Chhabra-Smoley Organization and Superior Drugs were each distributing controlled substances and prescription drugs *based solely on a customer's completion of an online questionnaire*, and that these organizations were distributing drugs outside the usual course of professional practice and not for a legitimate medical purpose in violation of the law."

- Paragraph 25 alleges that "The Chhabra-Smoley Organizations consisted of websites . . . which offered for sale controlled substances on Schedules III and IV, by means of the Internet, to customers who *were only required to complete an online questionnaire* and were not examined, diagnosed, or contacted *by the physicians who issued the prescriptions* in connection with their orders."

- Paragraph 26 alleges that "The Chhabra-Smoley Organization also included physicians whom Chhabra and Smoley partnered with, recruited, and hired to review the customers' online questionnaires and *to issue prescriptions for controlled substances based solely upon the customers' responses.*"

- Paragraph 27 concerns fulfillment pharmacies that allegedly "fill[ed] invalid prescriptions."

- Paragraph 30 contends that FedEx employees "knew that the Chhabra-Smoley Organization was distributing controlled substances *based on prescriptions issued by doctors after reviewing customers' responses to an online questionnaire.*"

- Paragraph 38 asserts that "*the purpose of the Chhabra-Smoley Organization*" was to "provide controlled substances to consumers without the need for a face-

to-face meeting with, or physical examination, laboratory tests, or diagnosis, by a physician," and that "the practice of prescribing medication *based solely on a physician's review of an online questionnaire, without a physical examination, laboratory tests, or face-to-face meeting* was not in accordance with the usual course of medical and pharmacy practice."

- Paragraph 68 alleges that "FEDEX employees knew that the payments from members of the Chhabra-Smoley Organization represented the proceeds of the sale of controlled substances and prescription drugs based on *invalid prescriptions* that were issued outside the usual course of professional practice and not for a legitimate medical purpose."

- Paragraph 73 asserts that "The Internet pharmacies for which Superior filled orders for controlled substances . . . offered for sale controlled substances in Schedules III and IV, by means of the Internet, to customers who were *only required to complete an online questionnaire* and were not examined or diagnosed by *the physicians who issued the prescriptions* in connection with their orders."

- Paragraph 74 alleges that "The Internet pharmacies for which Superior filled orders for controlled substances based on invalid prescriptions partnered with, recruited, and hired throughout the United States and Puerto Rico *physicians to review the customers'* online questionnaires and to *issue invalid prescriptions for controlled substances based solely upon the customers' responses.*"

- Paragraphs 75 and 76 each again refer to pharmacies that filled orders "*based on invalid prescriptions.*"

- Paragraph 77 alleges that FedEx employees "knew that Superior and its related Internet and fulfillment pharmacies were distributing controlled substances based on prescriptions *issued by doctors* after only reviewing customers' responses to online questionnaires."

- Paragraph 78 refers again to "invalid prescriptions."

- Paragraph 83 alleges that "FEDEX employees knew that *the purpose of Superior* was to provide controlled substances to consumers without the need for a face-to-face meeting with, or physical examination or laboratory tests by, a physician . . . . FEDEX employees further knew that the practice of *prescribing medication based solely on a physician's review of an online questionnaire*, without a physical examination, laboratory tests, diagnosis, or face-to-face meeting was not in accordance with the usual course of medical and pharmacy practice."

- Paragraph 86 contains allegations about "*prescriptions* [that] were issued *by doctors* employed by the online pharmacies after *either review of an online questionnaire or after reviewing a report of a physical examination conducted by a physician who was not unavailable at the time the prescription was issued* . . . ."

- Paragraph 112 alleges that "FEDEX employees knew that the payments from Superior and its related Internet and fulfillment pharmacies represented the proceeds of the sale of controlled substances and prescription drugs based on *invalid prescriptions* that were issued outside the usual course of professional practice and not for a legitimate medical purpose."

- Paragraph 119 asserts that "FEDEX knew that the money orders and checks were intended as payment for controlled substances that FEDEX had delivered and attempted to deliver from Superior to consumers.  FEDEX further knew that those orders had been placed by customers *after filling out an online questionnaire* with no contact between *the prescribing physician* and patient and were thus distributed outside the usual course of professional practice and not for a legitimate medical purpose and were not based on valid prescriptions."

Dkt. 28 (all emphases added); *see also, e.g.,* Dkt. 243-2 (Government Motion In Limine #2) at 1 (stating, in the context of discussing the common carrier exemptions enshrined

in Title 21 of the United States Code, that "[i]f the jury finds that the distributions were within lawful channels, *i.e.*, *that the prescriptions were valid*, they must vote to acquit.  If the jury finds that the distributions were not within lawful channels, *i.e.*, *that the prescriptions were not valid*, then the exemptions do not apply and the jury need not consider them" (emphasis added)).

Whatever the merits of the government's apparent contention that it would be a violation of the Controlled Substances Act or Food, Drug and Cosmetic Act for *anyone* to distribute a medication outside his or her own course of professional practice, that is not what the grand jury has charged here.  The indictment plainly alleges that the medicines at issue in this case were contraband because *the doctors* who issued them were acting outside the usual course of *their* professional practices and not for a legitimate medical purpose, and that the resulting prescriptions were therefore invalid. A course of proof that diverged from those charges in the manner suggested by the government would violate FedEx's due process and Sixth Amendment rights to receive sufficient notice of the charges and to be tried only upon an indictment found by a grand jury.  *Stirone v. United States*, 361 U.S. 212, 213 (1960); *Berger v. United States*, 295 U.S. 78, 82 (1935); *United States v. Ward*, 747 F.3d 1184, 1190-92 (9th Cir. 2014); *United States v. Dipentino*, 242 F.3d 1090, 1092-93 (9th Cir. 2001); *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir. 1997).  At the same time, the government's suggestion that the indictment's references to the "usual course of professional practice" and to a "legitimate medical purpose" could refer to the obligations of "someone" other than the issuing physician raises daunting issues of duplicity, jury confusion and lack of jury unanimity at trial.  If the alleged offenses are not founded on doctors' purported issuance of invalid prescriptions, then the prosecution could seek, and the jury could conceivably deliver, convictions based upon pharmacists', website operators' or others' divergence from their own courses of professional practice.  The Fifth and Sixth Amendments preclude the government from asserting such alternative bases for liability

under a single conspiracy count.  *United States v. King*, 200 F.3d 1207, 1212 (9th Cir. 1999); *United States v. Gordon*, 844 F.2d 1397, 1400-02 (9th Cir. 1988); *United States v. Aguilar*, 756 F.2d 1418, 1420 n.2, 1422 (9th Cir. 1985).

The Court must instruct the jury that the questions for their consideration relate to whether FedEx knew it was distributing medication by means of a prescription issued by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose; whether FedEx intended to distribute medications by means of a prescription issued by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose; and whether FedEx entered into agreements to distribute medications by means of a prescription issued by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose.

**B.     A Pretrial Instruction is Appropriate**

The government cites *People v. Ignacio*, 852 F.2d 459, 461 (9th Cir. 1988) for the proposition that preliminary instructions should provide the jury with a "general orientation."  *See* Dkt. 263-1 at 3.  That is precisely FedEx's point.  A proper orientation to this case will provide the jurors, in preparation for receiving months of testimony and evidence, with necessary guidance about the vital topics of what makes a prescription medication into illegal contraband, and how a non-medical professional might be liable under the criminal law for involvement in distributing such contraband.

**C.     Alternative to the Term "Pusher"**

In describing the conduct that would make a physician's conduct a violation of the Controlled Substances Act, the Supreme Court and the Ninth Circuit have each used the term "pusher."  *Moore*, 423 U.S. at 138; *Feingold*, 454 F.3d at 1004, 1007, 1008.  The government insists that the Court should not use the same term because some courts have affirmed instructions that did not use it.  Dkt. 263-1 at 1.  But none of those cases prohibited district courts from using the term, which, after all, both the

Supreme Court and Ninth Circuit found to be an accurate description of illegal conduct at issue.

In light of the "unique nature of this prosecution," Dkt. 165 at 8, it is appropriate for the Court to instruct the jury in language that makes the legal standard clear.  One of the things that makes this case so unusual is that the government has charged FedEx — a package delivery company that is far removed from the doctors' prescription-writing decision and generally has no obligation to understand the ethical mores of medical professionals — with *knowing* that certain doctors were engaged in practices so far outside the norm that they were acting not as doctors at all, but instead as drug dealers. In order for the jury to determine whether FedEx knew the type of crime in which the doctors were allegedly involved, the jury must understand for itself the nature of the crime.

In light of the government's objection, FedEx proposes an alternative.  The Court should employ the same language it used in the *Napoli* instructions: "To prove that a medication was distributed in violation of these laws, it is not enough for the United States to prove that the prescribing physician committed malpractice, intentional or otherwise.  Rather, the United States must prove that the prescribing physician used his prescription-writing powers as a means to engage in illicit drug dealing and trafficking." *See Napoli*, No. 10-cr-642-CRB (2012) Dkt. 1056 at 17.

### D.    Proposed Instruction

FedEx agrees that the government need not necessarily prove that a doctor *distributed* the prescription medications at issue.  *See* Dkt. 263-1 at 1-2.  Accordingly, FedEx proposes the following amended instruction, adapted from the Court's instructions in the *Napoli* trial.  *See Napoli*, No. 10-cr-642-CRB (2012) Dkt. 1056 at 17, 19, 25.

> During this trial, you will hear about various persons and entities that the government says distributed prescription medications in violation of the federal Controlled Substances Act or federal Food, Drug and Cosmetic Act.

A person or entity distributes a prescription medication in violation of those laws if the person or entity:

1. knowingly distributes a prescription medication;

2. knows that it is a prescription medication;

3. distributes the medication by means of a prescription issued by a physician not for a legitimate medical purpose and not in the usual course of business;

4. knows that that the distribution is by means of a prescription issued by a physician not for a legitimate medical purpose and not in the usual course of professional practice; and

5. intends that the distribution was by means of a prescription issued by a physician not for a legitimate medical purpose and not in the usual course of professional practice.

To prove that a medication was distributed in violation of these laws, it is not enough for the United States to prove that the prescribing physician committed malpractice, intentional or otherwise. Rather, the United States must prove that the prescribing physician used his prescription-writing powers as a means to engage in illicit drug dealing and trafficking.

## II.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #2: EXCLUDE EVIDENCE RELATED TO ONLINE PHARMACY ENTITIES THAT WERE NOT PART OF THE ALLEGED CHHABRA-SMOLEY OR SUPERIOR DRUGS NETWORKS

In Defense Motion In Limine #2, FedEx moves to exclude evidence related to FedEx's purported provision of shipping services for entities not alleged to have been part of the so-called Chhabra-Smoley or Superior Drugs organizations.  Defense MILs at 2-6.  Despite the content of the government's notice under Federal Rule of Evidence 404(b), *see* Dkt. 242-1 (Ex. A, government Rule 404(b) letter), the government now asserts that it will not offer uncharged pharmacies evidence under Rule 404(b), but instead as direct evidence of FedEx's knowledge and intent with respect to the charged co-conspirators.  Dkt. 263-2 at 8-10.  The evidence should be excluded as irrelevant under Rule 402 and unfairly prejudicial, confusing, misleading and a waste of time under Rule 403.

The primary thrust of the government's argument that this evidence has intrinsic relevance is its contention that "FedEx employees talked about online pharmacies as an industry and treated them the same in terms of policies and practices."  Dkt. 263-2 at 8.  Despite the government's "rather lengthy discussion," *see* Dkt. 263-2 at 1, however, the supposed fact that FedEx treated online pharmacy customers in similar ways does not render relevant all evidence related to FedEx's treatment of pharmacies not affiliated with the alleged conspiracies.  The questions at this trial should concern the ways in which FedEx treated its purported co-conspirators, and what it knew and intended with respect to them.

FedEx acknowledges that evidence relating to FedEx's general policies and practices may be relevant if it sheds light on FedEx's interactions with, knowledge about, or intent with respect to the alleged co-conspirators.  Some of that evidence may involve references to unaffiliated pharmacies, and FedEx will not object on relevance grounds to the introduction of such evidence.

However, evidence that relates solely to FedEx's interactions with or discussions

about a separate pharmacy says nothing intrinsic about its mental state concerning the alleged Chhabra-Smoley and Superior Drugs organization conspirators — especially if, as the government states, the prosecution "does not intend to prove . . . that each of these pharmacies was operating 'illegally.'" Dkt. 263-2 at 9.  The mere facts that FedEx serviced an uncharged online pharmacy, treated the pharmacy in a manner consistent with the way the company treated other online pharmacies, or learned that the pharmacy was closed by regulatory or law enforcement authorities are not probative of FedEx's knowledge and intent with respect to the *charged* pharmacies.  Such extrinsic matters are classic Rule 404(b) evidence, and they should be excluded for the reasons discussed in our opening papers.  The government should be required to prove FedEx's conduct and intent with respect to its alleged co-conspirators; it should not be permitted to attempt to convict FedEx by piling up inferences and innuendo based on the company's emails about other customers who may or may not have operated illegally.

The government's trial exhibit list, Dkt. 256-1, includes a large number of emails that demonstrate the government's intent to present entirely extrinsic evidence relating to FedEx's dealings with other pharmacy shippers.[1]  Below are some glaring examples.

## A.    UHTG

The government's trial exhibit list includes several emails related to a FedEx customer called United Health Care or UHTG.  UHTG shipped with FedEx Ground, not Express, and the emails proffered by the government constitute discussions that specifically relate to that customer in particular, not to general discussions of FedEx policy or procedure.  *See* Declaration of Raphael M. Goldman in Support of Reply re Defense Motions In Limine ("Goldman Decl.") ¶ 2, Ex. A (Trial Exhibit 040-115 [FDX_E3_0393675]; Trial Exhibit 040-116 [FEDEX_E2_00463940]; Trial Exhibit 040-

---

[1] FedEx filed its motions in limine before the government filed its exhibit list, so FedEx was unable to respond to the government's list in its opening papers.

117 [FDX_E3_0272980]; Trial Exhibit 040-119 [FDX_E3_0273693]; Trial Exhibit 040-123 [FDX_E3_0008454]; and Trial Exhibit 040-125 [FEDEX_E2_00460655]).  Those emails have no connection to FedEx's knowledge and intent with respect to the alleged conspirators; instead, they appear intended to promote the classic Rule 404(b)(1) theory that FedEx was willing to engage in alleged misconduct with other customers in addition to the supposed co-conspirators.  Especially since the government disclaims any intent to prove that UHTG was committing a crime and that FedEx knew it and intended to facilitate it, the evidence must be excluded.  *See United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994); Defense MILs at 2-6.

## B.     Rx Limited

Similarly, the government's exhibit list includes emails related to an entity called Rx Limited.  *See* Goldman Decl. ¶ 3, Ex. B (Trial Exhibit 040-013 [FEDEX_E2_00018315]; Trial Exhibit 040-076 [FEDEX_E2_00018319]; Trial Exhibit 040-077 [FEDEX_E2_00212760]; Trial Exhibit 040-110 [FEDEX_E2_00466802]).  Again, these communications between FedEx employees relate solely to discussions about Rx Limited.  They shed no useful light on FedEx's general policies or procedures, and are not at all relevant to the government's proof concerning the alleged Superior Drugs and Chhabra-Smoley conspirators.  The proposed evidence is directed to an impermissible Rule 404(b)(1) purpose — FedEx's supposed propensity for wrongdoing — and it would not even support that purpose, as the government does not plan to prove that Rx Limited was distributing prescription medications prescribed by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose.  The evidence should be excluded.

## C.     Medipharm and MedCare

Another such group of proposed exhibits involves companies called Medipharm and MedCare.  *See* Goldman Decl. ¶ 4, Ex. C (Trial Exhibit 040-010 [FDX_E3_0402512]; Trial Exhibit 040-047 [FDX_E3_0403938]; Trial Exhibit 040-048

[FDX_E3_0395595]; Trial Exhibit 040-049 [FDX_E3_0403953]; Trial Exhibit 040-050 [FEDEX_E_00004772]; Trial Exhibit 040-051 [FDX_E3_0403974]; Trial Exhibit 040-052 [FDX_E3_0403978]; Trial Exhibit 040-053 [FDX_E3_0403985]; Trial Exhibit 040-054 [FDX_E3_0403995]; Trial Exhibit 040-055 [FDX_E3_0403997]; Trial Exhibit 040-059 [FDX_E3_0043530]; Trial Exhibit 040-060 [FDX_E3_0009169]; Trial Exhibit 040-061 [FDX_E3_0009162]; Trial Exhibit 040-062 [FDX_E3_0016261]; Trial Exhibit 040-063 [FDX_E3_0258540]; Trial Exhibit 040-064 [FDX_E3_0258549]; Trial Exhibit 040-065 [FDX_E3_0258558]; Trial Exhibit 040-066 [FDX_E3_0404122]; Trial Exhibit 040-068 [FDX_E3_0010354]; Trial Exhibit 040-069 [FDX_E3_0404132]; Trial Exhibit 040-072 [FDX_E3_0051572]; Trial Exhibit 040-073 [FDX_E3_0052573]; Trial Exhibit 040-074 [FDX_E3_0060712]; Trial Exhibit 040-118 [FEDEX_E2_00018370]).  As the Court can discern from that long list of exhibits, the government apparently intends to undertake a significant detour into the story of FedEx's dealings with these customers, although the emails in question make no mention of any charged conspirator.  The evidence should be excluded.

### D.    Roots Pharmaceuticals, Marketing US Solutions and Related Entities

The government similarly intends to introduce communications about a shipper called Roots Pharmaceuticals and related entities called Marketing US Solutions, CyberSupport and others.  *See* Goldman Decl. ¶ 5, Ex. D (Trial Exhibit 040-112 [FDX_E3_0016999]; Trial Exhibit 040-113 [FDX_E3_0017008]; Trial Exhibit 040-126 [FDX_E3_0009346]; Trial Exhibit 040-127 [FDX_E3_0009353]; Trial Exhibit 040-128 [FDX_E3_0012102]; Trial Exhibit 040-129 [FDX_E3_0012104]; Trial Exhibit 040-130 [FDX082112 502-505]).  Once again, this tangential evidence relates solely to FedEx's provision of shipping services to uncharged pharmacies (at least some of whom used FedEx Ground, rather than Express).  The evidence is extrinsic and should be excluded.

For all of the reasons discussed above, the Court should grant Defense Motion In

Limine #2.  The Court should exclude the above-described evidence, along with similar extrinsic evidence the government may seek to present through witness testimony or documentary evidence concerning uncharged pharmacies, shippers and websites.

1
2

**III.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #3: EXCLUDE EVIDENCE POST-DATING THE CONSPIRACIES CHARGED IN THE INDICTMENT**

3

4

5

6

7

8

        In Defense Motion In Limine #3, FedEx requests that the Court exclude evidence post-dating the charged conspiracies.  Defense MILs at 6-7.  The government asks the Court to reserve ruling, but offers no sound basis for denying the motion.  Dkt. 263-3 at 1-2.  It suggests one category of post-May 2010 information that could be relevant: communications that "reference[ ] pre-May 12 conduct."  Dkt. 263-3 at 1.  But the government's evidence is not actually offered for that purpose.

9

10

11

12

13

14

15

16

17

18

19

        The government cites three examples of evidence that it might want to introduce and that were generated after the indictment period, Dkt. 263-3 at 1, and suggests that "FedEx did not specifically object" to the admission of any of the documents, *id.* at 2.  In fact, FedEx did object to the introduction of two of the documents.  With respect to Government Exhibit 3A, FedEx discussed that document on page 64 of its brief, *see* Defense MILs at 64, and in counsel's accompanying declaration, *see* Dkt. 242-6 Ex. O.  With respect to Government Exhibit 3C, FedEx discussed that document on page 72 of its brief, *see* Defense MILs at 72, and in counsel's accompanying declaration, *see* Dkt. 242-9 Ex. T.  Neither of those documents is a "communication [that] references pre-May 12 conduct," Dkt. 263-3 at 1, and neither should be admitted.

20

21

22

23

24

25

26

        As to the email chain in Government Exhibit 3B, the government disingenuously intimates that the document's supposed relevance derives from elucidating conduct that occurred before May 2010.  It is true that the email chain states that Treasure Coast Specialty Pharmacy was "lost to UPS in April [2010]."  But that information is completely unimportant.  The government reveals its true motive for introducing the email when it argues that the document shows that "FedEx was still actively pursuing online pharmacy business . . . ."  Dkt. 263-3 at 1.  That purpose has three problems.

27

28

        First, it suggests that the government intends to use the term "online pharmacy" as a proxy for an illegal operation.  It is not.  As the government itself has

acknowledged, "many reputable Internet pharmacies provide consumers seeking prescription drugs with a measure of safety, privacy and convenience."  S. Hrg. 108-684 (July 17 and 22, 2004, available at *https://www.gpo.gov/fdsys/pkg/CHRG-108shrg95190 /pdf/CHRG-108shrg95190.pdf*) at 232 (J. Taylor prepared statement).  Functioning as an "online pharmacy," or a pharmacy that fulfills orders placed over the internet, is not in itself a crime; the crime is committed only if the prescription being filled was issued by a doctor acting outside the usual course of professional practice and not for a legitimate medical purpose.  Second, there is nothing inherently relevant or inculpatory about the fact that FedEx pursued this customer: it is not even clear from the email that Treasure Coast Specialty Pharmacy was an online pharmacy, and certainly nothing in the exhibit establishes that the apparent pharmacy was fulfilling prescriptions issued by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose.  Third, and more generally, given the dates of the crimes charged in the indictment, it is not relevant whether FedEx was "still actively pursuing online pharmacy business" after May 12, 2010.

The government's exhibit list, which was submitted after FedEx filed its motions in limine, also includes several other emails authored after the alleged conspiracy period.  *See* Dkt. 256 at 94.  One such email is Trial Exhibit 040-132 (FDX_E3_0008280), a July 2010 email related to a complaint letter sent by Treasure Coast Specialty Company, the same customer that features in the email in Government Exhibit 3B.  Another is Trial Exhibit 040-134 (FDX_E3_0012112), a December 2011 email chain related to UHTG, the FedEx Ground account discussed more extensively in Part II.A, *supra*, because all evidence related to UHTG is improper extrinsic evidence.  A third document that post-dates the alleged conspiracies is Trial Exhibit 040-135 (FDX_E3_0410389), an email from September 2012 apparently offered for the purpose

of showing that FedEx's catchall system still had a "tag" for online pharmacy accounts.[2] Again, none of these emails reveal anything of relevance concerning FedEx's conduct, knowledge or intent during the period covered by the indictment.

The Court should grant FedEx's Motion In Limine #3.

---

[2] Copies of these three emails are attached as Exhibit O to the accompanying Declaration of Raphael M. Goldman in Support of Reply re Defense Motions in Limine.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #4: EXCLUDE EVIDENCE OF THE SO-CALLED "CHHABRA-SMOLEY ORGANIZATION" OR, ALTERNATIVELY, EXCLUDE EVIDENCE OF ALLEGED CO-CONSPIRATORS' STATEMENTS PURSUANT TO RULE 801(d)(2)(E)

In its opposition to FedEx's motion to exclude evidence of the so-called Chhabra-Smoley Organization on the grounds that the alleged conspiracy is time barred, the government concedes many of the relevant facts established in our moving papers:

- For the first three years of the alleged conspiracy, there was no Chhabra-Smoley Organization.  Vincent Chhabra and Robert Smoley were instead competitors.  Dkt. 263-4 at 3.

- From sometime in 2003 to approximately December 2005, Vincent Chhabra and Robert Smoley apparently "joined forces."  *Id.*

- After Chhabra's arrest in 2003, Vincent Chhabra's "role in the organization waned through 2004 into 2005 when he was finally incarcerated."  *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

There is no question that Vincent Chhabra and Robert Smoley parted ways by December 2005.  ████████████████████████████████████ , the divorce is confirmed by every relevant witness interview of which we are aware.  The witness interviews include that of Robert Smoley himself, who in April 2008 told DEA Special Agent Jason Chin that after 2005 he was "at war" with Vincent Chhabra and gave Chin the password — "*vincefuckedme*" — for the new email address that he had created after his break-up with Chhabra.

The witness statements reveal:

- DEA-6, Report of Interview of Robert Smoley, NAP-00004032 at -4042, -4045, -4061 (Goldman Decl. Ex. E):

    33. SMOLEY confronted CHHABRA while CHHABRA was in jail about Sabina CHHABRA [sic] purchase of the real estate and where the money

came from. CHHABRA denied any knowledge of any real estate purchases. SMOLEY stated that CHHABRA controlled all aspects of his (CHHABRA's) family's business. *At this time, SMOLEY decided to stop dealing with CHHABRA.*

. . . .

43. *SMOLEY stated that he was now at war with the CHHABRA family.* SMOLEY related that there was a computer programmer who worked for Camille, CHHABRA's girlfriend, that had access to SMOLEY's domain register. Camille ordered the computer programmer to transfer all of SMOLEY's domains to a company called CK ENTERPRISES. SMOLEY stated that his domains were registered with Tucows and that he (SMOLEY) immediately registered a company called CK ENTERPRISES and told Tucows to freeze his domains.

. . . .

108. SMOLEY permitted DEA agents to access the universemedia@gmail.com account and provided the following login details: username: universemedia@gmail.com; password: *vincefuckedme.*

- DEA-6, Report of Interview of Laura Hunt, NAP-00004100 at -4104-05 (Goldman Decl. Ex. F):

16. HUNT stated that she was aware that USA PRESCRIPTION had been indicted and acquitted. HUNT admitted to knowing about USA PRESCRIPTION prior to working at ICOM GROUP. *HUNT related that there was a disagreement between SMOLEY and CAROLINA that occurred in September 2005. Shortly thereafter, CAROLINA took control of the online pharmacy operation and SMOLEY and CAROLINA severed their business relationship.* HUNT stated that CAROLINA had not paid SMOLEY and owed SMOLEY money for the software leasing. HUNT stopped being the affiliate director for SMOLEY and CAROLINA subsequent to the split. HUNT stated that CAROLINA also ended WEB RX PARTNERS and started a new affiliate program in the Bahamas. HUNT stated that by this time, CHHABRA had served his prison time.

17. HUNT related that COHEN continued to work for CAROLINA doing accounting work. MAHADEO had asked HUNT if HUNT was interested in being the affiliate director for CAROLINA'S new operation but HUNT refused. *HUNT stated that she had no communication with CAROLINA or COHEN after they split with SMOLEY . . . .*

18. *HUNT stated that she, PERKINS, SMOLEY and Mark MAGNACCA started a new online pharmacy operation.* MAGNACCA was hired to be the operations officer in June 2005 and worked with WEB RX PARTNERS on a limited basis. HUNT stated that SMOLEY was heavily involved in the creation of the online pharmacy and was giving directions on how the pharmacy should be set-up. HUNT explained that her role for the new online pharmacy was to recruit pharmacies and doctors.

- DEA-6, Report of Melissa Perkins, NAP-00004077 at -4079 (Goldman Decl. Ex. G):

PERKINS related that in August 2005, SMOLEY, COHEN and SMOLEY's counsel, Pilar PINEIRO, met on a daily basis. According to PERKINS, COHEN couldn't explain any of the financials to SMOLEY so PINEIRO asked PERKINS to provide the financials to SMOLEY. *PERKINS stated that SMOLEY and COHEN had a disagreement and SMOLEY shared with PERKINS that he (SMOLEY) had previously helped the CHHABRA's. SMOLEY went on and stated that he didn't feel comfortable with the CHHABRA's anymore and SMOLEY intended to fire COHEN.* PERKINS stated that she was the staff accountant and handled account receivables, payroll, reporting and COHEN would handle the financials. PERKINS stated that when COHEN departed, she took on additional responsibilities that were previously done by COHEN. PERKINS explained that she had trouble keeping up with her new responsibilities.

- DEA-6, Report of Melissa Perkins, NAP-00004165 at -4170 (Goldman Decl. Ex. H):

  *SA Chin asked PERKINS why she decided to remain working with SMOLEY and not with COHEN after SMOLEY and COHEN had a falling out.* PERKINS stated that COHEN did not have a position for PERKINS, and SMOLEY did not really know what PERKINS did. PERKINS added that Pilar LNU asked PERKINS whose side she would take, and PERKINS related that she knew if she did not take SMOLEY's side, she would not have a job. PERKINS stated that she kept handling the ICOM GROUP account and the Images business which later became MSA.

There is also documentary evidence that in December 2005, Smoley filed a lawsuit against Chhabra's company and family and closed all of his FedEx accounts and opened new ones, explaining that he was a victim of fraud:

- On December 5, 2005, Smoley filed a lawsuit against Chhabra's girlfriend, a family member and a company that Chhabra apparently controlled; Chhabra filed his own lawsuit against ICOM on September 11, 2006.  Goldman Decl. ¶ 10, Ex. I.

- FedEx records reflect that Robert Smoley closed all of his shipping accounts on December 29, 2005 and opened new ones with an explanation of fraud.  Goldman Decl. ¶ 11, Ex. J (CHEERS 1136).

- On January 10, 2006, a FedEx sales person wrote an email explaining that Smoley's accounts were "going through a phase of switching their accounts due to the belief of fraudulent shipping activity on the existing accounts."  Goldman Decl. ¶ 12, Ex. K (FEDEX_E2_00018199).

Thus, ███████████████████████ after December 2005 Robert Smoley

and Vincent Chhabra went their separate ways. ████████████████████[3]

It is similarly beyond cavil that by October 2006, Smoley had entered into a new partnership with Dino Antonioni, Denis Leborgne, Claude Dierickx, and Brian Lloyd. ██ ████████████████████████████████████████ ████████████ Smoley's creation of that new partnership is confirmed by every relevant witness interview and other report about which we are aware.

- Affidavit of Jason Chin in Support of Seizure Warrant, NAP-00008522 at -8536 (Goldman Decl. Ex. L):

   In late October 2006, Leborgne met with Smoley, Lloyd, Antonioni and Jean Claude Dierickx about a new partnership in UMPS. All agreed to the new UMPS partnership and set a goal to fill 200 Internet orders per day and to begin manufacturing operations of human growth hormone (HGH). Leborgne wrote that work began on the new UMPS the next day and Smoley, PERKINS and Lloyd immediately began filling Internet drug orders out of UMPS while the pharmacy was renovated.

- DEA-6, Report of Interview of Robert Smoley, NAP-00004032 at -4049-51 (Goldman Decl. Ex. E):

   59. *SMOLEY stated that once he took UMPS back, LLOYD approached him (SMOLEY) and told him that he (LLOYD) knew some guys who were involved in the pharmacy compounding business and were interested in acquiring a pharmacy.* SMOLEY stated that the compounding business involved the compounding of human growth hormone (HGH) and steroids. SMOLEY stated that the people involved were LEBORGNE, LLOYD, ANTONIONI, and Jean Claude DIERICKS. SMOLEY met with LEBORGNE, LLOYD, ANTONIONI and DIERICKS, and they explained to SMOLEY about the compounding pharmacy business. SMOLEY agreed to provide the pharmacy location and formed a partnership with LEBORGNE, LLOYD, ANTONIONI and DIERICKS. SMOLEY told LEBORGNE, LLOYD, ANTONIONI and DIERICKS that they would have to put up the money to start the pharmacy. LEBORGNE AND DIERICKS put up $200,000 to buy the equipment to start the compounding pharmacy business.

   . . . .

---

[3] According to the government, after December 2005, Carleta Carolina (Vincent Chhabra's alleged representative) continued her own separate online pharmacy operation and ended up using Superior Drugs to fulfill prescription orders. Ms. Carolina was indicted along with Wayne White in the Superior Drugs prosecution in the Eastern District of Pennsylvania. United *States v. Carleta Carolina*, No. 09-682 JS, Dkt. No. 22. She was never apprehended and remains at large.

63. SMOLEY stated that UMPS began filling Internet drug orders around October or November 2006. LEBORGNE and ANTONIONI were filling online pharmacy orders at a pharmacy called METRAGEN in Deerfield Beach, FL. METRAGEN was where ANTONIONI was working as a Pharmacist. SMOLEY stated that LEBORGNE had recruited some affiliates to fill at UMPS and that the affiliates had their own credit card processing. SMOLEY stated that this was the first time he had meet LEBORGNE and ANTONIONI.

- Undated "MEMORENDUM" [sic] of Denis Leborgne to DEA Agent Brandon Bridges et al., NAP-00036487 at -6509 (Goldman Decl. Ex. M):

  Smoley asked me if I would be interested in a joint venture in a pharmacy. I told him I may and asked him his idea. Basically, he had the facility and licenses ready to start a pharmacy. We would need a pharmacist. I spoke to Antonioni, and he was interested. *I spoke about it to Jean Claude and late October 2006, me, Jean Claude, Lloyd, Smoley and Antonioni met at the Cheesecake factory in Aventura.* [¶] *We spoke for about 15 minutes and agreed to start a pharmacy.*

- DEA-6, Report of Interview of Claude Dierickx, NAP-00002595 at -2596 (Goldman Decl. Ex. N):

  DIERICKX stated that he and LEBORGNE invested $100,000 in UNITED MAIL PHARMACY and that the funds were from the JCD CONSULTING bank account. UNITED MAIL PHARMACY is owned by Bob SMOLEY, and DIERICKX gave the $100,000 investment to SMOLEY.

- DEA-6, Report of Melissa Perkins, NAP-00004077 at -4082 (Goldman Decl. Ex. G):

  PERKINS stated that in September 2006, she started working at UNITED MAIL PHARMACY SERVICES which was located in Hollandale, Florida. PERKINS stated that MAGNACCA and Brian LLOYD renovated UNITED MAIL PHARMACY SERVICES and SMOLEY advised PERKINS that LLOYD was a partner in the operations of this business. *PERKINS identified LLOYD, Dino ANTONIONI, Denis LEBORGNE and Jean Claude DIERICKX as partners in the operation of UNITED MAIL PHARMACY SERVICES.* PERKINS advised that LLOYD had previously worked with GALLEGOS and GALLEGOS was introduced to SMOLEY through LLOYD. PERKINS stated that SMOLEY told her that UNITED MAIL PHARMACY SERVICES was going to be a compounding pharmacy. PERKINS stated that she believed that SMOLEY or LLOYD told her that the partners were going to sell Human Growth Hormone ("HGH") and compounding creams.

Thus, four months before the applicable statute of limitations period, Robert Smoley had entered into a new venture with these four men; Vincent Chhabra, Carleta Carolina and their associates were nowhere in sight.

## A.    Argument

The government has two responses to these incontrovertible facts.  First, it

analogizes to cases involving the mafia and other organized crime for the proposition that where a core criminal organization exists and operates continuously, the fact that some members (even leaders) leave and others join, or that some members (even leaders) are arrested or die and are replaced, does not compel a finding that there are multiple conspiracies.  Dkt. 263-4 at 4-5.  But those cases are completely inapposite. For example, the government relies on *United States v. Patterson*, 819 F.2d 1495 (9th Cir. 1987).  Dkr. 263-4 at 4.  This Court is certainly familiar with *Patterson*, which involved conspiracy and drug charges against members of Felix Mitchell's notorious Oakland "Mob."  Because Mitchell "structured the Mob as an organization and directed its covert heroin distribution activities in Oakland and in other cities" over many years and because there was testimony and evidence that the same organization continued to operate after four members were arrested, the court found that rational jurors could conclude that there was but one over-arching conspiracy.  *Id.* at 1500, 1502.  The government's other citations, *see* Dkt. 263-4 at 4-5, are similarly beside the point.  *See United States v. Basciano*, 599 F.3d 184 (2d. Cir. 2010) (a mafia RICO case in which a claim of multiple conspiracies was neither raised nor addressed); *United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (another RICO case in which a claim of multiple conspiracies was neither raised nor addressed); *United States v. Palma-Salazar*, No. 2015 U.S. Dist. LEXIS 104724, 2015 U.S. Dist. LEXIS 104724 (S.D. Cal. Aug. 10, 2015) (in considering a motion to reduce the sentence of a member of El Chapo's drug trafficking organization, the court did not address a claim of multiple conspiracies.)

This case does not involve a core organization's morphing membership.  To the contrary, from 2000 to 2003 Vincent Chhabra and Robert Smoley were competitors, not conspirators; from late 2003 to late 2005, Chhabra and Smoley were apparently partners; and after December 2005 Chhabra and Smoley were "at war" with each other — engaged in lawsuits and competitors once again.  There was no core organization,

and at all times within the applicable statute of limitations, Vincent Chhabra and Robert Smoley operated separately, with different partners, with different personnel and at different locations.

There are numerous cases addressing defense claims of multiple conspiracies that are directly on point. In *United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015), the evidence established that the defendant conspired with one supplier to distribute methamphetamine until that supplier was arrested. Thereafter, the defendant conspired with a second supplier to distribute the same drug. Reversing the conviction of a single conspiracy, the Ninth Circuit found that the evidence "tended to show multiple conspiracies instead of the single charged conspiracy . . . ." *Id.* at 1097-98. In *United States v. Duran*, 189 F.3d 1071 (9th Cir. 1999), two defendants challenged their convictions of a single conspiracy to distribute cocaine. The evidence established that one defendant participated in a scheme to distribute cocaine from Mexico to the United States in October 1996 and that three months later both defendants participated in a scheme to distribute cocaine in Southern California. Finding that the "success of the one conspiracy was in no way dependent upon the success of the other" and that the participants had no reason to believe that the two schemes were so dependent, the Ninth Circuit held that "the evidence does not support the single conspiracy charged in the indictment, and there is a variance between the indictment and the government's proof." *Id.* at 1081; *see also United States v. Herrera*, 210 Fed. Appx. 569, 572 (9th Cir. 2006) (unpublished) (finding two separate conspiracies where two "middleman" defendants supplied methamphetamine to an undercover officer first from one supplier and then from another); *United States v. Durades*, 607 F.2d 818, 819-20 (9th Cir. 1979) (finding two separate conspiracies where a middleman purchased first from one supplier and then from another because the success of the latter enterprise did not depend upon the success of the earlier one). These cases show that the alleged Chhabra-Smoley Organization comprised multiple conspiracies; indeed, the situation in our case is

especially compelling because the members of the charged organization expressly divorced their operations.

The government's second response is to urge that FedEx itself is the glue that holds the so-called Chhabra-Smoley Organization together.  Dkt. 263-4 at 5.[4]  This is completely unconvincing.  Vincent Chhabra and Robert Smoley terminated their partnership in 2005.  Robert Smoley entered into a new partnership with Antonioni, Leborgne, Dierickx and Lloyd in October 2006.  There were (at least) two separate agreements; two separate partnerships; two separate conspiracies.  Nevertheless, the government proposes that there was but one conspiracy because FedEx accepted packages from both partnerships.  The government cites no authority to support the extraordinary proposition that the two separate conspiracies can be deemed one because they utilized the same courier or delivery service.  Not surprisingly, we have found none.  *See contra Kotteakos v. United States*, 328 U.S. 750, 754-55 (1946) (finding no single conspiracy where various groups conspired separately with the same person); *Lapier*, 796 F.3d at 1100-01 (holding that the mere fact that two drug suppliers used the same distributor did not mean that all three were part of a single conspiracy).

Finally, the government urges that any prejudice arising from the potential of multiple conspiracies can be cured by an appropriate jury instruction.  Dkt. 263-4 at 5.  True, common concerns such as juror confusion and/or spillover prejudice from multiple conspiracies can be addressed by jury instructions.  *See, e.g.*, *Lapier*, 796 F.3d at 1101 (finding plain error where court failed to give a specific unanimity instruction); *Duran*, 189 F.3d at 1082-83 (holding that a variance of proof from the indictment was ameliorated by a jury instruction).  Here, however, a jury instruction cannot cure the

---

[4] Actually, the government refers to the "three FedEx entities" as the glue that binds.  Dkt. 263-4 at 5.  However, as to the Chhabra-Smoley charges, the Court entered dismissals for FedEx Corporation and FedEx Corporate Services, Inc.  Dkt. 231.  Only Federal Express Corporation remains charged in these counts.

fundamental flaw in the government's case: the *charged* conspiracy agreement terminated more than a year before the expiration of the statute of limitations. *See, e.g.,* *United States v. Wilbur*, 674 F.3d 1160, 1177 (9th Cir. 2012) (holding that defendants could not be prosecuted for the period of a conspiracy that predated a legislative enactment making their conduct temporarily lawful, as that part of the conspiracy was beyond the statute of limitations); *cf. also Durades*, 607 F.2d at 820 (finding that the defendant's substantial rights were violated and reversal of his conviction required because the charged conspiracy was actually two separate conspiracies, and venue was not established for the conspiracy in which the defendant had participated). Because the charged "Chhabra-Smoley Organization" ceased to exist before the period of the statute of limitations and because Smoley later entered into a new and different partnership, the Chhabra-Smoley conspiracy charges cannot stand.

## B. Conclusion

The government has scraped together a single criminal organization in order to escape the consequences of the statute of limitations and to enhance the potential fine that could be imposed based upon co-conspirators' gross gains under 18 U.S.C. § 3571(d).[5]  That effort will fail as matters of fact and law.

Contrary to the government's suggestion, this Court is vested with the discretion to hold a pretrial hearing to determine the admissibility of evidence. *United States v. Long*, 706 F.2d 1044, 1053 (9th Cir. 1983); Fed. R. Evid. 104(c).  The Court should

---

[5] It bears noting that in all of the pleadings on file in all of the prosecutions relating to Robert Smoley, ICOM, UMPS, Vincent Chhabra, RX Network, and Chhabra's and Smoley's other websites and entities, we have found nary a reference to a so-called "Chhabra-Smoley Organization."  Smoley's name does not appear in Chhabra's December 2003 indictment.  In Smoley's plea agreement, he acknowledged that (1) in approximately 2004 he took over Chhabra's businesses and (2) that in 2006 he became partners with Antonioni, Leborgne, Dierickx and Lloyd in 2006.  *United States v. Smoley*, No. 10-619 JSW (N.D. Cal.), Dkt. 22 at 4.  The first mention we have found of a "Chhabra-Smoley Organization" is in the July 2014 indictment in this case.

require the government to make a proffer about how it intends to prove that the Superior Drugs organization comprised a single conspiracy.

As to the larger issue — the proposed exclusion of any evidence relating to the so-called Chhabra-Smoley Organization — we understand the constraints imposed by the Criminal Rules on its pretrial resolution.  Still, we urge the Court to fashion a remedy that relieves the Court, the jury and the parties from expending needless weeks receiving evidence concerning a conspiratorial organization that existed only for a brief time, not within the statute of limitations and primarily within the imagination of government prosecutors.  The indictment charges multiple conspiracies and the so-called Chhabra-Smoley organization did not exist within the applicable statute of limitations.

1

2

## V.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #5: REQUIRE A PROFFER CONCERNING THE ADMISSIBILITY OF EVIDENCE RELATED TO THE ALLEGED SUPERIOR DRUGS CONSPIRACIES

3

4

5

6

In Defense Motion In Limine #5, FedEx explains that the Court should require the government to proffer the evidence that will establish the existence of the broad Superior Drugs conspiracy charged in the indictment.  Defense MILs at 19-26.  The government opposes the motion, but its arguments are unpersuasive.

7

8

9

10

11

12

Contrary to the government's suggestion, this Court is vested with the discretion to hold a pretrial hearing to determine the admissibility of evidence.  *United States v. Long*, 706 F.2d at 1053; Fed. R. Evid. 104(c).  Here, two issues of admissibility present themselves, both of which arise from the likelihood that the government has combined into one alleged conspiracy numerous actors who did not, and did not intend to, join together into one monolithic joint venture:

13

14

15

16

17

18

19

20

• *First*, to the extent the Court determines that the entities referenced in the indictment were not part of a single conspiracy, the Court should determine which entities' conduct extended into the statute of limitations period.  To the extent that there were separate conspiracies, some of which entirely preceded the statute of limitations period, the evidence related to the time-barred entities should be excluded for the reasons discussed in Defense Motion In Limine #2: the evidence would be irrelevant, unduly time-consuming, and prejudicial.

21

22

• *Second*, the same determination will control the admissibility of co-conspirator statements under Rule 801(d)(2)(E).

23

24

25

26

27

28

The government asserts that "the main players" in the Superior Drugs conspiracy were "the three FedEx defendants and Superior."  Dkt. 263-5 at 1.  FedEx will show it did not enter into any criminal conspiracy with anyone, but in any case the government's assertion does nothing to undermine the necessity of the pretrial determination we seek.  If the other alleged players were not part of the same conspiracy, then any charges related to their conduct would be time-barred, and they would have to be treated as

uncharged pharmacies, as discussed in Defense Motion In Limine #2.[6]

As to the question whether "the Superior Drugs conspiracy" was actually one conspiracy, the government scarcely addresses it.  The government's primary contention seems to be that "Superior filled orders placed through numerous online pharmacies" and thus "all roads as to this count lead through FedEx's relationship with Superior."  Dkt. 263-5 at 3.  That is not an answer to the government's multiple-conspiracies problem.  "To show a conspiracy, the circumstances must lead to an inference that some form of *overall agreement* exists, and that each defendant knew or had reason to know of the scope of the conspiracy and . . . reason to believe that their own benefits were dependent upon the success of the entire venture."  *Lapier*, 796 F.3d at 1101 (internal quotation marks omitted, emphasis added).  In other words, there must be evidence of a "common purpose of a single enterprise."  *Id.* (quoting *Canella v. United States*, 157 F.2d 470, 476 (9th Cir. 1946)); *see also Kotteakos*, 328 U.S. at 754-55.  The alleged fact that several online pharmacy operations used the same fulfillment pharmacy is manifestly not sufficient to show that the operations were conspiring with one another.  *Id.* at 1097; *see also* Defense MILs at 25.  Nor is the alleged fact that "FedEx knew that Superior and [online pharmacy operators] were breaking the law."  Dkt. 263-5 at 1.  Again, a conspiracy is a joint venture — an agreement to act in concert.  The government's false allegations about FedEx do not even suffice on their face to establish a single conspiracy; the mere fact that a shipper transports packages for multiple customers that are committing similar crimes, even if the shipper knows they are committing crimes, would not show that the shipper intended to act with the



"common purpose of a single enterprise" with all of those shipping customers.

The Court should grant Defense Motion In Limine #5, require the government to make a proffer about how it intends to prove that the alleged conspirators joined into a single venture, and hold a hearing to determine the admissibility of evidence.

1

2

**VI.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #6: EXCLUDE EVIDENCE OF "GROSS GAINS" AND STRIKE THE ALTERNATIVE MAXIMUM FINE ALLEGATION FROM THE INDICTMENT**

3

4

Defense Motion In Limine #6 seeks to exclude from the trial evidence supporting

5

the indictment's maximum fine allegation pursuant to 18 U.S.C. § 3571(d).  The

6

government offers three objections.  First, the government claims that FedEx is

7

proposing "a new and problematic legal principle" — for which we cited "no authority" —

8

that would preclude the government from "proving an element of the charged offense."

9

Dkt. 263-6 at 1-2.  Second, the government claims that the alternative maximum fine

10

may be based on revenues, as opposed to pre-tax profits.  Dkt. 263-6 at 3.  Third,

11

premised in large part on acceptance of its second objection, the government claims

12

that the presentation of evidence in support of the allegation will be a simple and

13

straightforward matter, consisting only of testimony from a witness summarizing his or

14

her calculations of revenues that FedEx's alleged "co-conspirator pharmacies took in

15

from customers."  Dkt. 263-6 at 2-3.  Each of these arguments is unavailing.

16

**A.   The Court May Exclude Evidence Offered in Support of the Alternative Maximum Fine**

17

The government acknowledges that § 3571(d) expressly vests the Court with

18

discretion not to impose an alternative maximum fine if the "imposition of a fine under

19

this subsection would unduly complicate or prolong the sentencing process."  Dkt. 263-6

20

at 2.  Focusing on the phrase "sentencing process," however, the government asserts

21

that the language in the statute could not apply to trial and that there is no authority for

22

the "remarkable" proposition that it would.  *Id.*

23

The government's apparent confusion about the scope of the Court's discretion

24

under § 3571(d) stems perhaps from the fact that the statute was enacted before the

25

Supreme Court's decision in *Southern Union Co. v. United States*, __U.S.__, 132 S. Ct.

26

2344 (2012).  Before *Southern Union*, the "sentencing process" under § 3571(d) did not

27

include the trial.  After *Southern Union*, any fact that would increase the otherwise

28

applicable maximum fine must be proved at trial.  *Id.* at 2357.  The government's

nonsensical position is that the Supreme Court somehow eliminated the district courts' discretion under § 3571(d) when it clarified that fines are punishment subject to constitutional constraints.  It did not.  As matters of logic and common sense, this Court's discretion not to receive evidence to support a fine under § 3571(d) now extends to the trial.

Moreover, contrary to the government's assertion that FedEx's position is a "remarkable proposition" for which we cited no authority, there are numerous cases in which courts have exercised their discretion under § 3571(d) to exclude evidence at trial.  Most recently, as noted in our moving papers, Judge Henderson addressed the issue in *United States v. Pacific Gas & Electric Co.*, CR No. 14-175 (N.D. Cal.), Dkt. 201.[7]  There, after requiring an offer of proof from the government regarding its theory of "gross losses," Judge Henderson found that the presentation of evidence would be too complicated and time consuming and excluded it from the trial.  *PG&E* Dkt. 201 at 4.

Judge Henderson's exercise of discretion in *PG&E* was supported by ample precedent, also cited in our moving papers.  In *United States v. Sanford Ltd.,* 878 F. Supp. 2d 137 (D.D.C. 2012), the court considered the defendant's contention that evidence supporting the alternative maximum fine would unduly complicate and prolong the trial.  The *Sanford* court ultimately deferred the question whether to permit the government to present evidence in support of the alternative maximum fine and ordered the government to make an offer of proof "regarding the number of witnesses and kinds of evidence to be offered in support of the 'gross gain' to Sanford that was 'derive[d] . . . from' the charged offenses."  *Sanford*, 878 F. Supp. 2d at 153-54.  Obviously, the premise for the *Sanford* court's order was that it had the authority to exclude the fine

---

[7] It is worth noting that in the government's opposition papers to the defense motion in *PG&E*, it did not similarly assert that the court lacked authority to address the issue. Instead, the government asked Judge Henderson to exercise his discretion to permit the alternative fine allegation to proceed.  *See PG&E* Dkt. 147 at 3.

1  evidence from the trial.  Thereafter, the government filed a notice that it would not

2  present evidence in support of an alternative maximum fine at trial.  *United States v.*

3  *Sanford*, CR No. 11-352 (BAH) (D.D.C.), Dkt. 179.

4        Similarly, in *United States v. Citgo Petroleum Corp.,* 908 F. Supp. 2d 812, 814

5  (S.D. Tex. 2012), the court considered the government's motion to empanel a

6  sentencing jury after a jury returned a guilty verdict at trial.[8]  After evaluating the

7  caselaw concerning the definitions of "gross gains" and "gross losses," and the

8  evidence that would be offered, the court found "that empanelling [sic] a sentencing jury

9  in order to determine CITGO's gross pecuniary gain would unduly complicate or prolong

10  the sentencing process."  *Id.* at 818; *see also United States v. BP Products North*

11  *America Inc.,* 610 F. Supp. 2d 655, 683 (S.D. Tex. 2009) (in the context of a challenge

12  to a proposed plea agreement, the court considered the complexity and delay that

13  would result if the evidence supporting an alternative maximum fine had to be presented

14  to a jury).  Based on these authorities and the express language of the statute, this

15  Court has discretion to exclude evidence supporting the alternative maximum fine

16  allegation.

17

18        **B.        "Gross Gains" Means "Pre-Tax Profits"**

19        The government chafes at our characterization of *Sanford* as the leading case on

20  the definition of "gross gain" under § 3571(d).  The government blithely relies instead on

21  the Ninth Circuit's decision in *United States v. Hui Hsiung*, 778 F.3d 778 (9th Cir. 2015)

22  (as amended), and claims that *Sanford* "is at odds" with that decision.  Dkt. 263-6 at 3-4.

23  But the government is simply wrong.  As we pointed out in our moving papers, the court

24  in *Hui Hsiung* did not even address the definition of "gross gain."  Defense MILs at 30.

25  In *Hui Hsiung* the defendants raised only two issues regarding the trial court's

26

27  ───────────────

28  [8] Because the conviction is *Citgo* occurred before the Supreme Court's decision in
   *Southern Pacific*, evidence to support an alternative maximum fine had not been
   presented to the jury.

imposition of an alternative minimum fine: whether the fine could be based on the collective gross gain of all of the conspirators and whether the court erred by failing to impose joint and severable liability for the fine. *Hui Hsiung*, 778 F.3d at 760-61. In fact, the question of the proper definition of the term "gross gain" was neither presented nor addressed in either the trial court or the court of appeals. *Hui Hsiung* is irrelevant to the issue, and the decision is certainly not in conflict with *Sanford*.

We identified *Sanford* as the leading case on the definition of "gross gain" because of that court's careful, comprehensive and compelling analysis of the question. The *Sanford* court recognized the obvious: the term "gross gain" in § 3571(d) is ambiguous.

> The term "gross gain" is not defined anywhere in the Alternative Fines Act. The phrase appears ambiguous on its face because a "gross" monetary amount typically refers to "total income from all sources before deductions, exemptions, or other tax reductions," as opposed to a "net" monetary amount which would exclude costs and other deductions. *See* BLACK'S LAW DICTIONARY 831 (9th ed. 2006). The word "gain," on the other hand, typically refers to the "excess of receipts over expenditures or of sale price over cost," i.e., profit or "net" income. *See id.* at 747.

*Sanford*, 878 F. Supp. 2d at 148. Consequently, the court extensively canvassed the statutory text, legislative history, related statutes and caselaw. *Id.* at 148-50. With regard to the statutory text, the court noted that § 3571(d) applies only to a person who "derives *pecuniary gain* from the offense." *Id.* at 147 (emphasis added). The court found that this reference to "pecuniary gain," as opposed to proceeds or revenues, was appropriately interpreted by the drafters of the U.S. Sentencing Guidelines to mean "the additional before-tax profit to the defendant resulting from the relevant conduct of the offense." *Sanford*, 878 F. Supp. 2d at 148 (quoting U.S.S.G. § 8A1.2 cmt. 3(H)).

Turning to the legislative history, the court found it significant that the history for § 3571(d)'s predecessor statute, § 3623(c)(1), suggested that the alternative fine provision was "intended to enable federal courts to impose fines that will prevent convicted offenders *from profiting from their wrongdoing.*" H.R. Rep. No. 98-906 at 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(1984) (emphasis added).  In addition, that same legislative history established that the drafters of § 3623(c)(1) relied on the Model Penal Code, which provided for fines intended to deprive offenders of their illicit *profits*:

> In cases where the defendant has gained from his offense, the imposition of a sanction that has the dual purpose of removing the profit and removing the incentive to seek profit in this manner seems justified. Subsection (5) accordingly permits the fine to be measured in such cases by double the pecuniary gain derived from the offense by the offender.

3 Model Penal Code and Commentaries § 6.03 comment 2, at 61-62 (1985); *see Sanford*, 878 F. Supp. 2d at 149.  Based upon this history and other authorities cited in the opinion, the *Sanford* court concluded that "the term 'gross gain' means any additional before-tax profit to the defendant that derives from the relevant conduct of the offense."  878 F. Supp. 2d at 150.

Aside from its misguided assertion that *Sanford* is "at odds" with *Hui Hsiung*, the government's response makes no attempt to challenge *Sanford*'s conclusion.  The government does not even address the legislative history, related statutes or other authorities.  Perhaps these omissions are a tacit acknowledgement that *Sanford*'s analysis is correct.  Certainly, the *Sanford* decision is consonant with one inescapable fact: Congress is familiar with terms "revenues" and "proceeds" and knows how to use them in the criminal context (especially the sentencing context) when its intention is to refer to gross receipts, as opposed to profits realized *after* deductions for costs.  *See, e.g.,* 18 U.S.C. § 1956(a) ("Whoever, knowing that the property involved in a financial transaction represents *the proceeds* of some form of criminal activity . . . ." (emphasis added)); 18 U.S.C. § 853(a)(1) ("any property constituting or derived from, *any proceeds* the person obtained . . . ." (emphasis added)); 18 U.S.C. § 1963(a)(3) ("any property constituting, or derived from, *any proceeds* the person obtained . . . ." (emphasis added)); 18 U.S.C. § 3681(a) ("order such defendant to forfeit all or any part of *the proceeds* received . . . ." (emphasis added)); 18 U.S.C. § 3682(3) ("that the court has ordered a special forfeiture of certain proceeds . . . ." (emphasis added)).  By using the

term "gain," as opposed to "proceeds," revenues, or some other term of common parlance denoting gross receipts, Congress made its intention known.

Finally, we note that confining the scope of § 3571(d) to wrongdoers' pre-tax profits is sensible and consistent with Congress's punitive intent.  Under that interpretation, an alternative maximum fine would be based upon the profits not only of the defendant but all of its alleged co-conspirators and *then potentially doubled*; thus the punitive thrust of the statute is amply accomplished.  By contrast, if the provision permitted imposition of a fine on one defendant that doubled all of the *revenues* received not only by that defendant but also by every other alleged wrongdoer, the potential fine would be astronomical and completely untethered to any realistic assessment of the benefits realized by wrongdoers from commission of the offense. *See, e.g.,* Dkt. 28 ¶ 126 (threatening a maximum fine of more than $1.6 billion).  It is exceedingly unlikely that Congress intended to adopt so draconian a measure, especially without any discussion or debate.

For all of these reasons, the Court should rule that the alternative maximum fine must be based on alleged conspirators' pre-tax profits.

## C. Evidence in Support of the Alternative Maximum Fine Allegation will Unduly Complicate and Prolong the Trial

Urging that proof of the alternative maximum fine allegation will be a simple matter, the government has announced that it will prove "the amount of gross gains by presenting summary testimony and exhibits through a single agent."  Dkt. 263-6 at 2. The government further attests that the "gross-gain figure will include only revenues that the pharmacies received directly from customers."  *Id.* at 3.  Finally, the government argues that this figure should include revenues attributable to pharmacies who used other common carriers — i.e., FedEx's competitors — to ship.  *Id.*

The government's pronouncements are patently unrealistic.  First, as demonstrated above, the relevant "gross-gain figure" turns on the alleged co-

conspirators' pre-tax profits, not revenues.  While it might still be possible to present evidence of pre-tax profits through summary testimony and exhibits, the calculations would be far more complicated, require far more data, and provide many more points for cross-examination and rebuttal than a calculation of revenues.  Proof of pre-tax profits would necessarily require the government to delve deeply into the intricacies of these entities' business and financial operations.

Second, the government glosses over a fundamental predicate: under § 3571(d) the only "gross gain" that may be included in the alternative maximum fine calculation is "pecuniary gain" that is "derive[d] . . . from the offense."  Before the gross gain of any alleged co-conspirator could be considered, the government will have to prove that *all of that gain* was derived from the criminal offenses charged in the indictment.  This means that the government will have to prove beyond a reasonable doubt that FedEx conspired with each entity to distribute medications by means of a prescription issued by a physician acting outside of the usual course of professional practice and not for a legitimate medical purpose, and that all of the gains earned by each entity were derived from that crime.  If the government proves only that some portion of a co-conspirator's conduct violated the statutes in question, then that would require an even more complicated process of tracing to ensure that the fine is based on gains that arose only from offending conduct.

It is not lost on us that, even at this late stage of the proceedings, the government chose in its responsive papers not to identify those entities whose "gross gain" it would actually seek to prove at trial in support of the alternative maximum fine allegation.  By failing to provide that information, the government has withheld the necessary data that would permit the Court to evaluate whether the government's fine evidence would unduly complicate and prolong the trial.  In the absence of such specification, the Court should exercise its discretion and exclude the evidence.

█████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████[9]   We understand from the

government's response that it proposes to include in its calculation of "gross gain" only

data constituting payments made directly by customers, thereby alleviating potential

issues of double-counting.  But if indeed it is the government's intention to present

revenue evidence for Johar Saran, Kwic Fill and United Care in support of the fine

allegation, as suggested in its papers, then the issues of redundancy and double-

counting will arise.  Dkt. 263-6 at 2 n. 2.

    Even if the government limits its presentation to internet processing centers and

other entities that received payments directly from customers, and only to those

payments, the government will still have to prove that (1) each entity distributed

pharmaceuticals by means of a prescription issued by a physician not for a legitimate

medical purpose and not in the usual course of professional practice, (2) FedEx entered

into a conspiracy with each entity to distribute such pharmaceuticals, and (3) all of the

gains entered into evidence for each entity were in fact derived from those offenses.

Then, of course, FedEx will be entitled to defend the allegations.  All of this will add

significantly to the length of the trial.

    Finally, we briefly address the government's proposal to include gross gain

---

[9] The government correctly points out that Kwic Fill, United Care and Johar Saran (the operator of Tri-Phasic) are *referenced* in the indictment.  *See* Dkt. 28 ¶¶ 27 & 75.  But our point remains: they are not charged co-conspirators.

evidence attributable to alleged conspiracies involving FedEx's competitors.  Dkt. 262-6 at 3.  The government cites no authority for this novel suggestion, which would saddle FedEx with a fine derived in part from pecuniary gains attributable to conspiracies in which FedEx did not participate but in which UPS, the United States Postal Service and others apparently did.  Surely, whatever else the Ninth Circuit meant in *Hui Hsiung* when it referenced "'gross gains' calculation based on the gain attributable to the entire conspiracy," it cannot logically extend to gains attributable to one's own competitors. That result would defy any logic or fairness.

For all of the reasons above, the Court should grant Defense Motion In Limine #6 and should exclude evidence proffered in support of the indictment's alternative maximum fine allegation.

**VII.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #7: EXCLUDE EVIDENCE RELATED TO SHIPMENT OF CIGARETTES BY FEDEX GROUND TO RESIDENTIAL CONSUMERS ALLEGEDLY IN VIOLATION OF STATE AND FEDERAL LAW**

In Defense Motion In Limine #7, FedEx seeks exclusion of all evidence related to alleged deliveries of cigarettes to residential recipients by non-defendant FedEx Ground Package System, Inc. ("FedEx Ground").  In its opposition, the government claims that that "[t]he cigarette evidence will not consume excessive amounts of the jury's time and will shed light on several material issues of fact — notably, the defendant's intent, knowledge, and lack of good faith, mistake, accident, or misunderstanding."  Dkt. 263-7 at 2.  Every aspect of this assertion is incorrect, which is why an extended detour into a wholly unrelated matter should be excluded.

As to the amount of jury time that will be consumed, it is not the *accusation* of alleged wrongs involving FedEx Ground that will prolong this already lengthy trial.  The government's brief announces its intention to propound allegations of malfeasance in a cursory manner: i.e., by providing a copy of the Assurance of Compliance (AOC) to the jury but not calling any witnesses familiar with the document; by placing FedEx Ground shipping records into evidence yet declining to put on evidence regarding package contents; by calling a former sales employee (Heath Harlem)[10] to testify about a shipper that was a different salesperson's account; and by requesting that the jury be instructed "to not consider or decide whether the defendants' shipment of cigarettes was actually against the law."  Dkt. 263-7 at 10.

As discussed in our opening papers, the civil cigarette litigation in the Southern District of New York does share two important similarities with the internet pharmacy prosecution: (1) it is a complex, fact-intensive case encompassing ten years of history between FedEx and the City and State of New York regarding cigarettes; and (2) FedEx

---

[10] At Dkt. 263-7 at 7, the government refers to the employee as "Helmut Hagan."  FedEx presumes this is an error.

Ground is vigorously contesting that it engaged in any wrongdoing.  The claims of wrongdoing by plaintiffs in the New York proceedings are only *allegations*.  If the prosecutors are permitted to put these allegations before the jury in this case, FedEx will be compelled to put on evidence to rebut the contention that FedEx Ground engaged in any wrongs or that it "deceive[d] government officials so that [FedEx Ground] could continue to engage in their illegal conduct."  Dkt. 263-7 at 8; *see Tennison v. Circus Circus Enterprises*, 244 F.3d 684, 690 (9th Cir. 2001) (affirming exclusion of other acts evidence that would result in mini-trials); *United States v. Lukashov*, 3:09-cr-0120-BR, 2015 U.S. Dist. LEXIS 117621 at *13 (D. Or. Sept. 3, 2015) (excluding a defendant's request for other specific instance testimony where it would necessitate significant factual inquiry).

Nor will the New York cigarette litigation shed light on any material fact at issue in this case.  The cigarette litigation involves a FedEx operating company not charged in this matter, an entirely different commodity subject to different federal and state laws (some of which are directly applicable to common carriers), different shipping customers, and alleged non-compliance with the AOC.  While the government's papers offer a rote recitation of the permitted uses of Rule 404(b) evidence, the arguments beyond the boilerplate lay bare the government's true purpose: to claim that because FedEx Ground "knowingly and intentionally" delivered contraband cigarettes in contravention of one set of laws, it makes it more likely that FedEx Express "knowingly and intentionally" delivered prescription drugs issued outside of the ordinary course of professional practice and not for a legitimate medical purpose.  That is the textbook definition of propensity evidence that is barred under Rule 404(b)(1).

FedEx is on trial for the charges set forth in the superseding indictment, all of which relate to internet pharmacies.  The trial must be about the distribution of prescription drugs, not cigarettes.

### A. The Evidence Regarding Cigarette Shipments is Not Offered for Any Permitted Use Under Rule 404(b)(2), and Instead is Offered as Propensity Evidence in Violation of Rule 404(b)(1)

The government contends that putting on evidence regarding the New York cigarette litigation and residential deliveries of untaxed cigarettes by FedEx Ground "is highly probative of [FedEx Corporation's, Services' and Express'] knowledge and intent regarding their transportation and delivery of Internet drugs." Dkt. 263-7 at 7.[11]  The *Howell* and *Hernandez-Miranda* citations that follow this assertion show why the argument is misplaced.  In each of those cases, the government sought to admit evidence to show that the defendant had knowledge that the substances at issue were narcotics.  *See United States v. Howell*, 231 F.3d 615, 628 (9th Cir. 2000); *United States v. Hernandez-Miranda*, 601 F.2d 1104, 1108-09 (9th Cir. 1979).  But that type of knowledge (or absence of mistake) is not at issue in this trial.  No knowledge gained in the course of FedEx's dealings about cigarettes with the State of New York makes it more or less likely that FedEx was able to discern whether a shipment contained a prescription drug which was dispensed based on a prescription issued outside the usual course of professional practice and not for a legitimate medical purpose.  Just as telling, in the *Hernandez-Miranda* case, the court found that admission of the other bad acts evidence *was error* under Rule 403 despite its asserted probative value:

> The theory was that a person who has shown an inclination to smuggle contraband across the border on one occasion may be inclined to do so on another.  However, that is precisely the use of a prior bad act that is forbidden.  "The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of the issues, unfair surprise and undue prejudice."

*Hernandez-Miranda*, 601 F.2d at 1108 (quoting *Michelson v. United States*, 335 U.S. 469, 475-76 (1948)).

---

[11] FedEx is unsure of what the government means by the term "Internet drugs."  The charges allege that FedEx delivered prescription medications which were prescribed by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose.

Here, as in *Hernandez-Miranda*, the true thrust of the government's argument is that the actions of FedEx Ground regarding cigarettes should be admitted because they tend to show that FedEx has a "propensity" to engage in wrongful acts that involve restricted commodities.  The government's papers are hardly subtle on this point, stating that "the cigarette evidence reveals that the defendants treated contraband cigarettes in a manner that was similar to the way they treated contraband pharmaceuticals."  Dkt. 263-7 at 10.  The government wants the cigarette evidence in order to argue that it is FedEx's "character" to ignore the laws and warnings regarding restricted commodities, and that it therefore follows that the conduct charged in the superseding indictment is in conformity with that corporate character.  This is exactly what Rule 404(b) proscribes.  *See* Fed. R. Evid. 404(b)(1) ("[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"); *Mayans*, 17 F.3d at 1181 (quoting *United States v. Bradley*, 5 F.3d 1317, 1320 (9th Cir. 1993) for the proposition that "our reluctance to sanction the use of evidence of other crimes stems from the underlying premise of our criminal justice system, that the defendant must be tried for what he did, not for who he is").

The government next claims that "the defendant's dealings with government officials on the issue of cigarettes demonstrate that they were sophisticated business entities that were capable of engaging on issues relating to the transportation and delivery of a restricted commodity."  Dkt. 263-7 at 7.  That is not likely to be a disputed point; certainly the issue does not justify an extended detour concerning shipments of a different commodity.

The government's other efforts to claim that the New York cigarette litigation should be admitted under Rule 404(b) are even more attenuated.  Much of the government's opposition focuses on the idea that the cigarette litigation will shed light on FedEx's dealings with government officials.  Dkt. 263-7 at 7.  It is difficult to fathom

how the government plans to present FedEx's years-long history with New York regulatory officials in a manner that comports with the Confrontation Clause while honoring the representation that the cigarette issue will require nothing more than the five items of "limited evidence" set forth in the government's opposition papers.  Further, to the extent that the government's case devolves into this area, it will assuredly lengthen this trial, as there are two sides to this story as well.

But the government's real shortcoming is relevance.  What FedEx was told by the DEA, the FDA and other government officials and agencies about *internet pharmacies* will be highly relevant to FedEx's knowledge, intent and good faith.  What FedEx was told about untaxed cigarettes, what it agreed to do in that space, what it did or did not do, and the resultant litigation between New York and FedEx is of no moment in proving whether FedEx committed the crimes charged in the superseding indictment.  The fact that FedEx "came to terms" with the State of New York regarding "the delivery of cigarettes" does not shed any light on whether FedEx's alleged co-conspirators were distributing prescription drugs dispensed by means of a prescription that was issued outside the course of professional practice and not for a legitimate medical purpose, whether FedEx had the required knowledge that they were engaged in this activity, or whether FedEx acted with specific intent to further this illegal activity.  Dkt. 263-7 at 8.  The government contends that the two matters are comparable because in both instances "the defendants told government agents that they would comply with the applicable laws and exercise good faith and due diligence to identify and halt any illegal conduct."  Dkt. 263-7 at 8.  This is simply inaccurate: FedEx will vigorously contest that this is a true and accurate representation of the nature of FedEx's discussions with law enforcement with respect to internet pharmacies.  Nor does it capture the scope of FedEx's discussions with New York regulators.  In any case, the government's argument proffers nothing more than an impermissible propensity theory.

The government's final contention shares the distinction of being both the most

incorrect and the most troubling.  The USAO claims that "defendants' shipment and delivery of cigarettes evinces their corporate practice and plan for dealing with government regulators."  Dkt. 263-7 at 8.  Without any question, the evidence that will be adduced during the upcoming trial will dispel any notion that FedEx "sought to deceive government officials so that the defendants could continue to engage in their unlawful activities."  *Id.*  But the evidentiary problem is that the proposed evidence would plainly violate Rule 404 as applied to a corporate defendant.  The government is essentially alleging that FedEx, as a corporation, has a character trait of dishonesty, which manifested itself through the offenses charged in the indictment.  But Rule 404 proscribes the admission of character evidence to show that a person — or a corporation — acted in conformity with that trait.  *See 3 Penny Theater Corp. v. Plitt Theatres, Inc.*, No. 84 C 3394, 1985 U.S. Dist. LEXIS 13575 at *2-3 (N.D. Ill. Nov. 25, 1985) (prior misconduct would constitute impermissible character evidence under Rule 404(b)).  This is a case about internet pharmacies, and the evidence should be cabined to those interactions with government officials that relate to internet pharmacies.

## B. The Proposed Evidence Should Be Barred Under Rule 403 Because of Waste of Time and Confusion of the Issues

Even if the government had established some relevance for its proposed cigarette evidence, the evidence would still have to be excluded under Rule 403.  *See Mayans*, 17 F.3d at 1183; *United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir. 1985) (repeating the Ninth Circuit's frequent command that the admission of Rule 404(b) evidence must be "narrowly circumscribed").

As of the time of this filing, the government has identified 200 witnesses and thousands of trial exhibits and has advised that its case-in-chief could run as long as ten weeks.  In contrast, to show that non-defendant FedEx Ground engaged in the wrongful acts at issue in the cigarette litigation, the government proposes just three exhibits and the testimony of a single former FedEx Services sales employee.  While the former is

overwrought to say the least, the latter is insufficient to do anything other than unfairly prejudice the jurors by communicating to them a woefully incomplete story about a complicated civil case.

As set forth in FedEx's moving papers, while the City and State of New York have accused FedEx Ground of violations of a series of laws and the AOC, FedEx Ground has answered the government's complaints and is vigorously contesting that it engaged in wrongdoing or that it has any liability related to its actions.  If the government presents New York's allegations to the jury in this trial, FedEx will by necessity have to show that the actions of FedEx Ground are not as the prosecutors believe them to be.  Moreover, should the government look to the company's dealings with New York regulators to make a general accusation that FedEx has a corporate practice and policy of deceiving government agencies, FedEx would be entitled to rebut that spurious, incorrect and highly prejudicial contention, which would further lengthen and complicate this trial.  Thus, the consumption of additional trial time is not just a possibility; it is a certainty if the government is permitted to introduce the proffered evidence.  Avoidance of mini trials is a proper basis on which to exclude collateral other acts evidence.  *See United States v. Walden*, No. 93-50048, 1993 U.S. App. LEXIS 31982 at *7 (9th Cir. Dec. 1, 1993) (unpublished) (affirming the exclusion of other acts evidence as it would have resulted in a mini-trial on an uncharged offense); *see also Tennison*, 244 F.3d at 690.  In this instance, as there has yet to be any adjudication of wrongdoing against FedEx Ground in the ongoing New York litigation, a *full* trial would be required.

Introduction of evidence regarding alleged cigarette shipments by FedEx Ground will also result in confusion of the issues.  The New York tobacco litigation involves, in part, claims that FedEx Ground breached a contractual Assurance of Compliance reached with the plaintiffs in that case.  The government tries to set up a parallel between this negotiated contract and alleged promises that FedEx made in the course

of meetings with federal government officials about internet pharmacy shipments.  *See* Dkt. 263-7 at 8.  But there is no parallel because in this internet pharmacy case, FedEx has been charged with a crime — there is no criminal offense for "breach of contract." There is a considerable possibility that jurors will confuse the two matters and conclude that breaching a promise could be a basis for liability in this matter.  The government may even seek to invite this confusion.  *See, e.g.,* Dkt. 263-7 at 8 (government's claim that evidence of a breached promise will tend to establish that the failure to abide the rules and laws restricting the distribution of drugs was not the result of mistake, error or misunderstanding).

Finally, there is the issue of unfair prejudice.  The government cites to *Old Chief v. United States*, 519 U.S. 172, 180 (1997) for the proposition that "unfair prejudice" refers to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  Dkt. 263-7 at 9.  *Old Chief* supports FedEx's motion.  The allegations that have been made against FedEx Ground in the New York cigarette litigation have no relevance to any material fact that the government must prove at this trial.  Yet the chance that jurors may be lured into declaring guilt on the basis that FedEx is an alleged "repeat offender" in the arena of restricted commodity deliveries is considerable.  As the probative value is non-existent and the risk of unfair prejudice is high, the Court should grant Defense Motion In Limine #7.

1

2

**VIII.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #8: EXCLUDE EVIDENCE OF FEDEX'S POLICIES CONCERNING THE SHIPMENT OF ALCOHOL**

3

4

5

6

7

8

9

The Court should grant Defense Motion In Limine #8 and deny the government's Motion In Limine #8 covering the same subject.  FedEx's alcohol shipping program is not relevant to any issue that must be decided by the jury in this criminal prosecution and therefore fails to satisfy the requirements of Federal Rule of Evidence 402.  The evidence should alternatively be barred under Rule 403; evidence relating to a program designed to satisfy state law requirements on the interstate transit and receipt of alcohol will result in confusion of the issues, misleading the jury, undue delay and waste of time.

10

11

12

13

14

15

16

17

18

19

On one point the parties agree: this is not a negligence case.  *Compare* Defense MILs at 46-47 *with* Dkt. 263-8 at 2.  Consequently, whether FedEx's actions fell below established standards of care, or even if they demonstrated a conscious disregard of a substantial and unjustifiable risk, is irrelevant in the context of this criminal indictment.  The government must prove that FedEx acted knowingly and that it had the specific criminal intent required for the charged crimes.  *See Feingold*, 454 F.3d at 1003, 1007-09.  Evidence and argument about the presence or absence of a prophylactic corporate prescription drug shipper review program not mandated by statute or regulation might have a place in civil litigation, but is irrelevant and prejudicial in a criminal prosecution.

20

21

22

23

24

25

26

27

28

The Ninth Circuit's *Heredia* decision explains that deliberate ignorance is "categorically different from negligence or recklessness."  *United States v. Heredia*, 483 F.3d 913, 918 n.4 (9th Cir. 2007) (en banc); *see also infra*, Parts XVI and XIX (discussing distinctions among deliberate ignorance, negligence and recklessness).  The government's efforts to spotlight the absence of a corporate prevention program for pharmaceutical shippers is not consistent with the important divide separating criminal *mens rea* and criminally culpable conduct from matters lying outside the ambit of the criminal law.  The opposition brief posits that the alcohol shipping program is relevant because it may show "that the defendants could have monitored and restricted Internet

pharmacy shipments in the same way they monitored and restricted alcohol shipments."
Dkt. 263-8 at 1.  The quoted language, however, is the very essence of a negligence
theory of liability — that if FedEx had exercised what the government claims to be
"reasonable care," it allegedly might have learned which among its thousands of retail
and fulfillment pharmacy customers were engaged in the practice of dispensing
prescription medicine outside the usual course of professional practice and not for a
legitimate medical purpose.  FedEx's culpability in a criminal prosecution involves what
it did know, not what the company might theoretically have learned by establishing a
department within the company to pre-clear and monitor shippers in the business of
shipping prescription medication.[12]

In any event, there are critical distinctions between FedEx's alcohol shipping
program and the hypothetical "Internet pharmacy shipping program" that make the two
inapposite for purposes of comparison.  In the alcohol space, FedEx and other common
carriers are directly regulated by the states.  Conversely, FedEx is not a registrant under
the Controlled Substances Act and there are no regulations imposing "know your
customer" obligations on common carriers under either the CSA or the FDCA.  *See*
Defense MILs at 47-48.  The government persists in contending that "the CSA and
FDCA . . . impose requirements and restrictions on the defendants' transportation of
controlled substances and prescription drugs."  Dkt. 263-8 at 2.  Notably, this assertion
is not followed by citation to a statute from the United States Code or a regulation from
the Code of Federal Regulations.  That is because the assertion is incorrect.  The
government has never identified *any* federal regulation that imposes restrictions on
common carriers related to the transportation and delivery of prescription medication,

---

[12] According to the U.S. Government Accounting Office, there are over 70,000
registered pharmacies located in the United States.  *See http://www.gao.gov/
assets/680/671032.pdf.*  Any one of these is theoretically capable of dispensing a
prescription written by a physician outside the ordinary course of professional practice
and not for a legitimate medical purpose.

and certainly nothing that imposes requirements that FedEx proactively ascertain whether prescription medications placed in its network were validly prescribed under the law before accepting them for pickup and delivery.

The government's opposition also fails to address the critical practical differences between FedEx's alcohol shipping program and what the government believes FedEx should have implemented in the pharmaceutical space.  With respect to alcohol, the commodity is legal at the time it is tendered to FedEx but may become contraband because of something attendant to its transportation: either its delivery into a state that does not permit alcohol shipments from the origin state, or its receipt by an individual under the age of twenty-one.  For pharmaceuticals, the government claims that the commodity is already contraband at the time it is tendered because the physician's prescription that resulted in the dispensing of the drug was written outside the usual course of professional practice and not for a legitimate medical purpose.  *See* Part I.A, *supra*.  The alcohol program requires FedEx to monitor its own actions; a pharmaceutical program would require FedEx to make inquiries of the doctors and pharmacists that use FedEx's transportation services, inquiries that could violate HIPAA.  A program designed to make sure that FedEx is in compliance with the laws that govern its industry cannot be fairly compared to a program that would require FedEx to make sure that its retail and fulfillment pharmacy customers are complying the with the laws that govern their industry.  In short, there is no logical analogy between FedEx's alcohol shipping program and programs that FedEx theoretically could have implemented to detect illegal internet pharmacies.  The proffered evidence is irrelevant and should be excluded under Rule 402.

Finally, even if evidence of FedEx's alcohol program were deemed relevant, it would still have to be excluded under Rule 403 for unfair prejudice, confusing the issues, misleading the jury, and undue delay.  The government's assertion that "the restrictions that [the CSA and FDCA] impose on the shipment and delivery of

pharmaceuticals are analogous to the restrictions that state statutes impose on the shipment of alcohol," amply demonstrates that each of these concerns would come into play if evidence regarding the alcohol shipping program were admitted during this trial.

For all of these reasons, and for the reasons set forth in FedEx's opening motion and opposition to the government's Motion In Limine #8, evidence regarding FedEx's alcohol shipping program should be excluded.

**IX.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #9: EXCLUDE EVIDENCE OF SETTLEMENT NEGOTIATIONS AND STATEMENTS MADE DURING THOSE NEGOTIATIONS**

The government does not oppose Defense Motion In Limine #9.  *See* Dkt. 263-9. It should be granted.

1
2

**X.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #10: EXCLUDE EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES**

3

4

The government does not oppose Defense Motion In Limine #10, except that the government states that it may seek to present evidence of remedial measures if FedEx "opens the door" to such evidence.  *See* Dkt. 263-10 at 1.

5

6

FedEx does not plan to introduce evidence relating to the remedial measures. The Court should note, however, that the government plans to call FedEx employees and former employees in its own case-in-chief, and has asked the Court to permit the prosecutors to examine such witnesses by way of leading questions.  Dkt. 243-10.  The government should not be permitted to "open its own door" by leading FedEx employee witnesses into testimony concerning "feasibility" and then claiming it has been provoked into using remedial measures as "impeachment."  *See* Dkt. 263-10.

7

8

9

10

11

12

The Court should grant Defense Motion In Limine #10.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

XI.   **REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #11: EXCLUDE EVIDENCE OF GRAND JURY SUBPOENAS ISSUED BY THE NORTHERN DISTRICT OF CALIFORNIA**

The government proposes that Defense Motion In Limine #11, which seeks to exclude evidence of subpoenas issued by the grand jury in June 2008 and August 2009, can be denied as moot — but that proposal comes with a qualifier.  Dkt. 263-11 at 1.  The government claims that the FedEx defendants could potentially put this evidence at issue "if they present evidence or argument that the government never presented them a list of illegal internet pharmacies during the period challenged in the indictment."  *Id.*

FedEx will introduce evidence of its requests that law enforcement agencies identify shippers that were breaking the law.  This evidence will demonstrate the company's lack of knowledge, lack of criminal intent, and good faith.  The evidence, however, does not provide a basis for the government to introduce evidence of the contents of the subpoenas *duces tecum* issued as part of the grand jury investigation that culminated in the indictment in this matter.

In June 2008 and August 2009, a grand jury sitting in the Northern District of California issued subpoenas *duces tecum* seeking the production of shipping and other records related to certain FedEx account holders, among other documents.  As the government acknowledges, these were accounts "that the grand jury was investigating." Dkt. #263-11 at 1.  That FedEx was provided the identities of account holders that were *under investigation* by a grand jury would not refute FedEx's showing that law enforcement never affirmatively identified shippers that were breaking the law.  Any intimation that the subpoenas *duces tecum* were anything other than requests for records seems curious when juxtaposed with the assertions the government makes in its Motion In Limine #3 that "federal law enforcement agents and officials are prohibited from disclosing information regarding on-going investigations and from publicly accusing persons who have not been charged by appropriate legal process."  Dkt. 243-3 at 3.

Furthermore, according to the government, the alleged significance of the June 2008 and August 2009 subpoenas *duces tecum* may turn on "discussions with the defendants' counsel regarding the subpoenas." Dkt. 263-11 at 1.  On information and belief, these discussions involve communications with the current lead prosecutor for the government, as she was assigned to this matter at the time the grand jury issued the August 2009 subpoena.  As FedEx's request for identification of illegal shippers and the government's refusal to do so are material to FedEx's defense and its potential guilt or innocence, any claim that communications by the prosecutors regarding the subpoenas *duces tecum* are relevant on this issue would require testimony from the attorneys who participated in those communications.  Obviously, testimony from the parties' attorneys, including the government's lead prosecutor, would be fraught with concerns, including possibly the advocate-witness rule and the potential disqualification of counsel.  *See United States v. Prantil*, 764 F.2d 548, 553 (9th Cir. 1985).

Finally, the evidence of the grand jury subpoenas should be excluded because revealing the existence of the grand jury investigation that gave rise to this case could undermine the presumption of innocence and have an unfairly prejudicial effect under Rule 403.  Grand juries, of course, apply a standard of proof less rigorous than the one the trial jury will be bound to apply, are not governed by strict rules of hearsay and other evidentiary rules, and do not hear from the defense; yet the trial jury might be tempted to improperly assign some significance to the fact that another body of citizens found cause to charge FedEx with crimes.  Moreover, the grand jury subpoenas and affiliated communications in 2008 and 2009 related in part to a number of FedEx account-holders who are not alleged to have been part of the charged conspiracies.  Thus, the evidence could have the effect of bolstering an improper conclusion based upon a propensity theory of liability.

For these reasons, Defense Motion In Limine #11 should be granted without any conditions.

1

**XII.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #12: EXCLUDE EVIDENCE THAT FEDEX PURPORTEDLY VIOLATED STATE LAWS AND PROFESSIONAL ASSOCIATION GUIDELINES**

2

3          Based on the government's affirmative representation that it will only introduce

4    evidence of state laws and professional standards to show that persons other than the

5    FedEx defendants acted contrary to state laws and professional guidelines, *see* Dkt.

6    263-12 at 3, Defense Motion In Limine #12 is moot.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**XIII.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #13: EXCLUDE PROOF OF ADVERSE EVENTS**

In Defense Motion In Limine #13, FedEx seeks exclusion of evidence of various adverse consequences suffered by customers of online pharmacies.[13]  In general, it appears that the government does not oppose FedEx's motion, *see* Dkt. 263-13, *passim*, but some minor issues may need to be resolved.

**A.      Evidence of Adverse Consequences About Which FedEx Was Not Aware**

The government states that it does not intend to offer evidence concerning consequences of which FedEx was not aware.  Dkt. 263-13 at 1.

**B.      Evidence of Adverse Consequences About Which FedEx Was Allegedly Aware**

On the other hand, the government does plan to introduce evidence concerning deaths about which FedEx was supposedly aware.  Dkt. 263-13 at 1-2.  The government appears to agree not to offer extrinsic proof of these deaths, although it adds a caveat: "if the evidence is clear as to what occurred and what FedEx knew." Dkt. 263-13 at 2.  FedEx's view is that the only relevant evidence relates to FedEx's knowledge and information.  Whether or not that evidence is "clear as to what occurred," the circumstances surrounding the event are not relevant if they were not within FedEx's knowledge.  Nor would there be any relevance to prejudicial evidence such as testimony from family members about the circumstances of the adverse events.

Furthermore, the government asserts that FedEx objected to evidence relating to only one death about which FedEx was purportedly aware.  Dkt. 263-13 at 1.  In fact, FedEx raised objections to two such deaths — one of which occurred after the time period in the indictment, and one of which is evidenced only by very vague information

---

[13] The government calls the events "deaths," and ridicules FedEx for not using that term, Dkt. 263-13 at 1, but the government's own Rule 404(b) letter states that it also plans to introduce evidence of other consequences, such as "[d]rug abuse" and "overdose."  Dkt. 242-1 Ex. A at 12-14.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

possessed by a FedEx salesperson, who apparently learned about it long after the death occurred and possibly after the period of the charged conspiracies. Defense MILs at 64-65. Evidence related to those two deaths should be excluded.

Finally, the government does not address the evidence it has proffered of non-death adverse events, such as the lawsuit related to Randall C.'s purchase of medications. *See* Defense MILs at 64-65. For the reasons discussed in our opening papers, that evidence should be excluded.

## C.   Customer Witnesses

The government closes its opposition by stating that "defendants have not objected to "customer witnesses . . . that have been disclosed by the United States." Dkt. 263-13 at 2. These "customers" will apparently "testify as to their own first-hand experiences purchasing drugs that were delivered by the defendants, their interactions with the defendants, and the fact that they did not have a legitimate medical purpose for obtaining the drugs." Dkt. 263-13. FedEx does not oppose such testimony as a general matter. However, we note that the government has disclosed on its witness list at least 35 such witnesses. Such repetitive evidence would be cumulative, a waste of time and potentially prejudicial. *See* Fed. R. Evid. 403. The Court should require the government to reduce its list of such witnesses to a reasonable number.

Additionally, the government's witness list sometimes describes the subjects of these witnesses' testimony as including a discussion of "his addiction" or "her overdose." Again, the government should not be permitted to use these witnesses to present inflammatory evidence about consequences of which FedEx was not aware. Their testimony should be limited to facts that tend to demonstrate that their purchases from online pharmacies were made by means of a prescription issued by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose.

## XIV.  REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #14: EXCLUDE EVIDENCE RELATED TO DELIVERY OF MEDICATIONS TO TEENAGERS

Defense Motion In Limine #14 seeks the exclusion of evidence of "FedEx's delivery of drugs to teenagers."  Defense MILs at 67-68.  In its opposition, the government states that the issue at trial will be "whether FedEx knew that it was delivering controlled substances 'not for a legitimate medical purpose and not in the usual course of professional practice.'"  Dkt. 263-14 at 1.  Leaving aside the government's omission of the intent element of the crime, and its continued implicit insistence that it need not show that *physicians* acted outside the usual course of professional practice,[14] the government's statement does get to the crux of the matter. The question is whether FedEx knew it was distributing, and intended to distribute, medications by means of a prescription issued outside the usual course of professional practice and not for a legitimate medical purpose.  Since teenagers may be prescribed medications like anyone else, the fact that some recipients were teenagers would tell the jury nothing useful about whether the medications were prescribed in the usual course of professional practice or for a legitimate medical purpose, or about FedEx's knowledge or intent with respect to those questions.  Thus, the evidence relating to teens is irrelevant — but potentially prejudicial and inflammatory under Rule 403.  It should be excluded.

---

[14] See Part I, *supra*, for further discussion of this issue.

1
2

## XV.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #15: EXCLUDE EVIDENCE OF CUSTOMER COMPLAINTS AND CLAIMS

3

Defense Motion In Limine #15 seeks exclusion of evidence of "[c]laims made by

4

customers regarding delivery of drugs from Internet or fulfillment pharmacies named in

5

the Superseding Indictment or listed [as Rule 404(b) evidence] asserting issues such as

6

drugs were not ordered, wrong drugs were delivered, drugs were damaged or missing,

7

and similar complaints . . . ."  FedEx MILs at 68-69 (quoting Dkt. 242-1 Ex. A

8

[government Rule 404(b) letter] at 16).

9

The government argues that the evidence is relevant because it proves that

10

"online pharmacies were deviating from the usual course of professional practice."  Dkt.

11

263-15 at 1.  That contention is an example of government's attempt to broaden its

12

charges to permit conviction if *any person* acted outside the usual course of his or her

13

professional practice.  As discussed in Part I, *supra*, however, the charges in this case

14

relate to prescriptions that were invalid because they were issued by physicians acting

15

outside the usual course of professional practice and not for a legitimate medical

16

purpose — the government must show that FedEx knew the prescriptions were issued

17

in that invalid manner.  The fact that pharmacies had shoddy business practices is

18

irrelevant to that issue.

19

The government also suggests that evidence of customer claims will "prove that

20

FedEx knew it was shipping controlled substances and prescription drugs."  Dkt. 263-15

21

at 1.  That argument is a red herring.  The "customer claims" evidence cited in the

22

government's Rule 404(b) letter relates to complaints about pharmacies that are not

23

alleged to have been part of the charged conspiracies.[15]  In its recent filing, the

24

government disclaimed any intent to demonstrate that such uncharged pharmacies

25

were breaking the law.  Dkt. 263-2 at 9.  There is no reason, then, that the government

26

27

28

---

[15] The Court may therefore obviate much of this dispute by granting FedEx's Motion In Limine #2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

would need to prove that FedEx knew that those uncharged pharmacies were shipping controlled substances and prescription medications.  Nor is it relevant whether FedEx generally knew that "it was shipping controlled substances and prescription drugs."

Regardless, even if the customer claims evidence has some minor relevance, it is outweighed by the dangers of delay, wasting time, unfair prejudice, and misleading or confusing the jury.  The evidence would focus the jury's attention on pharmacies' shoddy business practices, rather than the question whether FedEx knew that the underlying prescriptions were issued by a physician acting outside the usual course of professional practice and not for a legitimate medical purpose.  *See* Fed. R. Evid. 403.

1

2

**XVI.    REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #16: EXCLUDE EVIDENCE RELATING TO NORTHWEST RESEARCH**

3

In Defense Motion In Limine #16, FedEx seeks an order excluding evidence

4

relating to information supposedly learned by Northwest Research, and evidence

5

relating to communications from Northwest Research to certain FedEx employees.

6

Defense MILs at 69-72.  The government opposes the motion, Dkt. 263-16, but it should

7

be granted.

8

The government's opposition primarily relies on the assertion that Northwest

9

Research had information related to FedEx's supposed co-conspirators.  Dkt. 263-16 at

10

1-2.  The government contends that because FedEx *could have* learned such

11

information, but did not, it was deliberately ignorant of the information.  Dkt. 263-16 at 2.

12

This reflects a misunderstanding of the deliberate ignorance doctrine.  Merely failing to

13

know information that one could have known is not the type of "deliberate ignorance"

14

that can substitute for knowledge in a criminal case.[16]  Rather, deliberate ignorance

15

involves "(1) a subjective belief that there is a high probability a fact exists and (2)

16

deliberate actions taken to avoid learning the truth."  *United States v. Yi*, 704 F.3d 800,

17

804 (9th Cir. 2013); *see also Heredia*, 483 F.3d at 922.  "A deliberate action is one that

18

is intentional; premeditated; fully considered."  *Heredia*, 483 F.3d at 920 (internal

19

quotation marks and citation omitted); *see also United States v. Ramos-Atondo*, 732

20

F.3d 1113, 1119 (9th Cir. 2013).  Thus, failure to investigate may be a deliberate action

21

if it is intentional, premeditated, fully considered.  *Heredia*, 483 F.3d at 920.  ■

22

23

24

25

26

27

28

---

[16] Under *United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976) (en banc) and *Heredia*, 483 F.3d at 922, a jury may sometimes be instructed that it can find the *knowledge* element of a crime based upon a finding of deliberate ignorance.  *See* Ninth Circuit Manual of Model Criminal Jury Instructions, Instruction 5.7.  A finding of deliberate ignorance cannot substitute, however, for proof of specific intent.  *See, e.g., United States v. Nektalov*, S2 03 Cr. 828 (PKL), 2004 U.S. Dist. LEXIS 21539 at *13 (S.D.N.Y. Oct. 25, 2004) ("[A] finding of conscious avoidance may satisfy the element of knowledge . . . but it cannot satisfy the element of intent."); *United States v. Ferrarini*, 219 F.3d 145, 155 (2d Cir. 2000); *cf. also Villegas v. Mukasey*, 523 F.3d 984, 989 (9th Cir. 2008).

1

2

3

4

5              Thus, the evidence concerning the information in

6   Northwest Research's possession is not probative of FedEx's supposed deliberate

7   ignorance, and certainly does not tend to prove FedEx's knowledge.

8          The government also contends that "Northwest Research was FedEx's agent

9   and Northwest's knowledge can be imputed to FedEx."  Dkt. 263-16 at 2.  The parties

10  have previously briefed the question whether a jury can properly utilize a "collective

11  knowledge" theory to aggregate the knowledge of FedEx's employees in seeking to

12  establish criminal *mens rea*.  *See* Dkt. 208, 235, 240.  As FedEx explained, the Ninth

13  Circuit has never approved such a theory of liability, even in a civil case, and its

14  decisions suggest that it is not likely to do so.  Dkt. 208 at 6-9; Dkt. 240 at 1-2.  But now

15  the government seeks to push the envelope even further, so that corporate "knowledge"

16  may encompass not only the collective information possessed by FedEx's employees

17  but also the knowledge of the employees of *other corporate entities* with which FedEx

18  has contractual relationships.

19         That result would be unfair — it would punish FedEx in a specific intent case for

20  information possessed only by third parties — and it is not supported by the

21  jurisprudence cited by the government.  The government's first citation, *Curtis v. United*

22  *States*, 262 U.S. 215 (1923), was not a criminal case and did not make any holding

23  about a third-party agent.  Rather, the case involved a transaction conducted on behalf

24  of a corporation by "the manager and vice president of the Company"; the Court found

25  that the corporation could not raise the "bona fide purchaser" defense in a suit to annul

26  land patents because the corporation was charged with the knowledge of its vice

27  president and manager.  *Id.* at 222; *see also Board of Trustees v. Roche Molecular*

28  *Systems*, 487 F. Supp. 2d 1099, 1119 (N.D. Cal. 2007) (applying the holding of *Curtis* in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

determining whether an employer could be considered a bona fide purchaser of patents when its employee had relevant knowledge).  The government's second citation, *Hernandez v. United States*, 300 F.2d 114 (9th Cir. 1962), similarly avails the government nothing.  That court noted in passing — in other words, in dictum — that "[t]he acts and knowledge of an agent may be 'imputed' to the principal."  *Id.* at 119-20. The court's holding did not apply that principle; instead, the court made the opposite finding.  As described by the court in a later case, *Hernandez* concluded that in a drug conspiracy case, "the knowledge and possession of a co-conspirator or an aider and abettor *must be proved independently* and *may not be supplied by the rules of imputed responsibility* traditionally applied in such cases."  *United States v. Gary*, 447 F.2d 907, 911 (9th Cir. 1971) (emphasis added).  Thus, *Henandez* does not stand for the principle the government ascribes to it.

The government's arguments are unavailing, and Defense Motion In Limine #16 should be granted.

1

2

**XVII.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #17: PRECLUDE GOVERNMENT FROM INQUIRING INTO PRIVILEGED MATTERS, INSTRUCT ON ATTORNEY-CLIENT PRIVILEGE**

3

4

5

The parties appear to agree that the jury should not learn the substance of attorney-client communications between FedEx employees and lawyers.  There is some disagreement, however, about how to effectuate this principle.

6

7

8

9

10

11

12

13

14

15

16

17

18

The government continues to advocate an intricate system designed to obscure from the jury that FedEx has lawyers at all.  Dkt. 263-17.  Such a system would be extremely complicated and likely unworkable, given the participation of lawyers in communications about which the government seeks to present evidence.  It is also unnecessary; there is nothing prejudicial to the government in the mere fact that FedEx employees communicated with lawyers.  Moreover, as FedEx observed in its opening papers, to the extent there is any concern, the jury may be instructed not to consider or speculate about the contents of privileged communications.  The only true danger of prejudice arises from the government's strange proposal that FedEx witnesses be required to distort the truth by calling attorneys "managers" — such testimony would raise questions that are not answerable with an instruction or evidence because the testimony would have no basis in the facts of the real world.  *See* Dkt. 260 at 2-3.

19

20

21

22

23

24

25

26

27

28

The government raises, as an example, the problem of FedEx employee Kendell Black.  Dkt. 263-17 at 3.  The government observes that this witness stated in an interview that he consulted with attorneys in FedEx's Legal department, and that FedEx has asserted privilege over the substance of the conversations.  *Id.*  Based on that relatively commonplace scenario, the government seeks to argue that the only fair way to proceed is to require Mr. Black to call the attorneys in question "other managers."  *Id.* It is not clear why the government expects this situation to be so problematic, nor why it believes FedEx is seeking to use Mr. Black's testimony as a "sword."  The government has listed Mr. Black on its own witness list, Dkt. 232 at 12, declared that it finds him to be a hostile witness, Dkt. 243-10, and asked to Court to allow it to ask leading

questions, *id.*  The government is in control of its own questioning; if it does not want to create misimpressions for the jury, it should craft its examination accordingly.[17]

Finally, as to the instruction FedEx proposed concerning the attorney-client privilege, it is adapted directly from Supreme Court and Ninth Circuit jurisprudence. *See* FedEx MILs at 74-75 (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389-91 (1981) and *United States v. Chen*, 99 F.3d 1495, 1500-02 (9th Cir. 1996)).  Given the government's frequent challenges to FedEx's privilege claims, it was already clear that the cited cases are not part of the prosecution's favorite line of jurisprudence. Nonetheless, they are the law.  There is nothing prejudicial or improper about explaining to the jury the legal concepts relating to the attorney-client privilege; indeed, an explanation will have the salutary effect of preventing confusion and improper speculation.

FedEx's Motion In Limine #17 should be granted.

---

[17] With respect to the specific line of questioning raised in the government's brief — "who in [Mr. Black's] management chain approved the policy," Dkt. 263-17 — and others, it seems that the government could avoid any problems by simply clarifying for the witness that its questions do not seek information about communications with lawyers.

**XVIII.  REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #18: PRECLUDE ARGUMENT THAT FEDEX SHIPPED FOR "ILLEGAL" OR "SHUT DOWN" INTERNET PHARMACIES**

Defense Motion In Limine #18 asks the Court to preclude the prosecution from arguing that FedEx is guilty because it transported medications tendered by "illegal" or "shut down" internet pharmacies.  Defense MILs at 75-76.  The government argues that this motion should be denied because FedEx's own employees used those phrases, Dkt. 263-18, but that contention misses the point.

As discussed in our opening papers and in Part I, *supra*, the charges in this case concern a specific alleged crime — the distribution of medications prescribed by a physician outside the usual course of professional practice and not for a legitimate medical purpose.  It will not be sufficient for the government simply to show that FedEx knew that some online pharmacies did something "illegal" or were at some point "shut down."  Rather, the government must show that FedEx intended to participate in the specific crime charged in the indictment.

Especially in light of the government's apparent hope to broaden the scope of its charges, *see* Part I, *supra*, the order we seek is appropriate.  The government should not be permitted to suggest to the jury that FedEx is guilty merely because some of its employees referred to pharmacy customers that were "illegal" or that had been "shut down."

1
2

## XIX.   REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #19: PRECLUDE GOVERNMENT FROM ARGUING THEORIES OF NEGLIGENCE OR RECKLESSNESS

3

Defense Motion In Limine #19 seeks an order precluding the government from

4

pursuing a negligence or recklessness theory of liability by, for example, suggesting that

5

FedEx did an inadequate job detecting which online pharmacies were transporting

6

medications prescribed by a physician acting outside the usual course of professional

7

practice and not for a legitimate medical purpose.  Defense MILs at 76-78.  The

8

government counters that it intends to introduce such evidence to demonstrate that

9

FedEx supposedly acted with deliberate ignorance.  Dkt. 263-19.

10

As previously discussed, deliberate ignorance involves "(1) a subjective belief

11

that there is a high probability a fact exists and (2) deliberate actions taken to avoid

12

learning the truth."  *Yi*, 704 F.3d at 804; *see also Heredia*, 483 F.3d at 922.  "A

13

deliberate action is one that is intentional; premeditated; fully considered."  *Heredia*, 483

14

F.3d at 920 (internal quotation marks and citation omitted); *see also Ramos-Atondo*,

15

732 F.3d at 1119.  Thus, failure to investigate may be a deliberate action if it is

16

intentional, premeditated, fully considered.  *Heredia*, 483 F.3d at 920.[18]

17

As the *Heredia* court made clear, "deliberate ignorance, otherwise known as

18

willful blindness, is categorically different from negligence or recklessness."  *Id.* at 918

19

n.4; *see also id.* at 919 n.6.  The government should not be permitted to put on a

20

negligence case just because it intends to seek a deliberate ignorance instruction at the

21

end of the trial.  But that does appear to be its intended course of proof.

22

For example, the government explicitly states that it plans to prove that FedEx

23

was *capable* of creating a program to "restrict[ ] Internet pharmacy shipments."  Dkt.

24

243-8 at 1.  Again, deliberate ignorance may only be proved through evidence that the

25
26
27
28

---

[18] Again, to be clear, deliberate ignorance is a theory potentially applicable only to the knowledge elements, not the specific intent elements, of the charged crimes.  *See* Footnote 16, *supra*.

defendant took *intentional*, premeditated steps with the specific goal of avoiding learning information.  *Heredia*, 483 F.3d at 920-21.  FedEx's capability of creating a program, and its mere failure to do so, are not relevant to a deliberate ignorance theory.

The Court should grant Defense Motion In Limine #19.

## XX. REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #20: EXCLUDE EVIDENCE OF MEASURES UNDERTAKEN BY OTHER PRIVATE CORPORATIONS

As the government does not oppose Motion In Limine #20, *see* Dkt. 263-20, it should be granted.

1

XXI.   **REPLY IN SUPPORT OF DEFENSE MOTION IN LIMINE #21: PRECLUDE REFERENCES BY EXPERTS TO EXCLUDED EVIDENCE**

2

3

As the government does not oppose Motion In Limine #21, *see* Dkt. 263-21, it

4

should be granted.

5

Dated: May 12, 2016

6

Respectfully submitted,                          ARGUEDAS, CASSMAN & HEADLEY, LLP

7

8

By: _____/s/_____
                                            Raphael M. Goldman
                                            803 Hearst Avenue
                                            Berkeley, CA 94710
                                            (510) 845-3000

9

10

11

                                            Counsel for Federal Express
                                            Corporation, FedEx Corporation and
                                            FedEx Corporate Services, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*U.S. v. FedEx Corp. et al.*                          71                    FedEx Reply re Motions In Limine
No. CR 14-380 (CRB)