**Pages 1 - 79**

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )      **NO. CR. 14-00380 CRB**
                                   )
FEDEX CORPORATION, FEDERAL         )
EXPRESS CORPORATION, and FEDEX     )
CORPORATE SERVICES, INC.,          )
                                   )
          Defendants.              )
_____   )

                              San Francisco, California
                              Thursday, May 19, 2016



                       **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff United States of America:
                    United States Attorney's Office
                    Criminal Division
                    450 Golden Gate Avenue, 11th Floor
                    San Francisco, CA  94102
                    (415) 436-6940
               **BY:  KIRSTIN M. AULT**
                    **JOHN HENRY HEMANN**
                    **JENNY CLARE ELLICKSON**




Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1    **<u>APPEARANCES</u>**:

2    For Defendants FedEx Corporation, *et al.*:

3                        Arguedas, Cassman & Headley LLP
                        803 Hearst Avenue
                        Berkeley, CA 94710

4                        (510) 845-3000
                        (415) 845-3003 (fax)

5              BY:   **CRISTINA C. ARGUEDAS**
                        **RAPHAEL M. GOLDMAN**

6                        **TED W. CASSMAN**

7    For Defendants FedEx Corporation, *et al.*:
                        FedEx Express, Litigation

8                        3620 Hacks Cross Road
                        Memphis, TN  38125

9                        (901) 434-8489
                        (901) 434-4523 (fax)

10             BY:   **PETER DAVID BLUMBERG**

11   For Defendants FedEx Corporation, *et al.*:
                        Federal Express Corporation

12                        Legal Department
                        1930 Nonconnah Boulevard, 3rd Floor

13                        Memphis, TN 38132
                        (901) 395-3382

14             BY:   **CONNIE LEWIS LENSING**

15

16

17

18

19

20

21

22

23

24

25

**Thursday - May 19, 2016**                                    **1:30 p.m.**

                         P R O C E E D I N G S

                             ---oOo---

          **THE CLERK:**  Please be seated.  Calling Case

CR. 14-0380, The United States of America versus Fed Ex

Corporation*, et al*.  Appearances, counsel.

          **MS. AULT:**  Good afternoon, Your Honor.  Kirstin Ault,

John Hemann, and Jenny Ellickson for the United States.

          **MS. ARGUEDAS:**  Cris Arguedas.  For the company is

Connie Lewis Lensing, Senior Vice President.

           **MR. GOLDMAN:**  And Raphael Goldman, Your Honor.

           **MR. CASSMAN:**  And Ted Cassman, Your Honor.

           **MR. BLUMBERG:**  And Peter Blumberg, Your Honor.

          **THE COURT:**  Welcome.  Good afternoon.  So this is the

time for our pretrial conference.  And I thought what I might

do is address the motions *in limine* first, and then address

some other issues as I have them; and then, of course, address

any issues that parties want me to address.

     So let's take the Government's motions first.  And what I

thought I would do is give you my ruling.  And if you want to

add anything to the submission, you may.  The length of

voluminous submissions that you've made -- I'll let you do it.

     I'm saying this is my, you know, judgment at this point.

I possibly could change my mind, but I'm not inclined to do so,

unless you have something.  You know.  *Oh, Judge, did you*

1    *consider this?  We forgot to mention it.  Or this just has come*

2    *to us like a bolt of lightning.*

3       And I think they're all numbered appropriately.  I assume

4    they are.  So I mean, like, number one, motion to preclude

5    Fed Ex from introducing evidence of consultation with attorneys

6    without waiting -- does that correspond to --

7            **MS. AULT:**  Yes, Your Honor.

8            **THE COURT:**  Okay.  So I was going to grant that.

9       However, there is the fourth prong of the Government's

10   order.  Let me take a look at that fourth prong.  If it is

11   necessary for a witness to refer to a conversation with an

12   attorney to respond truthfully and completely to a question,

13   the witness should be instructed to refer to the attorney as

14   management or a manager.

15       I don't know that that's true.

16       The answer is:  We'll take it on a case-by-case basis.

17   I'll listen to what is -- you know, if the Government believes

18   or the Defense believes that somehow an attorney is going to be

19   mentioned in some way, shape, or form, let's deal with it

20   outside the presence of the jury.  And we'll try to come to

21   something that's gradual.

22      Okay.  Number two.  Exclude evidence regarding

23   common-carrier exemptions.

24       I'm going to grant that.

25       Exclude evidence regarding actions federal agencies did

1    not take to prevent the charged crimes.

2         I'm denying that, to the extent it's relevant to somehow

3    some actions that Fed Ex either did or didn't do.

4         In other words, I can't sit here before the trial and say

5    a blanket exclusion -- I mean, exclude all evidence if it.   In

6    fact, for example, the Government says, *Well, we're going to do*

7    *X.   We're doing X.   We're doing Y.*

8         And Fed Ex goes, *Well, fine.   I'm not going to do*

9    *anything.   They're going to do it.*

10        And that's okay.   It goes to -- it's part and parcel of

11   this pot of *What did they know?   And what did they do?* which,

12   by the way, is, I think, the only real issue in this entire

13   case for which 177 witnesses are going to be called.

14        Okay.   Number four.   Excluding evidence relating to

15   entrapment by estoppel defenses, and exclude evidence of

16   certain interactions with law enforcement.

17        Well, I'm going to defer ruling on that.   I have to see

18   how it's relevant to whatever the defenses are with respect to

19   Fed Ex, whatever they say.

20        I'm not certain that it may -- I'm not certain that it

21   ought to be -- well, let me not have too many negatives in

22   here.   It may be relevant to other things that -- to other

23   aspects of Fed Ex's state of mind with respect to what they did

24   and what they didn't do.   I don't know.   I haven't seen it.   I

25   can't, as a blanket rule, simply say "Yes."

1        Okay.  Number five.  Excluding evidence of argument

2   regarding selective prosecution.

3        Well, I think that may be the subject of a separate

4   motion.  The question that's still in my mind is the Postal

5   Service.  What did the Government do about the Postal Service?

6   And, as I understand it, the Government says, *Well, we didn't*

7   *do anything about the Postal Service because they didn't do*

8   *anything wrong.*

9        And the question is:  Really?

10       I'm trying to understand that.  Didn't they deliver pills?

11   And didn't they deliver the same kind of medicine that Fed Ex

12   is accused of delivering?  And didn't they do it at or about

13   the same time?

14       If all of those things are "Yes," then I am interested in

15   why the Government didn't decide to prosecute the Postal

16   Service.

17       And that -- by the way, that's not a matter for the jury.

18   That's a matter for the Court.

19       So I would hear -- I would hear something on that if, in

20   fact, there is -- if, in fact, actually the Defense wishes to

21   pursue it.

22       They don't have to pursue it.  You know, you don't have to

23   affirmatively bring it forward.  It's up to the Defense.  If

24   they make a motion for selective prosecution, I would -- I may

25   hear evidence on it.

1      Now, have you already made a motion for selective

2  prosecution?

3           **MS. ARGUEDAS:**  No, we have not.

4           **MR. GOLDMAN:**  No.

5           **THE COURT:**  So it's not like I've ignored it.  I'm

6  capable of ignoring things, but it's more that it's not teed

7  up.  But it certainly wouldn't be for the jury, in the Court's

8  view.

9      Now, I must say, after having said that, that Fed Ex may

10  very well have believed that, *Gee, you know, the Postal Service*

11  *is doing the same thing we're doing, yet no action's being*

12  *taken with the Postal Service, so maybe it's all right*.  I

13  don't know.  I don't know.

14      But -- and you don't have to respond to this.  I'm just

15  saying this will be part and parcel of a separate motion, if it

16  is.  And if it's not, it may possibly come in if it's relevant

17  to their state of mind.  I don't know.  They'd have to make a

18  showing.  They would not be able to present it to the jury.

19      And, by the way, actually, a number of things that I'm

20  going to say on both sides.  I think the appropriate course

21  would be not to mention these things in the opening statements.

22      Where I believe that it's a close question or a question

23  as to whether or not I would let evidence in, I am trusting the

24  professionalism -- and I have every reason, good reason, to

25  trust the professionalism -- on both sides in this case, that,

1  while it is an uncertain issue for the Court -- that is, the

2  Court hasn't ultimately ruled whether it comes in or out -- the

3  better course is not to mention it during the opening

4  statements, but that if a party believes it ought to be or has

5  to be mentioned in the opening statements, we'll do so outside

6  the presence of the jury before the opening statement.

7       So I'm not precluding it, but there is a -- what I call a

8  "vehicle," a "safe harbor," whatever you want to call it, for

9  dealing with those types of issues.

10      Okay.  Admit party opponent's statements, and exclude

11 Fed Ex's introduction of its employees.  Stated that's got to

12 be on a case-by-case basis.  I can't take, you know, hours and

13 hours of statements just sort of put in some blanket way.  I

14 don't know.  Let's hear what they are.

15      Motion to exclude e-mail by DEA Agent Jim Byrom praising

16 Fed Ex.

17      Well, again, I don't know whether it will come in or not,

18 but don't mention it in the opening statement.

19      Motion to admit evidence of Fed Ex's alcohol-shipping

20 policies.

21      Motion to exclude it.

22      I'm denying it.

23      If so, that evidence is excluded.

24      Now, when I say that, again, there's a caveat that if Fed

25 Ex comes in and their defense says, *You know, what we do is we*

1  *look at all of these regulations.  We follow every one* -- they

2  say something like that, and you have evidence that they don't,

3  that may be relevant.  But it depends on the usual thing that

4  one has in a criminal case; that is, you know, is it

5  impeachment on a collateral matter?  Is it impeachment on a

6  major matter?  How does it come in?  What's being said about

7  it?

8       So, in other words, Fed Ex could open the door to it.

9       But you can't, as an affirmative thing, say, *Look.  I want

10 *to tell you about Fed Ex.  They don't follow the alcohol*

11 *regulations*.

12      Okay?

13      So -- but now, Ms. Ault, you're getting very agitated.

14 You appear to be --

15           **MS. AULT:**  Well --

16           **THE COURT:**  So just tell me what it is that you --

17           **MS. AULT:**  I think Your Honor may be confusing the

18 alcohol with the cigarettes.

19      The cigarettes are where we are arguing that they did not

20 follow their agreement.

21      The alcohol is where they had a policy in place for

22 dealing with the different state laws about alcohol -- about

23 shipping alcohol.

24           **THE COURT:**  Yeah.

25           **MS. AULT:**  And we want to admit that they did have

1   policies, and they were following them, and -- as evidence to

2   show that they had the capacity to do it with Internet

3   pharmacies.  And it wasn't an inability to do it.  It wasn't

4   ignorance, mistake, or accident.  I --

5          **THE COURT:**  So that may very well be.  Well, okay.

6   You're right.  I was confusing it.  And I think I have to think

7   about it some more.

8       So, in other words, you say what they could have done in

9   this case was what they did in addressing the issues with

10  respect to the different state laws regarding alcohol.  They

11  could have set up a structure to deal with it that way, as they

12  do with alcohol.  So it's not an impractical problem that they

13  had to deal with.  Okay.

14         **MS. AULT:**  That is correct, Your Honor.

15         **MR. GOLDMAN:**  Well --

16         **MS. ARGUEDAS:**  Can we go through your list before we

17  start arguing one way or another?

18         **THE COURT:**  Yeah.

19         **MS. ARGUEDAS:**  I think it would help us.

20         **THE COURT:**  All right.  Let's return to eight.  We'll

21  return to that.

22      The Defense experts -- I simply defer on that until it

23  becomes more fully formed in terms of what they would say, and

24  make a determination as to whether or not we need a *Daubert*

25  hearing, as an example, or something else.  Its just too

1    amorphous right now in order to rule on that.

2        Motion to permit leading questions on direct examination

3    of Fed Ex's employees called by the Government.  Yes, I grant

4    that.

5            **MR. GOLDMAN:**  Your Honor, quickly.

6            **THE COURT:**  I allow leading questions as a matter of

7    course, except in those cases where it appears to the Court

8    that the witness suffers from some inability, or where the real

9    issue is:  What is the witness' recollection?  You know.  What

10   is exactly?  And not allow, then, either side to suggest

11   exactly what the witness' recollection is; rather, to test it.

12   I allow it when it's important to test it.

13       Or, I mean, I don't have leading questions where it's

14   important to test it.  I do allow leading questions where it

15   doesn't really make any difference.  It moves things along.  I

16   allow both sides to do it.  You know, it just moves the case,

17   you know, maybe we could say, like, two months, you know, just

18   by allowing leading questions; cut, you know, fully 10 percent

19   off the projected time just by allowing that.  Okay?

20       Okay.  That's my ruling.

21       And, of course, there's not to be any mention of

22   punishment.  All right.  So those are, I think, the

23   Government's motions *in limine*.

24       So let's go back to number eight.  Let me get my notes on

25   that one.

1          **MS. ARGUEDAS:**  You don't want to go through ours

2    first?

3          **THE COURT:**  Sure.

4          **MS. ARGUEDAS:**  I do think -- I'm --

5          **THE COURT:**  I'll go through yours.

6          **MS. ARGUEDAS:**  I think it would help us if we knew

7    the whole thing.

8          **THE COURT:**  Yeah.  Okay.  Let's see.  There were only

9    22 motions *in limine* from Fed Ex.

10         **MR. GOLDMAN:**  Twenty-one.

11         **THE COURT:**  Twenty-one.  I exaggerate.  Twenty-one.

12     Okay.  Number one.  Give preliminary jury instruction on

13    illegal distribution.  I'm denying that.  I'm not going to give

14    any preliminary instruction.

15     What I will give is a statement of the case, so they'll

16    understand what it is generally about, but --

17     And I know there are those jury studies that say it's very

18    helpful to start telling them what the law is, and da, da, da.

19    da, and that I should allow mini openings.  And halfway

20    through, I should allow people to get up and talk about it and

21    entertain questions from the jury.  And, yes, that will be the

22    next generation of judges, but you're dealing with the present

23    generation of judges, who's not going to permit that.

24     Okay.  Exclude evidence relating to online pharmacies,

25    other than those charged in the conspiracies.

1    I'm denying that.  May be entirely relevant to the

2  prosecution.  And it appears to me that I would permit it.

3    Exclude evidence postdating the charged conspiracies.

4    Well, that depends.  That depends.  People can do things

5  after the conspiracy which bear on *What did people know during*

6  *the conspiracy?  What did they do?*  So I have to deal with that

7  on a case-by-case basis.

8    Exclude evidence relating to the Chhabra-Smoley conspiracy

9  405.  And the other was the Superior Drugs conspiracy.

10    I'm denying those.

11    Exclude evidence of gross gains, and defendant's request

12  to strike the alternative fine allegation from the Indictment.

13    Well, I'm denying that, but what I'm going to do is

14  bifurcate that in some way that I can.  That is to say I don't

15  know that I would have to -- before the case goes to the jury,

16  I have to give them this issue.  I'd like some further

17  clarification of that.  It's not an element of the offense.

18  Right?

19        MS. AULT:  It's not, Your Honor.  It's one of those

20  things the Supreme Court --

21        THE COURT:  Right.

22        MS. AULT:  -- has told us is not an element, but yet

23  still must be found by the jury.

24        THE COURT:  Yeah.  I may very well -- I may very

25  well -- my present inclination is to bifurcate it and try it,

1   if necessary, should there be a conviction.  Same jury, but not

2   part of the initial determination.  So therefore, from an order

3   of proof, the -- you know, we don't need to get into all of

4   that.

5        That means maybe 10, 20, 30 witnesses, 5 witnesses don't

6   have to be called.

7        Okay.  Exclude evidence relating to Fed Ex cigarette

8   orders.

9        I was going to grant that motion, as well as the

10  alcohol-delivery motion.  Grant that, as well.

11       So we can go back and discuss these seven and eight, with

12  the Government's eight, which is the one I confused.

13       Evidence relating to settlement negotiations -- I'm

14  granting that.

15       Exclude evidence of subsequent remedial measures -- I'm

16  granting that, subject to impeachment, should Fed Ex say, *Look.*

17  *There's nothing we could have done about it* and they come in,

18  after the Indictment showed all of the things, and they do *X*,

19  *Y*, and *Z*.  I think that opens the door to whether they could do

20  something about it or not.  So I will grant the motion, subject

21  to Fed Ex not opening the door.

22       Exclude evidence on Grand Jury subpoenas issued here.

23       What is that?  Let me look at that one.  Obviously.  Let's

24  see.

25            **MR. GOLDMAN:**  Your Honor, this is the one -- the

1  Grand Jury proceeding that gave rise to -- this case began

2  during a time in which the alleged Superior conspiracy was

3  still going on.  And we have asked the Court -- they -- the

4  Grand Jury issued subpoenas to Fed Ex during that time.  We've

5  asked the Court to exclude that evidence.

6          **MS. AULT:**  Your Honor, I think we talked past each

7  other in our briefing on this, so maybe this is one that we

8  should come back and talk about.

9          **THE COURT:**  Okay.  Let's go back and look at this.

10 I'm not clear in my mind what is really being talked about.

11     Exclude evidence of conspirators violated state laws or

12 professional-association guidelines.

13     Well, to the extent that these guidelines and state laws

14 demonstrate that the drugs prescribed were prescribed outside

15 the normal course of professional -- what is it called?

16 Practice?

17     I have this -- it's like I've never had this case.  This

18 is now the third iteration.  I can never get that statement,

19 but it's like outside the scope of --

20          **MS. ARGUEDAS:**  Yeah.

21          **THE COURT:**  -- permissible practice.

22          **MR. GOLDMAN:**  We all know it.

23          **THE COURT:**  Yeah.  We all know what we're talking

24 about here.

25     That is an element of the offense; is it not?  I think it

1    is.  And so I would -- I'm not going to exclude that evidence.

2         Exclude evidence on adverse events due to online-pharmacy

3    shipments.  And I guess it's exclude evidence on Fed Ex

4    delivering controlled substances to teenagers.

5         Well, as to both of these things, I think they are subject

6    to -- what is it?  403?  6?  406?

7              **MS. AULT:**  403.

8              **MS. ARGUEDAS:**  403.

9              **THE COURT:**  In other words, there are some hoops you

10   have to sort of go through.  First, it may be relevant to the

11   issue of whether it was outside the practice.  And so as to

12   that, it would probably come in.

13        However, it has to be very carefully tailored to:  What

14   did Fed Ex know about any of this evidence?

15        Now, as to that, I think it falls into two categories.

16   Again, Category Number One is simply to establish that these

17   drugs were outside -- prescribed outside the practice.  And

18   they didn't -- you know, they may or may not know that in any

19   particular case, but it's all a matter of proof.

20        And as to what they actually knew, because it's -- it's

21   relevant to, one, establishing that it was outside the

22   practices; also has to be tied to Fed Ex; that is, that they

23   knew what would happen.

24        Now, in any given case they may or may not know.  I don't

25   know.  I don't know what the evidence is going to show in any

1    given delivery.  Okay.  So that will all be subject to some

2    balancing test as to whether its probative value outweighs its

3    prejudicial effect, because you have somebody who dies.  You

4    have a teenager who testifies.  That carries with it a great

5    deal of what I would say "emotional force," and so it can't be

6    substituted.  The force can't be substituted for evidence of

7    guilt.  And that's what one has to be careful of, in terms of

8    this showing.

9        So you're going to have to go through your witnesses and

10   see what they are.  And obviously, there's going to be issues

11   as to cumulative evidence and all of those things that normally

12   apply.

13       Exclude evidence concerning Northwest Research

14   Investigation.

15       I'm denying.  That.  That is -- I think it may very well

16   come in, if it is shown that people at Fed Ex were aware of it.

17   Okay.

18            **MS. AULT:**  Your Honor, I believe you skipped over 15,

19   regarding customer complaints and claims.

20            **THE COURT:**  Well, are these complaints to whom?

21            **MS. AULT:**  To Fed Ex.

22            **THE COURT:**  Well, I think that goes all to -- I'm

23   denying it.  And that would go all to their state of mind; what

24   they knew.

25       Okay.  Now we're on 17.  Excluding evidence on privileged

1  matters and instruction on attorney-client privilege.

2      Well, I'm not going to instruct on the attorney-client

3  privilege.  My understanding is that Fed Ex is not asserting

4  advice-of-counsel defense here.  Is that correct?

5          **MR. GOLDMAN:**  That is correct.

6          **THE COURT:**  Okay.

7          **MR. GOLDMAN:**  But -- but there are --

8          **THE COURT:**  So it can't be, even though it, quote,

9  "May be contrary to the evidence" -- that is to say, the

10  evidence may show that attorneys, number one, were consulted;

11  or two, were privy to some of this information.  But if the

12  Defense is not being asserted, it seems to me that it's

13  prejudicial and not a probative force that lawyers were brought

14  in.

15      And I think that's because as soon as somebody gets the

16  idea that a lawyer was brought in and they continued it anyway,

17  they'll think either one of two things.  They'll think the

18  lawyer said *It's okay*, and that's not -- the lawyer may have

19  said, *but Fed Ex chooses not to -- knows to rely on it*, and/or

20  two, in the alternative, the lawyer said, *Don't do it*, and Fed

21  Ex decided to do it anyway.  And so it will look like they're

22  guiltier than their normal, more -- well, whatever that word

23  is -- but it allows inferences of two kinds, both of which may

24  not be -- or neither of which may be warranted under the

25  circumstances.

1          **MR. GOLDMAN:**  Well, that's why we asked for an

2   instruction, because there's going to be -- there are e-mails

3   that have redacted portions that are right in the middle of

4   them.  And --

5          **THE COURT:**  The instruction is:  You see a portion of

6   that letter being redacted, and it's been redacted because the

7   matters that are redacted aren't for you to consider.

8   Something like that.  Do it all of the time.  Do it all of the

9   time.  And I don't know.  I don't know what your experience has

10  been.

11         You know, I'm not so sure they rely on -- they start

12  guessing what's redacted.  Sometimes they do, but then they are

13  going contrary to the instructions of the Court.

14         Who knows?

15         Exclude evidence on illegal online pharmacies that were

16  shut down.

17         No.  In fact, you tie it to the defendants -- that is, in

18  terms of knowledge -- then I think that may be relevant.

19         Exclude evidence on theories of negligence or

20  recklessness.

21         You want to flesh that out a bit?

22         **MR. GOLDMAN:**  Yes, Your Honor.  And actually, the

23  Government's trial brief gives us a good opportunity.  So, for

24  example, in the trial brief the Government says that one of the

25  things that will show Fed Ex is guilty is that Fed Ex's

1  security did not conduct any investigations into its

2  online-pharmacy customers, or that Fed Ex did not provide

3  training or guidance with how do deal with online pharmacies.

4      Well, Fed Ex doesn't have an affirmative obligation to do

5  those things.  Maybe if this were a civil case, we could argue

6  about it being negligent for failing to train or failing to

7  investigate; but it is not obligated under the laws under which

8  it's charged to investigate or to provide training or guidance.

9  And suggesting that its failures to act constitute evidence of

10  guilt -- that is a problem, and it's unfair.

11      **MS. AULT:**  We are allowed to prove knowledge through

12  deliberate ignorance.  A failure to investigate can be

13  deliberate ignorance, as the Ninth Circuit has held.  So, while

14  we would never argue negligence or recklessness, we are allowed

15  to argue deliberate ignorance.  And the Ninth Circuit held in

16  an Internet-pharmacy case deliberate ignorance is a perfectly

17  appropriate means by which we can prove the defendant's intent.

18      And so to the extent that we can show that there was a

19  high -- they knew there was a high probability that their

20  customers were acting outside the usual course of professional

21  practice, et cetera, and they did nothing to investigate, that

22  is deliberate ignorance.

23      **MR. GOLDMAN:**  That's not quite right.  That leaves

24  out the second element of deliberate ignorance, which is

25  deliberate actions taken to avoid learning the truth.

 1          THE COURT:  I'm looking at that instruction:  The

 2   deliberate-ignorance instruction.

 3          MS. AULT:  Yes, Your Honor.  The Ninth Circuit has

 4   held that a failure to investigate can be a deliberate act that

 5   can support deliberate ignorance.

 6          MR. GOLDMAN:  But it has to be deliberate; in other

 7   words:  Intentional, premeditated, fully considered.

 8          THE COURT:  What I'm taking the Government is saying

 9   is, *We're not going to say anything about recklessness or*

10   *negligence.  We're going to say, "By the way, deliberate*

11   *indifference can't be considered by you, but can be considered*

12   *by the jury."*  I just want to find the instruction for a

13   minute.

14          MR. GOLDMAN:  I don't --

15          THE COURT:  I'm sure you have it.  Here it is.  Five

16   seven.  You may find that a defendant acted knowingly if you

17   find beyond a reasonable doubt that the defendant was aware of

18   a high probability that -- whatever that is -- and deliberately

19   avoided learning the truth.

20          MR. GOLDMAN:  That's the part that we think is so

21   important.  It has to be deliberate.

22          THE COURT:  Yeah.  Well, I'm going to give that

23   instruction.

24          MS. ARGUEDAS:  Not necessarily.

25          THE COURT:  But I'm going to give that instruction,

1  but it depends on the evidence, but I'm not going to permit any

2  sort of negligence, you know.

3      And, by the way, this is a good example of why you

4  shouldn't say what instructions you're going to give two months

5  before the trial commences.  I don't know, but I'm not ruling

6  it out.  It is a possibility.  And I would allow the Government

7  to try their case according to the instructions that they

8  believe, in good faith, that the Court may give.  And that is

9  an instruction that may be given.

10     However, as I say, it won't be to support a verdict if the

11 verdict is negligence or recklessness.  And, by the way, I may

12 very well entertain an instruction from the Defense pointing

13 that out.  I mean, I'm not wedded to, as I am in most cases --

14 but in this case I'm not wedded necessarily to the Model

15 Instructions as they're set forth.  As the Government

16 acknowledges, this is a novel --

17     Okay.  So then Number 20.  Exclude evidence of measures

18 taken by other corporations.

19     Well, again, as an initial matter, I probably would

20 exclude it; but I think I need to hear more of what is being

21 proposed in terms of evidence.

22         **MR. GOLDMAN:**  Your Honor, the Government didn't

23 oppose this one.  Correct?

24         **MS. AULT:**  That is correct.  Your Honor, we have no

25 intention of introducing evidence about what other companies

1   were doing --

2          **THE COURT:**  Good.  Granted.  Thank you.

3          **MS. AULT:**  -- so long as the defendants don't open

4   the door.  And this does tie back to the Postal Service motion,

5   so maybe we when we talk about that, we could talk about this.

6          **THE COURT:**  Well, the Postal Service will all be

7   done.  I hope to do that in advance.  But yes.  Okay.  I

8   understand.  Okay.  So I'm granting the motion.

9       Oh, of course, no expert's going to refer to excluded

10  evidence.  Right?  Number twenty one?

11      Okay.  So let's go back to that which we all wanted to

12  talk about.

13         **MS. AULT:**  Your Honor, I believe that there were a

14  couple of things that the Court wanted to discuss.  One was the

15  alcohol policies and the cigarette policies -- or the cigarette

16  practices.  So they differ, in that the alcohol policies and

17  procedures are policies and procedures that Fed Ex had in

18  place.  And we think that they are relevant to showing that

19  Fed Ex did consider the commodities that they were shipping;

20  took different actions with different commodities, depending on

21  how -- what was lawful to do with those commodities; and

22  created policies and procedures that they put in place; and

23  that -- and that they enforced that; required their shippers

24  to, you know, only ship into states where shipping alcohol was

25  allowed into that state; and required --

1        And then when people violated those policies --

2             THE COURT:  But then it's a clear case of --

3        It's constitutional, by the way.  States can enact

4   different laws with respect to distribution of alcohol.  Right?

5             MS. AULT:  Yes.

6        THE COURT:  It's in the book.  Okay.  So it's

7   recognized that you can have states with different procedures,

8   with different acts.

9        And, of course, Fed Ex is in the business, among other --

10  shipping other -- shipping alcohol.  They ship alcohol.  And so

11  it seems to me, just as a matter of practice, they're going to

12  have different policies with respect to different states'

13  requirements with respect to alcohol.

14        MS. AULT:  But the same is exactly true of

15  pharmaceuticals.  Different states allow pharmaceuticals to be

16  shipped in, or not.  And to the extent that they want to argue,

17  *The state laws were confusing.  There were 50 different state*

18  *laws.  How were we supposed to figure them all out?* --

19        THE COURT:  No, it's not that the laws were -- I

20  don't know necessarily that the law was confusing.

21        It's that there's a secondary consideration with respect

22  to these drugs.  The drugs -- it wasn't like a law saying, "If

23  you are going to ship drugs into Massachusetts, you have to do

24  *X*," where they say, "With alcohol you have to do *X*."

25        Now, what you're saying is that --

1        Aren't you saying, *In the 50 states, it's not that they*

2   *have different rules; it's they all have the same basic rule,*

3   *which is that you can't ship in drugs that were outside of the*

4   *normal practice, and that what was outside the normal practice*

5   *was that there wasn't a physical, in-person examination*.  So

6   it's not like there are different rules about it.  It's the

7   same rule.

8        And you're drawing an analogy between the alcohol, which

9   has a whole set of different rules, and drugs, which do not

10  have a set of different rules, as I understand the Government's

11  theory.  You're not saying there's a state out there that would

12  allow -- are you? -- that would have allowed the shipment of a

13  controlled substance, without an in-person, physical

14  examination?

15           **MS. AULT:**  No, Your Honor.

16           **THE COURT:**  Right.  So you have a good -- very

17  different case.  And I don't know that you can draw an analogy

18  between the two.  And an analogy between the two, number one,

19  is imperfect; number two, would invite all sorts of testimony

20  *ad nauseam* about why you have alcohol procedures for alcohol,

21  and why they're different from drugs, and what the laws are in

22  any given state.  And it seems to me an enormous undue

23  consumption of time.  I don't even understand that it's

24  relevant; but if it is relevant, it's so marginal in its

25  relevancy that I'm going to exclude it.

```
 1        There we go.  Done.
 2        Next?
 3            MS. AULT:  All right.  Your Honor, the next is the
 4   cigarettes, which --
 5            THE COURT:  Okay.
 6            MS. AULT:  -- is that the defendants entered into
 7   what's called, in New York, an "assurance of compliance," which
 8   is basically a settlement agreement with the City and State of
 9   New York about their shipping of tobacco products into the city
10   and state of New York, in violation of New York law.  They said
11   they wouldn't do it anymore, and then they kept doing it.
12        They said they would file a report explaining how they had
13   complied with the assurance of compliance.  They never filed a
14   report.
15            THE COURT:  Okay.
16            MS. AULT:  So we want to introduce evidence of that,
17   to show that what they did in this case --
18        We understand that their defense is going to be good
19   faith; that their defense is going to be that they wanted to
20   coöperate with the Government, they wanted to comply with the
21   laws, and they did everything they could do to do that.
22        So to the extent in this similar context they said they
23   would comply with the law, and then they just didn't, is
24   evidence that what they did in this case was not ignorance,
25   mistake, or accident.  It was not done in good faith.  It was
```

1 part of a company *modus operandi* to just think that they were

2 above the law.

3      **THE COURT:**  Well, I think what I have to do is wait

4 and see what the defense is.

5     I think that if their defense is *We always follow the law,*

6 *you know.  We always coöperate.  We do anything that the*

7 *Government asks us to do.  We're fully coöperative with the*

8 *Government.  Whenever they request anything, we do it,* then I

9 think I might consider letting in this evidence.

10     If their defense is, *Oh, the Government tells us X, but we*

11 *don't have to do it just because the Government tells us it's*

12 *X,* or *We tried to do what we did, and we were given inadequate*

13 *information by the Government,* or something else, I think I

14 have to take a look and see exactly what their defense is.

15     But I think that as an initial matter, you can't introduce

16 evidence of what I would call "other bad acts" just to show

17 that they're the kind of people that commit bad acts.

18      **MS. ARGUEDAS:**  Your Honor, this one was mine.

19      **THE COURT:**  So now you're ahead.  You want to

20 address --

21      **MS. ARGUEDAS:**  No, no.  I just want to say one thing.

22      **THE COURT:**  One thing you say to me, and I change my

23 mind --

24      **MS. ARGUEDAS:**  No.  I want to just correct one

25 statement, so that you have this in your mind as we go on.  I

1   understand your ruling.  We won't open the door.  I get it.  I

2   just want to make sure that you understand that the signatory

3   to the agreement that is now being sued by New York is Fed Ex

4   Ground, a defendant who is not in this case.

5          **THE COURT:**  Oh.

6          **MS. ARGUEDAS:**  I just want you to know that, but I

7   understand your ruling.

8          **MS. AULT:**  Your Honor, the other signatory to the

9   agreement is Federal Express Corporation, Fed Ex Express, which

10  is a defendant in this case.

11         **MS. ARGUEDAS:**  And they're not being sued.  That's

12  the point.  Fed Ex Express is not being sued.

13         **THE COURT:**  Not there.  Not there.  I'm not going to

14  deal with it right now.  Okay?  But I'm dealing with it now as

15  a preliminary matter.

16         **MS. AULT:**  Your Honor, I think the other issue that

17  we needed to come back to was the Grand Jury subpoena that was

18  issued in this District in 2008.  So I think that we may have

19  talked past each other in our motions, which is why the Court

20  is a little confused.

21         **THE COURT:**  Go ahead.

22         **MS. AULT:**  We believed that this was addressed to the

23  issue of -- the defendants have brought up this idea that the

24  Government didn't ever give them what we're calling a

25  "blacklist" of illegal Internet pharmacies that they shouldn't

1   ship for.  And in connection with a subpoena that was given to

2   them in 2008, they were given a list of 400 Internet pharmacies

3   that the DEA believed were, you know, under investigation.  So

4   we have agreed that we will not introduce evidence of that

5   list, provided they don't open the door.

6        We do want to tell the jury in the course of testimony

7   that, you know, very simply, in 2008 they were served a

8   subpoena, and they gave us a bunch of records, and that's how

9   we have all of these records that you're seeing right now.

10            THE COURT:  Well, in other words, you would limit --

11       I guess I'm not clear in my mind.  If that's what you want

12   to do, why do you have to talk about a Grand Jury, at all?  Why

13   you don't simply say parties have agreed that this is a Fed Ex

14   record?

15            MS. AULT:  Your Honor, it does become important,

16   because we believe that the defendants are going to argue as

17   their defense that they were -- try to put in evidence through

18   agents that they were very coöperative, and that the agents had

19   a very, very friendly view towards Fed Ex, and that Fed Ex was

20   very friendly towards law enforcement.  And then there came a

21   time when the agents started investigating Fed Ex, and served a

22   subpoena on them.

23            THE COURT:  Yeah.  Go ahead.

24            MS. AULT:  And the investigation became not just of

25   the Internet pharmacies; it also became an investigation of --

1          THE COURT:  They stopped being so coöperative.

2          MS. AULT:  We're not saying they -- but we're saying

3   the jury needs to be told that there was a moment in time where

4   the investigation -- where they were investigated.  The agents,

5   having investigating the underlying Internet pharmacies, they

6   came to suspect that Fed Ex was involved.  They started

7   investigating Fed Ex.  And now here we are.  And as part of

8   that process, they served a subpoena, and got a bunch of

9   records.

10          THE COURT:  So what?  I mean, tell me.  What is the

11   relevance for the jury?

12          MS. AULT:  The relevance to the jury is that we need

13   to explain to the jury how we got the records.

14          THE COURT:  Oh, that will be stipulated to.

15      Next.

16          MS. AULT:  Your Honor, we also think that it's

17   relevant to the jury, given what we believe the defendant's

18   defense is going to be, that they didn't just provide the

19   records voluntarily; they provided them as part of a subpoena.

20          THE COURT:  Ah.  So in other words, in other words,

21   the argument is -- now we get to it.  The argument is that

22   people who have been coöperative, and the light is -- and then

23   they become targets of the investigation, or subjects, or

24   whatever you want to say, and they suddenly become less

25   coöperative --

1       **MS. AULT:**  No, Your Honor, that's actually not our

2  argument.

3       **THE COURT:**  And that it's important that the jury

4  know that at some point they became less coöperative.

5       Let me tell you.  They're sitting here.  I can't imagine a

6  bigger sign of how they're not coöperating with you anymore

7  than the fact that now they're accused of a crime, and they're

8  fighting it.  So I don't understand why I'm not just commenting

9  on their right -- their constitutional rights -- to exercise

10  those rights against the Government, because that's actually

11  what the Constitution provides.

12       So I'm curious as to:  What is its relevance, other than

13  you'd like to show their present attitude?

14       But their present attitude is demonstrably clear.

15       **MS. AULT:**  Your Honor, that was not at all going to

16  be our point.

17       **THE COURT:**  Well, what is your point?

18       **MS. AULT:**  Simply going to be that there was an

19  investigation that -- that there was an investigation that was

20  conducted of Fed Ex.  We gathered a bunch of records, and we

21  got them using a subpoena.

22       It doesn't have to say -- we don't have to say "Grand Jury

23  subpoena."

24       **THE COURT:**  But so what?  So what?  Tell me why it's

25  important that the jury have this chronology before them.

1   That's what I need to know.

2           **MS. AULT:**  Because, Your Honor, we believe that the

3   defendants will claim as part of their defense that they were

4   very coöperative with the DEA and all sorts of other agencies.

5           **THE COURT:**  Up to a point.

6           **MS. AULT:**  By responding to subpoenas, among other

7   things.

8           **THE COURT:**  Up to a point.

9           **MS. AULT:**  That the agents have a very favorable view

10  of Fed Ex.

11          **THE COURT:**  You're saying that it's actually evidence

12  of guilt that they became less coöperative as time -- as events

13  unfolded?

14          **MS. AULT:**  Your Honor, we're actually not going to

15  argue that they became less coöperative.

16      What we're going to say is there came a point where the

17  agents suspected they were involved with a crime, and did what

18  they did --

19      Many other people, they suspected, were involved in a

20  crime.

21      -- and served a subpoena, and got a bunch of records.

22          **THE COURT:**  So why is that relevant?

23          **MS. AULT:**  Your Honor, we do think it's relevant that

24  they were legally required to provide the records, as opposed

25  to just voluntarily --

1          **THE COURT:**  Defendant's legally required to respond

2  in some manner to a subpoena.

3          **MS. AULT:**  Yes, Your Honor.

4          **THE COURT:**  What?  Is a jury going to get involved in

5  the process by which indictments are brought?

6          I just -- I think it's fraught with all sorts of things.

7          Then maybe I let that in.  And then maybe I start letting

8  in letters saying, *You know, you're totally wrongheaded about*

9  *this investigation.  You're doing this.  You're doing that.*

10  I'm sure they wrote quite a few letters.  They've got a lot of

11  lawyers over there, and those lawyers write letters.  My guess

12  is you probably got a few of those letters saying, *This is*

13  *wrong.  You're not focusing on the right issue.  And you don't*

14  *understand this*, and blah, blah, blah.

15          So those letters may or may not be relevant, but I really

16  think I'm just opening up some enormous inquiry into the

17  legitimacy of the prosecution and the legitimacy of the

18  defense.

19          **MS. AULT:**  Your Honor, perhaps what we should do is

20  just wait to see what their defense is.

21          **THE COURT:**  Great.  I'll do that.

22          **MS. AULT:**  Okay.  Thank you.

23          **THE COURT:**  Now you want to return to something that

24  you thought I was --

25          **MR. GOLDMAN:**  Well, there were a couple things I

thought might be worth raising.  There have been a couple times

today where the Court has granted a motion subject to Fed Ex

opening the door through its testimony.  I just want to point

out that the Government is going to be putting on Fed Ex

employees and former employees in its own case-in-chief.

Sounds like they're going to be able to lead them.

That's fine, but I don't want the Government to be able to

open its own door, and then provoke itself to be able to put on

the evidence that the Court's excluded.

**THE COURT:**  It doesn't do that.

**MR. GOLDMAN:**  Okay.  Just a couple small things.

**THE COURT:**  And my guess is that you'll be attentive

during the examination.  Point that out if that occurs.

**MR. GOLDMAN:**  We will be sure to do that, Your Honor.

A couple other small things is:  On the Northwest Research

motion we made to exclude evidence, the Court denied it, but

said that the Government must show -- must tie it to what

Fed Ex knew.

In my mind, there are two categories of Northwest Research

evidence.  Some of it is information that was solely within the

possession of Northwest Research.  Some of it is communications

to Fed Ex.

I understand the communications to Fed Ex might be

information that was within the knowledge of Fed Ex.  Stuff

that's solely within Northwest Research's knowledge --

1          THE COURT:  Well, I don't know.  I mean, that raises

2     a question as to *When are they your agent?  And to what extent*

3     *are you charged with the knowledge that your agent had?*

4          I don't know the answers to that.  I think they're

5     factually intensive.  They have to be demonstrated.  I was

6     certainly addressing the first part as distinct from the second

7     part, because if they did give information to Fed Ex, it

8     doesn't make any difference if it was an agent/principal.  Who

9     cares?  You have that information.  So that's easy.

10         The harder case is the one that you've described as the

11    second category.  And I need some factual -- I need the law,

12    and I need some facts.  Okay?

13         MR. GOLDMAN:  Okay.

14         MR. CASSMAN:  We have a case for the Court to

15    consider on that issue.

16         THE COURT:  Not right now.

17         MR. CASSMAN:  Okay.

18         THE COURT:  I will deal with that in --

19         Anything else on the motions *in limine*?

20         MR. GOLDMAN:  Yeah.  You know, there's one point,

21    Your Honor, that isn't exactly a motion *in limine*, but it came

22    up in the course of briefing.  And that is I think we need to

23    discuss what exactly is the crime that we're talking about

24    here, because --

25         THE COURT:  Oh, go ahead.

1          **MR. GOLDMAN:**  We've actually had some differences

2    about this.  In our view, the crime is --

3          **THE COURT:**  Okay.  So we're sort of finished with

4    motions *in limine*.

5          **MR. GOLDMAN:**  It arises out of the motions *in limine*.

6          **MS. ARGUEDAS:**  I'm not finished with them.  I still

7    have something to say about the motions *in limine* after this.

8          **THE COURT:**  Okay.

9          **MR. GOLDMAN:**  Your Honor -- and I sort of thought we

10   were in agreement about this.  The gravamen of the charge here

11   is that physicians did not have a bona fide doctor/patient

12   relationship with patients.

13        Fed Ex has to have known that those doctors were acting

14   improperly and the resulting prescription was therefore

15   invalid, because the doctor was not acting in the usual course

16   of professional practice, and not for a legitimate medical

17   purpose.  That's what the instructions in that brief say.

18   That's what the instructions that the Government has submitted

19   to the Court seem to say, but they take issue with that in some

20   of their papers.

21        And, in fact, if you look at the trial brief, it says that

22   the elements of conspiracy, for example, are an agreement

23   between two or more persons to distribute or possess with

24   intent to distribute a controlled substance outside the scope

25   of professional practice, and not for a legitimate medical

1  purpose.

2          **THE COURT:**  I had interpreted that with the knowledge

3  that they were outside the scope of medical practice.

4          **MR. GOLDMAN:**  Yes, but whose professional practice?

5  It needs to be the physician.  That's what the Indictment

6  charges.

7          **THE COURT:**  Yes, that's right.

8          **MR. GOLDMAN:**  Okay.

9          **THE COURT:**  You don't disagree with that; do you?

10          **MS. AULT:**  Well, the physician or pharmacist.  Yes.

11          **THE COURT:**  Well, physician or pharmacist.

12          **MR. GOLDMAN:**  Well, but the license.

13          **THE COURT:**  Well, okay.  Physician.

14      Now pharmacists?  Pharmacist?  I hadn't thought about

15  that.  I mean, we did -- you did prosecute pharmacists, but the

16  pharmacists knew that the -- what was happening with respect to

17  the physicians.

18          **MS. AULT:**  Well, and the -- yes.

19      And, I mean, there will be -- the Controlled Substances

20  Act and the regulation about prescriptions applies equally to

21  pharmacists and to physicians.

22          **THE COURT:**  Right.

23          **MS. AULT:**  They're commonly just referred to as a

24  "practitioner."  And in the past, the Court has defined

25  "practitioner" in the Jury Instructions in some way that is

1  some kind of medical professional.

2          MR. GOLDMAN:  That's not what the Indictment says in

3  this case, Your Honor.  For example, both conspiracy counts --

4          THE COURT:  Cite me to a page.  I have it here.

5          MR. GOLDMAN:  Well, go to paragraph 30, Your Honor.

6          THE COURT:  Paragraph 30.  Okay.

7          MR. GOLDMAN:  The charge there is that --

8          THE COURT:  Wait, wait, wait.

9          MR. GOLDMAN:  -- controlled substances based on

10  prescriptions issued by doctors after reviewing customers'

11  responses to an online questionnaire.

12      Paragraph 38 says the purpose of the Chhabra-Smoley

13  organization was to provide controlled substances -- blah,

14  blah, blah -- "the practice of prescribing medication based

15  solely on a physician's review of an online questionnaire,

16  without a physical examination, laboratory tests," et cetera.

17      In our reply brief, you know, we quoted these.  There are

18  three pages' worth of them, all talking about the wrong things

19  that the doctor supposedly did.  The Indictment's about

20  doctors.  If we want to have an indictment about conspiring

21  with pharmacists, that would be constructive amendment of the

22  Indictment, in our view.  It's not fair.  There's no notice of

23  that charge.

24      In theory, that might be a charge that's allowable under

25  the Controlled Substances Act.  We frankly haven't looked at

1    it, because this case is about things that the doctors did

2    incorrectly, and we think the Government should be held to

3    that.

4         **MS. AULT:**  Your Honor, what Mr. Goldman is referring

5    to are the manners and means sections of the conspiracy -- of

6    the Indictment.

7         The actual charge is:  Distribute outside the usual course

8    of professional practice, and not for a legitimate medical

9    purpose.  They are actually charged with conspiring with a

10   pharmacist, Wayne White.

11        So the idea that they're not on notice that pharmacists

12   were included in this Indictment is -- I mean, when there are

13   pharmacists that are named in the Indictment -- is

14   preposterous.

15        **MR. GOLDMAN:**  That's not what we're saying,

16   Your Honor.

17        You can conspire.  We understand that we're charged with

18   conspiring with pharmacists.

19        The question is:  Whose standard has to be violated?

20        **THE COURT:**  This is what -- you lose me.  First of

21   all, they did conspire with pharmacists, if what you mean by

22   "conspiring" is they agreed to pick up drugs from a pharmacy,

23   and ship it somewhere.  There's an agreement to pick up these

24   drugs, as I understand it.  Now, there's an agreement to pick

25   up.

1      Now, did they agree with the doctor?  Of course not.  They

2  had no idea who the doctor was -- or they did or didn't.  I

3  don't know.

4      They did know who the pharmacist was.  That is online, or

5  Smoley, or whoever they are.  They knew who that was.

6      And there was an agreement as -- and I don't know enough

7  about the workings of it, but my guess is there was a business

8  relationship, however that is defined, between Fed Ex and

9  Pharmacy A, B, C, D, E.

10      Did they conspire?

11      If what you mean by "conspire" is *Was there an agreement?*

12  the answer to that would be "Yes."

13      Okay.  Now the next question is:  What do they have to

14  know about the drugs in order to commit a criminal offense, as

15  that's understood?  Because it's not -- they have to know

16  something.  As to that, are you saying that if the pharmacist

17  knows that there was no -- that these drugs are out of the

18  ordinary course -- if the pharmacist knows that, and Fed Ex

19  agrees to deliver these drugs with the pharmacist, that's

20  enough?

21          **MS. AULT:**  No, Your Honor.

22      What we're saying is that Fed Ex agrees with the

23  pharmacists to deliver drugs.

24          **THE COURT:**  Right.

25          **MS. AULT:**  And the drugs are delivered outside the

usual course of professional practice, in that they're not

based on --

     **THE COURT:**  The drugs aren't delivered outside the

scope of practice.  It's that the drugs were prescribed outside

the practice.  The drugs were not delivered outside the scope

of practice --

     **MS. AULT:**  Well --

     **THE COURT:**  -- because drug companies are authorized

to deliver drugs.  So they deliver drugs.

  Now, what they're not authorized in doing is delivering

drugs that were prescribed outside the practice.  That's the

argument.

     **MS. AULT:**  Right.

     **THE COURT:**  And as to that, you have to show that.

     **MS. AULT:**  Correct.

     **THE COURT:**  But you can't show it by saying they

agreed to deliver drugs because that's outside of the practice.

It's not any drug that's outside the practice.  It's these

drugs that are outside the practice.

     **MS. AULT:**  Yes, Your Honor.

     **THE COURT:**  Okay.  I guess I don't quite see what the

argument is.  That's probably my problem here.

     **MS. AULT:**  And we don't quite, either, Your Honor.

     **THE COURT:**  What is it that you are trying to

address?

1          **MR. GOLDMAN:**  The argument is there is something that

2   makes these medications allegedly into contraband.

3          **THE COURT:**  Yes.  And that is that the drugs

4   prescribed by the doctors were prescribed outside the

5   medical -- acceptable medical practice.  That makes them

6   illegal.

7          **MR. GOLDMAN:**  Correct.

8          **THE COURT:**  That's what I think makes them illegal.

9      And then there are the people that facilitated the

10  distribution of these drugs -- these particular drugs.  They

11  are the pharmacists and, allegedly, Fed Ex.  Well, Fed Ex did

12  distribute the drugs.  So they're the pharmacists and Fed Ex.

13  But the question is:  What did Fed Ex know?

14         **MS. ARGUEDAS:**  Right.  Judge.

15         **THE COURT:**  Yes.

16         **MS. ARGUEDAS:**  I think we're now in agreement -- all

17  of us -- that what the Government has to prove is that Fed Ex

18  knew and intended to deliver packages that they knew and

19  intended contained medications that were prescribed outside

20  that were --

21         **THE COURT:**  Yes.

22         **MS. ARGUEDAS:**  Okay.  So --

23         **THE COURT:**  Let the record show that the Government

24  counsel is nodding in agreement with your last statement.

25         **MS. ARGUEDAS:**  Terrific.  So I want to take you back

1  to a point -- an earlier point, which is I want to really urge

2  the Court that you give that instruction; just that, or that

3  and plus whatever you usually give to the jury before we start

4  this case.  Because otherwise, they are not going to know how

5  to keep their eye on the ball.

6         **THE COURT:**  I'll think about it.  I'll think about

7  it.

8         **MS. ARGUEDAS:**  Because if you don't, Your Honor,

9  they're going to think, like anybody might think, that what

10 they're needing to pay attention to is:  Did Fed Ex pick up

11 packages that contained medications that were prescribed

12 outside the ordinary course?

13        **THE COURT:**  I might do that.

14        **MS. ARGUEDAS:**  If you tell them what they need to

15 think about, it's just only fair to them and to us.

16        **MS. AULT:**  Your Honor, the issue is going to be

17 crafting an instruction that actually only --

18     Well, it's --

19        **THE COURT:**  Okay.  So let's see.

20        **MS. AULT:**  -- trying to craft an instruction that

21 correctly states the law that doesn't overemphasize the law.

22        **THE COURT:**  You have no argument that I have to do

23 that at the end of the case; do you?

24        **MS. AULT:**  Correct.  Your Honor, you have to do it in

25 context with all of the other instructions.  We think it would

1  simply be a waste of time.

2          THE COURT:  Isn't that really the principal issue

3  here?

4          MS. ARGUEDAS:  We just agreed to what it is.  Fed Ex

5  have has to have known and intended --

6  (Simultaneous colloquy)

7          THE COURT:  I might question --

8          MS. AULT:  -- more complicated than that.  And we are

9  fully --

10          THE COURT:  Okay.  So let's have an exchange of

11  proposed instructions, and I'll consider it.

12          MS. ARGUEDAS:  Great.  Thank you.

13          MS. AULT:  I am fully confident that defense counsel

14  will be able to inform the jury during their opening of what

15  defense counsel thinks they need to keep the ball -- that they

16  need to keep their eye on.

17          THE COURT:  Except this is an unusual case; isn't it?

18  Or, in your words, "novel."

19          MR. WALDINGER:  I believe those were the Court's

20  words, Your Honor.

21          THE COURT:  Oh, well.

22          MS. ARGUEDAS:  Let's set a date by which we can brief

23  the instruction.  It's something we all have to know.  Might as

24  well do it now.  So let's just make some dates and we'll submit

25  something.

1          THE COURT:  Yeah.  That's a good idea.

2          MS. AULT:  As we stated in our motions *in limine*, we

3    think the Court's initial instincts are right.  We think this

4    process is fraught.  For example, the Controlled Substances Act

5    is not the only charge.  There's also the Food, Drug, and

6    Cosmetic Act.

7          THE COURT:  Then it's the same thing.

8          MS. AULT:  But it's not, Your Honor.

9          THE COURT:  It's just a different -- isn't it a

10   different violation of the laws?  It's a different violation of

11   the law under the same set of facts.

12         MS. AULT:  But it has different elements.  And so if

13   the Court is going to be --

14         THE COURT:  So do a lot of crimes.

15         MS. AULT:  If the Court is going to be instructing on

16   elements, the Court can't instruct only on some elements, and

17   not others.  And I understand the Court has a jury out.

18         MS. ARGUEDAS:  We -- we --

19         THE COURT:  That's okay.

20         MS. ARGUEDAS:  Can I suggest that we, within a week,

21   provide instructions?

22         THE COURT:  Yeah.  Let's have it within a week.  Let

23   the Defense submit an instruction to you.  And you can suggest

24   changes to it, unless you are overwhelmed by the correctness of

25   their assertion, and then you can -- and then I will take a

1    look at it.  If you each have your proposed, that's fine.  I'd

2    like to consider it, because I do think this is an unusual --

3    I'll use my words.  It's an unusual prosecution.  And I think

4    it's one that -- that it's important that the jurors understand

5    exactly what the issue -- at least, the principal issue is.

6          And it may be useful.  I may give it in the *voir dire*.

7          In other words, say, look.  I want to tell the ladies and

8    gentlemen of the jury -- prospective jury -- this is what this

9    case is about.  So it doesn't necessarily have to be, *You*

10   *should find the defendant guilty if you find that* -- blah,

11   blah, blah, blah.

12              **MS. ARGUEDAS:**  Right.  It could be a description.

13              **THE COURT:**  Just a statement of the case.

14              **MS. ARGUEDAS:**  Right.

15              **MS. AULT:**  That would be fine, Your Honor.

16   What we're concerned about is that if the Court gives a

17   partial description of what the crime is, or explains some

18   crimes, and not others --

19              **THE COURT:**  Well --

20              **MS. AULT:**  -- that we run into the problem of, on

21   appeal, having -- the Court having only given partial

22   instructions to the jury, which is always a fraught process.

23              **THE COURT:**  Well, there will be an appeal only if

24   there's a conviction.

25              **MS. AULT:**  That is correct, Your Honor, but we need

1   to be --

2           **THE COURT:**  Anyway, let's exchange -- and I think I

3   would do it as part of a statement of the case, so people

4   understand what it's about.  And you can put in all of the

5   caveats.  I'm not intending to instruct you.  The case has many

6   parts to it, and so forth, and so on.

7           **MS. ARGUEDAS:**  Great.  I have another subject.  Did

8   I -- can I take -- can I change subjects now?

9           **THE COURT:**  I don't know.

10          **MS. AULT:**  Excuse me?  I'm sorry.

11          **THE COURT:**  Can she change subjects?

12          **MS. ARGUEDAS:**  I just didn't want to interrupt

13  whatever --

14          **THE COURT:**  No.  We've heard enough of the other.

15          **MS. ARGUEDAS:**  So I want to talk about the

16  post-office situation.  The -- I want to be quite clear about

17  what I think the evidence will show.

18      You have a jury doing something?

19  (Whereupon a document was tendered to the Court.)

20          **THE COURT:**  Okay.  Why don't you tell the parties to

21  come in -- okay? -- before I answer their question.

22      Go ahead.

23          **MS. ARGUEDAS:**  I want to make a few quick points

24  about what I think the evidence will show.  And then I want to

25  talk about what the Court brought up, which is the

1  selective-prosecution motion.

2      One is the -- there will be evidence that Fed Ex did know

3  that the post office was shipping the same kind of packages

4  that Fed Ex was.  There will be evidence that Fed Ex was at the

5  same kind of meetings, for instance, that the post office was

6  at, as was all of the common carriers, where they were hearing

7  from the DEA and the agencies about the subject of online

8  pharmacies.

9      There will be evidence that Fed Ex employees were in

10  communication with Postal Inspectors about, you know, *If we*

11  *don't take these packages, you will* kind of thing.  So what you

12  were imagining is true.  That will be evidence.  It is part of

13  Fed Ex's state of mind.

14      But I want to turn to this concept of, *What did the*

15  *Government do with the post office?* because the Government,

16  when -- two times ago when we were in court, the United States

17  Attorney conceded that the Government did not investigate the

18  post office.  That is what was said.  We quoted it in one of

19  our briefs to you.  The Government did not investigate the post

20  office.

21      Frequently, the Government slides that statement into a

22  different statement, in which they say the Government has no

23  evidence that the post office committed the same kinds of acts.

24  I do not think that is an accurate statement that can be made,

25  when they have conceded that they did not investigate the post

office.  So actually the Government doesn't know what they did;
at least, not as a result of the investigation.

      **THE COURT:**  Well, do you?

      **MS. ARGUEDAS:**  Do I?  I know pieces of it.

      **THE COURT:**  I mean do you know whether or not -- as
an example, do you know whether or not the post office
delivered these packages?

      **MS. ARGUEDAS:**  Yes, I do.  For example, I have
concrete evidence which we provided to the Government at one
point, which is that when Fed Ex stopped shipping for an online
pharmacy or a pharmacy that dealt with online prescriptions,
Fed Ex stopped on one day, and on Tuesday the post office were
picking up the same packages from the same place.  So I know
that.

    I also know from the evidence in the case that the post
office was dealing with the same issues.  I've seen e-mails
about it.  I hear their comments at meetings.  In other words,
we know that.

    Do I know the scope of it?

    No, I do not.

    But I do know that online pharmacies primarily used three
common carriers:  Fed Ex, UPS, and the post office.

    It's my belief that it's somewhat informed that they more
often used Fed Ex and UPS, because Fed Ex and UPS are better at
delivering overnight than the post office is, but that's about

1    volume; it's not about doing the same thing.

2        But my real point here is:  Having conceded that the

3    Government did not investigate the post office, the Government

4    should not be allowed to say, *We have no evidence they did*

5    *anything wrong.*

6            **THE COURT:**  Well, you know, Ms. Arguedas, make your

7    motion.

8            **MS. ARGUEDAS:**  I was just about to turn to that.

9            **THE COURT:**  Make your motion.  And I'm not going to

10   require the Government to say anything.  Make your motion.

11           **MS. ARGUEDAS:**  We will do that.

12           **THE COURT:**  And there we are.

13           **MS. ARGUEDAS:**  We will do that.

14           **THE COURT:**  Okay.  Thank you.

15           **MS. ARGUEDAS:**  Thank you.  And I have a couple other

16   points.

17           **MS. AULT:**  Before we move on to something else --

18           **THE COURT:**  Sure, of course.

19           **MS. AULT:**  I just want to say that we understand that

20   what the Court is saying -- what the Court has ruled is that if

21   they would like to bring a selective-prosecution motion, they

22   can.  That is an issue for the Court.

23       But this stuff about the Postal Service is not coming in

24   in front of the jury.

25           **THE COURT:**  Well, I think my guess is that they would

1  like to introduce it.

2       **MS. ARGUEDAS:**  No.  I have intended -- the points

3  that I made at the beginning of -- when I was just talking

4  about the evidence of Fed Ex knowing that the post office

5  exhibited the same meetings and having conversations that we

6  will bring in in front of the jury --

7     The fact that the Government failed to investigate the

8  post office -- we have no intention of bringing that fact in

9  front of the jury.

10      **THE COURT:**  I don't know.  I need to look at the

11 motion.  And then I need to --

12      **MS. ARGUEDAS:**  Right.

13      **THE COURT:**  -- figure out what I want to do about it.

14      **MS. AULT:**  Well, Your Honor, the other point I wanted

15 to make is that, to the extent that the Defense wants to bring

16 in evidence about what other entities were involved in

17 assisting online pharmacies with committing their crimes, and

18 what happened to those other entities, such as United Parcel

19 Service, such as Google -- then, if they open that door, then

20 we should be able to put in evidence that other people were

21 investigated; that they did enter into agreements; that they

22 did pay large amounts of money to --

23      **THE COURT:**  Maybe.  Maybe not.  I don't know.

24      **MS. ARGUEDAS:**  I didn't say anything about that.  The

25 facts that I just put forward had nothing to do with what wound

1   up happening to them in terms of their investigation.   I'm

2   talking about what was going on at the time; what Fed Ex knew

3   at the time; who it was sitting next to at the meetings.

4   That's it.

5          MS. AULT:   We just wanted -- if the Defense is

6   planning to make the argument or raise the inference that other

7   people were doing this, too, and the Government didn't do

8   anything to them, we would then want to bring in evidence that,

9   yes, other people were doing this, too, and we did do things to

10   them.

11          MS. ARGUEDAS:   I just said we don't have any

12   intention to talk about who they prosecuted.

13          THE COURT:   Make a motion.

14          MS. ARGUEDAS:   Now I have another subject.

15          THE COURT:   Let me just hold that thought.

16   (Pause in proceedings.)

17          THE COURT:   Moving ahead.

18          MS. ARGUEDAS:   Yes, Your Honor.   I have another

19   topic, and it is the topic of --

20          MS. AULT:   Your Honor, I'm sorry.   Before we move off

21   of the post office, I'm concerned about what this could spiral

22   into, which is:   To the extent that they want to introduce

23   evidence that there were postal people from the Postal

24   Inspection Service -- not the post office, but the Postal

25   Inspection Service, which is a separate branch of criminal

1   investigators that were at these meetings -- to somehow raise

2   the inference that the post office was doing this, too, and

3   nobody was doing anything about it, it would lead us down a

4   rabbit hole of having to explain the difference between the

5   Postal Inspection Service and the post office.

6         **THE COURT:**  But that would be subject to a motion *in*

7   *limine*, given whatever particular evidence that is being

8   proffered.  I don't have that in front of me; do I?

9         **MS. AULT:**  I don't believe so, Your Honor.

10        **THE COURT:**  Good.  Okay.  Next?

11        **MS. ARGUEDAS:**  Your Honor.

12        **THE COURT:**  I anticipate that I would at some point.

13   Yes, Ms. Arguedas.

14        **MS. ARGUEDAS:**  As the Court has noted many times, and

15   which we agree with, this case is about:  What did Fed Ex know?

16   What did the Government say to Fed Ex?  What did Fed Ex say

17   back to the Government?  And what did Fed Ex do?

18   We are extremely concerned that the Government continues

19   to not appreciate that that's what the case is about, and that

20   that's the kind of evidence that they're going to have to

21   contend with in order to prove their knowledge and intent

22   beyond a reasonable doubt.  And that leads us to have a great

23   concern that they are not understanding their *Brady* obligation.

24   So, for example, I -- this is teed up exactly right now.

25   We are aware -- and we told the Government this earlier

1  this week.  We are aware of three people who were in law

2  enforcement -- two DEA officials -- who met with Fed Ex a lot

3  of times; had a lot of conversations with Fed Ex at a high

4  level -- meaning, you know, executives -- on the subject of

5  online pharmacies; on the subject of:  What are they?  What

6  makes them legal and illegal?  How can Fed Ex help the DEA do

7  its job?  You know, all -- exactly what is at the heart of this

8  case.

9      We are aware that quite recently, like in the last month

10 or so, the Government went to these three people and said, *When*

11 *you were with the DEA when you were meeting with Fed Ex*, *did*

12 *you ever ask Fed Ex to stop shipping for any online pharmacies?*

13     And the answer from these two DEA agents and another state

14 law-enforcement official was, *No, we did not*.

15     In my view, there can't be anything that's more *Brady* than

16 that.  These are the people who were meeting with Fed Ex.  They

17 are the DEA.  And they said, *We did not ask Fed Ex to stop*

18 *shipping for online pharmacies in general, or for any*

19 *particular online pharmacies, or using any criteria for online*

20 *pharmacies*.

21     I sent a letter to the Government and said, *Three people.*

22 *We know you asked these three people that we know.*

23     They said *No*.

24     That's *Brady*.  I want the report.

25     And they have written back to me yesterday, saying, *It's*

1    *not Brady; and if somebody said that to us, we wouldn't even*

2    *write it down in a report, but in any case, it's not Brady.*

3        So, number one, I would like the Court to say that it is

4    *Brady*, and order them to give me a report of those

5    conversations.

6        Number two, I only know about three of them.  For all I

7    know, there are 15 of them.  So I want them to have to look and

8    see what else they have, and give it over to us.

9        **MS. AULT:**  So as -- we don't think it's *Brady*, number

10   one, especially in the context in which this occurred.  It's

11   clearly not *Brady*, because the defendants raised a

12   public-authority defense in which they said they provided us a

13   list with hundreds of federal agents they claimed gave them

14   authority to distribute online-pharmacy drugs.  They have since

15   abandoned that defense, but they did that.

16       And so in the context of that we went and tried to find

17   out if any of the people they claimed gave them authority gave

18   them authority, and so asked them, *Did you ever say anything*

19   *one way or another whether they could or couldn't?*

20       And they said, *The subject never came up.  And, you know,*

21   *we didn't say anything one way or another.*

22       And the fact that a law-enforcement person never discussed

23   a topic with someone, that it never came up, is not *Brady*.

24       If they had said --

25       **THE COURT:**  I thought -- I don't understand that.

1        What they did was they continued a course of conduct:  *X*.

2    That is, they continued to deliver drugs.

3        Now, that occurred both before and after, as I understand

4    it.  I haven't seen anything.  As I understand, it occurred

5    both before and after they'd met with *X*; *"X"* being a Government

6    agent.

7        You know, the question --

8        If *X*, a Government agent, doesn't tell them to stop doing

9    that which is brought to their attention, isn't that *Brady*?

10       In other words, the crime is that they did *X*.

11       What they're saying is they met with the Government, and

12   the Government didn't tell them not to do *X*.

13           MS. AULT:  The Government is not required to tell

14   them not to do *X*.

15           THE COURT:  Oh, maybe.  Maybe as a matter of law

16   you're not required.  I can understand that, but that doesn't

17   mean that they've committed a crime.  And it also -- does it

18   not go to their state of mind as to whether they think they

19   have to do *X* or *not-X*?

20       *I met with the Government.  They told me about a problem,*

21   *but they didn't tell me that I should stop doing X.*  I think

22   that's relevant.

23           MS. AULT:  Your Honor.

24           THE COURT:  You know what?  It's *Brady*.  So as far as

25   I'm concerned now, that's my view.

1    I'd be delighted to review any authority you have for the

2  proposition that it's not *Brady* --

3        **MS. AULT:**  Your Honor.

4        **THE COURT:**  -- but it seems close enough to *Brady*

5  that you ought to turn it over.  I think you ought to get

6  together with the Defense and see what they want.

7    Now, I'll be glad to entertain a motion to turn over this

8  information, but remember this was a prosecution where the

9  Government said, *Whatever we have, we're going to give to the*

10  *Defense.  We understand that this whole case turns on:  What*

11  *did they know, and what did they do, and what did they do with*

12  *what they knew?*

13    And one of the things you know is the Government isn't

14  telling you not to do *X*.

15        **MS. AULT:**  And, Your Honor, the issue isn't about us

16  not turning something over to them.  It is that -- it is that

17  there is this absence of information.  And they are saying that

18  some --

19        **THE COURT:**  It's not an absence of information.  They

20  said that you met with the DEA agent, and you asked them the

21  question:  *Did you tell them not to do X?*

22        **MS. AULT:**  No, Your Honor.

23        **THE COURT:**  And they said, *No, we didn't.*

24        **MS. AULT:**  No, Your Honor, that is not -- we asked

25  them, *Did you tell them either way whether they could or*

1    *couldn't?*

2        And they said, *We didn't discuss it.*

3            **MS. ARGUEDAS:**  No.  Wait a minute.  No.  Wait a

4    minute.

5            **MS. AULT:**  Either way --

6            **MS. ARGUEDAS:**  That is not true.  That is not true.

7            **THE COURT:**  Stop it.  Ms. Arguedas, stop.

8        I want to get this straight.

9        You're saying that --

10       The allegation is that the witness did not tell Fed Ex not

11   to deliver these drugs?

12           **MS. AULT:**  That they both did not tell them that they

13   could, or did not tell them that they couldn't.

14           **THE COURT:**  Okay.  Fine.  Okay.  Fine.

15           **MS. AULT:**  They have to go together, because the fact

16   that they answered both questions --

17           **THE COURT:**  No, they don't.

18   (Simultaneous colloquy)

19           **MS. ARGUEDAS:**  -- offer of proof right now.

20           **THE COURT:**  Wait a minute.  Time out.

21           **MS. ARGUEDAS:**  It's -- what she's saying is

22   incorrect.

23           **THE COURT:**  Ms. Arguedas, I don't care whether it's

24   correct or not.  The fact of the matter is that it's not a

25   defense to a *Brady* violation to say that the sentence,

1   itself -- whatever that person said -- is incomplete; that it

2   had another portion to it.  And the sentence being -- the

3   statement is:  *We didn't tell them that they could and we*

4   *didn't tell them they could not deliver the drugs*.

5       Okay.  Let's assume that's a statement, which -- I have no

6   idea, but let's assume that's a statement.

7       You can't say it's not a *Brady* violation, because it's two

8   parts to a question.  Both parts are -- arguably, one is not

9   *Brady*; that is, *We told them they could deliver the drugs*.  But

10  one part could be viewed as *Brady*; and that is, *We didn't tell*

11  *them not to deliver the drugs*.  That could be viewed as *Brady*.

12      Be that as it may, I'm sure the Government doesn't want to

13  withhold that type of information, given the case.  It's

14  arguably germane to the case.  And I think it does fall within

15  *Brady*.  And I'll rule on it if it's presented to me, but I just

16  want to tell the Government that it appears to me to be

17  appropriate to turn over any statements of these individuals or

18  any individual in which the person said, *I didn't tell them not*

19  *to do it*, because that goes to the whole thing.

20      Fed Ex comes -- you contact Fed Ex.  You say, *We've got a*

21  *real problem there*.

22      And so the question is, *Okay*.  *If you're right it's a real*

23  *problem, what did you tell them to do?*

24      And you say, *Well, I didn't even tell them to do anything*.

25          **MS. AULT:**  Your Honor, I do think that this --

1              **THE COURT:**  I mean, is that really the way the

2    Government operates?  And I don't even know that those are the

3    facts.

4              **MS. ARGUEDAS:**  I would like to give you the facts,

5    Judge.  No.  It's my turn now, I think.  And I want to give you

6    these facts because I want the Court and I want counsel to

7    seriously understand that the way they are characterizing these

8    things are incorrect.

9         So this is what I know about two of these conversations.

10   In one, Ms. Ault was talking to the former Chief of

11   Pharmaceutical Investigations for the DEA.  The agents were on

12   the phone.  And Ms. Ault said to this chief from the DEA, *Did*

13   *you ever tell Fed Ex to stop shipping for online pharmacies?*

14        And she said, *No, I didn't.*

15        And Ms. Ault said, *Well, why not?*

16        And she said, *Because how would they know it wasn't going*

17   *to be heart medication that they were stopping?*

18        Same thing.

19        Ms. Ault and the agents talked to a second former Chief of

20   Pharmaceutical Investigations and said, *Did you ever tell Fed*

21   *Ex to stop shipping?*

22        And he said, *No.*

23        And she said, *Why not?*

24        And he said, *Because they might have stopped shipping for*

25   *somebody that some DEA office was investigating in Omaha, and*

1    *then those guys would have come and thrown me out of the*

2    *tenth-floor window.*

3          **THE COURT:**  That's figuratively?

4          **MS. ARGUEDAS:**  That is a very specific conversation.

5    It is clearly *Brady*.  I asked for it.  And they stand there --

6    both of them now -- and say, *No, it isn't*.

7          **THE COURT:**  Well, I'll just -- if I have a motion

8    before me, I'll decide whether it's *Brady* or not.

9          **MS. ARGUEDAS:**  I mean, I'll file a written motion if

10   you want.  I just said everything there was to say about it,

11   and you just said it was *Brady*.

12         **THE COURT:**  Well, look.  I haven't heard the

13   argument, other than they disagreed.  I haven't heard the

14   argument as to why it's not *Brady*.

15         **MS. ARGUEDAS:**  You have.

16         **THE COURT:**  They seem to say it's not *Brady* because

17   it was coupled with another statement.  And I don't quite get

18   why that means it's not *Brady*.  I don't get it.  You take both

19   statements.  Part of it's *Brady*.  I don't think the other part

20   makes it not-*Brady*.  It either is or isn't.  And I don't think

21   that it's coupled with *I didn't tell them they could do it*

22   means that:  Since I didn't tell them they couldn't do it, that

23   statement isn't *Brady*.  I don't know that that's the law.

24   That's the United States Government's view as to the law.

25   They'll give me authority which will sustain their position,

1    and I'll rule.  Okay?  Okay.

2        So you don't --

3        Ms. Ault, if you want to answer, you can, but you're going

4    to answer in a motion.

5        **MS. AULT:**  The only thing I would want to know is

6    that Ms. Arguedas originally said that there were three people

7    she was concerned about.

8        **THE COURT:**  She'll put them all in a motion.

9        **MS. AULT:**  We just want to know who the third person

10   is.  This is the first time she's explained that.

11       **MS. ARGUEDAS:**  The reason why I told them there were

12   three people before -- the reason why I didn't name them is

13   because these just happen to be people who shared with me their

14   conversation with the Government.  There are many more who I'm

15   sure are not willing to share with me.  I didn't particularly

16   want to tell them who they were, but I want them to go through

17   their *Brady* obligation in their way, which they have not done.

18       **THE COURT:**  File your motion.  Okay.

19       Now that we've dealt with that matter, anything else?

20   Because I have a matter.

21       **MR. CASSMAN:**  I have one; a jury questionnaire, and

22   the process for --

23       **THE COURT:**  Yes.

24       **MR. CASSMAN:**  -- working that through the system.

25       **THE COURT:**  Yes.

1      **MR. CASSMAN:**  I have been working with Mr. Ruby

2  primarily, who's not here today, on putting together a jury

3  questionnaire.  I believe that we will have one that is

4  90 percent agreed upon, with 10 percent -- we'll identify those

5  for you.

6      **THE COURT:**  Okay.

7      **MR. CASSMAN:**  We should have it, I assume, by the end

8  of the week --

9      **THE COURT:**  Great.

10      **MR. CASSMAN:**  -- this week.  Tomorrow.  Which would

11  mean tomorrow.

12      And we have questions for Your Honor about how that will

13  be; how and when --

14      **THE COURT:**  Pretty easy.  They're as follows.  First

15  of all, the Jury Commissioner has already sent out what I call

16  a "time qualifier," not identifying the case, but rather saying

17  it's going to commence on June whatever it is, and it's

18  anticipated to last for the most part of the summer -- I think

19  through mid August, but we'll talk about that in a minute.  And

20  is there some reason why you can't serve?

21      I mean, it's that sort of thing.  It's pretty generic.

22  We've done it in many, many cases.

23      And if it's a valid reason -- that is, a reason such that

24  the Jury Commissioner would, in the normal course, excuse that

25  person, that person would not be required to come in.

1        And if anyone wants to go look at those things, I'll

2   permit that, as well.

3        Secondly, once we have the -- what I call the

4   "time-qualified jurors," they're brought in, and they fill out

5   the questionnaire, and then they go home.

6        And then we furnish copies of the questionnaire to the

7   counsel before the jury-selection process commences.  It's

8   generally very short, and I'll tell you why.  Turnaround is as

9   quick as I can make it.  And that is because it happens,

10  notwithstanding whatever else I said, that the jurors go home.

11  The prospective jurors go home, and they go to the Internet.

12  And they go here and they go there, and they start to look at

13  the case and maybe even discuss it, notwithstanding the

14  specific instructions not to do that.

15       I'm more confident that once they come in and I tell them

16  why they shouldn't do it, it's more effective, but I'll put

17  that in quotes.  It's certainly more effective.  So that's the

18  process.

19            MR. CASSMAN:  For logistical purposes, Your Honor.

20            THE COURT:  Yes.

21            MR. CASSMAN:  I know in a case that I had with you

22  last year, we had the jury come in on the Thursday before the

23  Monday of jury selection; fill out the questionnaire.  And then

24  you asked the United States to arrange for the duplication.

25            THE COURT:  Just give me suggestions, and I'll do

1    them.

2              MR. CASSMAN:  So I think what we'd all like to do

3    is --

4              THE COURT:  You'd like to have three days to take a

5    look at it.  I'll try to do it, because I'm convinced that it

6    helps both sides.  It moves the jury process.

7              MR. CASSMAN:  If, for example, they come in on a

8    Thursday -- and I don't know what day you have them coming in.

9              THE COURT:  I don't know, either.  We'd better get

10   going on this right away.  Okay.

11             MR. CASSMAN:  So we'll have the questionnaire to you

12   tomorrow.  And then --

13             THE COURT:  Fine.  That's good.  Okay.  Thank you.

14             MS. ARGUEDAS:  Your Honor, do you -- can we move in

15   here before the day of the jury selection?

16             THE COURT:  Yeah, you can move in as soon as this

17   case moves out.

18             MS. ARGUEDAS:  Okay.  Great.  And we always want to

19   know these things, but we especially want to know because so

20   many of our people are from the East Coast.  Do -- does the

21   Court know now of any dark days it's going to have?  Like I'm

22   thinking about the judicial conference.

23             THE COURT:  Yeah.  I'm not going to be here.  I can

24   give you some dates that are on the questionnaire.  It's my

25   intention to go five days a week whenever I can.  I'll just

1  sandwich in my other calendars as I can, because I don't want

2  to lose dates.

3        **MS. AULT:**  And what -- how long will the days be?

4  Will the Court do half days on Wednesday or --

5        **THE COURT:**  No.  Full days.

6        **MS. AULT:**  Full days, five days a week?

7        **THE COURT:**  Right.

8        **MS. ARGUEDAS:**  Also there were some things that

9  needed to be, I think, dealt with by the Court.  I wish they

10  didn't, but I think they do.  The Government said in its trial

11  brief that they want to give us 24 hours' notice just for when

12  witnesses are to appear.  That seems wholly inadequate.

13        **THE COURT:**  Can't you come to some agreement on that?

14  Yes, you can.  Thank you.

15      Okay.  Next.

16        **MS. ARGUEDAS:**  I think that -- is that it?

17      Oh, yeah.  Would the Court issue an order -- we asked for

18  this in our trial brief -- to unseal the Grand Jury

19  transcripts?  They're going to be -- we're going to need them

20  to refresh people's recollection.

21        **THE COURT:**  We'll work out an agreement.  Work out an

22  agreement with the Government on it.

23        **MS. ARGUEDAS:**  Okay.

24        **THE COURT:**  Do the parties have anything else?

25        **MS. AULT:**  That's all, Your Honor.  Thank you very

1  much.

2      **THE COURT:**  Okay.  Well, the Court has something.   In

3  going through the trial brief, and given the Government's

4  Witness List -- ah, here we are.   The Government has identified

5  187 witnesses -- this is its case-in-chief -- plus 77 proposed

6  expert witnesses.

7      That's correct; isn't it?

8      **MS. AULT:**  Yes, Your Honor.   However, we have

9  submitted draft stipulations to the Defense which we met with

10  the Defense to talk about today.   And we provided them with a

11  list of -- I think it's around 60 witnesses that we believe

12  would have to be called, assuming we can come up with some

13  reasonable stipulations.   Sixty witnesses that would be called

14  in case --

15      **THE COURT:**  Sixty.   Okay.

16      So here is my question.   I'd like the views of the

17  parties -- not today, because I think you have to think about

18  it -- as to the order of proof in connection with this case.

19  Since we all agree that the crucial issue here is *What did Fed*

20  *Ex know, what were they told, and what did they do?* why

21  shouldn't that issue be tried first?   Why shouldn't the

22  Government produce all of its evidence as to *What did Fed Ex*

23  *know, and what did they do it about it?* and then proceed with

24  all the other witnesses in the case?   So I'd like you to think

25  about that.

1            And let me give you an analogy.  Let's assume an

2    individual is accused of possession of drugs, and his defense

3    is -- he has two defenses.  One is he didn't possess it.  And

4    number two is they're not drugs.

5            Could a Court, as an example, order the Government to

6    prove first that he possessed the drugs, or to prove, for that

7    matter, that they were drugs; either one or the other?  And at

8    the conclusion of all of evidence on Issue One or the other,

9    there either is sufficient evidence or not to proceed forward

10   with the case.

11           If, for example, the chemist testifies that, in my

12   analogy, these --

13           By the way, these weren't controlled substances.  Let's

14   say that he said that.  It's an element of the crime.  Could

15   the case proceed?  It could.  And, as a matter of fact, if it's

16   up to the jury to make a determination, it would have to

17   proceed, and both elements would be provided.  The evidence on

18   both elements would be provided to the jury.  And they would --

19   and then the Court would decide, again, whether there was

20   sufficient evidence as to the commission of the crime, pursuant

21   to Rule 29.

22           So it's not -- this is not an unprecedented view or

23   suggestion that I'm offering, but since we all agreed what the

24   issue is, and since you intend to call between 60 witnesses and

25   220 witnesses, it appears to me, in looking at these witnesses,

1   like Sarah X. and Molly Q. and da, da, da, da, da, that those

2   witnesses ought to come on after the Government has presented

3   its evidence of *What did Fed Ex know, and what did they do?*

4           **MS. AULT:**   Your Honor, the issue is going to be that

5   it's intertwined.

6           **THE COURT:**   Ah, I don't know that it's intertwined.

7   Why is it?  Explain to me why Molly Q. is inextricably

8   intertwined with the issue of *What did Fed Ex know?*  And

9   explain to me, more importantly, why is it inextricably

10  intertwined to the issue of, *What did Fed Ex know, to know what*

11  *Doctor X did in Puerto Rico with respect to how he dealt with*

12  *the online pharmacy in South Carolina?*

13      It may be required as an element of the crime that you

14  establish that.  I'm not saying that I think the answer to that

15  is clearly "Yes."  And the Court is well aware I can't split

16  elements of a crime.  We know that, but I'm not saying -- I'm

17  not splitting elements of the crime.

18      I'm thinking about ordering the proof a particular way

19  because it appears to me a rational way.  And it has many, many

20  advantages to it.

21      So I'd like your considered opinion.  And I'm not -- I'm

22  saying this and not asking you to comment, because I'm serious

23  about it, in the sense that I want to give -- my mind is open

24  on this issue.  I want to give the parties some time to think

25  it through and to see what their view is of the matter.

1            **MR. HEMANN:**  Seems very next generation.

2            **THE COURT:**  I know.  That actually is an extremely

3  good point.

4            **MR. HEMANN:**  Even --

5            **THE COURT:**  That is really good because, as you're

6  observing, Mr. Hemann, you're saying *We've never really done it*

7  *this way, or I'm not so aware of cases that deal with it that*

8  *way.*  And that is of concern to the Court.

9        But on the other hand, when I'm faced with a trial that

10  could very well go for months, where it is the position of the

11  parties that the essential element here, as far as Fed Ex is

12  concerned, is *What did they know, and what did they do?* and

13  when I've heard months and months of testimony already on the

14  issue of whether it's outside the course of practice -- I mean,

15  I can't pretend not to have a view, though I would say that

16  Fed Ex right now --

17        First, let me know what my view is.

18        And secondly, I'll wait to hear the evidence as it's

19  presented, because you may have a different view.  You may

20  present different evidence to me than I received the last time

21  around.  And it may or may not --

22        And, by the way, it's up to the jury.  It's not my view

23  that counts.  It's the jury's view that counts.

24            **MS. ARGUEDAS:**  Well, and on that subject, of course,

25  it's whether Fed Ex knew any of that stuff.  So -- but let me

1  ask.  Can I ask the Court a question?

2          **THE COURT:**  Yeah.

3          **MS. ARGUEDAS:**  Of course, I'm not really responding,

4  because I need to talk to my colleagues and my client, but I

5  think it's a very interesting -- probably a really good idea.

6      But I would like to ask:  What about this problem?  The

7  two DEA agents who met with Fed Ex numerous times -- they were

8  the primary people who met with Fed Ex.  They're on the

9  Government's 187-person Witness List; but when they gave us the

10 supposedly slimmed-down list, those two people are not on it,

11 even though there are no stipulations that relate to them.

12 Right?

13     In other words, it's not like they're going to be

14 stipulated away.  And they didn't even propose any

15 stipulations.  So they are completely crucial to *What did Fed*

16 *Ex know, and what were they told?*  And it would appear, if you

17 believe the Government's slimmed-down list, that the Government

18 does not intend to call either one of them.  So what would we

19 do with that?

20         **MS. AULT:**  Your Honor, we would take issue with

21 defense counsel's characterization about whether they're the

22 ones who met the most -- they're the most important.  This

23 is --

24         **THE COURT:**  No, no, no.

25     What the Defense is saying is:  What if they have

witnesses that they want to call on the issue of *What did they know?*  That's what they're saying.

And I don't know.  I think, now, that's -- I don't think they would be permitted to do so.  In other words, I have the belief that structurally -- structurally, the way it has to proceed is the Government has to put on all evidence that they have that they believe shows *X*.  I don't know that I can require the Government to call *Y*.  I just don't know whether I can.  And I'm looking at it in the context of a Rule 29(a) motion.

**MS. ARGUEDAS:**  Right.

**THE COURT:**  And the Rule 29 motion really states that -- basically that a party, having presented the evidence on the subject -- a party, having presented the evidence on the subject, the question is whether that's sufficient evidence to warrant a jury to consider whether or not they -- you know, that that element has been established.

So I think that's a good point.  Very good point.  You ought to take a look at it.

I'm giving you an initial reaction, though.  I think that -- I don't know that I can do that.  And also I'm not quite sure that even if I could do it, it involves saving any apportionment of time, because if it looks like really the -- you know, you need both sides to properly evaluate whether or not an element has been proven.  I don't think that's essential

1   to a Rule 29(a) determination.

2          MS. ARGUEDAS:  And may I say it may be that what I

3   just raised doesn't -- what the Court is suggesting still might

4   be a good idea.  They may not be able to survive a Rule 29,

5   even if you never do hear from those two witnesses.  So this

6   still could be a good idea to do, but I just wanted to raise

7   the issue that, honestly, it was -- it is surprising to me if

8   the Government would try to put on their case and omit these

9   people who met with Fed Ex, whether they were the most amount

10  of meetings or just a lot of meetings.  It would be surprising

11  to me.

12         THE COURT:  How surprising?

13      No, you don't have to answer that.

14      I mean, no.  I mean, the fact is they will decide.  They

15  will decide in their judgment how to present their case.  I

16  leave it up to them.  I'm not going to tell them how to present

17  their case.  You can make any argument you want to, if, for

18  example, they don't call these witnesses, and it ultimately

19  goes before a jury, you can make arguments about what is

20  appropriate under the circumstances.

21         MS. ARGUEDAS:  Right.

22         THE COURT:  Okay, but I want some thought to be given

23  as to whether or not I ought to direct an order of proof a

24  particular way.  That's -- it seems to me that could result in

25  substantial saving of time, though I don't know whether it

would or not, but it could.  It has that potential, in light of
the fact that that's basically the issue that's going to be
tried.

         **MS. ARGUEDAS:**  I had a trial with Judge Conti -- not
at all next generation -- who ordered the proof by conspiracy
because he thought there were going to be multiple
conspiracies, so it seemed like a good idea.

         **THE COURT:**  I've looked at it from a lot of different
points of view.  I've certainly looked at it from the idea that
I can split elements.  And clearly the Circuit says you can't.

    Okay.  Putting that one aside, I thought about:  What
about severing counts?  You know, I love severing counts where
it results in a savings.  I don't know.  I could be wrong.
Looking through the Indictment, as I did last night, it seemed
to me that what I can sever -- I could take one organization;
say, *Try that one first*.  I could take out misbranding.  I
could take out the money.  I could sever A, B, and C.

    But then I wondered:  In the conspiracy that's alleged
here, is it really going to -- is it going to save anything?

    For example, isn't the Government on the -- what?  You
have the Superior, and then you have the Smoley.  And how could
one say that if I severed out one or the other, that the
evidence wouldn't come in in the first or in the second -- the
evidence as to both?  Because the Government would argue, *Well,*
*you know, put the conspiracy in proper perspective of what they*

*did.  It wasn't just these people.  It was X and Y.*  And that
can be probative.  That's a factor that could be considered, so
I didn't think severance would work.

  And I thought, *Well, I could take out the "victims"* -- the
so-called "victims," or the individual drug orderers.  You
know.  Then I'd have the conspiracy without a substantive
offense.  But does that make any sense?

  And I thought, you know, then it's unfair to the
Government, because the Government -- if I severed them, I
still think that they would be able in their case to put in
some evidence to show the element of outside the normal course
and practice, and how it all worked.  So I didn't see severance
as an answer here.  It's a long way of saying it.  I didn't
think it would work, but I did think that it's worthy of having
a discussion on order of proof.

  **MS. ARGUEDAS:**  Do you want us to respond?  Do we come
back here and discuss it, or --

  **THE COURT:**  No.  I'd like you to just give me a
written submission -- I think sooner rather than later --
because, first of all, I don't think it's that -- while it may
be complicated, it's not -- you know -- address it.  I think
it's important from the Government's point of view, because if
I do order the proof a particular way, they have to prepare a
particular way.  And we're getting close to the trial.

  So I'd like -- I'd like somebody's answer.  I'd like you

1   to just exchange -- why don't you do this.  Why don't you file

2   a letter by Monday, and then respond to the letters by

3   Wednesday.  And then I'll take a look at it and see whether

4   this idea is just the Judge sitting here, thinking that, *Oh,*

5   *it's a great idea because I thought of it*.  That happens from

6   time to time.  Authorship of the idea is substituted for the

7   wisdom of the idea.  Yeah.

8           **MS. ARGUEDAS:**  I have a concern on this subject, if

9   this doesn't work, in order to shorten the trial.  And the

10  Court or the Jury Commissioner -- somebody has said to the

11  potential jurors that they should think of this as ending in

12  mid August.  There is no way this will end in mid August if we

13  don't do something like you just suggested.  And what concerns

14  me is if -- I think that the Court should be asking the

15  Government how long they really think their case is going to

16  take.

17          **THE COURT:**  Well, let's say we're down to 60

18  witnesses.  I'm banking on stipulations.  I -- you know, I'm

19  banking on that.

20          **MS. ARGUEDAS:**  The smaller list that they've given to

21  us has 70 witnesses on it, first of all.

22          **THE COURT:**  Okay.  Sixty.  Seventy.  But I've got to

23  believe that you can get it down to either fewer than 60 or 70.

24  So you have 60 witnesses in the *Napoli* case?  Sixty?

25          **MS. AULT:**  I want to say it was 63.

1            THE COURT:  I don't think so.

2            MS. ARGUEDAS:  What worries me is that whatever time

3   we take, then we will be putting on a defense unless you grant

4   a Rule 29.  And then they'll all be coming against us from this

5   jury, if you said to them they're going to be gone by Labor

6   Day, and we're talking to them at the end of September.

7            MS. AULT:  Your Honor, we have met with defense

8   counsel.  We have stipulations.  We've explained to them that

9   we -- you know, obviously, they can -- they have the right to

10  put us through our burden of proof.  And, you know, we are

11  happy to meet it, but we do think that a lot of the stuff that

12  the Court is concerned about -- proving the underlying crime --

13  can be done in a very short amount of time with summary

14  witnesses explaining things that the Court and defense counsel

15  have said are not at issue at this trial.  So I think if we

16  have some time to work through stipulations, so that we can --

17            THE COURT:  Well, that's what you're doing now.

18            MS. AULT:  Instead of -- for example, even with a

19  list of 60 witnesses, you know, we may not have to call ten of

20  them if we can agree with stipulations with the Defense that

21  one witness can put in evidence about what five other people

22  did.

23            THE COURT:  Well, that's the whole point of meeting

24  with them is -- that's the whole point.  So are you guys

25  meeting?

1          MS. ARGUEDAS:  We've met.

2          THE COURT:  Well, meet more.

3          MS. ARGUEDAS:  Yes.  We will meet more.

4          THE COURT:  Do you need a place to meet?

5          MS. ARGUEDAS:  No.  We're good with a place to meet,

6   Your Honor, but --

7          THE COURT:  Maybe you ought to meet at White Castle.

8          MS. AULT:  Your Honor, the fact that the Court is

9   going to be having full days five days a week is going to be

10  very helpful.

11         THE COURT:  And from time to time the Court -- I'm

12  not committing to this, but -- may appear to be impatient with

13  the questioning.  And that has a tendency to wrap things up,

14  because the jury sort of catches that.

15         MS. AULT:  Your Honor, we are doing everything we can

16  to keep the trial as short as possible.  It is in our

17  interests, as well, because we also know the jury has a limited

18  attention span.

19         THE COURT:  Right.

20         MS. AULT:  So we -- I think both my co-counsel and I

21  have been here a lot.  And we're going to do everything that we

22  can to try to keep the case as short and to the point as

23  possible.

24         THE COURT:  Right.

25         MS. ARGUEDAS:  We'll all have the good wishes,

1  Your Honor, but I still have the problem.  The Government has

2  said in the past that they expect their case to go through

3  August 31st.  That's already longer than what, apparently,

4  these jurors have been told.  If they do go through

5  August 31st, then we are September.  And they're going to hate

6  us for it if they've been told that they are allowed to be back

7  at their jobs.

8          THE COURT:  I'll tell them whatever I need to tell

9  them before I impanel them.  Let's see where we are.  Sometimes

10 I put my hope, rather than anything else.  Okay.  So I hope

11 that it will be concluded in August.  It's my expectation it

12 will be concluded in August.

13     Anything else?

14          MS. AULT:  No, Your Honor.

15          MS. ARGUEDAS:  Can I file a *Brady* motion in short

16 order?

17          THE COURT:  Yes.

18          MS. ARGUEDAS:  Everything's short.

19          THE COURT:  I don't care about any time requirements.

20          MS. ARGUEDAS:  Terrific.

21          THE COURT:  Just do it.  Just do it.

22          MS. ARGUEDAS:  Thank you.

23          MS. AULT:  Thank you, Your Honor.

24          THE COURT:  Okay.  We're in recess.

25 (At 3:20 p.m. the proceedings were adjourned.)

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4   *Lydia Zinn*

5   _____   May 27, 2016
    Signature of Court Reporter/Transcriber   Date

6   Lydia Zinn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25