**Volume 1**

**Pages 1 - 184**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

```
UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )        NO. CR 14-00380-CRB
                               )
FEDEX CORPORATION, ET AL.,     )
                               )
            Defendants,        )
_____)
```

San Francisco, California
Monday, June 13, 2016

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

     **DAVID R. CALLAWAY**
     United States Attorney
     Acting Under Authority Conferred by
     28 U.S. C. Section 515
     450 Golden Gate Avenue
     San Francisco, California  94102
   **BY: KIRSTIN AULT**
     **JOHN HEMANN**
     **JENNY ELLICKSON**
     **ASSISTANT UNITED STATES ATTORNEY**S

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
     Official Reporter
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
     Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2

     For Defendants:

3                                ARGUEDAS, CASSMAN & HEADLEY, LLP
                                 803 Hearst Avenue

4                                Berkeley, CA  94710
                          BY:    **CRISTINA C. ARGUEDAS, ATTORNEY AT LAW**

5                                **TED W. CASSMAN, ATTORNEY AT LAW**
                                 **RAPHAEL M. GOLDMAN, ATTORNEY AT LAW**

6

7                                SKADDEN, ARPS, SLATE, MEAGHER & FLOM,
                                 LLP

8                                525 University Avenue
                                 Palo Alto, CA  94301

9                          BY:   **ALLEN RUBY, ATTORNEY AT LAW**

10                               FEDEX EXPRESS LITIGATION
                                 3620 Hacks Cross Road

11                               Memphis, TN  38125
                          BY:    **PETER D. BLUMBERG, ATTORNEY AT LAW**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

Monday, June 13, 2016 - Volume 1

|                                         | PAGE | VOL. |
|-----------------------------------------|------|------|
| Opening Statement by Mr. Hemann         | 4    | 1    |
| Opening Statement by Ms. Arguedas       | 59   | 1    |

1    <u>**Monday - June 13, 2016**</u>                                    <u>**9:09 a.m.**</u>

2                          **P R O C E E D I N G S**

3                              ---000---

4          **THE CLERK:**  Calling Criminal Case No. 14-380, United

5    States of America vs. FedEx Corporation, et al.

6          Appearances, counsel.

7          **MS. AULT:**  Good morning, Your Honor.  Kirstin Ault,

8    John Hemann, and Jenny Ellickson for the United States.  This

9    morning we also have with us our case agents who are Jason Chin

10   and Brandon Bridgers of the DEA and Connie Leung of the Food

11   and Drug Administration Office of Criminal Investigations.

12         **THE COURT:**  Good morning.  Welcome.

13         **MS. ARGUEDAS:**  Good morning, Your Honor.  From our law

14   firm it's Chris Arguedas, Raphe Goldman and Ted Cassman on

15   behalf of FedEx, and with you us is Connie Lewis Lensing, who

16   is are Senior Vice-President of FedEx.

17         **MR. RUBY:**  Good morning, Your Honor.  Allen Ruby for

18   defendants.

19         **MR. BLUMBERG:**  Good morning, Your Honor.  Peter

20   Blumberg from FedEx.

21         **THE COURT:**  Good morning.  So let's begin.

22                          <u>OPENING STATEMENT</u>

23         **MR. HEMANN:**  Good morning, Your Honor.

24         **THE COURT:**  Good morning.

25         **MR. HEMANN:**  And may it please the Court.  This case,

OPENING STATEMENT / HEMANN

1   Your Honor, is about a drug courier.  It is about a prolific

2   drug courier.  It is about a drug courier that delivered

3   millions and millions of packages over a ten-year period of

4   time that contained illegal drugs.

5        This case is about a drug courier, Your Honor, that now

6   believes that it is above the same law that has been applied to

7   all of the members of the conspiracy that is alleged in the

8   Indictment.

9        This case is unique, Your Honor, because it involves a

10  massive volume of illegal drugs, perhaps an unprecedented

11  volume of illegal drugs.  It is surprising in many ways because

12  of the defendants' coldhearted, cold single-minded effort to

13  ensure that they were paid before their customers got arrested.

14  And it is unusual because defendants of this size generally are

15  not held to account in criminal cases.

16       But, Your Honor, this case is not novel.  At the end of

17  the day, we will prove to you that the defendants were no more

18  than part-time drug dealers who delivered drugs in large

19  quantities.  That the defendants were drug couriers, that they

20  knew were delivering drugs for drug dealers, and they knew were

21  delivering drugs to drug addicts.  This drug courier should be

22  treated in this Court just like Your Honor would treat every

23  other drug courier.

24       Now, just because this case is not novel does not mean

25  that it is not challenging.  But the challenge here,

**OPENING STATEMENT / HEMANN**

1   Your Honor, is not so much in the evidence, which will be

2   largely undisputed; the challenge here lies in treating this

3   enormous company with its air of legitimacy and its many

4   different business lines the same way this Court would treat a

5   person arrested coming across the border with drugs.

6       The challenge, Your Honor, is whether the rule of law

7   means the same thing for FedEx as it would mean for that

8   person.  And the fact that FedEx may otherwise be a legitimate

9   business and a drug delivery was only a small part of that

10  business doesn't make FedEx any different than the man or woman

11  arrested crossing the border.

12      The evidence in this case, Your Honor, will prove that the

13  defendants were delivering drugs outside the normal course of

14  professional practice and not for a legitimate medical purpose.

15      The evidence will show first that they were repeatedly

16  told exactly what the problem was, the legal problem.  They

17  were told repeatedly and by many different authorities that the

18  problem was that there were not valid prescriptions for the

19  drugs that were being sold by FedEx's customers.

20      Second, they knew that these customers, their own

21  customers, were shady, they were sneaky, they were on the run

22  from the DEA, they were likely to be shut down by the DEA, they

23  were fraudulent, and they were illegal.  And, Your Honor, these

24  are not my words.  These are their words at the time.

25      And what choice did they make knowing the things that they

1    knew?  They chose to keep doing it.  They deliberately did

2    nothing to determine whether their online customers were

3    distributing drugs without valid prescriptions.  And knowing

4    all that they knew, they were required to do something.

5        Their priority, the thing that they did choose to do was

6    to make certain that when their customers got raided and

7    arrested and shut down by the DEA, which they inevitably would

8    and always did, that FedEx had been paid first.

9        And even when they repeatedly failed to stay in front of

10   their crooked customers, even as they repeatedly got burned by

11   the drug dealers, by the pill mills that they were serving,

12   they chose to keep at it because they did not want to lose

13   revenue to UPS.

14       We're confident that the Court, once it hears and sees the

15   evidence, will find that the FedEx Corporation and its two

16   subsidiaries were delivering illegal drugs for people it knew

17   to be drug dealers, just like other drug couriers who were

18   investigated, charged, prosecuted and sentenced in courts all

19   throughout the United States, and we are confident that this

20   Court will resist the invitation that will be offered

21   repeatedly throughout this trial to treat FedEx differently

22   because it is a large company.

23       The stakes, Your Honor, in this case are high, both for

24   the rule of law and for the integrity of the system, and

25   fortunately in this case, the evidence is clear.

OPENING STATEMENT / HEMANN

1     I'm not going to spend an enormous amount of time talking

2    about the way the scheme worked because the Court has had an

3    opportunity to read the Indictment.  The Court has an

4    opportunity to look at other cases involving the same scheme,

5    and the evidence will come in pretty clearly as to how the

6    scheme worked.

7     It looks complicated.  It's not.  An individual, a buyer,

8    would search the Internet and find an online presence,

9    sometimes called an affiliate pharmacy, and they would type in

10   "cheap phentermine" or "discrete phentermine" and they would be

11   connected to or they would find an affiliate pharmacy.

12    They would connect to that affiliate pharmacy through the

13   Internet and identify the drug or drugs that they want.  That

14   affiliate pharmacy would do nothing other than act as a portal

15   or a window to the Internet pharmacy.  And the Internet

16   pharmacies -- you'll hear all sorts of names as we go through

17   the trial.  The primary Internet pharmacies in this case are

18   the Chhabra Smoley Internet Pharmacies, USA Prescriptions and

19   United Medical.  But there are many Internet pharmacies.

20    Once the Internet pharmacy received notice from the

21   affiliate that Jane Doe over here wanted phentermine, for

22   example, it would leap into action and it had to do a number of

23   things.  It had to make sure that when it came time for Jane

24   Doe to pay, it had a way of accepting the money.  And early in

25   the scheme, it was generally credit card companies.  It became

OPENING STATEMENT / HEMANN

1  increasingly CODs as the credit card companies declined over

2  time to work with these individuals.

3      But the Internet pharmacy also had to find a doctor and a

4  fulfillment pharmacy, a pharmacy that would ultimately put

5  pills in a bottle and send it to Jane Doe, and most importantly

6  for our case, either the Internet pharmacy or the fulfillment

7  pharmacy had to figure out how to get the pills to Jane Doe.

8      All of that was organized -- most of it was organized at

9  the Internet pharmacy in the middle.  The Internet pharmacy

10  would have a number of doctors who would agree to simply look

11  at online questionnaires that were filled out by the buyers.

12  And that is where the crime comes in.

13      The buyer would do nothing more, in most cases, than

14  simply fill out an online questionnaire.  That online

15  questionnaire would go first to the Internet pharmacy, then to

16  the doctor, and then the doctor oftentimes would just click a

17  button and approve the prescription, if you will, which would

18  be sent back electronically and handled entirely by the

19  Internet pharmacy and then ultimately by the fulfillment

20  pharmacy which would get the approval, such as it was, from the

21  doctor.  The pills would be bottled up and sent through FedEx.

22      You're going to hear, as the case goes on, that the

23  players change over time.  They change primarily because they

24  are run out of business by the DEA and the FDA.  You'll hear

25  that the constants throughout this case are FedEx and UPS.  The

1   deliver services stay and stay and stay.  And in fact,

2   interestingly, Your Honor, the delivery services have as much

3   visibility into this scheme as almost any player other than the

4   Internet pharmacy because the delivery services, FedEx and UPS,

5   are dealing directly with the fulfillment pharmacies.  They go

6   to the fulfillment pharmacies.  Go in there and see what they

7   are doing.  They deal with the Internet pharmacies directly.

8   And they deal with the buyers, who, as the Court will hear, are

9   often drug addicts and people who are purchasing these drugs

10  clearly without any legitimate medical purpose.

11       And FedEx is a company that is sophisticated, it is

12  data-driven, and it follows and researches and analyzes the

13  Internet pharmacies that it's working with and the fulfillment

14  pharmacies it is working with.  You will hear testimony and

15  evidence in this case about lists, whether the Government

16  provided lists or identified Internet pharmacies to FedEx.

17       You will also hear that starting in 2004, FedEx created

18  its own list, a detailed list of Internet pharmacies and

19  fulfillment pharmacies that it considered to be suspicious.

20  And we're going to talk about that in a little while.

21       Now, this is our rendition of how the scheme worked,

22  but -- this is how FedEx understood the scheme to work.

23       Could you put up 31-02, please, Ms. Leung.

24       Your Honor, if you could let me know if the screen is

25  working there.  We are attempting to put something up on your

1    screen.

2              **THE COURT:**  Not yet.

3       Yes.

4              **MR. HEMANN:**  This is an email, Your Honor, from Bonnie

5    Wagner, who you will hear from, and Bonnie Wagner describes in

6    the middle -- right in the middle of the scheme in 2006 what an

7    online pharmacy is.

8         "An online pharmacy or an Internet pharmacy is an entity

9    whose primary business is the marketing and/or selling of

10   pharmaceuticals or weight loss aids via the Internet.  This

11   description does not include established pharmaceutical

12   companies or drugstore chains with an online presence in

13   addition to their physical storefront."

14        And then she talks about the various products, some of

15   which are controlled substances, that these Internet

16   pharmacies, online pharmacies sell.

17        Then she describes how they operate.  And this is what

18   this chart depicts.  The products are purchased through an

19   Internet website.  Then the purchase order is filled by the

20   fulfillment center, a drugstore or warehouse who carries the

21   requested product.  The company operating the website and the

22   company operating the fulfillment center are normally separate

23   companies.  Online pharmacies often process and fulfill their

24   orders via web API.

25        Then she talks about why this is important and important

1  to FedEx.  "Many of these companies operate outside the" --

2  first paragraph up there.  Thank you, Ms. Leung -- "outside

3  federal and state regulations over the sale of controlled drugs

4  which require diagnosis and prescription by a licensed

5  physician.  Drugs purchased from these sites may be diluted or

6  counterfeit.  Several sites have been shut down by the

7  government without warning or simply disappeared, leaving large

8  balances owing to FedEx.  FedEx has written off more than

9  $6 million in unrecoverable revenue from these businesses since

10  2003."

11       FedEx, through Ms. Wagner, knows what the problem is for

12  FedEx.

13       "Because these companies attempt to maintain a low

14  profile, the local sales professionals are often the last to

15  know that large accounts of packages are being shipped from

16  their territory."

17       Then she says to the sales representatives -- she explains

18  to them how you recognize the online pharmacies.  Just below

19  this, please, Ms. Leung.

20       "How you recognize them.  These customers typically order

21  large numbers of FedEx padded packs to ship their product.

22  Large requests for padded packs should be reported to local

23  sales management immediately.  This order is usually the first

24  contact that is made with either customer service or inside

25  sales.  Also these businesses may not look like, quote, *normal*,

1   unquote, shipping operation.  Instead of operating in a

2   commercial warehouse in a business district, these shippers may

3   operate out of retail or office locations, a blank storefront,

4   a small brick and mortar pharmacy that never had large shipping

5   before or even a basement.  The business names on the airbill,

6   its signs and telephone listings may not match and the name

7   could be disguised so as to hide what their business purpose

8   is."

9        So, Your Honor, FedEx knew how the system worked and knew

10  at a very fundamental way that they were dealing with people

11  who were trying to hide, unreliable people who were operating,

12  as Ms. Wagner said, outside state and federal laws.

13       As we go through the trial, we're going to prove what

14  FedEx knew at the time by what they said at the time.  We are

15  going to introduce to the Court dozens and dozens of emails

16  written by FedEx employees at the time of the conspiracy.

17       This we believe, Your Honor, is the best evidence of what

18  they knew and intended while the events in question were taking

19  place.  You will hear from some of the witnesses, at least,

20  that they don't remember what they meant by a particular email.

21  You will certainly hear general denials that these witnesses

22  didn't mean to be doing anything wrong, and you will hear a

23  great deal of *I don't remember what I meant by this bad*

24  *sounding thing but let me tell you about some good things that*

25  *we were doing at the same time*.  You're going to hear a lot of

1    that.

2       General denials of bad intent are entirely irrelevant in

3    this case.  The question, as this Court has said for a very

4    long time, is what did FedEx know at the time.  The evidence of

5    that is not through witnesses who say *I don't really remember*

6    *what I meant when I said that but we were doing good things at*

7    *the time and I didn't mean to do anything wrong*.  The evidence

8    is what they say at the time.

9       I'm not going to spend a great deal of time this morning

10   on the charges and the elements.  The Court has the Indictment.

11   The Court has the jury instructions.  The Court provided an

12   overview at the status conference on May 31st of what the

13   elements that the Government must prove are, and we largely

14   agree with the way the Court formulated those elements.  There

15   are essentially four elements to the central conspiracy

16   charges.

17      First of all, that the drugs were controlled substances or

18   in the case of the FDCA conspiracy, prescriptions.  The

19   United States agrees with the Court's observation on the 31st

20   that it is likely that that element will be easily proven.

21      The second element is the drugs were distributed.  The

22   Government also agrees that, as the Court said, this will not

23   be seriously contested.

24      Most of the action in this trial, Your Honor, will be over

25   the second -- the last two elements, whether there were invalid

1    prescriptions and, of course, knowledge and intent.

2         As the Court observed, the validity of the prescriptions

3    will perhaps be contested.  We will prove that the

4    prescriptions were invalid, that they were not issued in the

5    usual course of professional practice when they were issued,

6    and not for legitimate medical purpose primarily through

7    employees and associates of the online pharmacies and

8    fulfillment pharmacies at the time, but also through a series

9    of undercover buys that were made during the course of the

10   conspiracy through some of the buyers who will come and testify

11   in court and through documents that were seized from the

12   Internet pharmacies and fulfillment pharmacies.

13        I don't think that that will be seriously contested as

14   well because, as I said earlier, the Court is going to hear

15   that these prescriptions were generated in massive, massive

16   daily numbers.  And the massive daily numbers were something

17   that FedEx knew very well.

18        But the issue here, the main issue is going to be

19   knowledge and intent, and as I go through my opening this

20   morning, that is where I'm going to focus most of my comments.

21   I think it is probably useful, although the Court has read the

22   Indictment, to talk about the two main conspiracies, the

23   Chhabra-Smoley organization and the Superior Drugs

24   organization.  I'm going to provide an overview now.  Special

25   Agent Chin is going to testify about these two organizations

**OPENING STATEMENT / HEMANN**

1    shortly, probably starting this afternoon, with an eye in

2    particular to what FedEx knew about these organizations and the

3    operation of these organizations.

4         As the Court knows, of course not everything that we prove

5    or are required to prove in connection with a drug conspiracy

6    must be known, many of the things, some of the things to the

7    defendant.  Some of the things happened away from the

8    defendant, and they are things under *Pinkerton* that the

9    defendant remains liable for.  I'm not going to talk a lot

10   about those this morning.

11        The Chaabra-Smoley organization is named, I guess, in our

12   indictment, after two individuals, Vince Chhabra and Robert

13   Smoley.  The illegal conduct began with Mr. Chhabra.

14   Mr. Chhabra started selling prescription drugs illegally and

15   controlled substances illegally in Ohio in 1998 and he was in

16   constant trouble almost from the beginning.  He founded a

17   company called USA Prescriptions in 1999 and moved it to

18   Florida in 2000.

19        This organization was primarily an Internet pharmacy,

20   although at times both Mr. Chhabra and Mr. Smoley operated

21   fulfillment operations as well, but it is primarily here an

22   Internet pharmacy.

23        In 2002, Mr. Chhabra opened a facility at 1485 North Park

24   Drive in Weston, which is near Fort Lauderdale in Miami.

25        Over the course of 2000 through 2003, Mr. Chhabra used all

**OPENING STATEMENT / HEMANN**

1   manner of fulfillment pharmacies, some of which you will hear

2   about, including RxNetwork, Prescription Resources and Superior

3   Drugs.

4        Mr. Chhabra opened an account with FedEx.  You'll hear it

5   referred to as the *885 national account*.  And he had a number

6   of accounts that were linked to it.

7        The concept of a national account is something that the

8   Court will hear about as the trial goes along.  A national

9   account is an account through which discounts are organized, at

10  least for the purpose of this case, and the importance of the

11  national account is that many players in the online pharmacy

12  schemes would want to glom onto these national accounts with

13  FedEx because they got discounts on shipping through the

14  national accounts.  And the buyers, in addition to being sucked

15  into this illegal scheme and receiving pills without seeing a

16  doctor, they were also paying a premium for their overnight

17  FedEx deliveries, while the individual operators received steep

18  discounts through their national accounts.

19       Mr. Chhabra started working with Robert Smoley and a woman

20  by the name of Carleta Carolina.  Mr. Smoley was an Internet

21  guy essentially and Ms. Carolina was a pharmacy person.

22       He started working with them in about 2003.  And at this

23  point in time, 2003, Mr. Smoley had begun to dabble in Internet

24  pharmacies.  Their primary fulfillment pharmacy was a company

25  called RxNetworks of South Florida.

1        RxNetworks of South Florida FedEx knew was the fulfillment

2    pharmacy for USA Prescriptions and FedEx knew that it had

3    administrative action taken against it by the DEA in 2002.

4        And one of the things, as I start with this, which doesn't

5    really sound major -- and I suspect the defense is going to say

6    well, you know, who cares.  They took action against -- the DEA

7    took action against this little pharmacy.  Who knows what it

8    was for.  They clearly got fixed and went back to work, which

9    they did.

10        It's relevant, Your Honor, even in these small little bits

11    because what the Court is to look at in terms of determining

12    knowledge, whether for an actual knowledge standard or a

13    deliberate ignorance standard, is the totality of the

14    circumstances.  And as the trial goes on, the Court will see

15    the totality of the circumstances growing and growing and

16    growing and these incidents occurring with increasing frequency

17    and increasing severity.

18        It begins with administrative actions taken to shut down

19    these new, at the time, Internet pharmacies in 2002, and it

20    grows very quickly into arrests for distributing controlled

21    substances.  And there is a body of work here that FedEx

22    operates in the middle of for 10 years.

23        The DEA suspended RxNetworks, Chhabra's fulfillment

24    pharmacy, in 2003.  FedEx knew that.  Chhabra was indicted and

25    arrested for violating the Controlled Substances Act by, as the

1    Indictment said, selling controlled substances outside of the

2    usual course of professional practice and not for legitimate

3    purpose.  And USA Prescriptions was shut down.  That both

4    happened in December of 2003 and FedEx knew that.

5        So Vince Chhabra is under federal indictment.  His case is

6    proceeding, and he moves his business to Robert Smoley.

7        Initially Mr. Chhabra's FedEx national account number was

8    merged with Mr. Smoley's national account number, a national

9    account number for Mr. Smoley's business.

10       Mr. Smoley started a company called Icom Group, I-C-O-M,

11   which absorbed Mr. Chhabra's business.  Mr. Smoley hired Louis

12   Cohen, who took over dealings with FedEx.  Mr. Cohen had

13   previously dealt with FedEx on behalf of Mr. Chhabra.  And

14   Mr. Smoley moved into Mr. Chhabra's space and eventually ran

15   both an Internet pharmacy and/or ran the Internet pharmacy out

16   of that space.

17       In 2005, Mr. Chhabra pled guilty and went to prison.

18   Mr. Smoley continued to ship drugs through FedEx.

19       Mr. Smoley and Icom Group used fulfillment pharmacies that

20   were shut down by the DEA.  And you'll hear some amount of

21   evidence about these fulfillment pharmacies as they are part of

22   the conspiracy.

23       The ones I'll mention this morning are Tri-Phasic, which

24   involved a man by the name of Johar Saran, S-A-R-A-N; United

25   Care Pharmacy and Kwic Fill pharmacy.  And he also shipped

**OPENING STATEMENT / HEMANN**

1  through his own company, United Mail Prescriptions at

2  Mr. Chhabra's old address.

3      The shutdowns that occurred that frequently came with

4  significant arrests and charges were a big deal and they were

5  known to FedEx.  FedEx knew the connection between the shutdown

6  fulfillment pharmacies and the Internet pharmacies that had

7  been controlled by Mr. Chhabra and Mr. Smoley, and we will

8  spend a fair amount of time in the trial on these and FedEx's

9  knowledge of them.

10      In 2008, Mr. Smoley was caught in a reverse sting executed

11  by some of the agents who are in the courtroom today.  He

12  ultimately pleaded guilty and was sentenced by Judge Alsup in

13  this courthouse to a term of 40 months in prison.  FedEx knew

14  about this.

15      Over the course of their relationship with Chhabra and

16  Smoley's companies, FedEx enjoyed revenue of almost 11 and a

17  half million dollars from Chhabra and Smoley's combined

18  accounts.

19      While Chhabra and Smoley were primarily Internet

20  pharmacies, Superior Drugs, which is the other conspiracy

21  alleged in the Indictment, was a fulfillment pharmacy.

22      Ms. Leung, can you put up 21-63, please.

23      This is, Your Honor, Superior Drugs, which is in Miami,

24  Florida or was in my Miami there.

25      As divey as the outside of Superior Drugs appears, it does

1   not hold a candle of what you will see of the inside of

2   Superior Drugs.

3        Superior was a fulfillment pharmacy and it shipped for a

4   dizzying array of Internet pharmacies over about 10 years from

5   2000 until about 2010.  It all told during that period of time

6   shipped 21 million doses of controlled substances using 30

7   different Internet pharmacies or on behalf of 30 different

8   Internet pharmacies.  FedEx had $4 million in revenue from

9   Superior Drugs from 2003 to 2010.

10       During this period of time, ten of superior's Internet

11  pharmacies were shut down.  Many of those had independent

12  relationships with FedEx.  Some of them used Superior's

13  national account number and its deep discounts to ship.  FedEx

14  knew these things.

15       Throughout the eight years, Superior never filled

16  legitimate prescriptions.  And to be clear, they never filled

17  prescriptions in the usual course of professional practice or

18  for a legitimate purpose.

19       You will hear from Wayne White, who is the

20  now-incarcerated former owner of Superior, that they never had

21  prescriptions for legitimate prescriptions for the pills that

22  they shipped.

23       Mr. White was arrested on an indictment from the Eastern

24  District of Pennsylvania in 2010.  He was convicted in 2012 and

25  sentenced to 108 months in prison.

OPENING STATEMENT / HEMANN

1          FedEx was very well aware of the law enforcement actions

2     that were taken against Superior's Internet pharmacies.  FedEx

3     knew of drugs that had been illegally distributed by Superior

4     through FedEx to FedEx customers, including Jami Beardsley and

5     Elizabeth Dillinger, who are people that FedEx -- these are

6     buyers that FedEx had personal dealings with and knew were

7     using Superior.

8          And they had been inside and seen Superior, which the

9     Court will appreciate when it sees the pictures.

10         I would like to talk now about the key issue, knowledge;

11    knowledge beyond what FedEx knew specifically of Chhabra and

12    Smoley and of Superior.

13         We are very confident, Your Honor, that we will prove to

14    you beyond a reasonable doubt that FedEx had knowledge of

15    exactly what the online pharmacies were doing, which was

16    selling pills without a legitimate prescription.

17         The motive of FedEx was to make money, which is fine, but

18    they wanted to make sure that they had the money before their

19    customers were put out of business by the DEA, which they knew

20    was going to happen.  And we will prove to you that FedEx

21    utterly and completely failed to investigate what they were

22    doing when they had a specific reason to know that there was a

23    problem with particular customers.  And we will prove this in

24    two ways.  We will prove actual knowledge here, that they knew

25    their customers were delivering drugs illegally, that is,

1    outside the usual course of professional practice and without a

2    legitimate medical purpose.  We will prove that they knew that

3    a large, large, large percentage of what they were doing on a

4    daily basis was illegal.

5        We will also prove deliberate ignorance.  And, Your Honor,

6    I'm going to give the Court -- the Court welcomed us to do

7    this, to leave a little bit of law in and I'm going to do that.

8    There is a case, *Ramos-Atondo*, which is 732 F.3d 1113 and the

9    pin cite is 1119, and it is a 2013 Ninth Circuit case.

10       What that case, which follow well-established Ninth

11   Circuit precedent, says is that, "Deliberate ignorance may be

12   proved by a showing of two things.  Number one, a subjective

13   belief that there is a high probability that a salient fact

14   exists."

15       Here the fact is that the drugs were being delivered

16   outside the usual course of professional practice and without a

17   legitimate medical purpose.  That is the fact that we will

18   prove to you FedEx subjectively believed that there was a high

19   probability of.

20       "And, number two, having that subjective belief took some

21   deliberate act to avoid learning the truth with a failure to

22   investigate being a deliberate act."

23       FedEx chose not to ask any of their online pharmacy

24   clients or fulfillment pharmacy clients directly about

25   prescriptions, even knowing that they were delivered controlled

OPENING STATEMENT / HEMANN

1    substances and prescription drugs.  They chose not to examine

2    the packages and determine whether the doctors or the patients

3    listed on the packages, which they were free to open, were

4    legitimate.

5        Now, I'm going to pause for a moment and note an

6    anticipated defense which is that FedEx was very, very

7    cooperative with law enforcement.  I don't believe that that's

8    relevant to the questions that are at issue in terms of their

9    knowledge of the legitimacy of the prescriptions.

10       But what you will hear in terms of that evidence is lots

11   of evidence that when FedEx got a subpoena or a search warrant,

12   it complied, and I will submit to Your Honor that's why it has

13   not been charged with obstruction of justice.  But it does

14   not -- compliance with legitimate legal process does not make

15   the company innocent of distributing drugs.  You will hear that

16   other Internet pharmacies complied with search warrants and

17   responded to subpoenas, which does not make them innocent of

18   drug distribution.

19       You will also hear that FedEx ignored information received

20   from law enforcement.  They continued to deliver drugs, even

21   after it was given specific warning.

22       I'm going to talk a little bit about that specific

23   warning. I'm going to talk about four things, Your Honor.

24   FedEx knew that the problem here was a problem with a lack of

25   face-to-face with the doctors, face-to-face examinations with a

**OPENING STATEMENT / HEMANN**

1    prescribing physician.  They knew that because they were told

2    by law enforcement.  They knew that because they were told by

3    experts in narcotics distribution and addiction.  They learned

4    that from the news media and they learned it from their own

5    employees.

6          Over the course of a number of years, FedEx had multiple

7    meetings with various law enforcement agencies, including the

8    DEA, the FDA, and the FBI.  They received all sorts of

9    information from these organizations, including detailed

10   PowerPoints -- and if you can pull up 60-12 and go to page 13.

11         This is one in particular, Your Honor, that you'll see and

12   you will hear from both Mr. Trant and Mr. Bynum, who are DEA

13   employees.  And this explains to FedEx what the issue was.  The

14   issue was a lack of a valid prescription.  And if you can just

15   go through this to the next page.

16         It was laid out to FedEx what the pharmacists'

17   responsibility was.  It was laid out to FedEx what the doctors'

18   responsibility was.

19         Go to the next page.

20         FedEx was informed what a legitimate medical purpose is

21   and what the DEA believed and the courts had consistently

22   held -- if you go to the next page, please -- what a valid

23   patient/physician relationship includes.

24         And if you go two pages down, specific information about

25   online consultations.  And FedEx was informed that online

OPENING STATEMENT / HEMANN

1    consultations fall well below the excepted standard of medical

2    care.  And they were told exactly why that is.  FedEx had

3    information as to what the problem was.

4         They not only had it in this forum, they had that

5    information in Congress.  There were hearings, because this was

6    a big issue.  This was a problem.  And FedEx was called to

7    Congress and FedEx sat through days of hearings.  A FedEx

8    representative testified, and you will hear that evidence from

9    that representative, Mr. Townsend.

10        And during the congressional proceedings, they were told

11   this information and more by the FDA and DEA that the problem

12   with Internet pharmacies is that they are distributing drugs

13   when the doctor doesn't actually see the patient.  That's the

14   problem.  That's what FedEx was told.

15        And the DEA told FedEx about specific incidents in which

16   this happened in which FedEx was involved.

17        If you can put up 26-81, please.

18        There was a woman by the name of Elizabeth Dillinger who

19   committed suicide as a result of prescription drug addiction

20   and abuse.  She was the daughter of the Broward County Public

21   Defender.  And after she died -- the investigating agents had

22   her telephone, and after she died, she received repeated phone

23   calls from Internet pharmacies asking her if they could refill

24   her prescription, prescriptions that were delivered to her by

25   FedEx.

1          The DEA got a copy of the police report that lays this out

2     and sent it to FedEx.

3          If you can go to page 3, please.  It's 26-81.

4          And what they were told, Your Honor, is -- if you go to

5     the very bottom -- among other things -- that very last

6     paragraph -- that the detective -- and this is a document that

7     was sent to FedEx by the DEA from the police department.

8          "I asked canine detective Pat Shay to reach out to his

9     contacts at FedEx.  Detective Shay told me that FedEx is very

10    familiar with Elizabeth.  She had been picking up mailers once

11    a week at the MCI drive facility in Pinellas Park over a year.

12    If she missed a week, there would be two packages waiting there

13    for her the next week."

14          And at the top -- we can just stop there.  If you can go

15    two pages on, please, to page 5.  Next page, please.

16          FedEx is told that "On Thursday, October 26, 2006, the

17    officer received a telephone call from FedEx notifying me that

18    the package I was waiting for had arrived.  This was the

19    package that the officers had ordered from the online pharmacy

20    after Elizabeth Dillinger's death.  The package originated from

21    Creative Pharmacy Services.  Inside the bag is a bag from

22    Superior Drugs, which was located at the same address."

23          So here, Your Honor, what FedEx is told is that a woman

24    who had not seen a doctor for the prescription she was getting

25    was sent prescriptions by FedEx and died as a result.  The

**OPENING STATEMENT / HEMANN**

1  prescriptions were from Superior Drugs.  And after this, FedEx

2  continued to deliver for Superior Drugs.  And they did not go

3  to Superior Drugs and say, *Hey, what's this about Dr. Hassan*

4  *Gaafar.  Are his prescriptions legitimate*?

5      So law enforcement is telling them the -- an organization

6  called CASA, the national center on addiction and substance

7  abuse at Columbia University, which is probably the leading

8  organization --

9          **THE COURT:**  Can I ask a question?

10         **MR. HEMANN:**  Yes.

11         **THE COURT:**  Would the law have permitted a call to

12  this doctor?  I don't know what his name is?  What's his name.

13         **MR. HEMANN:**  Hassan Gaafar.

14         **THE COURT:**  Right.  Dr. Gaafar.

15      Would the law have permitted Dr. Gaafar to discuss with

16  FedEx whether or not that individual had a personal

17  examination?  Under HIPAA, under the law, would that have been

18  permitted?

19         **MR. HEMANN:**  I do not know that answer, but we'll find

20  out.

21         **THE COURT:**  Don't you have to know that answer?  I

22  mean, you said -- I'm just following up.  You said FedEx didn't

23  go to the doctor and -- I'm trying to figure out -- and I --

24  that's probably conceded, though I haven't heard the evidence,

25  that they didn't phone the doctor.  But if they had phoned the

**OPENING STATEMENT / HEMANN**

1    doctor, the question I have is what could the doctor say?

2    Could he say anything at all?  Could he even say *that's my*

3    *patient*?  Can he say that under federal law?

4         And I'm not asking -- I am asking you now, but I'd like to

5    have that question answered.  That's one of the questions that

6    I have in my mind.

7              MR. HEMANN:  Certainly.

8              THE COURT:  Okay.

9              MR. HEMANN:  I don't know that there's -- and I

10   believe that there is no impediment for them going to Superior

11   and saying, *We are delivering drugs for this person.  How are*

12   *your prescriptions done?*

13             THE COURT:  That may be the case.  I'm just following

14   --

15             MR. HEMANN:  Gaafar --

16             THE COURT:  -- what you just said, that's all I'm

17   asking.

18             MR. HEMANN:  We will address that question --

19             THE COURT:  I don't want to interrupt.

20             MR. HEMANN:  No.

21             THE COURT:  But I want to make sure that I follow the

22   line of -- you know, after all, what you said is -- in part is

23   that FedEx failed to conduct an investigation.  And I don't

24   know what the requirements are with respect to that, but

25   clearly under deliberate ignorance, that seems to suggest

1    failure to investigate may be a part of deliberate ignorance.

2        But I'm also interested in whether or not the

3    investigation, as you've just suggested, would be appropriate

4    under the law.  And I also understand there are a lot of

5    different forms an investigation could take.  It could be

6    talking to Superior Drugs or it could be doing any number of

7    things.  Just the one that I asked.

8            **MR. HEMANN:**  We'll address that, Your Honor.

9            **THE COURT:**  Okay.

10           **MR. HEMANN:**  CASA I want to briefly cover.  CASA is an

11   expert in the area of addiction and substance abuse.

12       And 60-15, please.

13       In December of 2005, CASA sent a letter to the Chairman of

14   the Board of FedEx.  And it was not, as the Court will hear --

15   it did not go un-responded to.  And one of the issues that --

16   the paragraph up above that, please, Ms. Leung.

17       One of the issues raised in the letter that CASA wrote was

18   the website and the use of the websites.  And CASA told FedEx

19   the following thing:  "Only six percent of websites selling

20   these drugs require a prescription prior to dispensing the

21   drugs, and these drugs are shipped to consumers from both

22   inside and outside the United States."

23       FedEx is told that six percent are operating legally.  And

24   CASA sends to FedEx the backup for this.  And the backup is

25   Exhibit 60-16 and the Court will see is a report called *Under*

1   *the Counter, the Diversion and Abuse of Controlled Prescription*

2   *Drugs in the United States*, and this report explains what the

3   problem was and explains how it got to that six percent number.

4       FedEx sent -- this was the second report that CASA had

5   done.  CASA sent FedEx the first report and also sent FedEx the

6   four subsequent reports.  The numbers stayed about the same

7   from 2004 until 2008, when they started to drop a little bit.

8       But the reality is north of 90 percent of the pharmacies

9   that CASA studied -- and you'll hear about the study that they

10  did -- were operating illegally by writing bad prescriptions,

11  which is the issue.

12      So you'll wonder whether FedEx was absorbing this as it

13  was happening.

14      If you could put up 30-111, please.

15      During this -- sort of in the middle, a couple years after

16  the CASA report in 2005, in 2007 -- I'm sorry.  It's 30-111 --

17  a FedEx employee wrote in an email about what a typical online

18  pharmacy was, and you'll see -- there we go -- that first large

19  paragraph under *Victoria*.

20      And you will see the emails over and over again talking

21  about what the online pharmacies are doing and why they're a

22  problem, and this one is emblematic.  It says in the middle, "A

23  typical online pharmacy has a website offering prescriptions

24  for a premium price after an online or over-the-phone

25  consultation.  Rarely goes through an insurance provider and

1    there is no face-to-face consultation."

2         So they know this is the issue.  So not only do they know

3    from the DEA, the FDA and CASA, but they know from the news

4    media.  And there are -- you'll see, as we go through the

5    trial, a series of articles that are exchanged by individuals

6    by email within FedEx talking about takedowns, and the articles

7    go further than simply saying such and so online pharmacy, such

8    and so fulfillment pharmacy was shut down and everybody was

9    arrested.  They certainly say all of that.  But they say more

10   than that.

11        And if you could go to -- let's skip the first -- go to

12   16-80, please.

13        And in an email from -- and these are fairly high-level

14   people communicating.

15        The large paragraph starting with "they have started legal

16   procedures."

17        The article talks about what the problem is.

18   "E-traffickers are just a modern way of saying *drug dealers*,

19   the DEA administrator said.  The sting, quote, puts out of

20   business cyber-criminals who are selling powerful narcotics

21   without legitimate prescriptions to anyone with a computer and

22   cash."

23        And, again, the focus here, Your Honor, is the lack of

24   legitimate prescriptions.  And the Court will see a series of

25   newspaper articles in which this is the issue.  And the lack of

1   a legitimate prescription is the focus.  And so FedEx is

2   clearly on notice that when the shutdowns come.  This is the

3   reason for the shutdowns.  It's not vague.  It's not

4   hypothetical.  It's real and it is specific.

5        In one of them, an email from -- this is 40-38.  An email

6   exchange between Mary Shelfer, who you will hear from, and Josh

7   Croft, "A link to a news report is circulating within FedEx."

8        And if you can just blow up the top -- sorry, the top

9   part, the top two emails.  A little bit lower.  There we go.

10       This is sent -- this link is sent to Mary Shelfer, who is

11   referred to as the Internet pharmacy queen, and she's an

12   essential part of the case.  And Mary Shelfer forwards this

13   along to a number of other senior individuals with the note,

14   "Here goes another one," meaning here goes yet another Internet

15   pharmacy.

16       And the link that goes with the -- the video that goes

17   with this again explains to them in significant detail -- and

18   it's Brian Williams I think, the NBC anchor -- it's on the

19   national news, exactly what the problem is, which is that

20   doctors are prescribing drugs without seeing the patients.

21       So they hear from the government.  They hear from CASA.

22   They hear from the news media.  But they also hear from their

23   own employees.  And their own employees are having real

24   problems because their own employees, the drivers and the

25   people that work in the stores, are out there having to deal

1  with the drug addicts that are desperate to get their pills.

2  And it is not -- it -- it first sounds -- they're pills.  What

3  can the big deal be?  It was like *The Walking Dead*, Your Honor,

4  in some places where people were beating on the sides of FedEx

5  trucks and chasing drivers.  And this is documented.

6       And if you could pull up 50-20.  And go to page 4 at the

7  bottom.

8       This is from somebody working at a facility in Tennessee.

9  "I have personally seen" -- this is a FedEx employee, an

10  internal FedEx email.  At the very bottom there.

11      "I have personally seen numerous written documented safety

12  concerns from TRIA," that's the station, "couriers.  The

13  problems remain the same.  Carloads of individuals stopping

14  couriers in the street or approaching them at stops with each

15  person requesting a package shipped from an Internet pharmacy

16  individuals jumping on courier vans aggressively demanding

17  packages.  Individuals blocking courier vans with their POVs

18  and then demanding their packages.  Packages being addressed to

19  vacant houses and lots with the couriers being met with

20  carloads of people.  Packages being addressed to legitimate

21  businesses to include a school with people meeting couriers in

22  the lot, and finally the irate customers at the TRIA front

23  counter when we will not allow receipt of packages without

24  proper identification."

25      And this is document goes on to list in detail the issues

1    that the drivers were facing.  And sometimes, Your Honor,

2    you'll hear that folks who worked out here would have a

3    relationship with law enforcement -- out in the field, if you

4    will, would have a relationship with law enforcement such that

5    they would pick up the phone and call their local police

6    officer or their local DEA agent and say, *Hey, this is a*

7    *problem.  You know, we've got this woman*, and there's a woman,

8    Jami Beardsley, that you will hear about, who, after watching

9    this woman deteriorate and become increasingly addicted to

10   controlled substances over the course of several months,

11   somebody from -- some, you know, line-level person at FedEx

12   calls the DEA and says, *We got this Jami Beardsley problem.*

13   *Can you come out and have a look*?  And DEA went out and had a

14   look, and of course, lo and behold, Jami Beardsley is an addict

15   to controlled substances being delivered by FedEx.

16        So on the one hand you say great, pat yourself on the

17   back.  You've solved the Jami Beardsley problem.  Two problems

18   with that, though.  Number one, FedEx kept picking up from the

19   same pharmacy that was delivering to Jami Beardsley.  Number

20   two, when Jami Beardsley got out of rehab three months later,

21   FedEx started delivering to her again.  So the

22   self-congratulatory *we're pro law enforcement* deal only goes so

23   far.

24        So they had notice on all of these issues, but they also

25   had specific information about specific customers, FedEx

1    customers, that are identified in the Indictment and that are

2    affiliated with Chaabra-Smoley and Superior.  This is actual

3    knowledge, but it also goes to the pot of circumstances that

4    FedEx knew that surrounded the businesses that they were

5    delivering for and put them on notice that there was a high

6    probability that the drugs were being delivered outside the

7    usual course of business.

8         The courts that have looked at both actual knowledge and

9    deliberate indifference look at a totality of the

10   circumstances, including both the preexisting base of

11   knowledge, but also realtime observations by the participants

12   in the scheme, what is happening on the ground.

13        And, by the way, what you'll see in reading the emails

14   from the FedEx employees at the time is an extraordinary amount

15   of realism and common sense.  They knew what they were dealing

16   with and they knew what the problem was from FedEx's

17   perspective.  They know that they are dealing with criminals.

18        If you can put up 30-16.  And go to page 2.  This is a

19   memo from Betty Hale.  Sorry 30-16.  Is there -- the

20   attachment.  Sorry.

21        Let me just -- I'll read to Your Honor what the email

22   says, the memo says.  This is from Betty Hale, who is a very

23   high-level FedEx executive.

24        "There appears to be informal or undocumented links

25   between many of the online pharmacy customers.  FedEx may be

1    doing business with the same customer under multiple names.

2    Also there appear to be similar links between the online

3    pharmacy customers and the fulfillment centers, suggesting that

4    some fulfillment centers are doing business under multiple

5    names or that the online pharmacy customer in the fulfillment

6    center are in fact the same legal entity."

7        So they know what kind of businesses they are working with

8    and they know that some of them are enormously problematic,

9    including RxMedical, which is one of the ones that they had a

10   big problem with.

11       "They have approached," Ms. Hale says, "some of the

12   shippers to discuss rebilling charges in the hope that they

13   will provide information to allow us to locate and collect from

14   the owners of RxMedical.  The shippers all claim to have no

15   information on RxMedical, and we then learned that some of the

16   shippers are either the same company or are related in some

17   manner."

18       They obtain frequently information about specific

19   individuals that are part of the conspiracy that have had

20   problems with the DEA.  And you'll hear the name Tim McCoy

21   frequently in this trial.

22       If you could pull up 26-2, please, an email at the bottom.

23       This is an email communication between FedEx employees.

24   And one of the employees said -- talks about, at the bottom,

25   "for some time Superior Drugs has been using FedEx envelopes to

ship Tim's orders."  That's Tim McCoy.

And they're talking about envelopes because the envelopes
are relevant.  You know, there is the little flat cardboard
envelopes that FedEx has and there are the padded packs.  You
can't put pill bottles in the flat envelopes because they
break.  You need the padded packs.

The problem with padded packs is that they're too --
they're expensive.  They're much more expensive.  So the
customers are always saying *we want to go with the cheaper
option* and the FedEx employees are saying *you got to go with
the padded packs* and they go back and forth.

They are talking about Tim McCoy.  The response to this
email above is as follows:  "I don't know if you know or not,
but Tim is on the run from the US DEA.  They seized like
$200,000 worth of his product coming in from the Bahamas in
Miami.  Now he is trying to ship his packages into Ohio and
distribute them from there under a different name.  Dude is
shady as hell and doesn't think he's done anything wrong, which
maybe he has or maybe he hasn't.  I don't know nor care."

And it is clear that they do not care because they
continue to do business with Tim McCoy and his various shifting
affiliates.  And the thing is, Your Honor, you're going to hear
this is all very confusing.  How are we to keep track of all of
this nonsense?

Well, first of all, if you know it's nonsense, that's what

1    they would have described as a big red flag, but they did keep

2    track.  This is a sophisticated company.  It had lots of people

3    trying to keep track of the Tim McCoys of the world because

4    they want to get paid.

5        And if you put up 16-51, you see an email that ultimately

6    deals with Tim McCoy.  Put up the top, please.

7        And these are FedEx employees talking to each other about

8    keeping track:

9        "Good morning, I have been asked by Sharon to respond with

10   realtime updates for the following cases, which includes below

11   Tim McCoy, along with our recommendations for suit where

12   applicable.  I think we can all agree these cases have be

13   identified as problem accounts in a problematic industry,

14   Internet pharmaceuticals, which is now under intense

15   governmental law enforcement and judicial scrutiny."

16       And below -- I don't have to read it now -- it talks again

17   about -- the last sort of -- starting at 232130300 there, the

18   last third probably.

19       It talks about FedEx's ongoing relationship with Tim

20   McCoy.  The first email, *the shady as hell email*, is in 2003.

21   2004 they're still doing business with him, and as the Court

22   will see, in 2005 they are continuing to do business with Tim

23   McCoy companies.

24       And no matter how they try to stay in front of this, they

25   keep running in to problems.

OPENING STATEMENT / HEMANN

1        If you can look at -- put up 26-43, please, at the top.

2        "Another online pharmacy bit the dust.  Herman's largest,

3   3,000 pieces a day.  On Friday, the DEA came in, broke down the

4   doors and handcuffed everyone, including the owners.  Herman

5   and the AE were supposed to be there on a sales call.  Luckily

6   he had rescheduled it."

7        This is a drumbeat, it's a pattern, it's a reality, and

8   knowing all of this, knowing this reality, what do they do?  Do

9   they stop?  No.  They chose instead to make sure that they get

10  paid.  And the salespeople went a step further and made sure

11  that if they got stuck with a deadbeat account, that it

12  wouldn't hit them personally, and so FedEx developed both a

13  sales policy and a credit policy to make sure that they would

14  not lose money when the inevitable occurred.

15       You will see as the case progresses what the credit and

16  sales policies were.  The credit policy in particular evolved

17  over time.  At the beginning what the front office demanded was

18  that the sales reps get a credit card that could be charged

19  automatically.  Then they set up something called EZ-Debit,

20  which was essentially like an automatic -- FedEx could reach

21  into people's bank accounts and take money out when money was

22  due.

23       And it worked to some degree because it allowed FedEx to

24  get paid.  The policy -- if you could pull up 30-42, please.

25  And the bottom it says "take note."

1    The policy was pretty straightforward.  The policy

2  basically was before you open an Internet pharmacy account, you

3  must consult with credit and you must determine exactly what

4  this particular customer would have to do to secure its

5  account.  And it took a variety of forms over time.  But in

6  connection with this, Your Honor, they created lists because

7  they were requiring the salespeople to identify the at-risk

8  online accounts.

9    They describe these accounts as high risk.  And they were

10  high risk because there was a high probability that they would

11  be shut down by the DEA or the FDA.  And they created detailed

12  lists that included both the account names but also the reasons

13  why they had to be concerned about the account and the

14  affiliates of particular accounts.

15    But even these, Your Honor, were not foolproof, and you'll

16  see that even despite setting up these rather extensive

17  procedures to make sure that FedEx got paid in an -- by an

18  unreliable industry -- and I'll note, Your Honor, this is the

19  only industry with which FedEx did business that they required

20  this kind of policy.  It was unique to Internet pharmacies.

21  Even in risky businesses -- apparently flowers are a risky

22  business -- they did not require the flower companies to post

23  Letters of Credit.  But they required them from the Internet

24  pharmacies.  And they still didn't work.

25    If you could put up 16-80, please.

1      There's an email from Josh Croft to Mary Shelfer, and it

2   says at the very top, "Mary, this is the latest news on

3   Internet pharmacies.  We lost a good bit on this one.  The

4   reason for the bank Letter of Credit is that even on EZ-Debit

5   or credit card billing, we will have a one-week minimum

6   exposure."

7      So even a one-week minimum exposure was too much.  They

8   needed a Letter of Credit.  And when they talk about *this one*,

9   they lost a good bit on *this one*, it's interesting because this

10  is one that they knew a lot about even before the article got

11  circulated, the article identifying the people, because the DEA

12  had gone to FedEx and had identified these people, the people

13  who were arrested in this case, and said we have a problem with

14  them.  They are issuing -- they are shipping pills without

15  prescriptions.  And you will hear from a guy named Dale Newkirk

16  who went to FedEx, had meetings with people from Memphis, and

17  said we are going to shut down Johar Saran, who is the subject

18  of this article, and we are going to shut him down because he

19  is distributing pills without prescriptions.

20     And during the course of Mr. Newkirk's investigation, he

21  asked FedEx for information about who Johar Saran was doing

22  business with.  And FedEx produced to the DEA information about

23  the online pharmacies that Johar Saran was doing business with,

24  and those online pharmacies included the Icom Group.  The Icom

25  Group was an Internet pharmacy that Johar Saran was filling

1   for.

2        The DEA told FedEx that Johar Saran was operating

3   illegally.  FedEx participated in, at the DEA's request, the

4   takedown of Johar Saran, and yet FedEx continued to ship for

5   Icom after this.

6        FedEx also had a sales policy, and I want to orient the

7   Court slightly to *credit* is pay up front somehow.  Sales, the

8   sales policy, had to do with how the salespeople were

9   compensated.  The salespeople were very concerned that when

10  these companies, these Internet pharmacies, went out of

11  business, they would lose money personally because all of a

12  sudden they would not be collecting on their accounts and they

13  would take a hit to their compensation.  And so the sales group

14  developed a policy.

15       26-87, please.

16       And here was the policy:  "As we have done in the past,

17  the desire for volatile Internet pharmacies is to have them

18  placed in a catchall status from the onset, which means put

19  them in a place so when they go out of business, the individual

20  sales guy will not take a hit.  Put them in a special place.

21  The Internet pharmacy industry is governed by strict Drug

22  Enforcement Administration laws.  This type of business is

23  generally very volatile in nature, i.e., here one day and gone

24  the next.  There are often numerous volume shifts associated

25  with Internet pharmacies as they move the shipping location

1   often to avoid detection from the DEA.  As such, Internet

2   pharmacies are best placed in catchall status from the outset.

3   Please note that this action is for volatile pharmacies and not

4   reputable businesses."

5        So from the beginning, they take them and they put them

6   off in a separate place because they're going to go out of

7   business.  And the motive behind this, Your Honor, the motive

8   is just money.

9        And if you could look at 40-39.

10       It is said by one of the salespeople who is saying, "Let's

11  put them in catchall from the get-go and give them a dedicated

12  national account so that individuals don't get hit."  And then

13  what he says is, "After the gravy from the farm runs out, as

14  the DEA comes in, the shipping nine-digit account gets

15  deleted."  They have a plan for when the gravy runs out and the

16  DEA comes in.

17       And this is not only a plan, it's a vision.  And if you go

18  up to the top, you have Herman Robertson corresponding with

19  some of his colleagues and he says, "I reached out to the guy

20  below, the gravy guy.  He seems to share our vision of putting

21  these volatile accounts into some sort of catchall to insulate

22  local sales and reduce the overall amount of adjustments."

23       So they have this knowledge.  They have this solution,

24  this vision.  And they don't have good intent.  They have good

25  intent to make money.  They didn't respond to subpoenas.  They

1    didn't respond much beyond subpoenas, and numerous law

2    enforcement officers are going to tell you that they were told

3    that they could not get information except for with a subpoena.

4    But the real evidence of intent and knowledge in this case

5    isn't whether they were sometimes good or they were sometimes

6    helpful.  The question is what did they do when they had

7    specific knowledge?

8        And tomorrow I think you're going to hear from a fellow by

9    the name of Raymond Brashears, who is a Baton Rouge, Louisiana

10   police officer, and Mr. Brashears is going to tell you about an

11   interaction that he had with a man named Sam coal at the FedEx

12   hub in Baton Rouge, Louisiana in July of 2005, and he had a

13   very -- they were in and they were looking for pills.  And the

14   manager -- on an ongoing basis because, again, it had become a

15   massive national priority.

16       And the manager of that facility, Sam Cole, was unhappy.

17   And he wasn't unhappy because the DEA was there because the

18   DEA -- it was on a task force.  The DEA was there all the time

19   looking for cocaine and marijuana and drugs that Mr. Cole

20   thought were okay to look for.  But he was mad about the pills.

21   And he gave them a hard time.  And he gave them a hard time.

22       And one day, Mr. Brashears seizes some packages, and coal

23   says to him -- coal, the FedEx employee, says to him, *Who are*

24   *those packages from*?  And Brashears says, *United Care*

25   *Pharmaceuticals*.  And coal explodes.  *Well, you can't take*

1   *those.  They're one -- they're a million-dollar account and*

2   *they're totally legitimate.  They say they're legitimate.  You*

3   *can't take accounts -- they say they're legitimate, you say*

4   *they're not.  You can't take them.*

5       Brashears took them.  Back and forth goes on about United

6   Care.  United Care gets shut down ultimately.  But after the

7   DEA task force officer in Baton Rouge told FedEx that United

8   Care was shipping illegal pharmacies -- pharmaceuticals and

9   controlled substances, FedEx continued to deliver from United

10   Care Pharmaceuticals.

11       In fact, after that conversation and before United Care

12   finally got shut down, FedEx delivered 545,000 packages for

13   United Care.  They're a million-dollar account, according to

14   Sam Cole.  This decision, this approach, is the norm.

15       If you could put up Slide 1, please.

16       Over and over again did FedEx get specific information

17   about a specific account doing something specifically wrong.

18   In this instance, they were sued by the Chambers' family.  And

19   the Complaint, which you will see, Your Honor, is up on the

20   screen, and the Complaint was filed on May the 3rd, 2005, and

21   it named FedEx and the Pharmacy Group.  And the Pharmacy Group

22   had a national account with FedEx.

23       The Complaint alleges that the Chambers' son, a teenager,

24   was obtaining prescription medications illegally and without

25   permission and without a doctor's meeting, over the Internet.

1    And specifically that Tramadol and Butalbital were prescribed,

2    dispensed, and delivered as a result of an Internet

3    questionnaire with plaintiff, Randall Chambers, a minor, who

4    was not authorized by his parents to engage in such behavior,

5    and an earlier paragraph says that he had not seen a doctor in

6    the State of Colorado.  Well, after this Complaint was filed

7    and after FedEx was told, they delivered 1,577,000 packages on

8    the Pharmacy Group account.

9        Next slide, please.

10       They did it for a company called Hope Mills.  There was

11   some back and forth about an adjustment to an invoice.  And the

12   woman who was seeking further information says, "You wrote

13   *company closed, business moved to an undisclosed location.*"

14   And asks a series of questions trying to figure out whether the

15   adjustments to this invoice are appropriate.

16       A FedEx employee responds.  "Business, Hope Mills, did not

17   move to another account.  This was an Internet pharmacy account

18   selling drugs illegally over the Internet and its business was

19   curtailed by the FBI.  Quote, *undisclosed location*, unquote,

20   was put because the shipping address that is listed on our

21   database is an empty building that has been unoccupied for over

22   a year.  A credit card is being used to pay for the few

23   shipments they continue to do.  Please advice."

24       The few shipments after July 6, 2006, turned out to be

25   11,039 packages on the Hope Mills' account.

1    Next slide, please.

2    Here there is a back and forth over securing the account,

3    and when they say *securing the account*, they mean doing

4    something with credit, getting a Letter of Credit or an

5    EZ-Debit process set up to secure the payment for FedEx.

6    Bonnie Wagner hears from somebody named Larry Lawrence, an

7    account executive.  "This customer, SaveOnRx, was closed down

8    the following week after opening, by the DEA, in December.  He

9    has since moved back to Florida.  We can go ahead and delete

10   this account if needed.  He is now operating under SaveOnRx

11   under account number such and so."

12   So after this fellow -- and FedEx knows it is shut down by

13   the DEA.  He moves to Florida and starts again simply under a

14   different FedEx account number, and FedEx ships 347,489

15   packages for that new account number.

16   The Court will hear some evidence about a company called

17   CNL Financial, which is an Internet pharmacy, not a financial

18   company.  Internet pharmacy -- CNL was an Internet pharmacy

19   that was using several fulfillment pharmacies.  FedEx learned

20   that those fulfillment pharmacies -- that the online pharmacies

21   for them were shut down.  And the email that circulated within

22   FedEx said, "Two of my online pharmacies for multiple account

23   numbers were recently shut down.  One of the shippers say that

24   they will now ship out of Florida.  Please note the following

25   number, account number, that was opened today, the new one.

1   There is another account at the same address," and it gives

2   that account number.  "The account previously traded under the

3   name CNL Financial and that number."

4       So there is a shutdown, and what they do is what they

5   always do in the case of a shutdown.  They move and change

6   their names and they go to another account that FedEx knows

7   about in connection with knowing that the accounts have been

8   shut down or the businesses have been shut down by the DEA.

9       After learning this on November 3rd, 2005, FedEx ships

10  225,000 packages for the new account.  And this mentions here

11  there is another account at the same address.  The same

12  address.  And who is that account?

13      If you go to the next one.

14      The other account at the same address is Superior Drugs.

15  It's that crummy building that we looked at earlier today.  And

16  after this date, FedEx ships 225,990 packages for Superior

17  Drugs.

18      We talked a little earlier about the congressional

19  testimony that FedEx participated in, and FedEx was, as I said,

20  well aware that this was an issue nationally and that people

21  were concerned about it.  And FedEx made a presentation to

22  Congress.  And I'd like you to play a little bit of that

23  presentation from Mr. Townsend, please.

24      (Whereupon, the audio was played for the Court)

25          MR. HEMANN:  "If we receive information from law

enforcement agencies that a particular customer is violating

the law, we will cease accepting packages from that company."

Well, they did receive information from law enforcement

repeatedly and we've heard some of it already, but perhaps most

pointedly by the West Virginia state police in September of

2006.  There was an enormous problem in Appalachia -- Kentucky,

Tennessee, West Virginia -- with regard to prescription drugs.

Tennessee began to take -- or Kentucky began to take very

strict state action on it which pushed the trafficking over the

border and Kentucky residents would just pop over to

West Virginia or Tennessee or Ohio and attempt to buy pills

there, so the West Virginia police got worried about it and

they went to FedEx and they gave FedEx a list.  And it's a list

of 39 pharmacies, and this is how West Virginia described it to

FedEx.  "Pharmacies that are suspected of violating

West Virginia state law."  And it's a list with names.

And, mind you, by this point in time -- this is 2006 --

FedEx has had 20 iterations of their own list which has a lot

of these names on it.  After this, after getting this list,

FedEx sent 2,748 shipments into Little, West Virginia from

these pharmacies and 866,712 shipments from those pharmacies to

the rest of the country.

Your Honor --

**THE COURT:**  I'm sorry.  Can you run by those

statistics again?

1    **MR. HEMANN:**  Sure.  They're up on the screen there.

2  You have them.

3      From this list of pharmacies, after the date on which

4  FedEx received this list, they shipped 2,748 packages from

5  these pharmacies into West Virginia.  And they shipped

6  866,712 --

7    **THE COURT:**  800 --

8    **MR. HEMANN:**  866,712 nationwide.

9    **THE COURT:**  So is it your contention that the 2700

10  packages that went into West Virginia were like the supplies

11  and then the products were then distributed --

12    **MR. HEMANN:**  Oh, no.

13    **THE COURT:**  Then I don't understand the difference in

14  these statistics.

15    **MR. HEMANN:**  These are Internet.  These are Internet

16  pharmacies that the West Virginia police learned were shipping

17  into people in West Virginia.  These pharmacies operate in a

18  national way.  These aren't located in West Virginia.

19    **THE COURT:**  These are fulfillment pharmacies?

20    **MR. HEMANN:**  These are fulfillment pharmacies, yes,

21  Your Honor.

22    **THE COURT:**  They are.

23    **MR. HEMANN:**  These are fulfillment pharmacies.

24    **THE COURT:**  You are saying 2000 shipments went to

25  the --

1          MR. HEMANN:  Went from.

2          THE COURT:  What is the 800,000 number?

3          MR. HEMANN:  So the 2,748 were into West Virginia.

4          THE COURT:  Yes.

5          MR. HEMANN:  The 866,000 were to the rest of the

6   country.

7          THE COURT:  Oh.  Not West Virginia.

8          MR. HEMANN:  I think the number includes

9   West Virginia, but nationwide --

10          THE COURT:  Okay.  That's what I -- I'm sorry.

11          MR. HEMANN:  Okay.  So, Your Honor, we believe that

12   these words and deeds -- and I did not read all of the emails

13   that I have; you will see many, many more -- will prove beyond

14   a reasonable doubt that FedEx knew that it was delivering drugs

15   outside the course of professional practice and not for a

16   legitimate purpose.  They acted with both actual knowledge and

17   with deliberate ignorance.

18      And time and again -- and really the startling thing is

19   time and time again they are faced with information about these

20   Internet pharmacies which comes to them in the context of being

21   told repeatedly what the Internet pharmacies are doing and in

22   the context of studies that show only six percent are operating

23   legally, they describe these pharmacies as illegitimate --

24          THE COURT:  Six percent of the Internet pharmacies are

25   acting illegally?

1        **MR. HEMANN:**  Six percent are acting legally, was the

2   CASA number.  Six percent are acting legally.  Ninety-four were

3   acting illegally.

4        **THE COURT:**  Right.

5        **MR. HEMANN:**  They faced a choice, and the choice is

6   stop or go.  And time and time again, they went knowing what

7   they know and believing that there was a high probability --

8   subjectively believing that there was a high probability.  In

9   fact, the way the sales and credit staff communicate, it's not

10  a probability.  It's a certainty that they are going to be shut

11  down at some point.

12       And the unique program developed in FedEx for Internet

13  pharmacies was simply to make sure that they got paid first.

14  And they did nothing to determine whether the prescriptions

15  were legitimate.

16       If a regular person were sitting in the courtroom faced

17  with this knowledge, faced with this evidence, guilty, easy.

18       **THE COURT:**  Well, that argument -- why that argument

19  has no impact on me at all is -- of course that's true.  That's

20  true, if a -- if John Q. Citizen were out there facing that

21  evidence and so forth, may very well be that that person's

22  guilty of a crime.

23       But you're talking about a delivery company.  So you have

24  to really say in honesty -- you have to say if a regular

25  delivery -- and I have to figure this out.  If a regular --

1    you're saying any regular delivery company faced with this

2    evidence should be convicted.  That's really what you're

3    saying.  Isn't it?  Or have I just sort of missed it because I

4    don't -- it's not -- and I think I have to answer this one.

5        It's not FedEx's size that has an impact on the Court.  I

6    mean, of course it's an enormous corporation, but you don't

7    sort of give leeway to an enormous corporation where a smaller

8    corporation or smaller individuals you would not.  That's

9    not -- it's not that they're not the same in -- you know, in

10   light of the law.  But it doesn't mean that it's an irrelevant

11   factor.  It doesn't mean that it doesn't impact a decision as

12   to whether or not they met these requirements under the law of

13   knowing and intentionally doing something.

14       And that's what the focus is, at least in the Court's

15   mind.

16           **MR. HEMANN:**  And the Court is -- I agree with every

17   word that the Court just said, and I have a couple of

18   observations.  Number one, previously the Government provided

19   you with examples of other delivery companies that had been

20   prosecuted, and we'll get those to you again at the appropriate

21   time.

22           **MS. ARGUEDAS:**  I'm going to object to this,

23   Your Honor.  Are we going to go off into --

24           **THE COURT:**  No, no, no.

25           **MS. ARGUEDAS:**  -- and past pleadings --

OPENING STATEMENT / HEMANN

1      **THE COURT:**  No.  All right.  Let me just be silenced

2  by -- this is an opening statement.

3      **MS. ARGUEDAS:**  Never, Your Honor.

4      **THE COURT:**  That's right.  I need to hear your offers,

5  what you think the evidence is going to show, but you have

6  gotten into -- and I'm not thinking it's all inappropriate, but

7  you have gotten into argument in the sense that you say if

8  another person or, you know -- would do this, the Court

9  wouldn't turn a blind eye to that.

10      And I'm just saying as to that, of course you're right.  I

11  wouldn't turn a blind eye to anyone, but we are talking about

12  not somebody who is simply given a package or a series of

13  packages and say deliver -- hey, here is five bucks, go across

14  the street and deliver this, you know, this package, that's

15  leaking powder or something.  It's not that case at all.

16      It's a company or an entity or a defendant that is in the

17  business of delivering packages.  That's the business.

18  Admittedly you find people who deliver drugs all the time in

19  Mexican cartels and smuggling.  They're also in the business.

20  But that's their business.  Their business is to deliver

21  controlled substances.

22      **MR. HEMANN:**  Well --

23      **THE COURT:**  In this case while you argue this was part

24  of their business, I understand that, but it's a -- you have to

25  look the at context of their business before you start drawing

1    the analogies that you're drawing.

2           MR. HEMANN:  But I would say precisely to that, which

3    is precisely why FedEx, the evidence will show -- that FedEx

4    received information in a way that those other kinds of

5    businesses that the Court just identified would never -- the

6    DEA does not go and give a PowerPoint.

7       So FedEx was given information -- because of its corporate

8    nature, was given and received information in a way that is

9    different and --

10          THE COURT:  I understand.

11          MR. HEMANN:  -- I understand and respect that.

12   However, this is the only point in there, and this is -- the

13   concern is that because of its corporate form, the evidence

14   goes -- you've got Bruce Townsend over here hearing one thing

15   and you've got Mary Shelfer over here hearing another, and

16   you've got Josh Croft over here hearing another, and because it

17   can do that, because it can cabin its knowledge and because it

18   does cabin its knowledge and you're going to hear,

19   Your Honor --

20          THE COURT:  But isn't that a factor?

21          MR. HEMANN:  It is a factor.

22          THE COURT:  Is that not a factor.

23          MR. HEMANN:  It is a factor --

24          THE COURT:  You say you look at the totality of the

25   circumstances.  So don't I look at the totality of the

1    circumstances?  I don't just look at, quote, the incriminating

2    evidence and then say that's the totality of the circumstances.

3         **MR. HEMANN:**  Correct.

4         **THE COURT:**  Example A company has one million

5    employees or a hundred thousand employees and one employee

6    knows everything.  Actually, one employee goes and talks to

7    doctors and gets information from doctors.  Or goes to patients

8    and talks to all of the patients or talks to five patients or

9    ten patients.  Would the Government argue that because one

10   person in a cast of 100,000 employees knows everything, knows

11   everything, therefore the company is guilty?

12        **MR. HEMANN:**  It depends on who the employee is,

13   obviously.

14        **THE COURT:**  Okay.

15        **MR. HEMANN:**  Respondeat superior.

16        **THE COURT:**  So what the employees' responsibilities

17   are, how that employee  fits into the whole scheme of things.

18   But you then look at, what I say, the totality of the

19   circumstances, and size in that case and corporate structure in

20   that case may be the determinative factor in determining this,

21   in trying to reach a conclusion.

22        I'm not trying to lead you down a path.  I'm trying to

23   make sense out of what I'm saying.  That may be -- that just

24   may be a task too difficult to --

25        **MR. HEMANN:**  Well, Your Honor --

OPENING STATEMENT / HEMANN

1      THE COURT:  -- engage yourself in.

2      MR. HEMANN:  The issue is knowledge and the issue is

3  the way FedEx both received and processed internally that

4  knowledge.

5      THE COURT:  Finally let me ask this.  Is there a

6  difference and is it something that I ought to consider at all

7  as to what standards are used with respect to civil liability

8  versus criminal liability?

9      MR. HEMANN:  In what -- I'm not sure I --

10     THE COURT:  Well, I mean --

11     MR. HEMANN:  If you want to go with preponderance of

12  the evidence --

13     THE COURT:  What if all of this measures -- all of

14  these things are shown and so forth.  Say well, you know what,

15  this company based upon what the Government has produced, may

16  have been liable for civil damages.

17     The Government has an option, don't they?  They could go

18  after somebody civilly.  You can file a lawsuit.  You do it all

19  the time; right?  This is a special kind of lawsuit.  This is

20  called an indictment and a criminal prosecution.  But there are

21  all sorts of actions out there which the United States

22  government takes which are called civil lawsuits.  You do it

23  all the time.  Every day I see a lot of them and so forth.

24     Do I at all think about that in terms of trying to

25  ascertain criminal liability?

1          **MR. HEMANN:**  I think the answer has to be no.  I think

2     that the Court's job as trier of fact is to determine whether

3     the United States has proved beyond a reasonable doubt the

4     elements of each crime.  I think that the possibility of

5     civil -- the availability of civil remedies is an interesting

6     question and I think that there are, in fact, very few civil

7     remedies available with this defendant in this circumstance

8     because it's not registered.

9          **THE COURT:**  Okay.

10          **MR. HEMANN:**  Thank you, Your Honor.

11          **THE COURT:**  Thank you.

12     I think now we'll take a recess.  Okay.  We are going to

13     take a recess until 11:15.

14                    (Recess taken at 11:15 a.m.)

15               (Proceedings resumed at 11:16 a.m.)

16          **THE COURT:**  You're not waiving?

17                         (Laughter)

18          **MS. ARGUEDAS:**  Not waiving.  No, Your Honor.  I hope

19     you're comfortable there, Judge.

20          **THE COURT:**  I'm getting ready.

21     I thought we would go to about 12:30 and take a 50-minute

22     break or so and then resume --

23          **MS. ARGUEDAS:**  All right.

24          **THE COURT:**  -- if that's okay.

25

<u>**OPENING STATEMENT**</u>

**MS. ARGUEDAS:** May it please the Court: FedEx is innocent of these charges. FedEx did not break any laws. They did not conspire with anyone to break any laws. They had the intent to do their job as a parcel carrier and a shipper of packages.

To the extent that there were potentially illegal online pharmacies amidst the legal ones that used the services of FedEx, FedEx helped the DEA and other law enforcement try to identify them and gather evidence to prosecute them.

They were not only not in a conspiracy with any illegal pharmacies, but the opposite was true; and the good faith of FedEx and their approach to the problem was greatly affected by the conversations and interactions that FedEx had directly with the Drug Enforcement Administration and other law enforcement officials.

It is what the Court has been asking all along: What was FedEx told and what did FedEx say? And those conversations are the heart of this case, and those are conversations that the Government did not tell you about in their opening statement, and the participants in those conversations are not on the Government's witness list.

The not guilty verdict and, in my opinion, the Rule 29 is contained in that section of the case, although it is also elsewhere in the case.

OPENING STATEMENT / ARGUEDAS

1       Your Honor, in 37 years of being exclusively a criminal

2   defense lawyer, I have never waived a jury, and now here I am

3   having done so in one of the most important cases I have ever

4   had.  And it is one of the most important cases I've ever had

5   first and foremost because FedEx is innocent; but, secondly,

6   because the consequences of a conviction here would have wide

7   ramifications beyond just this case.

8       So I have never talked to a judge as a prior of fact about

9   applying the concept of reasonable doubt, but I would like to

10  give you my observations about it and I much appreciate that

11  you invited them.

12      When I'm talking to a jury about reasonable doubt, they

13  know that they're doing something very foreign.  They know

14  they're making a life-changing judgment about a stranger.  And

15  the good, serious jurors appreciate that since it's unlike any

16  other judgment they've ever made, they appreciate being given a

17  standard to use and a lens to look through because the whole

18  concept seems so big and so foreign to them.  And they have 11

19  other people who are reminding them to use the beyond a

20  reasonable doubt standard.

21      So in thinking about where I am here today -- and I'm very

22  mindful of the fact that the Court was a prosecutor and that

23  the Court was a Defense lawyer when you practiced law, you know

24  the respect that I have for this Court; but I'm thinking to

25  myself, it's been 20 years, or something like that, that you

1  have been every day making gigantic decisions about strangers,

2  sending people to prison or not, granting summary judgments or

3  not that change industries, deciding what's going to happen

4  with Volkswagen, huge things.  It's an everyday event,

5  something you're very familiar with, and the various standards

6  that you use in those decisions are never beyond a reasonable

7  doubt.

8      So what I would like to impart to you in the humblest of

9  ways is to say, here you're going to make a familiar kind of

10  decision; but if the Court doesn't keep it at the top of their

11  mind, it would be very easy for you to apply a standard that

12  you use in those other decisions, which would be a lesser

13  standard than beyond a reasonable doubt.

14      So I may come back to that point now and then, but I do

15  want to say also that while I think the Court is going to need

16  to pay particular attention to bring reasonable doubt to the

17  fore, I do not think this will be a difficult decision for the

18  Court.  I expect that we will win a Rule 29 motion before this

19  Court, but that's not the issue for today.  Today I'm

20  addressing the judge as a reasonable doubt judge, not a Rule 29

21  judge.

22      So if I may, this is a road map to the opening statement

23  that I'm going to give today.  I'm going to start with a

24  summary of the key points, then talk about who is FedEx, some

25  observations about the e-mail evidence, discussion of the

1     actual crime, how online pharmacies work; and then get to the

2     heart of the case, which is the communications between FedEx

3     and the Government; followed by the assistance FedEx gave law

4     enforcement; and then what did FedEx see and know about its

5     customers, that's further discussion of the e-mail evidence;

6     and then a discussion of the two conspiracies.

7          I have that road map up there, Your Honor, so that you'll

8     know how we're progressing, but also I wanted to say I won't be

9     knocked off course no matter what since I have this outline,

10    and I would invite the Court to pose questions to me at any

11    time.  I think that would be good.

12         So if I may start with the first point.  FedEx only picked

13    up packages in this case from pharmacies that were licensed by

14    the state and registered by the Drug Enforcement

15    Administration.

16         The DEA has the legal responsibility to register

17    pharmacies that distribute controlled substances.  The DEA has

18    the power to give registrations, the power to renew them, the

19    power to suspend them, and the power to revoke them.  And not

20    only that --

21         Oh, you know what, Judge?  I forgot to do this.  I made --

22    these are -- these are the graphics.

23         Not only that, but the law requires that if the

24    registration is no longer in the public interest, then the DEA

25    must withdraw the registration.  And that's the C.F.R. that

1    says that (indicating).

2        This case involves only pickups from packages that held a

3    valid and current DEA registration.  That's a copy.  And you

4    see, Judge, every one of these is in that binder I just gave

5    you and down at the bottom is the exhibit number.  So that's

6    the registration for Superior.  By the way, Superior and

7    Creative, they're the same thing, same name.

8        Not only do they all have a DEA registration, but they all

9    also have a state license because you can't have a DEA

10   registration unless you also have a state license.

11       And the legal obligations for the DEA to register

12   pharmacies applies to both walk-in pharmacies and shipping-only

13   pharmacies.  Walk-in pharmacies being where you might buy

14   toothpaste; and shipping-only pharmacies being a place that

15   apparently the Government might refer to as cruddy looking, but

16   it's a shipping area and sometimes they are not in the best

17   parts of town.  Whatever they are, they've got a license and

18   they have a registration.

19       FedEx was informed about these registration requirements

20   directly by the DEA in the meetings they had with FedEx,

21   directly by the DEA.  So in terms of the charges of this case,

22   if FedEx was picking up from a pharmacy that had been shut down

23   by the DEA and then reopened, like those e-mails suggested that

24   you heard this morning, if it had been shut down by the DEA and

25   reopened, it had a registration issued by the DEA, and FedEx

1   knew it because the DEA told them.

2       If FedEx was picking up from a pharmacy that was run by

3   people who used to be associated with people the DEA didn't

4   like, it was a pharmacy that had a registration issued by the

5   DEA.

6       And if it was a shipping warehouse in a part of town that

7   the Government today describes as seedy, it had a registration

8   from the DEA.

9       Second, FedEx understood that many online pharmacies

10  operated lawfully and provided important services to their

11  customers.  FedEx knew, the Government knew, everybody knew

12  that many online pharmacies were lawful and provided an

13  important service to their customers.  The Government told

14  FedEx that directly.

15      So nevertheless that the Government this morning gives us

16  a paper that a nonprofit sent to the Chairman of the Board of

17  FedEx that says only 6 percent of them are legal, that's not

18  what the Government told FedEx directly, and the Government

19  stated it many times and in many places.

20      If I can have the next slide.

21      That is a slide of the testimony of John Taylor.  He's

22  with the FDA, something big like Associate Commissioner.  He

23  testified before Congress, same Congress that you just saw

24  Bruce Townsend have that video of, and this is what he said to

25  the world about online pharmacies:  (reading)

1          "They can provide tremendous benefits to consumers:

2      Access, convenience, privacy.  FDA is aware that many

3      reputable Internet pharmacies provide consumers seeking

4      prescription drugs with a measure of safety, privacy, and

5      convenience..."

6          And one point I want to make directly to the Court, I know

7      you've had these two trials or more maybe of other online

8      pharmacies, I doubt if this was part of the trial evidence, but

9      this is the evidence of this trial.  That is the FDA talking to

10     Congress, and you will later hear that it's what the DEA said

11     directly to FedEx.

12         Three, FedEx believed it was not able to reliably tell

13     which shippers were breaking the law.  Now, why did FedEx

14     believe that?  Because the DEA told FedEx directly that the

15     laws presented problems even for law enforcement with their

16     superior tools to prove cases against illegal online

17     pharmacies.  And I'm going to get right to that, Your Honor --

18     well, not right to that because there's a few other points I

19     have to make first, but they're important.

20                        (Laughter)

21         The DEA told FedEx there was no federal statute giving an

22     explicit definition for a valid prescription, and the

23     Department of Justice was seeking better and clearer laws.

24         Thirdly, FedEx would see, because they would be assisting

25     the DEA investigate suspect pharmacies, they would see what was

1    happening because they were shoulder to shoulder with the DEA

2    helping them; and then they would see that the DEA did not take

3    action against the registrations of those same places for

4    reasons that are the Government's to decide.

5        We're not talking about that now, but we're talking about

6    what we saw.  So FedEx knows they give registrations.  FedEx

7    knows they have the obligation to take them away if they're not

8    in the public interest.  FedEx is watching investigations,

9    helping investigations, and nothing happens to those

10   registrations.

11       Fourth, FedEx continually assisted law enforcement in

12   their efforts to investigate and determine who was illegal.  So

13   FedEx didn't think it could reliably tell which shippers were

14   violating the law, but FedEx did not let it go at that.  FedEx

15   didn't say, "Oh, well, we can't tell.  Good-bye."

16       FedEx worked with law enforcement, and you are going to

17   hear all about it extensively and on two levels.  On the first

18   level FedEx leadership worked with the DEA leadership about

19   figuring out a whole subpoena plan for how to get information

20   from FedEx to the DEA about FedEx's own customers, by the way.

21   Always that's what we're talking about.

22       They also worked on the sort of granular case-by-case

23   level with the DEA to help investigate particular pharmacies.

24       And most incredible of all -- I've been told I should not

25   say that all the time because I say it too often, but most

1    incredible of all, FedEx helped the DEA investigate the two

2    people we're charged with being conspirators with, Superior and

3    Chhabra-Smoley, assisted the investigation.

4        FedEx always offered and agreed to stop shipping for any

5    customer if the Government identified the customer as acting in

6    violation of the law.  What FedEx said to the Government over

7    and over again, "You tell us which pharmacies are illegal, we

8    won't take their packages."

9        The DEA chose to never notify FedEx that a specific

10   customer was illegal, to never direct, to never request that

11   FedEx stop shipping for any specific customer.

12       FedEx had no participation whatsoever in the actual crime

13   here, which occurred when the doctors authorized the

14   prescription without a legitimate medical purpose and outside

15   the usual course of professional practice.  And, by the way, I

16   tend to shorthand that as "outside and without," if you're

17   looking for something other than "blah, blah, blah," which

18   happens too.

19       If a crime occurred here, it occurred when the doctor

20   wrote the prescription without a legitimate medical purpose and

21   outside the usual course of professional practice.

22       FedEx was nowhere near that decision.  FedEx had no

23   participation in it whatsoever.  None.  There will be no

24   evidence to suggest otherwise.

25       I think I'll take this down now.

OPENING STATEMENT / ARGUEDAS

1       FedEx made no agreements with any pharmacy other than the

2   ordinary contract and payment for carrying packages.  There are

3   no side payments.  There's no extra money.  There's nothing

4   under the table.  There's no special deals.  FedEx figures out

5   its shipping rate based on volume.  That's it.  That's all

6   there was.

7       What the Government is calling a conspiracy is FedEx

8   shipping packages at the same rates as they do every other

9   package for every other customer that FedEx has.

10      And if I can have the next slide.

11      This is an example of a picture of FedEx doing the work

12  that the Government claims is a conspiracy being the only

13  alleged criminal conspirators in the world to wear a uniform

14  and emblazon their name on a truck.

15      There is a complete absence of evidence to prove an

16  unlawful agreement between FedEx and its alleged

17  co-conspirators.  Mostly this is a conspiracy case.  The

18  Government has said FedEx entered into conspiracies with two

19  online pharmacy operators.

20      The basic element of a conspiracy is an agreement, not

21  just any agreement, an agreement to commit a crime.

22      And if we can have the Ninth Circuit's jury instruction.

23      I know you've given this a thousand times, but now you

24  have to apply it:  (reading)

25           "It is not enough, however, that they simply met,

1          discussed matters of common interest, acted in similar

2          ways, or perhaps helped one another.  You must find that

3          there was a plan to commit at least one of the crimes

4          alleged in the Indictment as an object of the conspiracy

5          with all of you" -- all of you -- "agreeing as to the

6          particular crime which the conspirators agreed to commit."

7          There is not.  It's a Rule 29 right on that.

8          Now, if I can have the next slide, Todd.

9          The premise of the Prosecution's case is wrong and

10   dangerous.  When the Government started this case, their

11   central theory was that FedEx had been warned by the

12   Government, and especially by the DEA, repeatedly about online

13   pharmacies in such a way that if they continued shipping after

14   those warnings, they committed a crime.  It's in the

15   Indictment.  It's the first major factual allegation they make

16   in the Indictment.  They say there were six meetings.  The

17   Government warned them.  That evidence does not exist.

18          As you will hear during the "what did the Government tell

19   FedEx" part of my opening statement, all of that evidence is

20   supportive of FedEx's position.

21          So when that foundation disappeared under their feet,

22   instead of reevaluating their case, they have rejiggered it to

23   have a different theory, and the new and different theory is

24   essentially this:  What the Government is saying to this Court,

25   to the world, is if FedEx was aware that Government authorities

1    were investigating a group of people, or a business, or taking

2    a regulatory action against a pharmacy, or serving a search

3    warrant on a location, or in a few cases making arrests of some

4    people, if FedEx knew those things, then FedEx needed to stop

5    picking up packages right then and there for those people or

6    for the associates of those people.

7        And FedEx should assume that if any of those people or

8    places got back into business, even though they had a DEA

9    registration to get back into business and a state license,

10   FedEx should assume that they must be doing the same business

11   in the same way so FedEx should stop taking their packages.

12       In that world, Your Honor, we don't need any adjudications

13   of anything because if FedEx and UPS stop taking your packages

14   in your business and they do it because they read in the

15   newspaper, according to Mr. Hemann, that the Government is

16   taking a regulatory action, well, then, we don't need to have

17   any proceedings because they're done.

18       And I have about 20 examples in my mind, but I would like

19   to give the Court two.  What happens -- what should FedEx do

20   when they pick up the newspaper and they see that the FDA has

21   announced that a medical device company has products that are

22   misbranded, fraudulent, that they're going to bring an action

23   to re-call them, hip transplants?  Should FedEx read that in

24   the newspaper and say, "Well, I'm not picking those up today"?

25   Is that what the Government is suggesting?  Because that's

OPENING STATEMENT / ARGUEDAS

1    where what they say leads.

2         And my current favorite.  Last week I turned on the today

3    show and I saw Eric Schneiderman, the New York Attorney

4    General, and he said, "Trump University is a fraud.  It's been

5    a fraud since day one.  It was a fraud every day it was in

6    business.  I'm suing them for $400 million and I'm going to

7    win."  So if you are FedEx -- this is the New York Attorney

8    General; he was not ambiguous about what he said -- does FedEx

9    say, "Well, I'm not picking up any packages nor am I delivering

10   any packages to them.  They might have checks in them"?

11        Then I think, well, Trump University is out of business.

12   Like, by the way, a lot of those e-mails that you're going to

13   see and heard about this morning, a lot of this is after the

14   fact; right?  They're reading so and so got arrested.  Well,

15   they're not shipping anymore, much like Trump University;

16   right?

17        I turn the channel, and there's Donald Trump, and he says,

18   "Yeah, we're shut down now, but I'm reopening in November right

19   after the election."  So should FedEx say, "Huh.  Well, I

20   wonder when he reopens, is he going to be doing exactly the

21   same thing again that Eric Schneiderman decided?  Do we have to

22   investigate that, or should we just decide right now since the

23   New York Attorney General said something?  Shall we just

24   convict him right now in terms of providing services?"

25        When I came here, I thought those theories and

1    implications were bad enough, but what I heard this morning is

2    worse because what I heard this morning is the Government, of

3    the United States of America stand in front of this Court and

4    the world and say FedEx should be blamed because they didn't go

5    to doctors and say, "How come you're giving that prescription?

6    What did you look at?  Did you meet with that patient?"

7         I heard the United States of America say FedEx was to be

8    criminally prosecuted and convicted because FedEx, and I quote,

9    "chose to not ask customers about their prescriptions."  We're

10   in a criminal court because this prosecutor wants to stand up

11   and say they should go to their customers and say, "You look a

12   little sick and sweaty.  You got a package today and you got

13   one yesterday.  You want to tell me about that, Mrs. Jones?"

14        They stood up here and said that the FedEx was on notice

15   of this and that because they read it in the newspaper when we

16   actually were having meetings with the DEA, and they're not

17   calling those people to the stand for you to hear?

18        Okay.  Who is FedEx?  FedEx is exactly who you know it to

19   be.  It is a package delivery company which delivers packages

20   to homes and businesses throughout the United States and

21   throughout the world.  In fact, interestingly, the Department

22   of Justice just signed a five-year, 100-million-dollar contract

23   with FedEx so that FedEx will exclusively deliver the packages

24   of the Department of Justice.

25        The people who work at FedEx are not doctors, they are not

1   pharmacists, and they are not law enforcement agents.

2       FedEx was the first overnight delivery express company in

3   the world.  It was founded by Fred Smith in 1971.  He is still

4   the CEO and Chairman of the Board.  It was a startup company

5   before anyone used that term.  Mr. Smith was a Marine who

6   served in Vietnam.  He came back.  He was in school.  The

7   professor said, "Write a paper on what you think would be a

8   good idea for a company."  And he wrote a paper that said, "I

9   think we should guarantee overnight delivery of mail, and we

10  should do it using airplanes."  And he doesn't remember what

11  grade he got, but it wasn't good.

12      But he didn't let that stop him, and he got funding from

13  people; and on the first night of operations, FedEx delivered

14  186 packages to 25 cities from the Little Rock airport, mostly

15  to FedEx families and employees.  They sorted the packages

16  around a card table.

17      You will meet many of these employees.  I have met more

18  than a hundred of them in my five years on this case.  It's

19  very common for FedEx employees to start at a low rung and to

20  move up.  Very often they stay for 20 or 30 years.

21      We hope that, as they say in Memphis, you get a chance to

22  visit with them when they're on the witness stand because the

23  suggestion that Mr. Hemann sort of lightly threw out that they

24  are people who would fail to remember bad things and then

25  remember good things couldn't be more false, and you'll see

OPENING STATEMENT / ARGUEDAS

1    that.

2        Today FedEx has 400,000 team members, 660 airplanes,

3    millions of account holders.  They ship 3.5 million packages a

4    night, more during the holiday season, and to 220 companies.

5        Obviously to accomplish this kind of massive distribution,

6    they have to divide themselves into departments, and it's very

7    important that every department do its job well and not try to

8    do anybody else's job.

9        So for our purposes in this case, these are the

10   departments that will come into play:  Sales, obviously what

11   they do; Credit and Collections, they try to make sure FedEx

12   gets paid; Operations, they are the guys you see doing the

13   delivery; and Security, they do workplace safety and they

14   interface with law enforcement if necessary.

15       Security is the department that has the job that works

16   with law enforcement.  Security is who met with the DEA for

17   years on this subject.  Security entered into agreements with

18   the DEA on the subject of online pharmacies, and it is Security

19   who assisted in the field in the investigations.  Despite the

20   fact that it was Security who had all those interactions, the

21   Government has chosen to take e-mails from Credit and

22   Collections and Sales to try to prove that FedEx had criminal

23   knowledge and criminal intent, but the e-mails do not prove

24   that.

25       Every case involving a big company has e-mails.  Ours is

1    no exception.  I don't think this is an e-mail case, but the

2    Government has their e-mails, we have our e-mails that we like,

3    so I would like to give you an introduction to the subject of

4    these e-mails.

5       The e-mails fall primarily into two categories.  The first

6    is the credit people talking to each other about whether online

7    pharmacies should have to post more credit in order to be our

8    FedEx customer because they have a history of nonpayment for

9    lots of reasons when one is that they're subject to regulatory

10   actions.  So it's credit people saying, "I want to make them

11   put up more money in front."  There's a big category of those.

12      The second one is salespeople talking to each other about

13   whether online pharmacies should or shouldn't be in their

14   compensation scheme because online pharmacies are volatile.  So

15   you can have a big account today, and it could move out next

16   year, and it could affect your compensation; and so it's the

17   salespeople saying to each other, "Let's just take online

18   pharmacies altogether, take them out of our compensation scheme

19   for good or for bad."  That's mostly what all the e-mails you

20   see are going to be talking about.

21      Very important is what is the source of knowledge when

22   they say what they say.  That wasn't very articulate, but what

23   I mean is so if an e-mail writer says, "The DEA shut down this

24   pharmacy," how do they know that?  That's what I'm trying to

25   get to.  They almost always know it because some other employee

OPENING STATEMENT / ARGUEDAS

1    told them.  Sometimes it's a customer who told them, and

2    sometimes it's what they read in the newspaper.  It's not more

3    than that.

4        Now, the Court is going to need to -- I say "going to need

5    to."  I would ask the Court to pay close attention to what

6    customers the e-mails are talking about because a whole lot of

7    these e-mails are talking about customers that FedEx is not

8    charged with.  I'm not saying that doesn't make them relevant.

9    I understand they can be relevant for knowledge, but they are

10   not about -- I mean, knowledge in some general way -- but they

11   are not about what we are charged with here.

12       And what we're charged with, let me say, all these

13   pharmacies basically are named the same thing.  They're either

14   named RxLimited or LimitedRx or RxUnlimited.  It's impossible

15   to keep straight.  So I've had on my desk for years these three

16   cards, which list the pharmacies, the individuals, and the

17   websites in alphabetical order, color coded by alleged

18   conspiracy, and I would like to pass them up to the Court

19   because I found them very useful, and I think you will too,

20   because we have to keep straight what we're charged with and

21   what we're not charged with.

22       But the main thing I want to say is you're going to read

23   the e-mails --

24           MR. HEMANN:  Excuse me.  Are you going to talk about

25   the cards?  Because I was wondering if I could have --

1      **MS. ARGUEDAS:**  You could have --

2      **MR. HEMANN:**  -- a spare.

3      **MS. ARGUEDAS:**  I'm sorry.  I forgot all about you,

4  Mr. Hemann --

5      **MR. HEMANN:**  I know.  I was sitting here quietly.

6      **MS. ARGUEDAS:**  -- but I shouldn't have.  Yes.

7      **MR. HEMANN:**  Thank you.

8      **MS. ARGUEDAS:**  I'm not going to talk about the cards,

9  though, but you can have them anyway.

10      **MR. HEMANN:**  Okay.  They'll be helpful to me too.

11      **MS. ARGUEDAS:**  Yeah.

12      Okay.  You're going to read the e-mails.  You're going to

13  hear the people who wrote them and got them.  You're going to

14  see good faith, well-intentioned people talking about their

15  credit problems or their sales problems.  And I do want to show

16  you one thing that I -- just an example of the kind of thing.

17      Okay.  So here's an e-mail from 2006.  You know, and as

18  always, all these e-mails go to 10 people or more.  And here's

19  the kind of thing I think the Government looks at and thinks is

20  important, where somebody's saying:  (reading)

21          "I can assure you that these types of accounts will

22      always result in a loss at some point.  They have a very

23      short lifespan and will eventually be shut down by the

24      DEA."

25      So I think the Government will look at that and say, "Oh,

1  there you go, Judge.  Guilty knowledge."

2      Later in this string, because, of course, they're all

3  conversations, here's what somebody says back to him:

4  (reading)

5          "I've had many of these accounts, both good and bad.

6      The first thing that we don't know is which ones are

7      legitimate and which ones are not.  Typically the on-site

8      pharmacists is the issue."

9      Now, is the on-site pharmacist -- the number of on-site

10 pharmacists really the issue?  Probably not, but that's what

11 they thought.

12     And then what does somebody else say?  (reading)

13         "Well, I've had several of these in my own region,

14     and we did do considerable work and maintenance on many of

15     them, and many of them are legit."

16     So, yeah, they can take -- you know, they can take that

17 bottom part, and we'll always be coming back with the top two

18 parts.  And the overall sense, I believe, any trier of fact

19 would have is there's not one of these e-mail writers who's

20 thinking, "Yes, I would like to agree and knowingly and

21 intentionally ship invalid oxycodone to somebody in Kentucky.

22     Just another one.  This I just have to -- I wasn't going

23 to do this, but Mr. Hemann this morning put up an e-mail from

24 Mary Shelfer, to Josh Croft and others, December 15th, 2005.

25 Very proudly the Government said, "Look at this.  This is where

OPENING STATEMENT / ARGUEDAS

1   Mary Shelfer said, 'Here goes another one.'"  And it attached a

2   video of a bust.  A bust.  That's one of their strongest pieces

3   of evidence.  It's actually a bust.  That's all they told you

4   about it.  "Here goes another one."  Callous, you know, fact.

5       Here's what they didn't tell you:  FedEx Security assisted

6   the DEA on the bust that is the subject of "here goes another

7   one."  It was a law enforcement action against two pharmacies,

8   New Day Pharmacy and Best International Pharmacy.  A year

9   before the bust, FedEx called the Florida Department of Law

10  Enforcement to report suspicious activity by New Day Pharmacy.

11  We called the cops.

12      Four months before this bust, FedEx Security again reached

13  out to FDLE, and this time they were talking about Best

14  International Pharmacy, the second one which is the subject of

15  "here goes another one."

16      Both of them, by the way, had stopped shipping with FedEx

17  by the time they're sending around this "here goes another

18  one."

19      And you want to know what else is important about that

20  "here goes another one" e-mail?  Mary Shelfer sent it to Steve

21  Pittman.  Steve Pittman is a security guy.  So if you're

22  wanting to make sure that the right people in FedEx know about

23  it, you would send it to Steve Pittman.

24      This is what we have been contending with for years.  They

25  stood here and gave you that and didn't give you what matters

**OPENING STATEMENT / ARGUEDAS**

 1    about it.

 2         Okay.  And I don't really need to put this up.  If it was

 3    a jury, I was going to put this up and leave it up the whole

 4    time I was talking.

 5              **THE COURT:**  No.

 6              **MS. ARGUEDAS:**  Okay.  But the point remains we've got

 7    specific charges here, not some general "all online pharmacies

 8    are bad."  We have specific charges that we agreed with those

 9    people, Chhabra-Smoley and Superior.

10         If I can have the next one slide.

11         That's what they've got to prove.  And, Your Honor, now,

12    see, here's where I thought you were going to ask me a

13    question, and I imagined that you were going to ask me the

14    question of aren't we still arguing about whether or not they

15    have to prove that it was prescribed by a doctor acting outside

16    the usual course.

17         And I was going to say, yes, we are still arguing about

18    that, but, honestly, I don't think it matters.  However you put

19    those words up there, they can't prove that and definitely not

20    beyond a reasonable doubt.

21         And you know I didn't just concede anything; right?  I

22    still think we're right.

23         Now, if I may, I would like to turn to where Internet

24    pharmacies, how do they work, and where does FedEx fit in.  I

25    know that you know this stuff.  I also know there are aspects

1    of how they work that would not have been, you know, in the

2    forefront in your previous trials; and so my commitment to you

3    is I will not waste your time and I will not tell you anything

4    that isn't important, but I do want to spend a little bit of

5    time on online pharmacies.

6         There were many types.  Some refill existing

7    prescriptions, like you send your prescription in, which maybe

8    you're familiar with.  Some are where the customer gives their

9    medical information on the website.  That's what you've seen

10   most of all in your cases.  And some import medications from

11   Canada or other foreign countries.  And very important, some

12   online pharmacies do all of those things.

13        Oh, you know what I forgot?  I forgot the -- excuse me,

14   Your Honor.

15                     (Pause in proceedings.)

16        **MS. ARGUEDAS:**  I almost forgot the most important

17   prop.

18        Some of them do all those things; and when they call FedEx

19   or UPS or the Post Office to pick up packages, this is what

20   they look like (indicating).

21        They had many different models.  Typically, and I've said

22   this over and over again in my own office, the words "online

23   pharmacy" are not very precise and sometimes they're not very

24   helpful because an online pharmacy is a constellation of

25   places.  So it's usually a website, a processing center like a

1    back office kind of place where they put it all together.  It's

2    a doctor or a bunch of doctors, and it's a pharmacy that fills

3    the scripts.

4        Even within the category of online pharmacies that use

5    questionnaires, there were different models.  Some used only

6    questionnaires.  Some required that the person give them their

7    name and number of their doctor and they might call the doctor

8    on the phone.  Some said, "Send in some records," like an MRI.

9    And some made them actually go see a doctor, their own doctor.

10       All of the online pharmacies that are in our case had one

11   feature:  A licensed medical doctor issued a prescription.  In

12   every instance what the Government has charged FedEx with, what

13   they're calling a crime has to do with the relationship between

14   the doctor and the patient or the lack of a relationship, and

15   what's in the doctor's mind when he or she fills out the

16   script.

17       So if I can have the next slide, Todd, please.

18       So that's the -- so down there we have the website; right?

19   This is the back office (indicating), and the back office

20   people are usually the ones that have the relationship with the

21   doctor.  So they send whatever information they want to the

22   doctor, and the doctor figures out based on whatever the doctor

23   requires whether or not to issue a prescription.  It's at this

24   point that the Government says a crime was committed.

25       If I can have the next slide.

OPENING STATEMENT / ARGUEDAS

1      And it's at that point that FedEx has nothing to do with

2  anything, and there will be no evidence that FedEx did.

3      If I can go to the next slide.

4      Let me also say, though, it's not as important now that

5  I'm in front of a judge instead of a jury, but FedEx is not

6  going to be defending the way the doctors acted in this case,

7  not at all.  We're not going to say -- we're not going to be

8  arguing about the law or what they did.  What we will be

9  standing up to say is:  Did FedEx participate in your

10  decisions?  And they're going to say no.

11      So then the website sends to a whole bunch of different

12  pharmacies.  And this is important, this is not something I

13  expect would have been in your prior trials.  These websites,

14  the back office part, if they had a thousand prescriptions to

15  fill, they were very likely going to send a hundred of them to

16  10 different pharmacies.  And by the same token, the

17  pharmacies -- I think that's our next slide -- the pharmacies

18  very often accepted prescriptions from 10 different websites.

19      So that all gets to be important because nobody -- not the

20  processing center or the website or the pharmacies -- needed to

21  tell FedEx or anybody who they were doing business with.  So

22  all of this logical inferences they wanted FedEx to draw when

23  somebody moves somewhere or gets shut down and other people

24  take up the cause, there is no reliable way to know from a

25  pharmacy how many sources do they have of prescriptions, and

OPENING STATEMENT / ARGUEDAS

1    the same thing with the websites.  Where are they all sending

2    all of their prescriptions?

3         FedEx knows whatever piece of it it knows from billing or

4    shipping, but it doesn't know and has no way to know that whole

5    story that's in that complicated slide.

6         So again, what are we picking up?  We're picking up this

7    (indicating).

8         Now, so they call FedEx or UPS or the Post Office, which

9    the Government failed to say in its -- it said "UPS" a couple

10   times, but it never said "Post Office."  No question about it,

11   all the parcel carriers were used:  FedEx, UPS, the Post

12   Office, DHL so long as they -- during the time when they were

13   still operating in the United States.  All the parcel carriers

14   were called by these places.  They come, they pick it up.

15        It's not a mystery that when you pick up from a pharmacy

16   and you get something that rattles, that there's something in

17   there like that, but it is not known what's in there.  Like, is

18   it medicine?  Is it a controlled substance?  Is it a

19   noncontrolled substance?  Is it a supplement?  Are they

20   vitamins?  Not known and not allowed to be known.

21        And you put your finger on it this morning, HIPAA.  No one

22   is allowed to know that or get into it.  Didn't I just see

23   President Obama had to waive HIPAA yesterday in order to be

24   able to find out who the dead were in Florida?

25             **THE COURT:**  Does FedEx have the authority to open up

1    any package it wishes to?

2        MS. ARGUEDAS:  It does.  In your agreement when you're

3    a FedEx customer, you are agreeing to open up any -- they have

4    the authority to open up if they want to.  Let me say, though,

5    to that, Your Honor, the FedEx does not -- would not open up in

6    order to invade somebody's medical privacy.  In other words,

7    they treat these packages like they are -- should be held

8    privately whether they're medications or they're not

9    medications.

10       So the idea that FedEx should just open it up and look in

11   it -- and what would FedEx have known anyway?

12       THE COURT:  Well, that's one thing that I observed

13   early on.  What they would have seen, I guess, a couple of

14   things.  One is they would have seen that there were controlled

15   substances versus vitamin supplements.  I suppose --

16       MS. ARGUEDAS:  Correct.

17       THE COURT:  -- they would have seen that by looking at

18   it.  But if they were controlled substances, what would they

19   have seen?  They would have seen, I guess, a description of the

20   controlled substance.

21       MS. ARGUEDAS:  It would have said "oxycodone," right.

22       THE COURT:  It would have given the name of the

23   patient.

24       MS. ARGUEDAS:  Right.

25       THE COURT:  It would have given an Rx number, I think.

1    I don't know.  I haven't looked at a pillbox in sometime.

2             MS. ARGUEDAS:  That's right.

3             THE COURT:  And I think it would have given the name

4    of the physician, although I'm not even certain of that; and,

5    of course, it would have given the name of the fulfillment

6    pharmacy because that's the way they're labeled.

7             MS. ARGUEDAS:  Right.

8             THE COURT:  What it wouldn't have said in any way was

9    whether that individual who was ordering that drug had had an

10   in-person physical examination.  It wouldn't have said that.

11            MS. ARGUEDAS:  Right.

12        And let me say, what FedEx does -- I always want to make

13   sure that I have to say "generally" because there's

14   exceptions -- you know, when you have 400,000 employees, there

15   are always exceptions to everything.  But in general, if FedEx

16   is looking at a package, whether it's a rattling pharmacy

17   package, whatever it is, if they think something about it

18   doesn't look right, they call law enforcement and law

19   enforcement comes over.  And then quite often they do open the

20   package, but they do it when law enforcement is standing there,

21   you know, in order to be able to deal with whatever they find

22   out there.

23        It would not be typical, nor would it be a good idea, for,

24   you know, the people who run the hubs to just start ripping

25   open packages because they think somebody doesn't look like an

1    appropriate customer, but they frequently involve law

2    enforcement, and they have since 1971 when Mr. Smith started

3    the business.  I mean, FedEx has a very close relationship with

4    law enforcement.  They always have, and it's something they're

5    proud of.

6         So I -- if you don't mind -- you said -- did you say

7    12:15 or 12:30?

8              THE COURT:  12:15 or so.

9              MS. ARGUEDAS:  Because I would like -- even though I'm

10   at the beginning of the next section, it's the most important

11   section, and I would like to start it before we go to lunch.

12   Is that okay?

13             THE COURT:  Sure.

14             MS. ARGUEDAS:  Great.

15        What was going on between FedEx and the Government?  What

16   did the Government say to FedEx?  What did FedEx say to the

17   Government?  And what does it tell you about knowledge and

18   intent of FedEx?  You have been asking this question, and I

19   have been dying to answer it.

20        If we can have the timeline graphic, please.

21        So this is a timeline, Judge.  The left-hand side is all

22   the communications that FedEx had with mostly the DEA; and

23   later on this afternoon the right side is a few examples of the

24   enormous investigation that FedEx did with the DEA, including

25   against our co-conspirators.

1        So, first, in 2002, two years into this supposed

2    conspiracy, FedEx requested a meeting with all of the

3    government agencies that were involved with regulating or

4    enforcing online pharmacies.  Everybody was there:  FedEx, FDA,

5    Homeland Security, the Postal Service, the DEA, the FBI,

6    everybody.  FedEx asked for the meeting.

7        FedEx representative was Bob Bryden.  Bob Bryden was the

8    vice president of corporate security and he had been with FedEx

9    for two years at that point.  For the 22 years before that, he

10   had been with the Drug Enforcement Administration.  He had

11   started as a field agent at the DEA, promoted to the chief of

12   operations, and wound up being third in command of the whole

13   agency.  He had spent his entire career devoted to combating

14   illegal drugs.

15       He asked for this meeting.  He went to it at the DEA

16   headquarters, the building he used to work in with many of the

17   people he used to work with, and Bob Bryden does not appear on

18   the Government's witness list.

19       He sat down with the agencies.  He said, "FedEx wants to

20   work with you guys on this online pharmacy problem."  There was

21   no other topic at this meeting.  It's just online pharmacy

22   problem.  He said, "Let's have a task force.  Government,

23   private industry, let's deal with this problem."

24       And he said to the agencies, "As of right now, we'll stop

25   shipping immediately for any customer if you tell us they're

1   operating illegally."

2        And the agencies all said, "Fine."  They had no complaints

3   or disapproval; and in a friendly, possibly bureaucratic way,

4   they said, "Thank you for this meeting.  We'll get back to

5   you."  And they never did.  Never did anything with what FedEx

6   suggested.  Never picked up any ball at all.

7        So then what happens?  Well, a year later Customs informs

8   FedEx that one of FedEx's customers, RxMex, based in Mexico,

9   was illegally shipping prescription medication into the

10  United States.  And what does FedEx do?  They get the

11  notification from Customs, and they immediately close the

12  account, exactly what they said they would do, "If you tell us

13  a customer is acting illegally, we will shut down the account,"

14  and they did.

15       Now, if I can do this one section -- and, again, I've been

16  told do not say too often "this is a really important piece of

17  evidence."  I won't say it too often, but this coming up is a

18  really important piece of evidence.

19       It's a letter that FedEx wrote to Congress a few months

20  after this RxMex shutdown that I just described in December of

21  2003.  Congress was holding hearings that you just saw just on

22  the subject of online pharmacies.  They asked FedEx to

23  participate.  They asked everybody, all the common carriers,

24  all the credit card companies, all the government agencies,

25  everybody.  And FedEx sent a letter that said what FedEx was

1    doing, what it was not doing, why it was taking the approach it

2    was taking, and what its intentions were.

3         In one two-page letter, everything I'm going to say in

4    this letter, nothing has ever changed.

5         So if I can have the next one.

6         So the first thing they do is they describe the meeting

7    that I just described to you with Bryden, where they said,

8    "We'll shut down."  And everybody said, "Thank you very much.

9    See you later."  And those are all the people who are at the

10   meeting.  You can see absolutely every agency is there times

11   two.

12        Next one, please.

13        And they then say -- and, by the way, in July of 2003,

14   Customs told us about RxMex, and we shut down the account.  So

15   they're saying, "We're serious.  We did it.  We mean it."

16        And then they say:  (reading)

17             "FedEx has and will respond to specific intelligence

18             from law enforcement authorities as demonstrated above."

19        Meaning Customs and RxMex.  So they're saying, again, "You

20   tell us, we will shut it down."

21        Then:  (reading)

22             "FedEx has not taken across-the-board action to

23             prevent all shipments by companies with known Internet

24             pharmacy websites."

25        FedEx says:  (reading)

1           "We're not trying to shut down every account

2        associated with an online pharmacy."

3           And, by the way, that's sort of a little -- that is a

4     subterranean theme in the Government's position.   They

5     basically are saying, "Well, they're all so bad, you should not

6     ship for them."

7           Valid or not, here's FedEx saying, "We have not -- we're

8     not doing that.   We're not trying to prevent all shipments by

9     companies from online pharmacies."

10          And they say why.   They say, "First of all, we haven't

11    been requested to do so by law enforcement."   Nobody ever

12    requested that of them.   Nobody had at that point.   No one ever

13    did.   And you can understand why, since contrary to what the

14    Government says in 2016, back then when John Taylor is talking

15    to Congress, they're talking about how online pharmacies are a

16    good thing too.

17          So they say, "Nobody's ever asked us to do that," and I'm

18    telling you no one ever did.

19          And then they say more on why:   (reading)

20          "FedEx has no way of knowing whether such unilateral

21        action could potentially interfere with an ongoing

22        government investigation."

23          So FedEx is saying to Congress, to the world, to all of

24    those other people that are sitting around in the congressional

25    hearings, "If we were to unilaterally shut off shippers without

1    somebody from law enforcement first identifying them as that,

2    we would risk interfering with ongoing law enforcement

3    investigations."

4        Because that's what law enforcement -- that's how they

5    make their cases; right?  They watch the evidence going back

6    and forth.

7        And you're going to see the Government tell FedEx that

8    over and over again in the ensuing years, but right now we're

9    saying it to Congress, "Well, one reason why we're not making

10   unilateral decisions to stop shipping is we might mess up your

11   investigations."

12       And then they give another reason:   (reading)

13           "Furthermore, the necessary criteria have not been

14       established by the government to narrowly tailor such

15       action to avoid any negative impact on legitimate

16       shipments."

17       I have to say that does look like it's awkwardly worded,

18   but what it means is the government has not established

19   criteria for which FedEx can judge legitimate from

20   nonlegitimate shipments, and they didn't want to do something

21   that would negatively impact, meaning stop, legitimate

22   shipments of medications that people need.

23       The lack of a government-established criteria was not --

24   they were not criticizing the government.  It was simply a

25   fact.  So they send this letter that says, "We'll stop if you

1    tell us for anyone specific.  We're not stopping all of them.

2    We are not stopping all of them because we might mess up law

3    enforcement investigations, and we're not stopping all of them

4    because we don't have a criteria that the government has given

5    us for us to be able to tell the good from the bad."

6         And nobody -- no one from Congress, no one from law

7    enforcement, no one from the DEA, no one from the FDA -- no one

8    has the slightest criticism for FedEx for the comments that

9    they make in this letter.

10        THE COURT:  During the course of the alleged

11   conspiracy, did the government -- and by that I mean any

12   government agent -- ever request FedEx not to pick up shipments

13   from a particular site?

14        MS. ARGUEDAS:  No.

15        THE COURT:  Does the Government agree with that?

16        MS. AULT:  The Court is putting us on the spot.

17        THE COURT:  Well --

18        MS. ARGUEDAS:  It's only been eight years.

19        THE COURT:  Wait a minute.  Wait a minute.

20        MS. ARGUEDAS:  It's only been eight years for the

21   Prosecution.

22        THE COURT:  Wait a minute.  Wait a minute.  Let's --

23   yeah, this is the trial of the case.  Everybody's on the spot

24   on this one.

25        MS. AULT:  Your Honor --

OPENING STATEMENT/ ARGUEDAS

1      **THE COURT:**  I mean, if you can't answer the question

2  now, just say, "I can't answer.  We have to review," and so

3  forth.

4           **MS. AULT:**  I believe that the answer to that is no.

5           **THE COURT:**  Okay.

6           **MS. ARGUEDAS:**  Wait a second.

7      I was going to say, the Government picked the right

8  answer.  There is no evidence of it, and I believe they just

9  said that to us in a *Brady* letter.

10          **THE COURT:**  Okay.  Okay.  Let's move on.  I just

11 wanted to make sure that I focus on issues that at least I

12 think are of some significance.

13          **MS. ARGUEDAS:**  That actually is a good place for us to

14 stop.  Even though I'm dying to keep going, I think that's a

15 good place.

16          **THE COURT:**  All right.  I see about 4 inches of --

17                         (Laughter)

18          **MS. ARGUEDAS:**  Triple spaced.

19          **THE COURT:**  "Dying" may be the right choice of words.

20     Okay.  Thank you.  And I will see you at -- well, let's

21 resume at 1:15.

22          **MS. ARGUEDAS:**  Great.  Thank you.

23          **THE COURT:**  Thank you very much.

24                (Luncheon recess taken at 12:18 p.m.)

25          **THE COURT:**  I guess I don't have to say, *Let the*

OPENING STATEMENT/ ARGUEDAS

1    *record reflect all parties are present.  The defendant is*
2    *present.*  Right?  I don't have to say that every session?

3              **MS. ARGUEDAS:**  No.

4              **THE COURT:**  We can assume the defendant is present if
5    a lawyer is present.

6              **MS. ARGUEDAS:**  Correct.

7              **THE COURT:**  Okay.  Great.  Okay.  Thank you.

8         You may continue.

9              **MS. ARGUEDAS:**  So first of all, Your Honor, in
10   response to the question you just asked before lunch, we
11   received a letter on May 25th, 2016.  This was after the
12   dust-up we had in here about getting *Brady* information out of
13   the Government.

14        After that, the Government sent us this letter signed by
15   Kirstin Ault that says, "To be entirely clear, no witness to
16   whom we have spoken has said that agents of the DEA or any
17   other law enforcement agency directed FedEx to stop shipping
18   drugs for particular Internet pharmacies."

19        So going back to our timeline, we now are at January 2004.
20   This is a month after the letter to Congress was written.  And
21   the DEA asked to come down and meet with FedEx.  They will
22   admit that they were getting going on this because Congress was
23   putting pressure on the agency and these upcoming hearings.

24        And the DEA sent to Memphis the Chief of the
25   Pharmaceutical Investigations Section.  Her name is Elizabeth

OPENING STATEMENT/ ARGUEDAS

1   Willis, Dr. Elizabeth Willis.  She was 31 years with the Drug

2   Enforcement Administration, all in the Diversion Unit, and I

3   don't know if the Court knows this, but DEA is divided -- half

4   of it -- I don't know if it's half, but part of it is diversion

5   dealing with online pharmacies, all that, and the other half --

6           THE COURT:  No.  I know -- actually know --

7        MS. ARGUEDAS:  I'm saying half --

8           THE COURT:  -- extensive how it's organized.

9        MS. ARGUEDAS:  I'm saying half.  It probably isn't

10  half.  But a portion of it is dedicated to the diversion of

11  pharmaceuticals, meaning diverted out of the legal, you know,

12  process.  And the other are the DEA agents that we're more

13  familiar with in criminal cases with the badges and guns and

14  everything, making cases.

15      So Elizabeth Willis was 31 years with the DEA, all in

16  Diversion.  When she retired, she was the Chief of the

17  Pharmaceutical Investigations Section.

18      She flew to Memphis to meet with FedEx to see what kind of

19  voluntarily cooperation the DEA could get from FedEx related to

20  the problem of online pharmacies.  It was a two-day meeting.

21  It was a two-day meeting with the Chief of Pharmaceutical

22  Investigations, which the Government did not mention to you in

23  their opening statement, and Elizabeth Willis is not on the

24  Government's witness list.

25      The DEA started the meeting by describing its power to

1   regulate all pharmacies, online pharmacies and not online

2   pharmacies.  They described to FedEx their power to grant and

3   revoke and renew registrations and that they were under a legal

4   obligation to withdraw them if they were not in the public

5   interest.  And that the DEA registration -- to get one, you

6   have to have a state license.

7       And if I may, Your Honor, the, I don't know, example that

8   the Government likes to use about oh, what if FedEx was a

9   regular person and what if -- and they're no different than a

10  courier picking up from a drug dealer and delivering to a

11  illegal person who wants drugs, I would ask the Court to

12  consider that in those instances that the Government draws your

13  attention to, the drug dealer is not licensed and registered by

14  the Drug Enforcement Administration.  So all of the arguments

15  that they make along those lines fail spectacularly.

16      So the DEA chief took the time to tell us about the

17  registration process.  And why is this important to the case?

18  It is important because the DEA explicitly educated FedEx about

19  the registration laws and the powers and tools that the DEA had

20  at its disposal.  They became part of FedEx's knowledge because

21  the DEA wanted to give them that knowledge.

22          **THE COURT:**  Two words have been used, one is *licenses*,

23  one is *registration*.  What's the difference between the two?

24          **MS. ARGUEDAS:**  Yes.  The DEA gives a registration that

25  allows pharmacies to handle controlled substances.  You can

1    only get a DEA registration if you also have a state license

2    issued by whatever state the place is in.

3         **THE COURT:**  So the licenses are state.  The

4    registration is federal?

5         **MS. ARGUEDAS:**  Correct.  But each one had both because

6    you can't get one without the other.

7         So the particular point here is that FedEx had knowledge

8    given to it by the DEA that if a pharmacy shipper is open and

9    operating and dealing with controlled substances, it was

10   because the DEA gave it a registration, allowed it to keep the

11   registration, and they had that knowledge because the DEA

12   thought it was important to give it to FedEx.

13        Furthermore, at this meeting, the DEA told FedEx that it

14   had a lot of investigatory resources and tools:  5300 agents at

15   that time; a two-billion-dollar budget in 2005.  And they had

16   resources and tools that even the FDA doesn't have and lots of

17   other law enforcement agencies don't have and certainly, of

18   course, FedEx did not have, and they detailed them.

19        The DEA can subpoena.  The DEA can inspect at will any of

20   these agencies because of the registration.  The DEA, of

21   course, can ask for a search warrant.  The DEA gets data from

22   all kinds of other sources.  The DEA can suspend or revoke a

23   registration or give criminal charges.

24        And if I could spend a moment on the data from other

25   sources, everybody else in this process is what's called a

registrant under the Controlled Substances Act.  So, in other words, the wholesaler -- I guess that's what you call them -- McKesson, they are a registrant, and when they have controlled substances, they have to account for every single pill that they have to the DEA.

And when it goes to the middleman that delivers it to the pharmacy, they're a registrant and they have to report those numbers to the DEA.

And when the pharmacy gets it, they have to report those numbers to the DEA.

So, in other words, quite literally, the DEA, because of this registration process, which FedEx is not in, they know where every Oxycodone pill is in the United States of America and they know when a whole bunch of them leave one place and go to the next place.  That is information that the DEA has that of course FedEx does not have.

The DEA, that day in Memphis, told FedEx that there were legal online pharmacies and there were illegal online pharmacies, that both kinds were using the services of FedEx, and that the DEA was not asking FedEx to get out of the online pharmacy business.  The DEA was looking for voluntarily assistance from FedEx to get information that would help the DEA identify the illegal ones from the legal ones.

The DEA told FedEx about the difficulty with determining and proving which online pharmacies were legal and which were

OPENING STATEMENT/ ARGUEDAS

1    illegal.

2         Now if I can have the next slide.

3         Judge, Elizabeth Willis told FedEx that there was no

4    federal statute defining a valid doctor/patient relationship or

5    a valid prescription.  She told FedEx that to prove legitimate

6    medical purpose or the absence of required the DEA to prove

7    what was inside the doctor's mind.  And she told FedEx that the

8    concept of outside the usual course of professional practice

9    was defined by various states in various ways.

10        If I can pause here for a moment, the fact that the

11   United States of America intends to put on a case here and not

12   call Elizabeth Willis to the stand because they don't want the

13   trier of fact to hear that evidence to me is wrong.

14        The DEA that day -- this is over two days -- told FedEx of

15   the problems that those issues presented for when the DEA

16   itself was needing to prove that online pharmacies were using

17   medications based on invalid prescriptions.  So the DEA might

18   close a pharmacy or try to suspend its registration and the

19   pharmacy might move to a different state because a different

20   set of rules would be there governing the conduct.  Or the DEA

21   might shut down a pharmacy and it might be only temporary.

22   Because the DEA -- and this is applicable whether they were

23   going after the place's registration or bringing a criminal

24   case -- you know, whatever action they were taking, the DEA

25   gets to bring a case, but then the defense gets to answer it.

1       So the DEA told FedEx that there were extra facts that the

2   DEA needed to prove to make a successful case that an online

3   pharmacy was acting illegally, whether they were bringing a

4   criminal case or a registration case.  And as an example, the

5   DEA said like maybe we would prove that the doctor was paid per

6   approved prescription.  Right?  Not just for looking at one,

7   but they only get money if they say *yes* to the prescription.

8       Or that a doctor prescribed Oxycodone a hundred percent of

9   the time, no matter what the diagnosis was.

10      Or the DEA maybe would conduct surveillance on the doctor

11  and watch him or her filling out hundreds of prescriptions

12  while they're sitting on a park bench.

13      The DEA said to FedEx those are the kind of extra things

14  we have to prove because of the -- I don't know what the right

15  word is -- because of the way the law is written right now.

16      The DEA and FedEx in these meetings were in agreement on

17  these points of discussion, and they, both sides, agreed that

18  the laws needed to be strengthened and both sides agreed that

19  the DEA could use the assistance of FedEx for the DEA to do its

20  job enforcing the laws.

21      And FedEx said to the DEA, *We want to assist law*

22  *enforcement but we cannot be law enforcement*.  Those words were

23  spoken.  And the DEA Chief of Pharmaceutical Investigations

24  said, *I understand that*.  Because they -- she knew that FedEx

25  doesn't have all those investigative tools.  Can't serve search

1    warrants or subpoenas or conduct controlled buys.

2        The DEA was asking for voluntarily cooperation from FedEx

3    and the DEA was appreciative that FedEx was so willing to give

4    it.

5        One of the people at the FedEx meeting from FedEx was Bob

6    Bryden, the guy that had been 24 years with the DEA before he

7    became Vice-President of FedEx.  So they are explaining to the

8    DEA the kind of information they have that might be helpful to

9    them.  We could give you volume of pickups and of deliveries.

10   We could give you average of parcels.  We could give you two

11   years of customer history, of shipping, billing, all that --

12   all those things that you need to prove a case, and the DEA

13   said great, that would be great.

14       And the DEA asked will FedEx share information upon

15   request from the DEA?  And FedEx said yes.  Yes.  Starting

16   immediately.  And they did.

17       There's some things I left on the cutting room floor,

18   Your Honor.  For instance, I was going to go off and say how

19   three weeks --

20       **THE COURT:**  Well, wait.  You're not leaving it on the

21   floor --

22       **MS. ARGUEDAS:**  No, I'm not.  Okay.  Anyway, we did.

23       Next, again, maybe in the top five of the most important

24   pieces of evidence in the case, the DEA asked FedEx an

25   important request.  Will FedEx stop pickups and delivers upon

1    notification by the DEA that a customer is in violation of

2    federal law?  That is a request that the DEA made to FedEx, and

3    FedEx --

4            **THE COURT:**  Is that in a letter or --

5            **MS. ARGUEDAS:**  I'm going to get right there.

6        FedEx said yes, agreed immediately.  We'll skip the next

7    slide and get right to what the judge is interested in.  If we

8    could have 719-10.

9        Judge, these are notes from the DEA.  You see it's Exhibit

10   100-612.  These are Dr. Willis' notes.  She says, "First of

11   all, the meeting was extremely productive."  And then in

12   orange, she says, "FedEx agreed to stop pickups and deliveries

13   upon notification by DEA that a customer is in violation of

14   federal law."  That is a DEA document, which, by the way,

15   Your Honor, we got from the 17(c) subpoena that you issued.

16       The Government has it, too.  She's not on their witness

17   list.

18       As it turns out, the evidence will show the DEA never did

19   give FedEx that notification.  The Government made a choice not

20   to do that.  Not one time.

21       Ms. Willis was asked -- Dr. Willis was asked well, why

22   didn't you ask FedEx to unilaterally stopping shipping for any

23   of its customers, and Dr. Willis, if she were called here,

24   would say, and has said to the Government directly, that

25   FedEx -- that one reason was that FedEx would wind up

1   inadvertently stopping shipments for legitimate and important

2   medication which, I point out, is exactly what FedEx said in

3   the letter to Congress.  "The necessary criteria have not been

4   established by the Government to narrowly tailor such action to

5   avoid negative impact on legitimate shipments."

6       So if we can go to the timeline, so the next event is

7   June 23rd, 2005.  It's the Parcel Carrier Meeting.  Let's look

8   what the evidence shows about it.

9       This meeting was held on June 23rd, 2005.  It was at the

10  Sheraton Hotel in Arlington, Virginia.  It was an all-day

11  meeting.  All the Government agencies were there:  DEA, FDA,

12  FBI, Customs --

13      **THE COURT:**  Is this accurate?  Were all these

14  people --

15      **MS. ARGUEDAS:**  Sitting around that table like that at

16  attention?

17      **THE COURT:**  I understand the coloration.  There are

18  three redheads, two old people, but I just don't want -- I just

19  want to -- were all those people at this meeting or just the

20  ones identified?

21      **MS. ARGUEDAS:**  Just the ones you see identified.

22      **THE COURT:**  All right.

23      **MS. ARGUEDAS:**  But who's there is every agency and

24  every parcel carrier, FedEx, UPS, the Postal Service, DHL, and

25  something I never heard of called Purolator.  It's a common

OPENING STATEMENT/ ARGUEDAS

1    carrier, apparently.

2        The Government people made seven presentations; 151

3    PowerPoint slides were shown.  The meeting went from 10:00 to

4    3:30.  Mark Hogan attended on behalf of FedEx.

5        Mark Hogan was the Managing Director for Security,

6    security at FedEx.  He had worked at FedEx since 1984, always

7    in the Security Department, and before that, he was a police

8    officer in Memphis.

9        Mark Hogan is not on the Government's witness list.

10        The tenor of the Parcel Carrier Meeting was clear from the

11    start, and there's all these emails to prove it.  They were

12    seeking voluntarily efforts, voluntarily efforts by the parcel

13    carriers, to say what can we do about this online pharmacy

14    problem?

15        In the 151 slides that were shown by the Government, there

16    is no slide that says anything like *you are obligated to deny*

17    *shipping service if you see certain characteristics*.  There is

18    no slide that says *you must investigate your shipping pharmacy*

19    *customers and determine if you think they are breaking the law*.

20    There is no slide that says *you shouldn't take packages from*

21    *any online pharmacies*.  Nothing like that.

22        It was all about we have an emerging problem, what can we

23    do about it?

24        At the end of the roundtable -- of the thing, the 151

25    presentations, there was a roundtable discussion which will

1    show you exactly the state of mind of the participants and,

2    most particularly, the understanding, knowledge, intent of Mark

3    Hogan, meaning FedEx.  Again, it proves the opposite of the

4    prosecution's case, and lucky for us, we have notes

5    contemporaneously taken of the people who were at the meeting.

6         The first thing that happened at this meeting was all the

7    parcel carriers said to the Government *Well, could you just*

8    *tell us which customers you want us to stop shipping for?*  They

9    all wanted that.  And the Government said, *No, we will not be*

10   *giving you that information.*

11        So hearing that there would be no notification from the

12   Government about what to do with particular customers, they

13   started talking about well, what are the possible solutions?

14        So this is the first set of notes from Mark Hogan, and

15   what we did here, Judge, on the left is the actual notes that

16   you'll have in evidence.  They're handwritten.  And then we

17   typed them so it would be easier to read.  So the orange box is

18   the top half of the page.

19        **MS. AULT:**  Your Honor, I'm sorry to interrupt, and we

20   understand that the Court said for openings, the Court didn't

21   particularly care about whether evidence was admissible or not,

22   but we actually don't believe that any of these notes that were

23   taken during meetings are admissible evidence.  They're clearly

24   hearsay.

25        And we would have to have -- Ms. Arguedas has represented

1    that the Court will have these in evidence, but we don't see

2    any theory by which they could come in evidence.

3         THE COURT:  Okay.  Well, I'm going to permit the

4    presentation.  It's not unusual that counsel on either side say

5    the evidence is going to show X and the evidence turns out to

6    be inadmissible.  I have no idea whether it's admissible or

7    not.

8         MS. AULT:  In an ordinary case, though, Your Honor, if

9    we had a jury, the parties would need to agree that the

10   evidence was admissible before it was shown, but I believe the

11   Court said that's not applicable in this case --

12        THE COURT:  Believe me, this is not the ordinary case.

13        MS. ARGUEDAS:  So the notes say -- and these are Mark

14   Hogan's notes.  They're talking about possible solutions and,

15   he's saying, "Follow the money.  Regulate Internet pharmacy

16   sites."  And this is the point that is important right now.  He

17   says, "Require in-person exams between doctor and patient".

18   Require in-person exams between doctor and patient."

19        In other words, having seen the 151 slides, he's saying

20   well, we need to pass a law that requires in-person exams

21   between doctor and patient.  And he's bringing that up as a

22   possible solution, and no one at that meeting, no one from the

23   Government said, *Well, wait a minute, that already is the law*,

24   which is not surprising because DEA Chief Elizabeth Willis

25   didn't say that was the law last year and you're going to hear

1  shortly that neither did DEA Chief Matt Murphy in evidence that

2  I will present to you shortly.

3      So FedEx offered to help get laws passed about these

4  Internet pharmacies.  And the point of this discussion is while

5  the Government, I think, is going to claim that the definition

6  of a valid prescription was always clear, that's not what they

7  were saying to FedEx directly back at the time of these events.

8  In fact, they said --

9      **THE COURT:**  Can I ask a question before we go off?  I

10  think Ms. Ault will have an answer.  The act that was passed --

11  and I forget --

12      **MS. ARGUEDAS:**  2009, Ryan Haight.

13      **MS. AULT:**  Ryan Haight Act.  It was passed in 2008.

14      **THE COURT:**  So that was the first time that the

15  federal government enacted into law the requirement that

16  in-person physical examinations would be required?

17      I understand the whole state structure, and I understand

18  the overarching -- that there was a guideline of it has it to

19  be outside and under -- inside, whatever it is --

20      **MS. ARGUEDAS:**  Without --

21      **THE COURT:**  I've already forgotten that one.

22      I understand that.  But it was -- the legislation for the

23  first time was in 2008.

24      **MS. AULT:**  Yes, Your Honor.  It was always illegal to

25  do this without a face-to-face meeting between the doctor.

1   It's just that the federal law did not explicitly state it.

2   But it was always illegal.

3       **THE COURT:**  Right.  No.  I understand -- well, I have

4   had two cases on that point, but I'm now thinking about your

5   objection that this wouldn't come in, and I'm trying to figure

6   out why it wouldn't come in.

7       Isn't it evidence of a state of mind of the defendant?

8       **MS. ARGUEDAS:**  Yes.

9       **THE COURT:**  What the defendant believes is being told

10  to him?  It may be inaccurate, but doesn't it go -- it's not

11  being introduced for the truth of the matter.  It's being

12  introduced for his state of mind.

13      Now that you raised it, Ms. Ault, tell me why wouldn't it

14  come in.

15      **MS. AULT:**  Because it does not come in under the state

16  of mind exception because the state of mind exception is a very

17  narrow exception for things like *I feel happy today, I feel sad*

18  *today.*  This is a state of mind exception for exactly what the

19  state of mind exception says it does not apply for, which is to

20  introduce evidence of what the person believed or thought,

21  which is not what the state of mind --

22      **THE COURT:**  So, in other words, if he wrote instead of

23  require in-person exams *between doctor,* if he said already the

24  law that he require -- that an in-person examination is

25  required, if he wrote that, that would come in, wouldn't it?

OPENING STATEMENT/ ARGUEDAS

1          **MS. AULT:**  No, Your Honor.

2          **THE COURT:**  Why doesn't it come in as an admission?

3          **MS. AULT:**  Because as an admission by a party --

4          **THE COURT:**  Well, it's a defendant.

5          **MS. AULT:**  They can't introduce their own self-serving

6     statements to support their own case.

7          **THE COURT:**  But it would come in as an admission.  The

8     Government would be able to introduce it, wouldn't it?

9          **MS. AULT:**  We would be able to introduce it against

10    them, but they are not able to introduce it in support of their

11    own case.

12         **THE COURT:**  Okay.  All right.  Well, I'm not faced

13    with the evidentiary issue right now; right?

14         **MS. AULT:**  Correct, Your Honor.

15         **THE COURT:**  Okay.

16         **MS. ARGUEDAS:**  So Mark Hogan's state of mind right

17    then and there.  If I can have the next slide, please.

18         This is a slide that was shown by one of the Government

19    presenters, and it says, "Action items for industry, provide

20    governmental authorities with designated contacts empowered to

21    take action when problematic websites are identified by law

22    enforcement."

23         So that's --

24         **THE COURT:**  By the way, is this admissible?

25         **MS. AULT:**  Your Honor, I don't know where this came

1   from.

2            MS. ARGUEDAS:  You don't?  Well, that's amazing

3   because it's -- it was in Mr. Hemann's opening statement.  It's

4   one of the Charles Trant slides that was given at the Parcel

5   Carrier Meeting.

6            MS. AULT:  If this is one of Charles Trant's slides

7   then, Your Honor, I believe that it is admissible to show what

8   the defendant was told.

9            THE COURT:  Right.  And it says, "When problematic

10  websites are identified by law enforcement."

11       So my question would be well, what did law enforcement

12  identify?  Did they identify specific sites?

13            MS. AULT:  They did not, Your Honor.

14            MS. ARGUEDAS:  It might be Charles Gunther.  But it

15  was at the Parcel Carrier Meeting.

16       So, what you just said is what I was about to say,

17  Your Honor.  So if you're looking at this slide and you're

18  FedEx, you say, *Oh, good, when problematic websites are*

19  *identified by law enforcement.*  And FedEx, showing its intent,

20  wasted no time in identifying their point of contacts.  Right

21  then and there Mark Hogan stood up and said, *That will be me,*

22  *I'll be your point of contact.*

23       And these are Carolyn Becker's contemporaneous notes.  She

24  was an FDA lawyer for the government at that meeting, and there

25  she says, "Will provide single point of contact.  Mark is

1    liaison from FedEx for the Department of Homeland Security.

2    Can serve as point of contact for us as well."

3        The evidence will show that the Government never contacted

4    Mark Hogan about a problematic website.

5        If I could have the next slide, please.

6        These are also Carolyn Becker FDA lawyer notes, and she's

7    writing down what Mark Hogan said to all of the assembled

8    government agencies.

9        "If your agents want to come in to any of our facilities,

10   just let me know and we'll make that happen."  Right?  Agents

11   can come into facility, just ask to reach out to him or

12   security specialist.

13       If a trier of fact wants to know what FedEx's intent was,

14   well, that's a pretty good piece of evidence for it.  *Come on

15   in to any of our facilities*.  *Just give me a call*.  The

16   evidence will show that no one from the Government ever did

17   reach out to Mark Hogan to come in to a FedEx facility.

18       Further, during the Government presentations of the 151

19   slides, several of them made references to COD payments,

20   collect on delivery payments, as being a method that suspect

21   pharmacies like to use.

22       COD payments was a regular part of FedEx business.  It's

23   used by lots of customers, lots of industries, but the

24   Government was saying in this meeting that our suspected online

25   pharmacies, they like to use COD.

1    So what did FedEx do?  FedEx, who's been accused of all

2    these felonies, FedEx right then and there offered to give the

3    Government all of its COD records and all of its payment

4    records because they were interested in it for their

5    investigations, and those are Carolyn Becker's notes.  *COD*

6    *info, will turn over to us.*

7    They conclude the meeting, and everybody says, *This is*

8    *great, thank you very much.  We, the Government, we know that*

9    *you carriers are being exploited by criminals.  We hope to be*

10   *able to work together and continue the dialogue about how we*

11   *can do that*, which is exactly what FedEx did.

12   March 16th, 2006, pretty much in the middle of this

13   supposed conspiracy, the DEA -- this is eight months after the

14   Parcel Carrier Meetings.  FedEx again hosts a meeting with the

15   DEA at the FedEx headquarters in Memphis.  Again, this is a

16   meeting that -- absolutely crucial evidence about FedEx's

17   knowledge and intent.  The Government has chosen not to discuss

18   it in their opening statement.

19   The person that the DEA sent down to FedEx for -- to

20   Memphis was Matt Murphy.  He was now the Chief of the

21   Pharmaceutical Investigations Division.  Dr. Willis had

22   retired, and Matt Murphy had replaced her as Chief.  He is not

23   on the Government's witness list.

24   FedEx was represented by the Vice-President of Security

25   and other executives, and they were down there for two days,

1    another two-day meeting.  This is the second time that the DEA

2    is talking directly to FedEx, just the DEA and FedEx, only on

3    the subject of online pharmacies.  And two of the people, one

4    from FedEx and one from the DEA, took notes.  Thank goodness.

5         So Mark Hogan took notes and the next one, Jim Byrom, took

6    notes.  He was the subordinate to Matt Murphy, the Chief.  He

7    is called the Program Analyst, which is a thing in Diversion, I

8    guess, and they both took notes.

9         To begin with, the DEA Chief, Matt Murphy, began the

10   meeting by saying, "We're here to seek your cooperation."  He

11   said, "We're not trying to turn FedEx into a division of the

12   Drug Enforcement Administration."  He said, "As we all know,

13   some of the online pharmacy customers are legitimate, your

14   customers, and some are not.  The issue as always is

15   determining which was which."

16        In these two-day meetings, the DEA never suggested that

17   FedEx itself was doing something wrong by shipping packages for

18   pharmacies from the online pharmacy industry.

19        Always the discussion was how can we work together, how

20   can FedEx help us, the DEA, identify and investigate the

21   illegal ones.

22        So let's look at the first slide.  Same thing.  There is

23   the handwritten notes.  We made them easier to read.

24        So this is the DEA's first point.  "The DEA registers

25   every touch point on the Internet pharmacy supply chain except

1   for the website piece."  So he is reiterating what Dr. Willis

2   had said before, and he's going through that whole registration

3   process.

4       And the point of that is if there's a controlled pill in a

5   package that FedEx is picking up from a shipping pharmacy, it

6   can only be there if the DEA has granted and let stay in place

7   a registration.  The DEA is telling FedEx that.

8       And they say, "If we move against the registration, then

9   the registrant gets to defend itself in court, like you would

10  expect."  So what practical meaning does this have now that

11  we're hearing it twice from the DEA.

12      If they're shipping controlled medications, they have a

13  valid DEA registration.  If they've closed and reopened, they

14  have a valid DEA registration.

15      And if they've closed and moved somewhere else, they have

16  a valid DEA registration.

17      The next slide, please.

18      This is what Mark -- I'm sorry -- Matt Murphy, DEA Chief

19  said.  "DEA requires at least one face-to-face meeting between

20  patient and doctor before a controlled substance can be

21  prescribed. This is a DEA regulation, not a law.  They would

22  like Congress to pass a law."

23      Matt Murphy, because we're going to call him if they don't

24  call him -- what he says about that note is he says, "Actually,

25  I didn't say" -- this -- so that's the note that FedEx took,

1    right?  Mark Hogan took.  And what Matt Murphy says, he says,

2    "I didn't actually say the DEA requires a face-to-face meeting

3    with the patient."  He says, "I told FedEx that that was the

4    policy of the DEA.  More like a good practice.  It was not yet

5    a law."

6         If I can go to the next slide.

7         And this, Your Honor, is a slide that the DEA agent took,

8    Jim Byrom.  He is writing down what Matt Murphy is saying.  And

9    here's what Matt Murphy said.

10        "Website operators not operating explicitly outside the

11   law."  It's Exhibit 100-562.  "Website operators not operating

12   explicitly outside the law."

13        Now, let's think about this for a minute.  As you know

14   well and as they explained, it's the website operators and the

15   processing centers who organize the doctors and the

16   questionnaire process.  Here is the DEA telling FedEx directly

17   and clearly the website operators are not operating explicitly

18   outside the law.

19        Now, as you just pointed out, we do not intend to get into

20   a big argument about what the law was or wasn't.  It is

21   obviously quite complicated.  We are concerned here with what

22   the DEA told FedEx and how that bears on FedEx's knowledge and

23   intent.

24        If I can have the next one.  Again, these are the DEA

25   notes and they're asking FedEx for legislative assistance about

1    the doctor/patient relationship.  Everybody understands they

2    need a law to clarify this situation.  FedEx has government

3    affairs people.  They want to know, *Will they help you, will*

4    *they help us?*  And what did FedEx say?  *Yes, of course*.

5        So to summarize, DEA is looking for voluntarily

6    assistance -- voluntarily assistance.  DEA says to FedEx, "We

7    register every touch point on the Internet pharmacy chain,

8    except for the websites."  DEA says, "There is no federal

9    law" -- by the way, he didn't say *statute*.  He said *law*.

10   "There is no federal law requiring a face-to-face meeting

11   between a doctor and a patient."  And the website operators are

12   not operating explicitly outside the law.

13       This is why we say Rule 29 to the Court.  It is easy to

14   say not beyond a reasonable doubt.

15       So what did FedEx say to the DEA during these meetings?

16   So, again, FedEx says, "Could you tell us who the illegal

17   online pharmacies are because we don't want to ship for them.

18   We won't ship for them."  And what does the DEA say?  Well,

19   this is -- this is rich.  The DEA says, "We would love to give

20   you a suspect list, but the Department of Justice won't let

21   us."  There's the note.  "DOJ will not allow DEA to provide us

22   with a suspect list."

23       So, okay.  But you know why?  And they explain this.  They

24   explain this to FedEx.  The DEA says to FedEx, "We'd love to.

25   The Department of Justice won't let us because the Department

1    of Justice doesn't want to get sued." So what they say is that

2    the Department of Justice doesn't want the DEA to effectively

3    shut down a private business like the pharmacies by giving

4    FedEx what would effectively be a don't-ship list where there

5    hadn't been a convincing level of proof established anywhere.

6    They said there really needs to be some due process before the

7    DEA can tell a private company to stop doing business with

8    another private company. Some level of due process. Or else,

9    they said, it would be an end-run around the registration

10   statutes because actually there is a process for this. We're

11   supposed to go after their registration in court and they get

12   to answer and there's a proceeding.

13       So the DEA made that clear to FedEx because, as Matt

14   Murphy said, you can't just shut down a company because they

15   feel dirty.

16       And you know what else they said? They said the

17   Department of Justice didn't want the DEA to name a name and

18   have FedEx cut off the customer's account and then have it turn

19   out that the customer wasn't actually breaking the law, because

20   that would be a lawsuit, too.

21       Now, I ask the Court to compare that with what the

22   prosecutor said in his opening statement this morning.

23       So FedEx said, *Okay, you're not -- you can't give us a*

24   *list*. *Okay*. It's all friendly. This is a cooperative scene

25   here. So, FedEx said, *Well, let's look at some other ways then*

1    *that we can work this out,* and they said, *how can we more*

2    *easily give you records about our own customers, tracking the*

3    *packages, who's sending them, who's paying the bills?  How can*

4    *we do that.*  All about FedEx's own customers.  *How can we help*

5    *the DEA?*

6         I ask you, Your Honor, is that evidence of somebody who is

7    in a conspiracy with Chhabra and Smoley and Superior?  Or are

8    they trying to help the DEA investigate their own customers?

9         And they had these talks.  They talk about something

10   called a go-buy list.  It's a DEA term.  It's like a template

11   for subpoenas.  FedEx's people are there saying *let's figure*

12   *out exactly -- we'll tell you what we have, tell you how to ask*

13   *for it so you can get it better, easier.*

14        They were going to send this go-buy list out to every DEA

15   office in the United States in order to make everything go

16   better.  They also talked about the concept of training,

17   online pharmacy -- training FedEx's people about online

18   pharmacy shippers.

19        FedEx did not have to engage in any training on this

20   subject.  There's no law that says FedEx has to train people

21   because law enforcement's asking you to.  But FedEx wanted to

22   help.  So FedEx said to the DEA, *We don't think we should train*

23   *the frontline people,* meaning couriers, the drivers, or the

24   salespeople.  *We think we should train our security personnel*

25   *because they are the ones in our organization who interacts*

OPENING STATEMENT/ ARGUEDAS

1    *with law enforcement.*

2        And what did the DEA say?  They said, *Great.  We*

3    *understand that.  Good.*  And FedEx immediately invited the DEA

4    to come to the next training session they had with their

5    security people.

6        Now, FedEx did not leave the conversation there.  FedEx

7    also said, *But you know who you should talk to?  You should*

8    *talk to our account managers.*  That's what they call their

9    salespeople.  *Because our account managers are the best sources*

10   *of information for leads about online pharmacies because*

11   *they're the ones who, you know, are -- really see them and talk*

12   *to them.*

13       Now, is this just me talking?  No, it is not.  That is Jim

14   Byrom's notes.  He's the DEA guy.  "Account managers best

15   recipients of leads via subpoena."

16       So let me say the Government read you those emails this

17   morning and then they're going to put in a zillion more.  Those

18   are from the salespeople, the people who FedEx said *you should*

19   *talk to them.*

20       DEA never did.  They never issued a subpoena.  They never

21   made a request.  They never asked to sit down and talk to them.

22   DEA is not on trial here.  FedEx is.  But if we're talking

23   about intent and knowledge and they want to use those

24   salespeople's emails against us, that's us saying *you should*

25   *talk to them.*  Never did.

1          DEA thought the March 16th meeting was great.  And the

2     next thing that happens, august, FedEx had invited them to the

3     Global Security Summit.  That's the training thing.  DEA said,

4     *Great*.  They came down there and they came down again for a

5     couple of days.  Matt Murphy, not on the witness list, was the

6     guy who gave the PowerPoint slides.

7          That's Matt Murphy, Judge.  And he's giving a training

8     session.  He has 30 slides.  You will see them.

9          Once again, there are no slides that say *FedEx, please*

10    *make unilateral decisions about terminating your customers*.

11    *There's no* slide that says, *Questionnaires only*.  *That's*

12    *illegal*.  *If you see that, stop shipping*.

13         There's no slide that says, *If you hear a pharmacy has*

14    *been shut down by the DEA, then don't ship for them*.  *Even if*

15    *the DEA lets them reopen with a new registration, don't ship*

16    *for them if they've been shut down*.  Nothing.  Nothing.

17    Because that's not what they were asking them to do.  It's what

18    the Government says today, but it's not what they said then.

19         It's been asked of Matt Murphy recently by the Government,

20    *Well, why didn't you tell them to stop shipping for these*

21    *customers*?  *Why didn't you tell them to unilaterally stop*

22    *shipping*?  And Matt Murphy said, *Well, because they'd likely*

23    *wind up interfering with a DEA investigation*.  Something that

24    was going on around the country.  They'd get in the way.  He's

25    the guy that said, *And if that happened, those agents from*

1    *around the country, they'd come throw me out the 10th floor*

2    *window.*

3        I say that to say that's exactly what FedEx said,

4    remember, in its letter to Congress.  "FedEx has no way of

5    knowing whether such unilateral action could potentially

6    interfere with an ongoing government investigation."

7        So 2004 they say to us, *Would you stop shipping if we*

8    *notify you*?  We say *yes*.  2006, they say, *Well, we would have*

9    *loved to notify you, but we can't.  The Department of Justice*

10   *won't let us.*  Then FedEx says, *Okay, let's work on this*

11   *subpoena project* and that's where we are.

12       So we -- the -- after this meeting -- sorry.  After the --

13   they came down to do the training, the second part of that

14   two-day meeting was talking to the subpoena -- doing the

15   subpoena project.  And the subpoena project was important

16   because the subpoena project had two levels of importance.  One

17   is they were going to target specific pharmacies so -- you

18   know, make cases like we are all familiar with.

19       But the second one was develop a system for the DEA to

20   combine FedEx's shipping records with other data, meaning from

21   credit card companies and the stuff they get from the

22   registration about where all the pills are moving.  In other

23   words, they have a lot of information.  They wanted to take

24   FedEx's shipping, add to it, and they thought, the DEA thought,

25   they were really going to have a good way to investigate and

1   deal with this problem.  And FedEx said great.  And they sat

2   down to talk about it.

3        They worked hard at it.  I'm not going to go through the

4   details of it, but they got -- they got all into what's the

5   best way to do it.  And while the Government somewhat snidely,

6   I would say, says, *Oh, well, so what?  They have to answer*

7   *subpoenas anyway,* well, yeah, but companies do not have an

8   obligation to sit down with the subpoenaing agency and help

9   them write the subpoena in the first place.  They don't have an

10  obligation to tell them exactly what kind of documents that

11  could be good for the law enforcement agencies about their own

12  customers.  They don't have that obligation.

13       They don't have an obligation to have a good two-way

14  communication.  But FedEx wanted to do that, and it did do

15  that, and the DEA was really appreciative of it because they

16  knew they were going beyond their obligations, and you're going

17  to see the level of appreciation that they showed to FedEx.

18       And if I may, I am not -- FedEx -- neither me nor FedEx is

19  trying to say now we would like a standing ovation for working

20  with law enforcement in this way.  Not at all.  What we are

21  saying, though, is it is directly relevant to intent.

22       Okay.  FedEx also invited the DEA to return for further

23  training of their security people at a meeting in Chicago.  For

24  reasons known only to the Government, the DEA did not accept

25  that invitation.  At no time did the DEA tell FedEx it was

doing anything wrong or could be breaking a law or should be

doing anything at all differently.  It was only *thank you very*

*much*.

        Okay.  Now, here we go again.  We have Rule 29 evidence

coming up right now, Judge.  And it's especially significant

because this is a piece of evidence that Mr. Hemann relied on

quite a bit in his opening statement, and it shows how far off

they are in their analysis of this case.

        So this is December of 2006.  It's a few months after that

Global Securities Summit, and Matt Murphy contacts FedEx's

vice-president about Superior Drugs.  Superior Drugs, one of

our co-conspirators, somebody they say we were in a conspiracy

with.  So now let's look at what happened.

        This exchange -- if I can have it up there -- is

emblematic of the partnership that existed between the DEA and

FedEx of FedEx's intent to help the DEA investigate Superior

and not to conspire with Superior.  And the Government used

this and now look at what it actually says.

        "Thank you for the holiday card.  I've enjoyed working

with you and your staff during the past year.  The enclosed

email illustrates the magnitude of the problem and how easy it

is for people to obtain drugs illicitly over the Internet.

What is particularly disturbing is that the suppliers are

hounding customers to buy more drugs.  I appreciate your

continued support and look forward to working with you in 2007.

1    Because this investigation is ongoing, please do not

2    disseminate the information contained in the attachment.  Enjoy

3    the holiday season.  Matt, Section Chief, Pharmaceutical

4    Investigations Section."

5         Now, there is a bunch of attachments to this email that he

6    is saying take a look at and let me talk about that.

7    Mr. Hemann did, but he didn't tell you all about it.

8         So Elizabeth Dillinger shot herself with a gun.  Committed

9    suicide.  In her note -- this is all in the attachments.

10   Everything I'm telling you is in the attachment that the DEA

11   sent to FedEx.

12        In her suicide note, she talked about that she had a pill

13   problem and that she was getting medications from certain

14   pharmacies.  And the pharmacies, Superior Pharmacy, kept

15   calling her machine, even after she was dead, saying *don't you*

16   *want to order some more, want to re-up* and it was ghoulish and

17   horrible.

18        The pills she had gotten from Superior before she died had

19   been delivered by FedEx from Superior to Elizabeth Dillinger.

20   The police report showed that.  They're all in the attachments

21   that the DEA is sending to FedEx.

22        So the police called FedEx and said, *What do you know*

23   *about all this?*  And FedEx gave them all the information they

24   had like they always do about whatever the shipping records

25   were, whatever they wanted.

1     The police then did a controlled buy on Superior, used

2  FedEx to do it.  And the reports and the attachments in the

3  email discuss internal DEA -- their internal DEA emails to each

4  other about the further investigation they're going to do of

5  Superior, our co-conspirator.  So, for instance, it's a DEA guy

6  to a DEA guy, and he's saying, *We're continuing with this*

7  *investigation*.  *Next we're going to go interview the pharmacist*

8  *at Superior*.

9     They also discuss other ongoing DEA investigations of

10  other websites and pharmacies.  Now, DEA investigations are

11  confidential.  Normally law enforcement does not distribute

12  reports about ongoing investigations to a private company.  But

13  the DEA pharmaceutical investigations chiefly sent these to the

14  FedEx vice-president.  Why?  Because he saw FedEx as a partner

15  in this law enforcement effort to investigate Superior.  Online

16  pharmacies in general, but Superior, our co-conspirator.  And

17  he's making the point in that email that says *this is why we're*

18  *doing what we're doing, because it's a worthy effort because*

19  *the problem is great*.  And he's appreciating DEA's -- sorry,

20  FedEx's help.

21     Now, what is not in that email?  There is no -- nothing in

22  that email that says, *This is the kind of shipper, by the*

23  *way -- thanks very much for your help, but this is the kind of*

24  *shipper FedEx should not service*.  It doesn't say, you know,

25  *Bruce, let's talk about how FedEx can recognize those signs*.

OPENING STATEMENT/ ARGUEDAS

1   Or *you should take a deeper look into Superior*.  No.  It does

2   not say that.

3       It says, *We really appreciate working with you*.  But the

4   most important thing is the last line.  The last line says,

5   "Because this investigation is ongoing, please do not

6   disseminate the information contained in the attachment."  This

7   is the investigation of our co-conspirator Superior Drugs.

8       Matt Murphy will testify that when he said *do not*

9   *disseminate*, that meant don't tell anyone and don't do anything

10  because we have an ongoing investigation of Superior.  Do what

11  you're doing.  Don't change a thing because that will mess up

12  our investigation.

13      And what else could *do not disseminate* mean because I'm

14  going to get to that in a moment because we've got a lot --

15  we've got a lot of messages like this from the DEA.

16      So today -- by the way, it turns out the Government didn't

17  take Superior Drugs' registration away until four years later,

18  not until May 2010.  So they decided that, whatever their

19  reason is, fine or not fine, we're not talking about what they

20  should have done here.  We are talking about FedEx's knowledge

21  and intent.

22      But they have accused FedEx of a crime because it shipped

23  packages from Superior during these same years when the

24  Government was allowing it to stay open, stay registered.  The

25  Government knew FedEx was delivering for Superior because they

1    put it in those attachments.  The Government told FedEx it was

2    investigating Superior and the Government said to FedEx, *don't*

3    *do anything different, don't say anything about it.*  That's a

4    Rule 29.

5        Next, please.  Okay.  June of 2007.  FedEx and the DEA

6    keep working on this subpoena project.  DEA keeps expressing

7    enthusiasm about it.  So does FedEx.  They work on language

8    together.  Oh, there's one of their enthusiasm emails.  Can we

9    have that next one.

10       This is from the DEA to FedEx, "We believe there will be a

11   robust capability to systematically correlate and analyze

12   different sources of data.  We believe that shipping records

13   could also be an important component of this analysis,

14   particularly those records that have been associated with known

15   or suspected shippers of controlled pharmaceuticals."

16       So look at what that means.  This is DEA to FedEx saying,

17   *We really want your shipping records.  We know they're going to*

18   *be from people who were known or suspected shippers of*

19   *controlled pharmaceuticals.  We want them because we're going*

20   *to put them together with other stuff we get and we're going to*

21   *really be able to do something good here.*  That's what they

22   said to FedEx.

23       So FedEx says great.  They send somebody to -- a FedEx

24   person goes to meet the DEA lawyer to work on the language.

25       And, by the way, in the midst of this subpoena project,

1    this is another email from the DEA to FedEx because you know

2    what else they always say?  They say, *Oh, well, FedEx wouldn't*

3    *give us anything unless it was by subpoena*.  You heard them say

4    that this morning.

5        First of all, that's not true.  We gave them lots of stuff

6    that wasn't by subpoena.  But second of all, this proves that

7    it was a DEA requirement that we give it by subpoena.  "Our

8    chief counsel has advised that business data obtained from

9    companies cooperating with DEA or from another third party must

10   be obtained pursuant to an administrative subpoena, grand jury

11   subpoena."

12       It was the way the DEA wanted it.

13       So our people meet with the DEA lawyers.  They finalize

14   the language.  Everyone is looking forward to it.  DEA says to

15   us, *We're going to send it out to you right away*.  *We're into*

16   *it*.  And then what happens?  DEA abandons the subpoena project.

17   They get into a bureaucratic tangle.  They cannot decide

18   whether it should be DEA headquarters that issues the subpoena

19   or some other division.  They never issue it.

20       The DEA agents who have been working on it are surprised

21   and disappointed, and they never tell FedEx that the subpoena

22   project is dead.  They never say that.  So FedEx is still

23   thinking it's coming because nobody ever says, *Oh, by the way,*

24   *that's not happening*.

25       Okay.  FedEx invites the DEA to train at another security

 1    conference on May 1st and May 2nd in Memphis.  They also ask

 2    them to come to Salt Lake City.  DEA did not accept any of the

 3    invitations and the DEA admits that they received the

 4    invitations from FedEx to participate in training but were

 5    unable to line up DEA participation.

 6         Okay.  I'm now turning to a different topic, which is all

 7    the ways in which FedEx assisted law enforcement, including

 8    about our co-conspirators.

 9         **THE COURT:**  Do you want to take a recess?  We can take

10    a recess.  We will be in recess until 2:30.

11         **MS. ARGUEDAS:**  2:30.  Great.  Thank you.

12              (Recess taken at 2:16 p.m.)

13              (Proceedings resumed at 2:34 p.m.)

14         **MS. ARGUEDAS:**  Yes?

15         **THE COURT:**  One other thing while I'm thinking about

16    it, so that's why I want to raise it.  You have interspersed in

17    your discussion today the possibility of Rule 29, and you've

18    also made mention of the fact that the Government doesn't

19    intend to call, not everybody, but basically the witnesses that

20    you've described.

21         So the Court -- if that's the case, everything that you

22    have told me, while it may be extremely probative in terms of a

23    trial and in terms of a verdict wouldn't be considered by the

24    Court in a Rule 29.  That's my understanding of the law.

25         In other words, I may even, as an example, because I

1    intend to do it, require witnesses to be called out of order;

2    and I may very well -- depending on the nature of this

3    discussion, I may decide that it doesn't look like I could do a

4    Rule 29 motion.  I don't know.  I haven't -- we're not there

5    yet.

6        But maybe the better way of dealing with it is simply just

7    to proceed; and if, you know, before some section of a witness

8    is called -- I don't know.  I haven't really thought about it,

9    but now this highlights the problem that would have been

10   present in either a Court or a jury trial.

11       MS. ARGUEDAS:  Right.  I've been worrying about this

12   problem for quite a while because --

13       THE COURT:  There's no way to deal with it.

14       MS. ARGUEDAS:  -- because I honestly was hoping that

15   the Government would feel honor bound having heard this opening

16   statement to call the witnesses that actually dealt with FedEx,

17   and then you would have them.

18       As a matter of --

19       THE COURT:  Like I said, that's up to them.  I'm not

20   going to direct them.

21       MS. ARGUEDAS:  It is up to them, but they do have an

22   obligation as the United States of America.

23       MR. HEMANN:  Well --

24       THE COURT:  We're not there yet.

25       MR. HEMANN:  Yes.

1      **THE COURT:**  So I don't need -- I don't know -- I

2  should let the Defense complete its opening, and then -- this

3  is one of the observations I was going to make at some point

4  today, so I made it now so I don't forget it -- and we can have

5  a discussion of it.

6      I want to make sure that you complete your opening

7  statement, and then ask the Government in light of the opening

8  statement, are there any views that they have with respect to

9  how they're going to proceed.  And maybe you need some time to

10  think about it and deal with it.

11      **MR. HEMANN:**  One thing, Your Honor.  There's obviously

12  several meetings that Ms. Arguedas has spoken about, and we

13  have three witnesses who definitely are coming:  Charles Trant,

14  Jim Byrom, and Ms. Tucker from FDA --

15      **MS. AULT:**  Becker.

16      **MR. HEMANN:**  -- Becker from DEA or FDA.

17      **MS. ARGUEDAS:**  Two of those are from the same meeting.

18  But can we not do this now?  Because I'm in the middle of my

19  opening statement.

20      **THE COURT:**  It's my fault.

21      **MR. HEMANN:**  I just wanted to respond.

22      **THE COURT:**  It's my fault.

23      **MS. AULT:**  Your Honor, that was the point, we have

24  been trying not to because it is an opening statement; but the

25  people that Ms. Arguedas has identified, they are on our

1    witness list.  Whether we choose to call them or not,

2    Ms. Willis and Mr. Murphy are on our witness list.

3         THE COURT:  I'm not there yet.

4         MS. ARGUEDAS:  No, they are not.  They were on the

5    185-person list, and they have never been seen since as it got

6    smaller and smaller; and they have not received a subpoena and

7    they've not been told they're going to testify.  That's Bryden,

8    Murphy, and Willis.  So let's be accurate.

9         THE COURT:  Be that as it may, let's conclude -- I

10   mean, let's proceed.  You don't have to conclude, though when I

11   say "proceed," I expect at some point you'll conclude.

12                        (Laughter)

13        THE COURT:  And I'm not suggesting you're taking too

14   long.

15        MS. ARGUEDAS:  I understand.  I understand.

16        THE COURT:  Okay.  Go ahead.

17        MS. ARGUEDAS:  All right.  See, look, we're getting --

18   we're more than half.

19       FedEx assisted law enforcement.  So what else was FedEx

20   doing besides having the meetings with the DEA people and being

21   told what they were told?  They were actively working with

22   state, federal, and local law enforcement to help law

23   enforcement determine which online pharmacies were breaking the

24   law.  There are many examples, and I am going to highlight only

25   a few.

1        The first one is operation Cyberx.  That's in that time

2   period, 2004 to 2005.  It is directly relevant to our case to

3   the allegation that FedEx was a co-conspirator with the

4   Chhabra-Smoley group because this evidence proves that FedEx

5   was the opposite of a co-conspirator.  FedEx was a partner with

6   law enforcement providing information that enabled law

7   enforcement to prosecute illegal pharmacies, including

8   associates of Chhabra and Smoley.

9        Cyber -- it's spelled out CyberRx, but they call it

10  Cyberx -- was a major DEA investigation in Texas.  FedEx

11  assisted enormously in the investigation.  FedEx provided

12  research to the DEA about various customers and entities

13  voluntarily, not in response to a subpoena.

14       FedEx allowed the DEA to come into its facility and

15  inspect packages voluntarily, not in response to a subpoena.

16       FedEx Security -- Security -- would literally take FedEx

17  packages off the FedEx trucks and deliver them to the DEA

18  office so that the DEA could examine them and take down

19  information voluntarily, not in response to a subpoena.

20       One of the main targets of the DEA investigation was

21  Tri-Phasic Pharmacy, a co-conspirator.  It's on your plastic

22  card there.  Among the information that FedEx gave to the DEA

23  was that two other entities on your card were paying a lot of

24  the bills -- some of the bills for Tri-Phasic; right?

25       So the DEA is investigating Tri-Phasic, has, you know,

1    targeted Tri-Phasic.  FedEx gives them information that says,

2    "Here's two of the bill payers, Robert Smoley and Icom."  And

3    there's the evidence of it, Judge.  That's a FedEx screen shot

4    of a thing they have.

5              THE COURT:  So I'm following this, this is a

6    multicolored chart --

7              MS. ARGUEDAS:  Yeah.

8              THE COURT:  -- but it doesn't have a guide for the --

9              MS. ARGUEDAS:  Right, because it's alphabetical.

10   Blue, I think -- find Superior and then we'll know what color

11   is which.

12             THE COURT:  Superior is blue.

13             MS. ARGUEDAS:  Okay.  So Superior -- everything in

14   blue relates to the Superior organization, and everything in

15   yellow relates to the Chhabra-Smoley.

16             THE COURT:  And the green?

17             MR. CASSMAN:  Both.

18             MS. ARGUEDAS:  Oh, green is both.

19             MR. CASSMAN:  Blue and yellow.

20             MS. ARGUEDAS:  Oh, there you go.

21                        (Laughter)

22             THE COURT:  There's a logic to everything.

23        Okay.  Thank you.

24             MS. ARGUEDAS:  So they're targeting Tri-Phasic.

25   Here's FedEx saying, "Icom and Robert Smoley, they pay the

1    bills for Tri-Phasic."

2        Okay.  As always, FedEx keeps the confidence of law

3    enforcement, doesn't ever tip off any of their alleged

4    co-conspirators as to anything ever that went on.

5        The cooperation between FedEx and the DEA went on for a

6    year.  It was an enormous amount of work by FedEx, lots of

7    people putting in lots of hours.  It was a tremendous effort.

8    It is an effort that in those meetings that I have described

9    about the subpoena meetings, the DEA people would talk about

10   what they did in CyberRx, what FedEx did as the, you know,

11   pinnacle of "This is how you can help us.  That was great.

12   Let's try to model, you know, the future after Cyberx."

13       So what does the DEA do?

14       Let me just say, so Cyberx concludes and the Government

15   arrests -- and then, Todd, coming out of order a little bit,

16   748-02.

17       That's fine.  Okay.  There we go.

18       Cyberx concludes.  The DEA arrests 16 people, they shut

19   down 20 entities, and they seize hundreds of packages.

20       Here's what they do not do:  They do not arrest Robert

21   Smoley or shut him down.  They do not shut down Icom.  And they

22   do not say to FedEx, "Stop shipping," or anything like that.

23   "Hey, guys, we don't quite have enough evidence against those

24   two, but maybe you ought to take a closer look at them."  No,

25   nothing.

1      So the DEA here has made a decision as a result of a

2  massive year-long investigation that FedEx has helped with,

3  they've cut the cards and who's on the side of not getting shut

4  down or arrested is Robert Smoley and Icom.

5      The kind of thing that FedEx does, so, for instance, the

6  Government made an official request, meaning a subpoena, to

7  say, "These packages are probably going to still keep coming,

8  you know, after this take down, so for 30 days look for the

9  packages and give them to us if you see them."  That lasted for

10 30 days.

11     FedEx went on and did that for months.  And when they did

12 it for months, among the packages they turned over to the

13 DEA -- now this is voluntarily -- is Waterview Pharmacy and

14 United LLC.  They're on your card.  They're one of our alleged

15 co-conspirators, and there's FedEx giving the information.

16     Now, the essence of what the Government said this morning

17 and is saying with their whole prosecution is that the DEA

18 makes a decision and they arrest 16 people, but not Robert

19 Smoley.  But FedEx is supposed to do what the DEA did not do,

20 which is stop shipping for him?  And they're supposed to divine

21 that on their own?

22     Same thing.  They shut down 20 entities.  Icom wasn't one

23 of them, but FedEx is here charged with a crime because they

24 didn't do what the DEA didn't do when the DEA has a legal

25 obligation to take away the registrations if they're not in the

 1   public interest?

 2       Not only that -- if I can have 753-01 -- at the time of

 3   these arrests, the DEA remembered very well -- I'm sorry -- the

 4   Department of Justice remembered very well what today's

 5   Department of Justice has forgotten because at the end of their

 6   press release for the 16 arrested, it says:  (reading)

 7           "The details contained in the Indictment are

 8           accusations, and the defendants are presumed to be

 9           innocent unless and until proven guilty in a court of

10           law."

11       But this morning's Department of Justice, that's out the

12   window under their theory.

13       So, Todd, now we're Back on Track to 779-13, the timeline.

14       So now let's talk about Baton Rouge.  The Government

15   talked about this too.  Here's Baton Rouge's story.

16       Second half of 2005, first half of 2006, two they're

17   actually local police officers but they were assigned to the

18   DEA Task Force, so for our purposes they are DEA Task Force

19   agents, they ask if they can come into the FedEx facility and

20   carry out investigations.  They want to be in the FedEx station

21   and look at whatever packages they want to look at that have to

22   do with online pharmacies; and FedEx showing its intent says,

23   "Yes.  Come on in."

24       So if we can pause there for a moment.  FedEx doesn't have

25   to do that.  This is private property.  They don't have to say

1    to the DEA, "Come on in and look at everything," but they did

2    because it was their intent to assist law enforcement.

3        So they come in, and the DEA Task Force officers spend

4    almost a year in the DEA -- FedEx facility, three days a week,

5    sometimes more, and they look at whatever packages they want to

6    look at, and they look at the sender addresses, and they look

7    at the return addresses, and they look at whatever they want to

8    look at.

9        And on many occasions they asked FedEx, "Can we take this

10   package and do a controlled delivery?"  Right?  Where they

11   bring it out to the recipient and then they interview the

12   recipient if the recipient's willing.  FedEx does not have to

13   say yes to that, but FedEx did say yes to that.

14       So they did that, and they would take them out.  They'd

15   talk to the customer who was getting the package and they'd

16   say, "What's in there?  Where did you get it?  Did you talk to

17   a doctor?  What website did you go to?"  All of these things.

18   All of these things are found out by the DEA outside the FedEx

19   facility, but only because FedEx let them in in the first place

20   and gave them the packages for the controlled delivery.

21       Okay.  They did 185 controlled deliveries during the year

22   that they were inside the FedEx hub.  185.

23       If I can have the next slide.

24       During those controlled deliveries, they found out about

25   81 Internet pharmacies, 97 websites, and 50 doctors who they,

1   you know, thought they should bring cases against or continued

2   to investigate.  Many of the entities on that list, the 81 and

3   the 97, many of them are entities that the prosecutors today

4   say FedEx is conspiring with.  I mean, it is ridiculous.

5       It was such valuable information that the local offices of

6   the DEA said, "Send me what you're getting.  Send me this

7   evidence that you got."  So the Baton Rouge guys were sending

8   it to all those different places, this information that they

9   got from FedEx's cooperation.

10      If I could figure out how to make, you know, like a Tony

11  Serra level flourish, I would, but I want to ask the Court what

12  kind of drug conspirator says to the DEA, "Come in to where I

13  work, rummage through all my packages for a year, take any one

14  you want, do a controlled delivery; and even though we know

15  what you're doing, we won't tell any of our alleged

16  co-conspirators"?  It is ridiculous whether we're talking

17  Rule 29 or beyond a reasonable doubt.

18      If I can have the next one.

19      FedEx received over 200 subpoenas from the DEA over the

20  course of this time period.  We've already talked about the

21  thing that Matt Murphy sent to Bruce Townsend about

22  Superior Drugs that says "do not disclose."  "Do not

23  disseminate the information" is what it said.  That same

24  message was given to the DEA more than 200 times.

25      So if I may have...

1    So we've got 200 subpoenas that had on the top this

2    language:  (reading)

3         "You are requested not to disclose the existence of

4         this request for an indefinite period.  Any such

5         disclosure could obstruct and impede an ongoing

6         investigation and thereby interfere with the enforcement

7         of the law."

8    For FedEx the only contact they had with these people is

9    they picked up their packages in the normal course of business.

10   So if you say to FedEx, "Don't disclose the existence of this

11   request," that means don't stop shipping.  Because what reason

12   could FedEx have given to the customer?

13   "Oh, you're a licensed and registered pharmacy, but we're

14   not going to pick up your packages anymore.

15   "Well, why not?

16   "Well, I can't say because if I did say, I'd be violating

17   that instruction 200 times."

18   Not to mention, not to mention that when you get a

19   subpoena that says that, well, that means the DEA is

20   investigating.  Investigating.  It doesn't mean that they've

21   drawn a conclusion.

22   Not to mention, that when the DEA draws a conclusion,

23   that's not the last word.  If you're FedEx and you get 200

24   subpoenas, you would think, especially because of what the DEA

25   has told you about their obligations, you would think that

1   they're going to investigate and take some appropriate action.

2       That's the places that subpoenas went to (indicating), and

3   those are the dates (indicating).

4       Now, Kentucky.  Kentucky.  Mr. Hemann this morning talked

5   about West Virginia.  I do not think he made himself that

6   clear, but I think this was his point:  I think his point was

7   West Virginia State Police or local police gave FedEx a list of

8   shippers that were violating or they thought were violating

9   West Virginia law.  And I think his point was that FedEx,

10  having gotten that list of shippers, still let those shippers

11  go elsewhere in the United States.  I think that was his point.

12      So now I want to talk to you about Kentucky because

13  Kentucky is quite relevant and it's where all this started.

14      So Kentucky is its own microcosm.  It's a very good idea

15  of what could happen when law enforcement gives FedEx clear

16  instructions and when there are clear and unambiguous laws.

17      Kentucky had an enormous, huge problem of medication,

18  prescription medication, abuse.  They have a lot of people who

19  are addicted in Kentucky, especially Eastern.  They had online

20  pharmacies were pouring into Kentucky using all of the parcel

21  carriers -- UPS, FedEx, Post Office -- to the point where when

22  the drivers for FedEx would be driving in the hills of Kentucky

23  to deliver packages, the recipients who were anxious to get the

24  packages would be like, "Where's mine?  Where's mine?  Where's

25  mine?"  They were harassing the drivers in a way that

1    potentially seemed unsafe, so FedEx did what you might think

2    they would do.  They called law enforcement.

3        And they said, "This is happening.  Can you help us?"

4    They called the DEA, who offered pretty much no help.  They

5    called the local police, who offered some help but mainly

6    referred them to the Kentucky Bureau of Investigation, which is

7    the statewide Kentucky law enforcement; and they called them,

8    and they got a lot of help.

9        And FedEx worked hand in hand with the KBI, the Kentucky

10   Bureau of Investigation, to the point where the Kentucky law

11   enforcement officers, Lynne Thompson and Jennifer Shearer, who

12   are not on the Government's witness list, will testify that

13   FedEx personified the best and most complete kind of

14   cooperation that a private company could give to law

15   enforcement.

16       And here's what they did.  They let KBI -- so first what

17   FedEx did is they instituted something called "hold at

18   location," meaning they weren't going to deliver anymore into

19   the hills.  People had to come into the FedEx station to pick

20   it up, hold-it location.  And they let the KBI set up an office

21   inside the FedEx station so that when the people were online to

22   pick up these packages, the KBI was able to interview them and

23   to do like a controlled delivery in a way.  They'd say, "What

24   are you getting?  Where did you get it?  You know, what

25   website?"  They talked to them.

1    And they conducted those interviews.  They got 60

2    interviews.  They used those interviews.  They brought them to

3    the Attorney General of Kentucky, and the Kentucky Attorney

4    General used those interviews to get a law passed in Kentucky

5    that I'm about to describe.  And these officers will tell you

6    that without FedEx's cooperation, they wouldn't have gotten

7    that law.

8    So the law essentially was that if you were an

9    out-of-state pharmacy and you wanted to ship medications into

10   Kentucky, you had to register with the state.  And before you

11   could register with the state, the Kentucky Bureau of

12   Investigation would do an investigation of you so that they

13   were able to make a good list of -- a list of approved

14   shippers.  We call it a good list.

15   And so the KBI was able to give to FedEx a good list, like

16   the West Virginia list is my point.  And FedEx would look at

17   the good list.  If they saw packages that weren't on it, they'd

18   hold those packages -- they don't have to, but they did -- and

19   give KBI time to come down with a search warrant to seize them.

20   Basically it went beautifully to the point where in those

21   meetings that I was talking about earlier, FedEx would

22   frequently say to the DEA, "You know, Kentucky has this law and

23   it works great.  Let me tell you how we do it."  So that's how

24   it happened.

25   Now, the Kentucky law improved the situation, but it

1    didn't solve it because, for example, the package recipients

2    started to figure out that they could have their packages sent

3    to them in Indiana or West Virginia, you know, just across the

4    border, and then they wouldn't be in the Kentucky law

5    situation.

6        These same packages because of the way FedEx routes, they

7    would go through Kentucky.  So FedEx would see that the

8    packages would be passing through the Kentucky hub and be on

9    their way to West Virginia or Indiana, and FedEx would call the

10   KBI, the state police who they were working with, and they

11   would say, "We don't want to ship this across the state line.

12   This doesn't seem right.  We don't want to."

13       And KBI said to FedEx, "There is no basis to seize them.

14   Kentucky has a law.  Indiana doesn't.  There's nothing you can

15   do about it.  You've got to let them go on their way."

16       Everybody knew this was a problem.  You would hear

17   testimony, if they would call them -- or we will if we have

18   to -- the KBI made a special trip to the DEA headquarters in

19   Virginia to tell them about this problem because, of course,

20   they knew.  This is a national problem.  It's across-state-line

21   problem.  They're Kentucky.  This could be a DEA problem.

22       The DEA had sporadic and inconsistent interest.  And the

23   DEA -- when it did drop in on a particular case, the DEA never

24   one time suggested that FedEx was doing anything wrong or

25   illegal.

1          And maybe more to the point, and this is -- you know,

2     Lynne Thompson and Jennifer Shearer, these are -- again, these

3     are people who were 35-year law enforcement with Kentucky, they

4     will testify that in the midst of this whole experience they

5     called their own local DEA office to say, "What can we do about

6     the packages crossing state lines?"  They said, "What is the

7     definition of a valid prescription?  Can we do anything about

8     this?"

9          And the DEA told those 30-year law enforcement, "It's a

10    gray area.  The definition of a valid prescription is a gray

11    area," and they gave KBI no information that would help them.

12    And the KBI people would say that to the FedEx people because

13    they were every day in the same place.

14         Now, I'm sure Kirstin Ault wants to say, "Well, that's

15    right.  It's wasn't a gray area."  You know, it doesn't matter.

16    That's what they were saying and that's how they experienced it

17    and that's what FedEx was told.

18         To give you an example -- if I can have the next -- so

19    this is -- there's a million of these, but here's one example.

20    This is an e-mail that went from the KBI person,

21    Lynne Thompson, to one of our FedEx employees, and she's

22    saying, "I was contacted by the DEA in Tampa about a pharmacy."

23    And she describes it.  "The DEA has FedEx records.  The

24    pharmacy uses several names."  Names them, gives them the

25    address.  "Can you watch for these packages?"

1        And then she goes on to say, "They opened a package.  It

2   had 2,000 pills.  They ship over a thousand packages a month."

3   So this is the DEA making a request of FedEx by way of this KBI

4   person.

5        And what are they asking?  They're saying, "Can you watch

6   for these packages?"  They're not saying, "And what are you

7   shipping them for?"  They just want to know, "Can you watch for

8   these packages?"  So if you're FedEx, you do that.  You watch

9   for the packages and you give them what they've asked for.

10       If the Government in 2016 doesn't like something that they

11   were -- the way they did it in Kentucky or West Virginia, then

12   the Government in 2006 should have said something like that.

13   Because you know what happened in 2006?  That's Jemella

14   DeRaimo.  She works for FedEx.  She's getting the highest award

15   the KBI can give for above and beyond cooperation with online

16   pharmacies.

17       Okay.  Credit Department.  You've heard this.  I'm going

18   to go through it pretty quickly.  These are the e-mail writers,

19   credit people and salespeople.

20       We could give you a binder of every e-mail written in the

21   case for the 10-year period; and if you read them, you would

22   never find an e-mail like you've seen in about a million other

23   cases, you will never find an e-mail that says, "Let's talk

24   about this further off line"; or, "This isn't something we

25   should be talking about by e-mail"; or, "Delete after you read

1  this."  You will not find that because it doesn't exist because

2  these are people who are talking about a business problem.

3      I've said this already.  The Credit and Sales Department

4  had different jobs than Security.  These people were just doing

5  the job that they had.

6      So let's talk about credit.  Credit and Collections, their

7  job is to make sure FedEx gets paid for its services.  FedEx

8  has millions of accounts.  You want to go online and open an

9  account, you get one.  They are extending you credit because

10  they don't -- you don't pay till two weeks after you ship.

11      If you ship a lot, you could get, you know, a huge amount

12  of indebtedness to FedEx.  In 2003, the Credit Department saw

13  that there was a group of customers who tended to run up high

14  bills, and then might stop shipping and not pay what they are

15  owed.  They were associated with online pharmacies.

16      Now, this was all new, by the way.  I'm now talking about

17  2003.  We have an e-mail from 2004 which tells somebody to

18  Google something, and then it says, "Google is a popular search

19  engine."  You know, we were in a different world back then.

20      So okay.  So they -- Credit says, "This is what we want to

21  do.  We want to have the online pharmacies make more frequent

22  payments, get a letter of credit, establish limits, or let us

23  do EZ debit where we go right in and take the money out."

24      None of these procedures were invented for the online

25  pharmacy, contrary to what you heard this morning.  So, for

1   example, you know who else gets that?  Political campaigns.

2   They also tend to rise up and run away without paying.

3        Okay.  This is the first -- never mind.

4        This policy applied to all accounts affiliated with online

5   pharmacies unless they had a Dun & Bradstreet report or a long

6   history with FedEx, every account associated with online

7   pharmacies unless they had a Dun & Bradstreet report.

8        Mr. Hemann said this morning that it was a credit

9   requirement and created a list of suspect pharmacies.  That is

10  100 percent false.  There is no evidence to support it.  It's

11  dead wrong.  It was a list of all online pharmacies.  Not

12  suspect ones, not illegal ones, not nothing like that.  It was

13  every one.

14       And if I can have the next slide.

15       This is how they defined it in a million e-mails and

16  briefs and everything else.  It was "any entity whose primary

17  business is the marketing and selling of pharmaceuticals or

18  weight loss aids through the Internet."  You know, weight loss

19  aids, they don't even require a prescription.  If you didn't

20  have a Dun & Bradstreet and you did that, you had to put up

21  more money.

22       Now, one of the purposes of the credit policy was to drive

23  the bad pharmacies off the customer list of FedEx.  Why do I

24  say that?

25       If I could see 902.01, or whatever it is.

1          This is a memo from one of these people to the other one,

2     Hale.   That's somebody that they talked about this morning.

3     And here they saying:   (reading)

4               "Many online pharmacies have been closed due to fraud

5          and illegal sales.   In a recent case, a teenager died

6          after being illegally supplied with a controlled drug that

7          was delivered by FedEx.   Application of proper credit

8          procedures will identify those fraudulent online pharmacy

9          customers and drive them off our customer list."

10         So if you want to know what their knowledge and intent and

11    good faith was, there it is written at the time as one of the

12    credit employees said, "What kind of crook would get a letter

13    of credit from a bank?"

14         So it was their hope that that would be one of the good

15    things of having these credit requirements.

16         And if I may look at the next one.

17         One of the things that -- well, let me just say this

18    first.

19         So here's another e-mail chain.   This is all them talking

20    to each other.   We want -- I guess the point I want to make is

21    this:   Making them put up money in front, that only made them

22    less attractive to online pharmacies; right?   That's not a way

23    to get business, "Let's make you do something harder and

24    worse."

25         So they're talking to each other, "Should we do it?"   And

1    here is a guy advocating for it.  And he says:  (reading)

2            "We're seeing increase in the number of online

3        pharmacies being set up and quickly accumulating very

4        large balances.  To date, there is no standard state

5        regulation of this industry."

6        That's what they thought.  That's what they saw.

7    (reading)

8            "This lack of regulation has led to several cases of

9        fraud and illegal selling and shipping of controlled

10       substances."

11       The last paragraph of this thing says:  (reading)

12           "In addition, FedEx Security is currently working

13       with the Secret Service," that's what he thinks it is,

14       "regarding fraudulent activity related to several online

15       pharmacies."

16       The point is the Government likes to take the top

17   paragraph -- they like -- well, they said it a lot this

18   morning.  They said, "All FedEx cared about was getting paid."

19   Well, FedEx cares about getting paid for sure; and the credit

20   people, that's their whole job, is to figure out how to get

21   paid.  Security's people is to work with law enforcement.  So

22   they try to make those things look like they're just callous;

23   right?  Well, the Credit people were doing their job and they

24   knew that Security was doing its job.  So it's not callous.

25       Okay.  Credit got the changes they wanted.  The new credit

1   rules went into effect.  It was published in something called a

2   "Sales Brief," meaning telling the salesmen that's what they

3   have to do.  The Sales Brief went out to 4,000 people, and

4   here's what it said:  (reading)

5              "Government regulations haven't been formulated yet,

6         so it's causing these problems."

7   And the last line:  (reading)

8              "It has also increased the investigations into fraud

9         cases for FedEx Security, who is working diligently with

10        the FDA and the DEA."

11  It's kind of point, set, match there.  They don't think

12  they're sending for obviously illegal shippers.  They think the

13  regulations haven't been formulated, and they think they're

14  working with law enforcement, which they were.

15      Now, this one really gets me.  They have acted this

16  morning, and I expect to hear it again, as if FedEx failed to

17  tell the DEA that they actually had a list of these online

18  pharmacy customers.  The credit list it's called.  That's what

19  he said, and I bet he'll say it again.

20      We have four good pieces of evidence to disprove that, but

21  I'm just going to give you one, and the one is a statement by

22  Jim Byrom, DEA agent.  And do you know what he said?  This is

23  what he said:  (reading)

24             "FedEx indicated to them that in general they knew

25        who were the pharmaceutical accounts.  They offered to

1      share this information not knowing if they were illicit or

2      not illicit pharms."

3          So let's put to rest the notion that FedEx kept that as

4   some kind of secret from the DEA.  We'll give it to you.  We've

5   got a list.  We just don't know which ones are which.

6          Okay.  Sales.

7          Look, Judge, I hardly have any left here.

8          The Sales Department -- if I can take a look at 514-02 --

9   the Sales Department, unlike many companies, most of their

10  salary is fixed; 80 percent is a fixed salary, 20 percent is

11  variable.  Very important to FedEx to note that this is not a

12  commission, the variable.  So if I'm a salesperson, I do not

13  get a commission because I have Superior Pharmacy as a

14  customer.  They do it by region.  So if I have San Francisco

15  and San Francisco did a million dollars worth of business last

16  year, I am expected to do 1.1 million next year; and if I do

17  1.2 million, then a piece of my salary is going to go up.  If I

18  do 800,000, it's going to go down a little bit.

19         So there's a concept called the goal adjustment.  If my

20  thing goes down to 800,000 and it's not my fault because a

21  place goes bankrupt or an online pharmacy moves or an online

22  pharmacy gets shut down, I can go to the bosses and say, "That

23  was not my fault.  I want a goal adjustment," and I'm probably

24  going to get it.  If they went to UPS, I'm not going to get a

25  goal adjustment.

1        So what happens with online pharmacies is that because

2   they move around so much and are so volatile, everybody was

3   always asking for a goal adjustment and it was a big pain.

4        As a result, the salespeople started talking to each other

5   and saying, "Why don't we just take them out of our

6   compensation and put them in catchall."  Catchall is something

7   that already existed.  It was not new created for online

8   pharmacies.  It was -- for instance, flowers do go into

9   catchall, political campaigns.  You know, flower shops ship a

10  lot on Valentine's Day and then they disappear.  The point is

11  it's not new.

12       If I can have the next one.

13       If an industry, or whatever you call it, is in catchall,

14  it just means it just doesn't count at all.  Your income

15  doesn't go up when you have it, and it doesn't go down when it

16  leaves.

17       So a lot of these e-mails that you're going to see are the

18  salespeople talking to each other about whether they did or

19  didn't want that; and you can imagine it's about compensation,

20  some of them got pretty intense.

21       If I can have the next one.

22       The point is they did do it.  They did put it in catchall,

23  and from that point on the salespeople had no incentive to sign

24  up an online pharmacy.  It didn't help them.  It didn't hurt

25  them.  It was irrelevant to them.

1          The Government is going to use snippets of e-mails.  We

2     are going to ask you to look at them all.  You know, I dread

3     what's coming now because they're going to bring people in here

4     and they're going to say, "Read this little thing"; and then

5     I'm going to get up and say, "No, read that other little thing

6     above it."  It's going to be terrible, but it has to be done,

7     and I'll show you why.

8          If I can have 903.01.

9          This is the kind of thing I mean.  So here's an e-mail.

10    This is a not guilty beyond a reasonable doubt e-mail because

11    look at what it says, and you can see it went to like 10

12    people, 12 people:  (reading)

13              "In Pennsylvania, Virginia, and North Carolina, and

14         possibly other states, state laws allow the rapid setup of

15         online pharmacies.  These pharmacies ship Express like

16         crazy, staffed by licensed pharmacists.  Then the DEA

17         comes in and shuts them down for not illegal activity (it

18         is not) but they are not compliant with DEA regulations."

19         So do you see what I'm saying?  If they show an e-mail to

20    those other people over there that doesn't say that, then I've

21    got to show that one.  Because what does that say about what

22    their state of mind was?  It says, "I see a DEA shutdown, but

23    it's not for illegal activity.  It's for not complying with DEA

24    regulations."

25         And this is not crazy because it's what Dr. Willis told us

1    way back when, and it's what they saw.  So you want a

2    state-of-mind e-mail?  A shutdown is not for illegal activity.

3         Okay.  If I can have the next one.

4         This is Superior.  Shutdowns.  The Government's whole case

5    is:  If we shut them down, everybody needs to shun them, shun

6    them and their relatives forever.

7         Here's an e-mail:  (reading)

8              "This account, Superior Drugs," one of our

9         co-conspirators, "has not gone out of business.  They were

10        shut down for a few days by the DEA.  The company they

11        were fulfilling for moved elsewhere."

12        They were shut down for a few days by the DEA.  So what

13   should we make of that?  FedEx doesn't know why they're shut

14   down or why they're reopened; but the DEA looked at them,

15   looked at them enough to shut them down, and then looked at

16   them enough to let them reopen.  So what do we do there,

17   Mr. Hemann?  Do we say, "Oh, well, I don't care about the

18   reopening?  We can't ship for them."

19        Next one.

20        You see what's going to happen here, I've got a lot of

21   these, not for the opening, but you see what I'm saying.  You

22   want to talk about state of mind?  Okay.  Here's another one.

23   These are credit people talking about why someone's not paying

24   their bills.  He says:  (reading)

25             "Well, there's several reasons he can't pay us.  He

1    was shut down for a month because Florida law no longer

2    allows him to ship his packages out of the state of

3    Florida, so now he ships out of New York."

4    Okay.  He shut down.  He moved.  Just like the DEA told

5    us.  That's a not guilty beyond a reasonable doubt e-mail.

6    This is a good one.  Look at this next one.  These also

7    are credit people.  Something happened, I don't -- I don't

8    know.  (reading)

9        "All account numbers at that location were placed on

10    a credit hold.  I am now receiving calls from the

11    websites" -- remember the websites that are not explicitly

12    outside the law according to the DEA? -- "I am now

13    receiving calls from the websites saying they are moving

14    their shipping to pharmacies in other locations that are

15    compliant" -- compliant -- "with DEA, even giving me their

16    DEA license number."

17    Can I have the next one, please.

18    This is part of a whole long discussion, again, about

19    catchall and all of that, but look at what the bottom one says.

20    So they're debating; right?  And they're saying -- here's what

21    this guy says:  (reading)

22        "The pharmacies I visited had a licensed pharmacist

23    on-site and a DEA license on the wall.  The pharmacies

24    that I personally dealt with appeared to be legitimate.

25    They told me they were routinely inspected and they paid

1   their bills."

2   The DEA told FedEx that when they went after a

3   registration, the pharmacy had a right to defend itself,

4   something near and dear to all of our hearts it should be, the

5   idea that you have a right to defend yourself, the right to

6   present evidence, the right to challenge the DEA, and then a

7   court decides.

8   This is something that FedEx saw happen.  So, for

9   instance, that one says:  (reading)

10          "The volume has dropped drastically due to federal

11          regulation has shut them down.  They have a hearing

12          scheduled to get their licenses back."

13   So did they win or lose?  I don't know.  But according to

14   the Government, they should have been put out of business by

15   FedEx and UPS before they had their hearing.

16   Next one, please.

17   They're talking about whether to put it in catchall or

18   not, and they're trying to say whether they work hard to

19   service these pharmacies.  And somebody is saying:  (reading)

20          "I couldn't agree more.  The issue is very volatile.

21          The DEA may shut a pharmacy down, but if they prove they

22          are operating legally, they may reopen again."

23   It's not just what they thought.  It's what the DEA told

24   FedEx.

25   Now, let's talk about products.  One of the things that

1    makes this whole situation so confusing is that different laws

2    apply to different medications.  Maybe this is something that

3    you had in your previous cases.  I don't know.

4         These pharmacies switched products all the time, and they

5    didn't need to tell FedEx what they were doing in terms of

6    products, but FedEx knew they shipped products.  So, for

7    example -- if I could have the next slide -- (reading)

8              "You can't tell with their names what they're

9         shipping; and even if they open with one product line,

10        they often ship following whatever trends are in the

11        market."

12        And if I can have the next one.

13        (reading)

14             "Sav-On is working on a contract with the government

15        on providing Medicare, diabetic supplies, and moving away

16        from embarrassment drugs."

17        By the way, Judge, in some parts of the country, they call

18   things "embarrassment drugs."  Here in our district we call

19   them "lifestyle drugs."

20        So they ship different -- they change products.  And so

21   why does that matter?  Here's a website.  They were selling

22   phentermine, Viagra, Cialis, hydroxy, controlled,

23   noncontrolled, no prescription at all.  They can change to

24   Viagra, St. John's Wort, diabetic.

25        What we know is this (indicating).  We don't know -- okay.

1        The reason why it particularly matters to us is that

2   different rules apply depending on what it is.  So controlled

3   substances like phentermine are treated differently than

4   noncontrolled medications like Viagra.

5        And here you asked this question.  The Ryan Haight law.

6   That is when the face-to-face statute came into effect and it

7   was April of 2009, but very important.  That only applied to

8   controlled medications.  So it applied to phentermine but not

9   to Viagra, which matters if that's what you're seeing.

10       But, more important, if we can talk about Ryan Haight in

11  this case, the Chhabra-Smoley conspiracy is all over by

12  February of 2008, so you don't have to think about that at all

13  related to them.

14       The only counts against FedEx that extended past Ryan

15  Haight relate to Superior, and I'm about to tell you about

16  Superior.

17       Superior.  It's ridiculous that we are charged with

18  Superior, and I'm going to prove it to you right now.  But, in

19  any case, to put it more lawyerlike, FedEx was assisting law

20  enforcement in its investigation of Superior throughout.  So

21  Ryan Haight doesn't matter to us.  I think the Government might

22  even agree with that.

23       Okay.  I want to talk about money for a minute.  The

24  question would be on any trier of fact's mind:  Did FedEx have

25  a financial motive to spur it on to commit felonies with online

1    pharmacies?

2         There is no amount of money that would cause FedEx to

3    enter into a criminal conspiracy with an online pharmacy; but

4    in this case, there is a particular absence of a financial

5    motive.  And I would like to give you a few numbers.  I thought

6    the Government was going to use them.  These are the numbers

7    they used in the Grand Jury, so these are the ones I picked.

8    They actually used numbers that were smaller than this.

9         In the Grand Jury the Government said FedEx had a gross

10   revenue of $187 million over a seven-year period.

11        **THE COURT:**  I'm sorry.  187?

12        **MS. ARGUEDAS:**  187 million over seven years.  The

13   number came -- right there (indicating) -- the number came from

14   the list of shippers that were on the credit list.  So it's

15   actually quite overrepresented because some of the people on

16   the credit list were legal, some of them no one knows anything

17   about, but I just want to use it as an example.

18        First of all, the profit on that 187 million is

19   5.2 million.  5.2 million.  More to the point, it's a

20   seven-year span of time; and during the time that we're talking

21   about 187 million, FedEx's gross revenue was 227 billion, which

22   amounts to .08 percent.

23        I had this in here more, Judge, when we thought we had a

24   jury, but I think it's still worth talking about since the

25   Government is saying that FedEx's motive was money.

1      But I do want to say we are -- I'm not saying that FedEx

2  didn't want to make itself available to service licensed and

3  registered pharmacies in the online pharmacy business.  That is

4  what FedEx does.  It is in the DNA of FedEx to offer to the

5  general public, "We will ship your packages."  It would not be

6  typical for FedEx to write off a whole entire industry of

7  online pharmacies when no government authority had even

8  suggested that they should do so and when they're made up of

9  licensed and registered business.

10     It would not be typical for FedEx to look inside sealed

11  packages containing medications and make a judgment about

12  whether that person deserves this package, nor would FedEx look

13  at the recipients of medication packages and make a judgment

14  about whether they should.  What FedEx did do, which I've said

15  in spades I think, is report suspicious behavior and help the

16  DEA in all these ways.

17     So now I want to talk about Superior.  If there is -- if

18  there was ever -- and it doesn't take long to explain it.

19     So April 13th, 2004, FedEx -- I'm sorry -- the DEA sends a

20  subpoena to FedEx asking for all the account records for

21  Superior Drugs, and the DEA told FedEx on their subpoena

22  exactly how FedEx should view the DEA's investigation and how

23  it should act towards its customer Superior Drugs.

24     And I realize this is the end of the afternoon, but that's

25  why I saved this bit of blockbuster evidence because here is

1   the subpoena that they gave FedEx about our co-conspirator.

2   This is what it said:  (reading)

3            "This is only an investigation, and your customer

4        retains his presumption of innocence."

5        There is no answer to that.  (reading)

6            "To avoid compromising this is ongoing criminal

7        investigation which could allow individuals who are

8        selling illegal drugs to continue to do so in our

9        communities, we request that you and your company not

10       disclose this request to your customer."

11       So we have had -- well, this is 2004 where they say,

12   "We're investigating.  Don't tell them, and presume them

13   innocent.  Presume them innocent because this is only an

14   investigation."  And these prosecutors have charged FedEx with

15   felonies because they shipped having gotten that.

16       Then let's move to April 12th, 2006.  FedEx Oklahoma City

17   calls the DEA about a suspicious package.  Calls the DEA.

18   Who's the sender?  Superior Drugs.

19       Now, did Mr. Hemann stand up here this morning and say,

20   "FedEx didn't initiate.  Maybe they answered some subpoenas,

21   but they have to answer subpoenas"?  That is what he said.

22       Now it's April 2006, FedEx calls the DEA, "This doesn't

23   look right.  Come on out here."  DEA comes out -- DEA Oklahoma

24   comes out, talks to FedEx, talks to that person that called.

25   Then says to the manager of the facility, "Can we take that

1   package and do a controlled delivery?  Will you let us do

2   that?"  FedEx says, "Sure."  This is our co-conspirator.

3       So they do that, and the DEA goes out, does the controlled

4   delivery, gets information that's helpful to them; and they

5   send that information, the DEA Oklahoma sends it to DEA Miami

6   because DEA Miami I guess is in charge of investigation.  Of

7   course, they used FedEx to send the evidence.  Because why

8   wouldn't you?  And the DEA takes no action against Superior.

9   Doesn't suspend the registration.  Doesn't do anything.

10      Okay.  So now life goes on.  Now it's December of 2006.

11  That's the Elizabeth Dillinger, "Hello.  I'm Matt Murphy.

12  You're Bruce Townsend.  Here's everything there is to know

13  about our Superior investigation.  Don't disseminate," which

14  means don't disseminate and do anything different.  That's the

15  next thing that happens.  And a big thank you.  Not a "Why are

16  you doing this?"

17      And then what happens?  July of 2007, the DEA sends FedEx

18  another subpoena, and what does it say?  It's 2007, "This is

19  only an investigation" -- only -- "and your customer retains

20  his or her presumption of innocence."  That's what they told

21  us.

22      By the way, when I talked about the 200 subpoenas that

23  said don't tell anyone that this is happening, interspersed is

24  about 20 others that had that "presumption of innocence"

25  language in it for other pharmacies.  I'm just talking about

the Superior ones because we're accused of conspiring with

them.

So now in 2004 and 2007 the federal government says to

FedEx:  We've not yet determined whether Superior Drugs is

committing a crime.  We're conducting an investigation, but

it's only an investigation; and your customer, Superior,

retains his presumption of innocence.  And the DEA left their

registrations intact.  Let's not forget that.

So then what happens?  December of 2008, FedEx Security in

Texas e-mails the DEA to report a suspicious package.  From

who?  From Superior.  Unsolicited FedEx e-mails the DEA and

says, "Are you familiar with Creative Pharmacy?"  Which I told

you that's the same thing.  "Are you familiar with

Creative Pharmacy?"

Do I have that?  Yeah.

Okay.  The bottom was is the e-mail from FedEx:  (reading)

        "Are you familiar" -- "Joel, are you familiar with

        Creative Pharmacy services out of Miami?"

And then back from Joel Dunn of the DEA:  (reading)

        "We are familiar with them.  If you'll send me her

        name, contact information, and about two months' worth of

        shipping data, I'll forward a report on to the office that

        is investigating them."

The United States of America said all FedEx ever did was

answer a few subpoenas, which they have to do.  This is our

1    co-conspirator, and we dropped the dime.

2        Joel, DEA Joel, made it clear to Jim from FedEx that Miami

3    DEA is handling it.  We're not interfering with that.

4        So then what happened?  Okay.  March of 2009.  Now it's

5    the FBI investigating Superior/Creative, and the FBI calls

6    FedEx and says:  (reading)

7            "Can you assist us with the Creative Pharmacy

8            services investigation?  Would you hold all their outgoing

9            packages and we'll serve search warrants later?"

10       FedEx does not have to do that.  They could say, "Bring a

11   warrant or don't bring a warrant," but they did.  They held all

12   the packages for two days, kept them at the station.  And on

13   the third day, the FBI came out to examine the packages.

14       Oh, and, by the way, FedEx also gave the FBI information

15   that linked Creative to the Spence Group.  They're on your

16   card, one of our co-conspirators.

17       So the FBI comes out and they seize 105 packages from

18   Superior.  Not all of them.  They just take 105.  Of course, we

19   don't get to know why they do what they do, but they take 105

20   and they leave the rest to go on in commerce.  So I guess the

21   FBI didn't think they were facilitating felonies.

22       Now, I really am almost done here, Judge, but I do want to

23   say this:  You might be wondering, anyone might be wondering

24   why the DEA let Superior be registered and operating for eight

25   years when there was all this evidence against them.  You might

1    wonder why the DEA let Icom and Smoley keep operating after

2    CyberRx.

3        But the Government's failure to close Superior is

4    particularly stark.  They did their first buy on Superior in

5    2002.  Then they sent the subpoena in 2004.  Then our Oklahoma

6    people snitched them off in 2006.  2007 they sent us another

7    "presumption of innocence" subpoena.  2008 we call them again.

8    2009 the FBI comes takes some of the packages, not all the

9    packages.

10       If I can have the next one.

11       From 2002 to 2009, the registration was intact.  In fact,

12   twice -- three times it was renewed by the DEA.  This went on

13   for eight years.

14       Only the Government --

15       **THE COURT:**  I have a question.  With respect to

16   Superior and with respect to people who -- there were a number

17   of people who lost their lives as a result of these drugs being

18   improperly distributed; is that true?

19       **MS. ARGUEDAS:**  Yep.

20       **MS. AULT:**  Yes, Your Honor.

21       **THE COURT:**  All right.  Did any of these drugs come

22   from Superior?

23       **MS. AULT:**  Yes, Your Honor.

24       **THE COURT:**  Okay.  So the Government can be prepared

25   to tell me why they're not responsible in their failure to act

1    for the consequences of their inability or reluctance or

2    whatnot to stop this particular pharmacy.

3        Okay.  Go ahead.

4        **MS. ARGUEDAS:**  Well, that, Judge, was exactly the

5    point I was about to go to.

6        Mr. Hemann, I think wisely, didn't talk about deaths this

7    morning, but the Government sure has a lot of times in this

8    case in pleadings, in the Indictment.

9        **THE COURT:**  Well, I'm aware of it.

10       **MS. ARGUEDAS:**  And I --

11       **THE COURT:**  That's one of the things that makes the

12   online pharmacy so -- this practice so serious.  I don't think

13   anybody's standing up here saying this is trivial.

14       **MS. ARGUEDAS:**  Not a bit.

15       **THE COURT:**  To the contrary.  To the contrary.  It's

16   serious, and it seems that a great deal of effort was devoted

17   to investigation and to gathering evidence, and so forth, with

18   respect to it, and that's -- it's appropriate and laudable.  I

19   understand all that.  I understand all that, but that's not

20   this case.

21       **MS. ARGUEDAS:**  Understood.  And really that's where I

22   was going to end actually, Judge, to say -- you've already said

23   it.  I don't need to say it.

24       So my ending is this:  There is no possibility that a

25   reasonable finder of fact could think FedEx was guilty beyond a

1   reasonable doubt on either knowledge or intent; and however we

2   get to that point, sooner is better, but this is not a close

3   case, not from any point of view.

4        Thank you.

5        **THE COURT:**  Well, I would like to discuss something

6   about order of witnesses because whether accurate or not, it's

7   clear to me that -- or it seems to be based upon the

8   presentations of both sides that it's important that the Court

9   get a full picture of what was said to FedEx.  What was said to

10  them?  What did they know?  What was said to them by the

11  Government?

12       So I think that when you go through your witness list, you

13  will pay particular attention to those individuals identified

14  by the Defense as having conversations -- Government agents

15  having conversations with FedEx in which they said,

16  purportedly, the things that Ms. Arguedas said they said.  Some

17  of them are statements.  Some of them are recounting of notes.

18  Some of them are, I guess, witness interviews.

19       But, at any rate, that is of significance.  So I don't

20  want to spend three months and then at the end find out what

21  everybody said about it if, in fact, that knowledge is

22  certainly within the control of the Government.  These agents

23  are within the control of the Government.  Maybe not all of

24  them now and so forth.

25       But I think that it would be useful to call an agent and

have a full exposition of what was said to FedEx at different

times, and to include in that collection of agents the people

that the Defense has argued, unless you don't believe they were

DEA agents or something.  I mean, which, of course, you believe

they're DEA agents.  You told me that.

     And I think that would be useful, and I think we need to

have those six meetings and so forth.  The Prosecution should

call those people.  We should find out what they're going to

say.  Maybe they'll say what the Defense said.  Maybe they

won't.  Maybe it will be -- I think it's relevant.  I don't

think anybody says it's not relevant, but maybe there's

evidence that would somehow either explain it or contradict it

or carry the day in some other way.

     And I'm not precluding the Government from putting on all

that evidence.  It's just that I don't want to end up at the

end of the Prosecution's case having a very incomplete picture

of what was going on.

     And I do think that it is, in especially this type of case

in which there is not a jury, it is the Government's

responsibility, as the embodiment of the Department of Justice

concerns, to present that kind of evidence.  If they believe it

to be exculpatory as the Defense contends, they have an

obligation to present it.  That's my view.

     I don't sit back and say, "Okay.  The Government is aware

of all of this evidence.  They have no obligation to present

1    it," especially when we're less concerned about the order of

2    the trial than we are in the what I would say the normal,

3    rather rigorous -- rather rigorous jury trial.  It's not a

4    question of a Fifth Amendment privilege.  It's not a

5    question -- none of that is of concern here that I understand.

6    I mean, I can always be enlightened about it.

7         But I just think you ought to give some thought to that.

8    I think you ought to seriously consider now that it's out there

9    what is -- you know, what has been said.

10        I'm not looking at this case -- I try to cut out the --

11   there's a certain level, as there is in any case, of an

12   advocate's concern about the way the other side has presented

13   the case, and we've heard a fair amount of that today.  I'm not

14   concerned about that because, first of all, it hasn't been

15   presented to me yet.

16        Secondly, I have a great deal of confidence that it will

17   be presented to me fairly, but I don't want the Government to

18   go back tonight and just say, "Okay.  Well, here are our 20

19   witnesses, and we're just going to stick to our game plan."

20   Because I think whatever the game plan was, and I don't know

21   what it was, but whatever the game plan was, I think it ought

22   to be fleshed out in terms of the arguments or proffered

23   evidence or discussion of the evidence presented by the

24   Defense.

25        The legal effect of it, by the way, is quite another

1    issue.  I understand that.  But I don't want to get to, quote,

2    the legal effect of it till I know what the evidence is, then

3    we can discuss what is the legal effect.  Is there a legal

4    effect that DEA doesn't revoke a license?  Does that mean

5    anything?  Does it mean they renew a license?  I don't know.

6    That's sort of an interesting question.  It may.

7         Is there a legal effect to the Government saying, "We're

8    not going to tell you who they are -- these people are"?  Does

9    that make a difference?  It might, might not.  I don't know.

10   But I want a factual record, which is what I would call a

11   fairly full, complete factual record.

12        And I will say, finally, it is the Government's obligation

13   to do so if they're made aware of the existence of this type of

14   evidence.  And I think the opening statement, just listening to

15   the evidence and looking at it, just looking into the proffer

16   and looking at it, while I understand it's a proffer and while

17   I understand it's also a characterization, I also see in front

18   of me statements that are made by individuals.  So it's not

19   like, "Well, we hope to show that this particular agent will

20   say that at that particular meeting such and such happened."

21   Because you may go back, talk to the agent, and he will say,

22   "No, it didn't happen."

23        But what has been shown to me this afternoon and you are

24   definite statements in the agent's words as to what happened.

25        So that's my comment for the day.  I think we'll start at

1   9:00 o'clock.  I can take up any matters that you might have.

2       Ms. Ault?

3       **MS. AULT:**  Your Honor, the only thing that I would say

4   is this, which is that you heard a very lot of not evidence

5   from the Defense today.

6       **THE COURT:**  You mean those things would not be in

7   evidence?  Is that what you're saying?

8       **MS. AULT:**  That some of them may come in, some of them

9   may not come in; but as the Court knows, everything that

10  Ms. Arguedas said today is not evidence, and so we would

11  encourage -- and also everything --

12      **THE COURT:**  Well, I don't know.  I don't know

13  whether -- of course, everything everybody says is not

14  evidence.

15      **MS. AULT:**  Yes, Your Honor.

16      **THE COURT:**  I'm not looking at, "This is outrageous,"

17  or, "What do you expect them to do," or, "They were told 48

18  times," characterizations of the evidence.  I understand

19  there's a difference between a characterization, which is not

20  evidence -- it's argument -- and evidence.

21      But I'm saying you can go back over the opening -- you

22  have a transcript -- and you've looked at the -- or I guess

23  you'll look at the exhibits, and you'll see what is in there.

24      Now, if you believe that certain things would never --

25  cannot go into evidence, I can certainly rule on that.  And

1   you're correct in the argument that all you have to do is

2   discuss the evidence.  Yes, it is.  We're a court of evidence.

3   We have rules of evidence.  We're a court of law which has to

4   consider evidence.

5        But, you see, when you talk about somebody's intention, it

6   seems to me at the very least everything that they're told

7   comes in.  Everything they're told comes in, and they were told

8   if it's to be believed, a lot of things which are evidence.

9   That's evidence.

10       Now you go back and you say, "Well, what they said in

11  response to that may or may not be evidence."  And to that I

12  say, it depends on how it comes up, it depends on whether in

13  the -- there's a doctrine of completeness which says if you

14  take one part of the statement, you have to put in the rest of

15  the statement if it's to explain the one part of the statement.

16       And what counsel has said is that you can't -- it's going

17  to be very hard to take a piece of an e-mail chain and make an

18  argument that the rest of the e-mail chain doesn't come in if

19  it's part and parcel of the same thing, if it's a discussion of

20  the same issue.

21       I have the same rule with the jury as I am with me.  I

22  wouldn't have anything different.  So to your statement that

23  what she has said this afternoon is not evidence, I agree, it's

24  not evidence.

25            MS. AULT:  And --

1            **THE COURT:**  But I'll tell you, listening to it, I

2      think there's a lot in it that certainly would be evidence.

3            **MS. AULT:**  And, Your Honor, I simply wanted to point

4      out to the Court that the United States is going to put on its

5      case; and in the normal course, the United States, in the

6      course of its case, will meet the defense but we don't put on

7      the defense.  And so to the extent that a lot of things that

8      Ms. Arguedas raised were their defense, we are not going to

9      structure how we present our case the way they have structured

10     how they present their defense.

11           **THE COURT:**  So explain to me how that's consistent

12     with the Government's obligation to present the truth.  Tell me

13     if, in fact, you have access to information which is contrary

14     to an assertion of guilt and you have access to that, do you

15     feel you have any obligation?  Do you think you -- well, put it

16     this way:  One, do you have an obligation to present it?  Or,

17     two, is your obligation simply limited to turning it over to

18     them?

19           Is that -- I mean, you've done that -- I believe you've

20     done that.  I don't know.  We're not getting into a fight over

21     that.  But they talked about all sorts of things that they

22     have.  Is it really your view that you have absolutely -- that

23     you have no obligation to present that even though that may put

24     certain statements that your witnesses say in a particular

25     context?

1      **MS. AULT:**  Your Honor, the beginning point of that is

2    whether we believe that it is evidence of innocence, whether we

3    believe it does contradict guilt.  And we don't have to buy

4    into the Defense's belief on that, and we don't buy into the

5    Defense's belief on that.

6      The Court has --

7      **THE COURT:**  Well, do you believe if the DEA told --

8    let's take some of this.  Let's say the DEA says to -- FedEx

9    says, "Just give us the names of illegal operations.  We'll

10    shut them down."  They say that to the DEA.  And the DEA says,

11    "We're not going to give you any names."  Take that.  Does that

12    come in?  Is it your obligation to present that?

13      **MS. AULT:**  We don't believe so, Your Honor.  We don't

14    believe that that is consistent with innocence.  We don't

15    believe that --

16      **THE COURT:**  No.  It's consistent with a presentation

17    that would not be a complete presentation.

18      Why isn't it -- in other words, your argument is -- maybe

19    we should just get to it as a matter of law.  Your argument is

20    that if you tell them not -- if you tell them -- for example,

21    your subpoenas, "These people are presumed to be innocent and

22    don't disclose the subpoena to anyone."  You say that.  By the

23    way, isn't there a criminal sanction if you do?  There isn't.

24    Well, who knows.  I've never had that case.

25      **MS. ARGUEDAS:**  We didn't do it.

1          **THE COURT:**  The Government says there ought to be.

2     Okay.  But be that as it may, it's a direction of the

3     government not to disclose it.  Maybe it is only in the Bank

4     Secrecy Act.  I think it is in the Bank Secrecy Act.

5          **MS. AULT:**  That is correct, Your Honor.

6          **THE COURT:**  Okay.  But it's not in these, fine.  Be

7     that as it may, a person may or may not know whether it can be

8     supported by criminal sanctions, but it certainly has some

9     value.

10         So if the government says, "Don't tell X" -- and that what

11    they mean by that, by the way, is "Don't tell them directly or

12    indirectly" -- "that they're under investigation," is that

13    consistent with innocence?

14         **MS. AULT:**  I'm sorry.  I don't think I understand

15    Your Honor's question.

16         **THE COURT:**  Well, I'm trying to figure out, if they

17    tell them -- I'm sorry.  I didn't articulate clearly.

18         If they tell them not to disclose to a pharmacy that

19    records are being subpoenaed, they tell them not to, and FedEx

20    continues to service the pharmacy because if they stopped

21    serving the pharmacy, they'd have to explain why they have

22    canceled the account -- I mean, they could say -- they could

23    even say, "We canceled the account and we can't tell you why."

24    Okay.  They could say that but that, of course, discloses an

25    investigation certainly indirectly.  They're not idiots.

1    Suddenly they're not being picked up, their packages -- and, by

2    the way, it's putting them out of business, of course.  It's

3    going to put them out of business.  So it's not like, oh, this

4    is unimportant.  It's very important why FedEx stops picking up

5    the packages.  So it's a disclosure.

6        And the government said, "Don't make that disclosure."

7    Are you saying to me that's not evidence of their intent?

8    Because I would be astounded at that.

9        Putting it another way, putting it another way, let's say

10   DEA said, "Please deliver those packages.  We want -- we want

11   to trace them.  We want to see what happens."  Let's say they

12   said that.

13       **MS. AULT:**  That would be entirely different,

14   Your Honor, and that did not happen.

15       **THE COURT:**  And that's because that's so-called

16   governmental estoppel or something.  I see.

17       Okay.  Well, I'll be entertained by the brief on that

18   subject.  Nevertheless, I am saying to the Government now is

19   the time to look -- in a court trial, since all of this is

20   coming in, to please call a number of witnesses who have been

21   identified by FedEx who participated in significant meetings

22   with FedEx on these issues.  I'm asking the Government to do

23   it.  I'm not ordering you to do it.  I'm asking you to do it

24   without waiving your right to argue that none of this is

25   relevant or that it's not relevant.  You can argue that.

1    I won't hold it -- I won't hoist you by the petard of

2    having it there.  And the reason is, quite simply, I don't want

3    to start hearing about the doctors and the people who talk to

4    the FedEx drivers and all of that stuff, which I think may be

5    very well -- very legitimate material and evidence with respect

6    to the criminal charges, until I'm satisfied about what all

7    these witnesses have to say or what some of them do anyway.

8        MS. AULT:  So, Your Honor, I would say to that, that

9    that actually presents us with a logistical difficulty, which

10   is that we had a trial plan.  The Court then asked us to order

11   our proof in a certain way, so then we had another trial plan.

12   And now the Court is asking us to order our proof in yet

13   another way, but yet we have to start tomorrow, and there is no

14   way --

15       THE COURT:  You don't have to call their people

16   tomorrow.  Call the people that you intend to call.  I'm just

17   saying before you rest, remember, this is -- I've been told all

18   sorts of dates, like July 8th and some other dates.  We've got

19   a lot of time here.  By the way, these are DEA agents.  You can

20   get them in here.  Just give some priority to getting these

21   people in.

22       Anyway, maybe it's just simply a plea on my part that I

23   don't see any reason not to get to the issues that have been

24   identified by both sides.

25       After all, the argument is -- the issue is the same.  You

1   don't disagree with that.  The issue is:  What did they know

2   and what did they intend?  This evidence seems to go to those

3   issues in the Court's view.  So I think it would be useful to

4   have witnesses on that subject.

5        MS. AULT:  And we would simply point out to the Court

6   that there's also a lot of evidence about what they knew and

7   what they intended that had nothing to do with what the Defense

8   presented in their opening statement.

9        THE COURT:  Fine.  I'm not precluding you from putting

10   that on.

11        MS. AULT:  And we would just hope that the Court would

12   keep an open mind while we put that on given that we can't

13   possibly get these other witnesses here any sooner than we had

14   planned.

15        THE COURT:  I don't know whether you can or not.  I

16   mean, I assume that our conversation today may inspire the

17   Prosecution to contact some of these people to see whether they

18   can come in; and if you need some help in that regard, the

19   Defense may be able to give you contact information.

20        After all, they say they're going to have them here.  So

21   it's a question of are they going to have them here in August,

22   or are they going to have them here in July, or are they going

23   to have them here in June?

24        MS. ARGUEDAS:  Judge, Ms. Ault interviewed both Matt

25   Murphy and Elizabeth Willis on the phone within the last 60

1    days.  Both agents were on the call, and according to the

2    Government, no notes were taken of those interviews.  So she

3    has absolutely their contact, and they are accessible to her.

4              THE COURT:  Well, anyway, have some discussions on

5    that issue.

6              MS. AULT:  I would simply --

7              THE COURT:  I think it would be useful.

8              MS. AULT:  -- point out that getting somebody to talk

9    to you on the phone is entirely different than getting them to

10   fly out to San Francisco to testify.

11             THE COURT:  Well, if you need -- are they presently

12   Government employees?

13             MS. ARGUEDAS:  They are retired from the DEA.  Both of

14   them, as well as the two law enforcement people from Kentucky,

15   are absolutely willing and able to come to San Francisco.  They

16   expect to have to come to San Francisco.  And, by the way, one

17   of the Kentucky law enforcement people is currently assigned to

18   the DEA Task Force in Louisville.

19             THE COURT:  Okay.  Well, be that as it may, I'm not

20   going to get into the logistics.  I'm just suggesting find out

21   about it.  Okay?

22             MS. AULT:  And we will, Your Honor.  We will be

23   putting on other witnesses that also reflect FedEx's knowledge

24   and intent, and I simply would like for the Court to keep an

25   open mind with the evidence that we will present, because the

1    evidence that the Defense has talked about is not the only

2    evidence, and we think it is not the most important evidence.

3         THE COURT:  Well, I don't know what -- I don't know --

4    I'm not in a position to make value judgments as to what's the

5    most important evidence at this point.  I don't know until I

6    hear all the evidence.  I'm just saying I'm going to hear their

7    evidence, so I think it would be useful to hear their evidence

8    sooner rather than later.

9         MS. AULT:  Yes, Your Honor.  It is an unusual

10   circumstance in which the Court -- in which the Government has

11   to put on the evidence that the Defense thinks is most

12   important first, and --

13        THE COURT:  Well, you don't have to put it on first.

14   I'm not saying you have to put it on first.  But, remember, you

15   said to me one of the reasons you waived a jury was because of

16   the construct of the case, you thought that it would be more

17   difficult for you to present it to the jury in a conventional

18   way and, therefore, you at nobody's suggestion waived a jury --

19   I mean, when I say "nobody's," I didn't and I don't think the

20   Defense did -- waived a jury.  So I'm saying, having made that

21   decision, then I think you ought to take advantage of the

22   situation understanding it's a concept.

23        Judges all the time hear evidence way out of order.  Now,

24   I'm not -- I don't want to disrupt, you know, the flow of your

25   case.  If these people had no bearing whatsoever on your case,

1    if somebody said, "Well, look, I didn't commit the crime

2    because I wasn't in San Francisco.  I was in Miami," I don't

3    know that I would ask the Government to please call the

4    witnesses located in Miami.

5        That's not this case.  This case describes -- and, again,

6    I'm accepting the Defense characterization of it -- several

7    high-level meetings, significant high-level meetings with DEA,

8    FedEx, and other carriers, and they've all been identified, the

9    dates have been given, notes have been given, a description of

10   what occurred has been given, all of that.

11       And I look at that, and I say, "Well, if that's true, it

12   certainly is relevant."  Now, if -- I don't think the

13   Government is saying it's not relevant.  You just say it's not

14   important.  You're not saying it's not relevant because, of

15   course, it's relevant.  So you say it's not important, and

16   maybe it is and maybe it isn't, and maybe one has to judge from

17   an entire context.  I don't disagree with that.

18       But you can't say, "Well, we have an obligation to put

19   on -- why are you making us put on evidence that is

20   irrelevant?"  No, it's not irrelevant.  I don't think I've

21   heard that.

22       Anyway, have a pleasant evening.  I'll see everybody at

23   9:00 o'clock tomorrow.

24            MS. AULT:  Thank you, Your Honor.

25               (Proceedings adjourned at 4:02 p.m.)

1

2

3              **CERTIFICATE OF REPORTERS**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, June 13, 2016

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

13

14

15    _____

16          Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                  U.S. Court Reporter

17

18

19

20

21

22

23

24

25